**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AT&T/DIRECTV NOW SECURITIES LITIGATION | Judge Valerie E. Caproni |
| | No. 1:19-cv-02892-VEC |
| | CLASS ACTION |
| | <u>JURY TRIAL DEMANDED</u> |

<u>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**</u>
<u>**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

# TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ................................................................. 1

II.    INTRODUCTION ............................................................................... 2

    A.    The Exchange Act Claims ...................................................... 5

    B.    The Securities Act Claims ..................................................... 16

III.    COMMON ALLEGATIONS .............................................................. 18

    A.    Jurisdiction and Venue.......................................................... 18

    B.    Parties and Witnesses ............................................................ 19

        (1)    Plaintiffs .................................................................... 19

        (2)    Defendants ................................................................. 20

            (i)    AT&T ............................................................. 20

            (ii)    Executive Defendants ................................... 21

            (iii)    Scheme Defendants...................................... 23

            (iv)    Director Defendants ..................................... 23

        (3)    Confidential Witnesses ............................................. 25

    C.    Background on AT&T's Business and Relevant Events ..................................... 29

        (1)    AT&T's Business.......................................................... 29

        (2)    AT&T's TV Business and the DirecTV Acquisition.............................. 30

        (3)    Announcement of DirecTV Now................................. 33

        (4)    The Time Warner Acquisition .................................... 34

IV.    EXCHANGE ACT ALLEGATIONS................................................... 38

    A.    Substantive Allegations and the Context of Defendants' Fraud.......................... 38

        (1)    AT&T Announces DirecTV Now as Core to its Business and Announces the Time Warner Acquisition................................................. 38

(2)    AT&T Boasts About DirecTV Now's Launch Despite Serious Technical Problems................................................................. 45

(3)    Time Warner Shareholders Vote to Approve the Merger while AT&T Continues Touting the Success of DirecTV Now ......................... 48

(4)    In May 2017, Bloomberg Reports That DirecTV Now's Growth Is Sputtering................................................................. 52

(5)    The Acquisition Closes and AT&T Publishes 2Q18 Financial Results................................................................. 54

B.    The True Situation Regarding DirecTV Now........................................................ 56

(1)    Fraudulent Account Creation Practices .................................. 56

(i)    Confidential Witness Testimony.................................. 56

(ii)    Other Corroborative Accounts of Fraudulent Account Creation.................................................................. 65

(iii)    AT&T Investigates the Fraudulent Activity .................................. 68

(2)    AT&T Artificially Inflated DirecTV Now Subscriber Numbers by Promoting and Rewarding Account Fraud ................................ 73

(3)    AT&T Artificially Inflated DirectTV Now Subscriber Numbers by Pushing DirecTV Now on its Own Employees ......................... 77

(4)    DirecTV Now Subscriber Figures Reflected Aggressive Promotional Activity Resulting in High Customer Churn which AT&T Carefully Tracked ....................................................... 77

C.    The Materially False and Misleading Statements and Omissions During the Class Period......................................................................... 85

(1)    September 21, 2016 – Goldman Sachs Communacopia Conference ....... 85

(2)    November 30, 2016 – DirecTV Now Launch Event ................................ 87

(3)    December 6, 2016 – UBS Global Media and Communications Conference .................................................................. 87

(4)    December 7, 2016 – Barclays Global Technology Conference and Testimony to U.S. Senate........................................................... 89

(5)    January 20-25, 2017 – 4Q16 Financial Results ...................................... 91

(6)    February 17, 2017 – 2016 Annual Report ............................................... 93

(7)    March 8, 2017 – Deutsche Bank Media, Internet and Telecom Conference ..................................................................................... 95

(8)    March 27, 2017 and April 2017 – Code of Conduct .................................. 97

(9)    April 25, 2017 – 1Q17 Financial Results .................................................. 98

(10)   May 10, 2017 – Jefferies Technology Conference ................................... 99

(11)   May 23, 2017 – JPMorgan Tech, Media and Telecom Conference ....... 100

(12)   May 31, 2017 – Interview with Brad Bentley ......................................... 100

(13)   July 25, 2017 – 2Q17 Financial Results ................................................ 103

(14)   September 12, 2017 – Goldman Sachs Communacopia Conference ..... 105

(15)   October 24, 2017 – 3Q17 Financial Results .......................................... 107

(16)   November 8, 2017 – Wells Fargo Media & Telecom Conference ......... 108

(17)   November 16, 2017 – Morgan Stanley TMT Conference ..................... 109

(18)   December 5, 2017 – UBS Global Media and Communications Conference ................................................................................................ 110

(19)   January 31, 2018 – 4Q17 Financial Results ........................................... 111

(20)   February 20, 2018 – Annual Report for 2017 ........................................ 111

(21)   March 6, 2018 – Morgan Stanley Technology, Media & Telecom Conference ................................................................................................ 114

(22)   April 25, 2018 – 1Q18 Financial Results .............................................. 116

(23)   June 6, 2018 – Bank of America Merrill Lynch Global Telecom, Media & Technology Conference .......................................................... 118

(24)   July 24, 2018 – 2Q18 Financial Results ................................................ 119

(25)   September 12, 2018 – Goldman Sachs Communacopia Conference ..... 120

D.    AT&T Reveals the Truth Regarding DirecTV Now and the Materialization of the Previously Concealed Risks ........................................... 121

(1)    October 24, 2018 .................................................................................... 122

(2)    November 2018 ...................................................................................... 127

            (3)     December 4, 2018 ................................................................. 129

            (4)     January 2019 ..................................................................... 130

            (5)     Post-Class Period Events Further Reveal the True Dire Condition of DirecTV Now ................................................................. 132

    E.      AT&T, the Executive Defendants, and Defendant Shay Acted with Scienter Throughout the Class Period ................................................. 134

            (1)     The Executive Defendants and Defendant Shay had Access to Real-Time Metrics For DirecTV Now During the Class Period ........... 135

            (2)     The Executive Defendants Had the Motive and Opportunity to Inflate DirecTV Now Subscriber Rolls Until the Acquisition Closed ............................................................................... 140

            (3)     The Executive Defendants and Defendant Shay Had Actual Knowledge, or Reckless Disregard, of the Pervasive and Undisclosed Improper Sales Practices Detailed Herein ......................... 143

            (4)     DirecTV Now was Promoted as the Core of AT&T's Business Plans and the Lynchpin of the Massive Time Warner Acquisition ........ 144

            (5)     Admissions Reveal that the Misstatements and Omissions were Knowing and Intentional ................................................................. 144

    F.      Loss Causation ................................................................................. 145

    G.     Application of Presumptions of Reliance .......................................... 149

    H.     No Safe Harbor ................................................................................ 151

    I.      Exchange Act Counts ...................................................................... 152

            (1)     Count I: Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against AT&T and the Executive Defendants ...................................................................... 152

            (2)     Count II: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against AT&T and the Scheme Defendants ......................................................... 154

            (3)     Count III: Violation of § 20(a) of the Exchange Act Against the Executive Defendants .......................................................... 156

V.    SECURITIES ACT ALLEGATIONS ................................................... 157

    A.      Substantive Allegations and Context of Misstatements and Omissions ............. 157

(1)    AT&T Touted DirecTV Now as Core to its Business and as the Reason for the Acquisition .................................................................... 157

(2)    DirecTV Now Suffered from Severe Product and Service Issues Creating Dramatic Risks and Problematic High Churn Trends ............. 167

     (i)    DirecTV Now Was Not and Would Not Be a Profitable Product ...................................................................................... 167

     (ii)    Aggressive Promotional Activity and Improper Sales Practices .................................................................................... 170

     (iii)    DirecTV Now Posed a Severe Risk to AT&T's Business Because It Faced Serious Technical Problems ......................... 188

     (iv)    DirecTV Now Was a High Churn Product That Would Not Retain Subscribers .................................................................. 189

B.    The Materially False and Misleading Statements and Omissions in the Registration Statement and Prospectus ................................................... 194

   (1)    Regulatory Duties .................................................................... 194

   (2)    The Deficient Registration Statement ...................................... 195

   (3)    The Deficient Prospectus ......................................................... 200

     (i)    The Shareholder Vote ...................................................... 203

     (ii)    The Stock Sale ................................................................. 203

C.    Decline in AT&T's Stock Price and Revelations Following the Sale of AT&T's Stock ........................................................................................... 204

   (1)    AT&T's Stock Price Drops Corresponding to Negative Revelations About DirecTV Now ................................................ 204

   (2)    Plaintiffs and Class Members are Damaged ........................... 209

D.    Securities Act Counts ............................................................................. 210

   (1)    Count IV: Violation of § 11 of the Securities Act Against AT&T, the Director Defendants, and Defendants Stephenson and Stephens ..... 210

   (2)    Count V: Violation of § 12(a)(1) of the Securities Act Against AT&T .......................................................................................... 213

   (3)    Count VI: Violation of § 12(a)(2) of the Securities Act Against AT&T .......................................................................................... 216

(4)  Count VII: Violation of § 15 of the Securities Act Against the
Executive Defendants ........................................................................... 220

VI.  CLASS ACTION ALLEGATIONS ............................................................. 221

VII.  PRAYER FOR RELIEF ............................................................................ 223

VIII.  JURY DEMAND ...................................................................................... 224

## I.      NATURE OF THE ACTION

1.      Court-Appointed Lead Plaintiffs Steamfitters Local 449 Pension Plan ("Local 449"), Iron Workers Locals 40, 361 & 417 Union Security Funds and Iron Workers Local 580 Joint Funds ("Iron Workers"), Local 295 IBT Employer Group Pension Fund ("Local 295"), and additional named plaintiff Melvin Gross (together, with Local 449, Iron Workers and Local 295, "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned counsel, hereby bring this Amended Consolidated Class Action Complaint (the "Complaint") against AT&T Inc. ("AT&T" or the "Company"), Brad Bentley, John Donovan, Richard W. Fisher, Scott T. Ford, Glenn H. Hutchins, William E. Kennard, Michael B. McCallister, Beth E. Mooney, Samuel A. Di Piazza, Joyce M. Roché, Matthew K. Rose, John T. Stankey, John J. Stephens, Randall L. Stephenson, Cynthia B. Taylor, Laura D'Andrea Tyson, Geoffrey Y. Yang, and Brian J. Shay (collectively, with AT&T, the "Defendants").[1]

2.      The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of attorneys from the law firms Pomerantz LLP and Labaton Sucharow LLP ("Co-Lead Counsel"), which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by AT&T; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; and interviews of former employees of AT&T and their affiliates with knowledge of the matters alleged herein.[2]  The allegations

---

[1] Defendants Stephenson, Stephens, Donovan, Stankey, and Bentley are collectively referred to as the "Executive Defendants."  Defendants Di Piazza, Fisher, Ford, Hutchins, Kennard, McCallister, Mooney, Roché, Rose, Taylor, Tyson, and Yang are collectively referred to as the "Director Defendants."  The Executive Defendants along with Defendant Shay are referred to as the "Scheme Defendants."

[2] Confidential witnesses ("CWs") are identified herein by number (CW-1, CW-2, etc.).  All CWs are described in the masculine to protect their identities.

herein are also based on consultation with experts in the areas of: (1) streaming media technology, content, and business models; and (2) loss causation and damages.  Co-Lead Counsels' investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.   INTRODUCTION

3.     Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities who: (a) acquired AT&T common stock pursuant or traceable to the SEC Form S-4 registration statement and prospectus issued in connection with AT&T's June 2018 acquisition of and merger with Time Warner, Inc. ("Time Warner"), and/or (b) purchased or otherwise acquired AT&T publicly traded securities during the period from September 21, 2016 through January 30, 2019, inclusive (the "Class Period"), and were damaged thereby.

4.     AT&T is a telecommunications, media, and technology company.  Its major business lines involve providing customers with mobile phone service, broadband internet and TV.[3]  AT&T's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "T."  AT&T expanded its TV business, which had previously focused on a product called U-Verse TV, by purchasing a leading satellite TV provider, the DirecTV Group, Inc. ("DirecTV"), in July 2015.

---

[3] The term "TV" is used herein to refer to products that deliver video to customers, in the broadest sense that the term is ordinarily used.  It includes both video services that are broadcast to viewers whose devices passively receive and display that content and on-demand video streaming services.  As used herein, the term is agnostic to the technology being used to distribute the content (*e.g.*, satellite, fiber optic cable, and internet).

5.      This deal put AT&T in a tenuous position as the world's largest paid-TV provider, despite knowing this was "a business . . . in decline," given the broad trend of declining subscriptions for traditional paid-TV (*i.e.*, "cord cutting").  As Defendant Stephenson explained, he was "not in love" with DirecTV's satellite TV business, but AT&T had been trying to launch a mobile phone friendly TV streaming service and "to that end" it bought DirecTV, in a $67.1 billion merger, financed by one of the largest corporate debt issuances in history.

6.      Roughly seven months after purchasing DirecTV, AT&T announced it would be launching its new internet-based TV streaming platform called DirecTV Now.  This service would be of critical importance to AT&T, as it was a path forward for AT&T's TV business.  In September 2016, Defendants began publicly boasting about this "exciting product," which would launch in 4Q16 with "100 plus channels at a very, very aggressive price point," low capital requirements, and reasonable profit margins.  By mid-September 2016, news outlets were reporting that AT&T had plans for DirecTV Now to be its primary video platform.

7.      Then, on October 22, 2016, AT&T announced that it had entered into a definitive agreement to acquire Time Warner in a deal valued at $108.7 billion (the "Acquisition").  Time Warner was a media company with a large library of video content, intellectual property assets, and video production capabilities.  The Acquisition would be financed with a mix of AT&T's stock and cash, with cash coming from another massive undertaking of debt by AT&T.

8.      The strategy behind the proposed Acquisition was to combine AT&T's TV business with Time Warner's video content.  The deal announcement was replete with references to mobile video content and touted the combined company's potential for innovation, such as through "the upcoming launch of . . . DirecTV Now."  The prospect of combining AT&T's mobile phone business and a successful streaming service with Time Warner's video content was

compelling because it would uniquely position AT&T to compete in the difficult TV business. However, the viability of this plan hinged on AT&T's ability to successfully pivot from its faltering legacy TV businesses to a modern streaming platform—and thus the success of AT&T's risky pair of mega-acquisitions turned on the success of DirecTV Now.

9.      On October 25, 2016, just three days after announcing the Acquisition, AT&T announced that DirecTV Now would launch at the "unexpectedly low price of $35 a month," which a leading technology publication called "a shot across the bows of cable companies" and "a way of bolstering support" for the Time Warner Acquisition.  This price served the dual purpose of signaling to the market that AT&T was ready to compete in the lower-cost business model of other non-traditional TV services (*e.g.*, Netflix and Hulu), while signaling to antitrust regulators that AT&T was willing to operate at consumer-friendly price points.

10.      On October 25, 2016, the *Wall Street Journal* broadcast an interview with Defendant Stephenson and Time Warner CEO Jeff Bewkes.  In response to the very first question, Defendant Stephenson focused on the launch of DirecTV Now, and how AT&T was trying to reach the 20 million households that had "cut the cord" and left the "premium content system," and then expressly stated "**that's what this deal's about and I think it's important to understand it.  DirecTV Now is what we're calling it**."

11.      On February 15, 2017, Time Warner shareholders voted to approve the Acquisition.  However, the U.S. Department of Justice ("DOJ") sued to enjoin the closing of the merger.  This litigation dragged on until, in June 2018, AT&T won approval in the district court. Shortly thereafter, the deal was closed (600 days after signing).  When the deal closed, AT&T issued 1.185 billion new shares of AT&T's stock directly to former shareholders of Time Warner common stock.

A.     **The Exchange Act Claims**

12.     The claims asserted in Section IV allege that from September 21, 2016, and until January 30, 2019, AT&T and the Executive Defendants falsely depicted DirecTV Now as a fast-growing product with increasing subscribers and strong margins that would offset declining subscriber levels in AT&T's other video products, including its mature satellite DirecTV product. For example:

(a)     Defendant Stephenson represented that early ***"demand"*** for DirecTV Now was "***rather dramatic***" and "***really, really impressive***" and explained how the product was expected to reduce "***churn***," among AT&T's other products as it generated greater attachment to the AT&T brand among customers.[4]  Stephenson also reiterated AT&T's unique position to offer such a product on a "***profitable basis.***"  ¶245 (12/6/16).

(b)     Defendant Stephenson boasted that DirecTV Now was off to a "***really fast start***" and Defendant Stephens claimed that DirecTV Now was a viable substitute for older TV products by noting that due to DirecTV Now, AT&T had "***solid***" quarterly "***video subscriptions***." ¶259 (1/25/17).

(c)     Defendant Stephens represented that AT&T had "***moved off***" the promotional pricing it had used during the launch of DirecTV Now and was then operating with "***run rate prices.***"[5]  ¶272 (3/8/17).

(d)     Defendant Stephens discussed how DirecTV Now was reducing overall churn at AT&T, how product growth was occurring despite the fact that AT&T had "***pulled back***

---

[4] "Churn" refers to subscriber loss.  To have higher churn means more customers are leaving the product.

[5] The term "run rate" refers to maintaining performance in one period over a later period.  In context, the phrase "run rate pricing" signifies that the pricing is stable and mature, rather than temporary and promotional.

*on marketing*" the product, and how DirecTV Now subscriptions were "*offset[ting] linear TV subscriber decline*."  ¶279 (4/25/17).

(e)    Defendant Stephenson boasted that DirecTV Now had "*caught fire*" despite the fact that it had "*no promotion, no advertisement*" and despite that AT&T *"hardly pa[id] the reps to sell it*," adding that "*the reality was that the demand*" for the product was "*really, really high*."  ¶284 (5/23/17).

(f)    Defendant Stephens represented that DirecTV Now had "*good margins*" and spoke positively of the "*relative stability*" in its customer base.  ¶324 (3/6/18).

(g)    David Christopher noted the decline in linear TV subscribers, and represented AT&T was "*offsetting that decline with DirecTV Now at a subscriber level.*"  ¶330 (6/6/18).

13.    AT&T and the Executive Defendants also routinely represented DirecTV Now's subscriber numbers as climbing higher and higher, and told the market that their plan to offset its declining legacy TV products was working.  The following chart shows the purported increasing number of net additional subscribers AT&T published to investors:

|          | 4Q16    | 1Q17   | 2Q17    | 3Q17    | 4Q17    | 1Q18    | 2Q18    |
|----------|---------|--------|---------|---------|---------|---------|---------|
| Net Adds | 200,000 | 72,000 | 152,000 | 296,000 | 368,000 | 312,000 | 342,000 |

14.    While AT&T and the Executive Defendants repeatedly touted the success of DirecTV Now, depicting it as a fast-growing product with strong margins and brisk subscriber growth, in truth, this apparent success was a complete mirage.  Information provided by multiple former employees of AT&T and its affiliates from across the country collectively confirm a wide-ranging fraud, perpetrated at the highest levels of the Company, as it pertains to subscriber numbers, promotional activity, customer churn, and the growth and success of DirecTV Now.

15.     **AT&T Encouraged the Creation of Fake Customer Accounts to Perpetuate the Illusion of Brisk DirecTV Now Growth.**  The DirecTV Now's subscriber numbers that Defendants publicly touted were false and artificially inflated.  AT&T employees from across the country were strong-armed into creating fake DirecTV Now accounts, by utilizing various tactics to covertly add the product to customer's AT&T accounts without their knowledge.  For example, employees were taught and actively encouraged to convert activation fees that customers traditionally had to pay to upgrade their phones into DirecTV Now subscriptions by waiving the fee, but charging the customer anyway, and applying the payment to up to three DirecTV Now accounts using fake email addresses without telling the customer they had been signed up for the subscription.  One former employee in Michigan estimated that around 40-50% of the customers he dealt with beginning in early 2017 complained of being billed for DirecTV Now which they told him they never signed up for.  Another former employee in Hawaii stated that "at least half" of the DirecTV Now accounts were "bogus," based on what he was seeing internally.  Another former employee who fielded online customer complaints from across the country estimated that he was seeing between 20-40 complaints per week from customers being billed for DirecTV Now despite not signing up for an account.

16.     As described by former employees, these improper sales practices were known to and/or encouraged by AT&T employees in the positions of Sales Representative, Store Manager, Area Manager, Director of Gulf States, District Manager, Director of Sales, as well as Defendant Shay, AT&T's President of Retail Sales and Service.  As one former employee put it, everyone within the sales organization "totally knew."

17.     **AT&T Promoted Unreasonable and Extremely Aggressive Sales Quotas for DirecTV Now.**  Former employees describe a culture, driven by the top, with intense pressure to

sell as many subscriptions to DirecTV Now as possible.  Former employees describe sales targets that were not realistic, including a directive from Defendant Shay to double sales every month for months on end.  Employees were "hounded on" to sell DirecTV Now and told they would be "held accountable" and that employees failing to hit their goals were put on "a performance improvement plan" to "scare them."  This extremely aggressive sales pressure prompted employees to resort to "unnatural sales or flat-out fraudulent" sales tactics which were a far cry from AT&T's representations that DirecTV Now growth was driven by organic demand, and limited promotional activity, with "virtually all" of its subscribers coming to DirecTV Now from online.  Part of this aggressive sales environment was an expectation pressure on AT&T employees to sign up for the product, or risk being penalized professionally.  These improper and undisclosed sales tactics also artificially inflated DirecTV Now's subscriber numbers and created an unsustainable house of cards.

18.     **DirecTV Now Was Sold Through Highly Discounted Promotions Which Resulted in High Customer Churn.**  Multiple former employees explain how DirecTV Now was being "sold" at heavily discounted promotional rates.  While some public information was available about certain DirecTV Now promotions, AT&T routinely downplayed the role of this activity.  For example, in May 2017, Defendant Stephenson represented that DirecTV Now had "caught fire" despite being sold with "no promotion, no advertisement, don't even hardly pay the reps to sell it."  Additionally, AT&T and the Executive Defendants failed to disclose that many subscribers would sign up for DirecTV Now to obtain free product giveaways and then cancel their account once the required promotional period lapsed.  Through these promotions, customers were given more value from AT&T than they were paying for DirecTV Now which enticed even

AT&T employees to sign-up and then immediately cancel their DirecTV Now subscriptions once the promotional period ended.

19.     **AT&T Senior Management, including the Executive Defendants, and Defendant Shay, Tracked Increasing DirecTV Now Subscriber Churn.**  AT&T analyzed data about DirecTV Now churn on a regular basis. Former AT&T employees confirm that AT&T's sales reporting team had details on DirecTV Now subscribers and cancellations, and information on promotions and operations impacted by promotions which were used by the Company's sales teams to push more promotions. In fact, all promotional activity was studied to allow AT&T to forecast the "take rate" or acceptance rate, pricing and churn of all DirecTV Now promotions. AT&T had an analytics group that studied, reviewed and documented DirecTV Now customer churn and the results of these reports were provided to David Christopher, President of AT&T Mobility & Entertainment, who had to sign off on "everything" related to promotions and pricing.  On a monthly basis, the churn metrics and weekly forecasts for the Entertainment Group products including DirecTV Now, traditional DirecTV and U-Verse TV were rolled-up to Defendants Stankey, Bentley, and Shay.

20.     Statements directly from Defendants confirm the breadth of the information they reviewed.  As Defendant Stankey stated in a *Dallas Business Journal* article, Stephenson got "weekly checkpoints on how we're doing on weekly indicators of financial performance – subscriber counts, metrics, customer service, new results."  In an interview by the Hollywood Reporter, Defendant Bentley described his reaction to reviewing "viewership behavior," "customer satisfaction," and "intent to churn" data.  During an interview with Boston College's CEO Club Defendant Stephenson stated that "we have the mobile data, we have the viewership data, we have all that information."

21.     Former employees report that beginning in early 2018, AT&T experienced significant churn in DirecTV Now subscribers in all markets. Former employees also confirm that Defendant Stankey would have reviewed the analytics he received for DirecTV Now and that "there was no way that John Stankey" did not know about DirecTV Now churn. Defendants Stephenson and Stephens received Operational Review Packages which included concerns related to DirecTV Now churn from all markets.

22.     A former lead financial analyst reported that by the summer of 2018, monthly reporting packages and weekly analyses showed that more than 40 - 50% of DirecTV Now customers in 2018 were cancelling their accounts once their promotions ended.  Another former employee confirmed that he saw a 35% "take rate" (or, 65% churn rate) for DirecTV Now. Former employees also explained that AT&T was just trying to "outrun[]" the churn for a while. DirecTV Now was described by certain members of AT&T's finance team as a "sinking ship" as early as 6-12 months after it was launched on November 30, 2016.

23.     Given the heavy promotional activity, intense sales pressure, and prevalence of fake accounts, it is unsurprising that many DirecTV Now accounts were not being used and were promptly cancelled.  As one employee who reviewed customer accounts from around the country estimated based, on account usage data available through AT&T's "Evergent" system, that **approximately 50%** of all DirecTV Now accounts he reviewed were not using (or engaging with) the service at all.

24.     **DirecTV Now was Experiencing Severe Technical Issues and Its Pricing Was Unsustainable.**  DirecTV Now was not a viable product, it had been rolled out before it was ready for deployment, and it was experiencing severe service issues during the Class Period including frequent interruptions, service freezing and buffering, app crashes, being automatically

logged out, missing features and billing issues, leading one media source to report that the product was being characterized as "simply unusable."  In addition, DirecTV Now was being "sold" at what was later disclosed by the Company as irrationally low prices instead of rational pricing that would have allowed the product to provide profitable revenue for AT&T.  This was contrary to AT&T's public assurances the product was profitable.  According to one former employee, during the entire first year of offering DirecTV Now, not one subscriber was profitable.

25.     In short, AT&T and the Executive Defendants knew or recklessly disregarded that AT&T would not be able to mitigate the exodus of its high-margin satellite TV subscribers with its new DirecTV Now subscribers due to DirecTV Now's low acceptance rates (*i.e.*, low "take rates"), high churn rates, and low to negative margins, and they were masking this by creating "bogus" customer accounts to inflate the perception of subscriber number growth.

26.     The truth became known to the market through several partial revelations and materializations of concealed risk.  The first partial revelation was made before the market opened on October 24, 2018, in connection with the announcement of AT&T's 3Q18 financial results (the first full quarter after the Acquisition), when the Company revealed a dramatic deceleration of DirecTV Now net subscriber additions, **which plummeted more than 85%**, from 342,000 down to 49,000 quarterly, compared to DirecTV Now net subscriber additions of more than 300,000 in each of the prior three quarters (4Q17-2Q18).  The Company attributed this precipitous decline in DirecTV Now subscriber growth to the decision to "scal[e] back our promotions and special offers" and move toward "market pricing in the quarter."

27.     Shockingly, AT&T revealed it "had expected" its price increases to negatively impact DirecTV Now subscriber numbers and that the more than 85% deceleration in subscriber

growth was actually a better result than AT&T had expected.  The Company justified the DirecTV Now price increases as an affirmative business decision to reduce "low-value, high churn customers" in an attempt to "stabilize" the value proposition of DirecTV Now.  This revealed that AT&T's prior narrative that DirecTV Now had organic growth on decent margins with "run rate" pricing had been false, or at the very least, materially misleading to investors.

28.     During the related earnings call on October 24, 2018, an analyst from JPMorgan expressed surprise "by the numbers" given AT&T's prior representations about the strength of DirecTV Now, adding: "**but you said it was better than expected?**"  In response, Defendant Donovan revealed, for the first time, that DirecTV Now had high churn, calling it a "tale of two cities" with many DirecTV Now subscribers "just jumping from promotion to promotion," concluding, "so, we actually expected a far worse outcome than we had."  On this news, AT&T's stock plummeted on unusually heavy trading volume, dropping from a closing price of $33.02 per share on October 23, 2018 to a closing price of $30.36 per share on October 24, 2018, **a drop of more than 8% in a single day**.

29.     After the October 24, 2018 disclosure, analysts and investors expressed deep concern.  An analyst asked—in polite understatement— "we and other people were a little surprised by the numbers, given the commentary about resiliency in September in DirecTV Now." *The Motley Fool*, a popular online investment analysis publication, published an article titled: "**AT&T Hit a Brick Wall When it Raised TV Prices**."  Barclays called the shocking news a "**big surprise**" and "**significantly worse than expected**."  Cowen said the issues were "**poorly messaged beforehand**," and Scotiabank saying the results were "**much weaker than expected**."

30.     Following this partial revelation, AT&T continued to provide additional information to the market that further demonstrated that its prior public statements and omissions

about DirecTV Now were materially false and misleading and certainly woefully incomplete.

For example, on November 14, 2018, Defendant Stephens characterized the DirecTV Now price

increase as a conscious shift from "promotions to grow the base" pricing to "market pricing."

This was a stark contrast to AT&T and the Executive Defendants' Class Period statements

describing DirecTV Now as generally having non-promotional pricing, strong margins, and "run

rate" pricing.  On November 29, 2018, Defendant Donovan falsely assured investors that

DirecTV Now was still growing and resulting in a "stable total base" of subscribers.

31.     On December 4, 2018, during an analyst conference, when talking about DirecTV

Now, Defendant Stephenson stated that AT&T was working on "**getting the price point right,

getting it to where it's profitable**," which would require AT&T to reach a "different segment of

the market."  This further revealed that DirecTV Now was not a profitable product, contrary to

Defendants' prior assurances.  However, while making this partial revelation of the truth,

Defendant Stephenson also told another lie, stating that DirecTV Now subscribers had grown to

2 million, from the prior quarter end of 1.858 million subscribers, implying the product had

returned to modest growth.  In truth, as would later be disclosed, during 4Q18, AT&T actually

lost 267,000 DirecTV Now subscribers.  On this combined news, AT&T's stock fell by **3.09%,**

but the full effect of the disclosure of this decline was suppressed by AT&T's continued

materially false and misleading statements.

32.     On January 9, 2019, AT&T disclosed that roughly one year prior (*i.e.*, January

2018), about 500,000 DirecTV Now customers (what Defendant Stephens referred to as "about

1/3 of our customer base") were on a 3-month promotion for $10 per month, and that as AT&T

moved away from an "intensely promotional environment," there were "**risk[s] of those

customers choosing not to renew.**"   This statement further revealed the extent of the

promotional activity for DirecTV Now, the extent of the churn problem DirecTV Now was facing (whether due to fake accounts being purged as customers discovered them, or by customers deciding not to renew the poorly functioning product), and the fact that DirecTV Now was not profitable.  In reaction to this news, AT&T's stock's price fell from a closing price of $31.28 per share on January 8, 2019, to a closing price of $30.10 per share on January 9, 2019, which was a drop of **3.77%.**

33.     Finally, on January 30, 2019, AT&T disclosed that at the end of 2018, essentially **none** of the 500,000 heavily discounted DirecTV Now subscribers remained on the service.  The Company also announced that DirecTV Now subscriptions in the fourth quarter of fiscal 2018 had declined by 267,000 subscribers – a stark reversal of supposed net adds in 4Q17 through 2Q18.  During the earnings call, Defendant Stephens revealed that **six months prior**, AT&T had 500,000 subscribers on "highly discounted DirecTV Now offers" generally requiring them to pay only $10 a month, but that "at the end of the year, essentially none of those customers remained on those offers" and as AT&T eliminated these "promotions for low-value, high-churn customers" this "clearly elevated subscriber losses in the quarter."  Defendant Stephenson further clarified that AT&T had allowed those customers to "attrit out" and that he looked at that customer segment as "low-end, very promotional" and admitted they were "not engaging on the product."

34.     In reaction to this negative news, AT&T's stock price plummeted from a close of $30.70 per share on January 29, 2019 to a close of $29.37 per share on January 30, 2019, a loss of $1.33 per share, or **a decline of 4.3%** on unusually high trading volume of approximately 93 million shares.  As one analyst put it: "DirecTV continues to crush AT&T and is hemorrhaging

subscribers.  **Even worse is that the new DirecTV Now is losing subscribers just after two years of being in service.  Not a good sign.  The stock is likely dead money now**[.]"

35.     Since the end of the Class Period, AT&T has reported two additional quarters of financial results, and each time disclosed that subscribers were fleeing the DirecTV Now product in droves.  On April 24, 2019, AT&T announced its 1Q19 results, and revealed that an additional 83,000 subscribers had left the DirecTV Now platform.  On July 24, 2019, the Company announced its 2Q19 results and revealed that an additional 168,000 subscribers had abandoned DirecTV Now, with AT&T experiencing a net drop of 946,000 TV subscribers.  By this point, it was clear that DirecTV Now was in terminal decline.  On July 30, 2019, AT&T announced it was changing the name of DirecTV Now to AT&T TV Now.

36.     The Executive Defendants were motivated to heavily promote DirecTV Now until the Time Warner Acquisition closed.  Indeed, a major part of the value proposition behind the Acquisition was the possibility of integrating AT&T's video distribution assets with Time Warner's media production capabilities and vast video content library.  The launch of DirecTV Now was an important test of the viability of AT&T's side of that bargain.  In convincing Time Warner shareholders that it made sense to trade their stock for AT&T's stock (notwithstanding the tremendous debt AT&T was straddled with), AT&T touted the success of DirecTV Now.

37.     AT&T and the Executive Defendants also had a strong incentive to artificially inflate DirecTV Now's subscriber numbers as those numbers were used to promote DirecTV Now as a valuable advertising platform and the Company needed a larger subscriber base and sufficient scale in order to attract advertisers to the platform.

38.     Moreover, several of the Executive Defendants had strong personal interests in promoting the success of DirecTV Now in order to persuade the market of the logic behind the

Time Warner Acquisition.  The failure of DirecTV Now, prior to the closing of the Acquisition, would have jeopardized the transaction, a result that would have been disastrous for the Defendants.  Successfully closing the Acquisition was all but sure to generate enormous financial benefits for the Defendants, most especially the Executive Defendants.  In fact, in the short time since the Acquisition closed, several of the Executive Defendants were rewarded handsomely for closing the Acquisition.  According to the Company's 2019 Annual Proxy dated March 11, 2019, Defendants Stephens and Stankey saw increases in salary "Commensurate with the close of the Acquisition."  Defendant Stankey's salary more than doubled from $1.1 million to $2.9 million. Additionally, Stephens and Stankey both received $2 million cash bonuses "in recognition of [their] significant contributions that led to the structure and completion of the merger."

39.     As a result of Defendants' materially false and misleading statements and omissions, Plaintiffs' and other Class members' suffered significant losses when AT&T's stock precipitously declined.

**B.     The Securities Act Claims**

40.     The claims asserted in Section V do not allege fraud and relate to deficiencies in the registration statement AT&T used to register the shares sold in the Acquisition and in the prospectus AT&T used to offer and sell those shares.

41.     If the Acquisition went forward, part of the merger consideration paid to Time Warner shareholders would be AT&T's stock.  Therefore, under the relevant securities laws, AT&T needed to file a registration statement with the SEC, which needed to comply with certain SEC requirements, including the requirement to disclose significant risks AT&T faced.  AT&T filed a registration statement (the "Registration Statement") on July 5, 2017, and it was declared effective by the SEC the following day.

42.     Despite publicly stating that the Acquisition was "**about**" DirecTV Now, the Registration Statement did not include any discussion of the risks associated with DirecTV Now despite the obligation under SEC regulations to disclose the most significant factors that would make investment in AT&T's stock risky.   However, at the time that the Registration Statement became effective, there were tremendous risks regarding the rollout of DirecTV Now that should have been disclosed, including: (a) DirecTV Now was not and would not be a profitable product; (b) DirecTV Now account growth was dependent on aggressive promotional activity and unsustainable sales tactics; and (c) DirecTV Now faced serious technical challenges.

43.     The Registration Statement also incorporated by reference certain subsequently filed documents.   While none of these documents disclosed the risks associated with DirecTV Now, several of these subsequent filings contained misleading statements about DirecTV Now. For example, AT&T filed a Form 8-K with the SEC on January 20, 2017, in which it stated there were "*[m]ore than 200,000 video net adds, entirely driven by DirecTV Now.  This includes only paying customers*."   Similarly, on January 25, 2017, AT&T filed a Form 8-K with the SEC boasting of "*Strong DirecTV Now launch with more than 200,000 paid net adds*" and describing "*strong DirecTV Now growth*."   These statements were misleading because they failed to disclose that DirecTV Now's subscriptions were driven and inflated by aggressive promotional activity and unsustainable sales practices, and that far from a "strong" launch, DirecTV Now faced serious technical problems in the months following the launch.

44.     As part of the Acquisition, AT&T offered and ultimately offered and sold shares to Time Warner shareholders.   The document(s) used to offer or sell securities are referred to as "Prospectus" and are subject to the same obligation to disclose significant risks that govern the

Registration Statement.[6]   The Prospectus included the Registration Statement and was misleading for all the same reasons the Registration Statement was misleading.  It also included a Form 425 filed with the SEC on January 26, 2017, stating that DirecTV Now was driving down customer churn and that the "***foundation***" had been laid for AT&T's business plan of bringing Time Warner content onto DirecTV Now.  This statement was misleading because it failed to disclose that DirecTV Now would not meaningfully reduce customer churn—as it was an unsustainable and unprofitable product that dependent on aggressive promotions and unsustainable sales practices.  For the same reasons, it was misleading to describe DirecTV Now as part of a foundation for AT&T's business plans.  Plaintiffs and Class members suffered losses as a result of these deficiencies in the Registration Statement and Prospectus.

## III.   COMMON ALLEGATIONS

### A.   <u>Jurisdiction and Venue</u>

45.     Counts I-III asserted herein arise under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) ("Section 20(a)").  Counts IV-VII asserted herein arise pursuant to Section 11 of the Securities Act (15 U.S.C. §§ 77k) ("Section 11"), Section 12(a)(1) of the Securities Act (15 U.S.C. §§ 77l(a)(1)) ("Section 12(a)(1)"), Section 12(a)(2) of the Securities Act (15 U.S.C. §§ 77l(a)(2)) ("Section 12(a)(2)") and Section 15 of the Securities Act (15 U.S.C. §§ 77o) ("Section 15").

46.     Venue is proper in this district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), Section 22 of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged Securities Act and Exchange Act violations or the

---

[6] The term "Prospectus" refers to the Form 424B3 and any documents incorporated therein, as well as any other material used to market, offer, or sell AT&T Stock in connection with the Acquisition that constitutes a prospectus under the Securities Act.

effects of the violations have occurred in this judicial district.  Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this judicial district.  AT&T transacts business in this district, and the Company has offices located within this judicial district.

47.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

48.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NYSE, a national exchange within the United States.

**B.     Parties and Witnesses**

**(1)     Plaintiffs**

49.     On June 24, 2019, the Court appointed Local 449, Iron Workers, and Local 295 to serve as the Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 53).

50.     Local 449 is a union pension fund based in Pittsburgh, Pennsylvania.  It represents approximately 2,700 union-trained steamfitters and their beneficiaries.  Local 449 is a sophisticated institutional investor that had $535 million in total pension assets under management as of April 2018.  As set forth in Exhibit A, Local 449 purchased AT&T common stock[7] during the Class Period and was damaged as a result of the materially false and misleading statements and omissions alleged herein.  In addition to purchasing AT&T's stock in the

---

[7] Any AT&T shares purchased by way of conversion as part of the Acquisition were by definition "traceable" to the Registration Statement and offered and sold pursuant to the Prospectus used by AT&T in conducting the offering and sale of AT&T stock as part of the Acquisition.

secondary market, Local 449 acquired AT&T's stock when Local 449's Time Warner stock was exchanged for AT&T's stock as part of AT&T's Acquisition of Time Warner.

51.     Iron Workers provides retirement, disability, and survivor benefits to the Ornamental Iron Working Industry.  Iron Workers is a sophisticated institutional investor that had approximately $1.4 billion in total assets under management as of 2019.  As set forth in the Certification previously submitted to the Court (ECF No. 37-4), Iron Workers purchased AT&T Stock during the Class Period and was damaged as a result of the false and misleading statements and omissions alleged herein.

52.     Local 295 provides retirement, disability, and survivor benefits to Air Freight Chauffeurs, Handlers, Warehousemen, Allied Workers, Miscellaneous, Production and Industrial Employees.  Local 295 is a sophisticated institutional investor that had approximately $489 million in total assets under management as of 2019.  As set forth in the Certification previously submitted to the Court (ECF No. 37-4), Local 295 purchased AT&T Stock during the Class Period and was damaged as a result of the false and misleading statements and omissions alleged herein.

53.     Melvin Gross is an additionally named plaintiff and was injured when he sold his Time Warner stock in exchange for receiving AT&T's common stock as part of the Acquisition in June 2018.  As set forth in the Certification previously submitted to the Court (ECF No. 1), Mr. Gross acquired AT&T's stock when his Time Warner stock was exchanged for AT&T's stock as part of AT&T's Acquisition of Time Warner.

      **(2)     Defendants**

            **(i)     *AT&T***

54.     Defendant AT&T is incorporated under the laws of Delaware, with principal executive offices located at 208 S. Akard St., Dallas, Texas, 75202.  AT&T common stock is

listed on the NYSE under the ticker symbol "T."  Throughout the Class Period, AT&T maintained additional corporate offices in New York, maintained more than 600 retail stores, and had more than 3,000 employees in New York.

### (ii)   *Executive Defendants*

55.     The Executive Defendants, by virtue of their senior positions at AT&T, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.

56.     Defendant Brad Bentley ("Bentley") was the Executive Vice President of Marketing for AT&T Entertainment Group during the Class Period.  Defendant Bentley worked at DirecTV since 2000, where he was instrumental in launching and growing the direct sales channel.  He also served as Senior Vice President of Sales and Marketing for DirecTV.  In that capacity, he developed the sales and marketing strategy, and execution across all channels of distribution.  More recently, he was Senior Vice President of Revenue Strategy & Planning for DirecTV, where he was responsible for DirecTV pricing and packaging, including annual price increases, national promotions, along with the oversight of all acquisition and retention investments.  After AT&T acquired DirecTV, Defendant Bentley served as Executive Vice President of Marketing for AT&T's Entertainment Group.  Bentley played a critical role in the launch of DirecTV Now.  His responsibilities included managing DirecTV Now's development budget, delivering it to the market, keeping tabs on its overall performance and costs, and establishing its profit-and-loss structure.

57.     Defendant John Donovan ("Donovan") was the CEO of AT&T Communications from August 2017 through the end of the Class Period.  Prior to that he was the Chief Strategy

Officer and Group President of AT&T Technology and Operations.  In his role as CEO of AT&T

Communications, he states on his LinkedIn profile that he is "responsible for AT&T's global

telecommunications and video services, including its Business, Entertainment, and Technology

& Operations divisions."  Defendant Donovan received total compensation in 2016 of

$9,508,310, total compensation in 2017 of $15,193,700, and total compensation in 2018 of

$14,585,867.

58.     Defendant John T. Stankey ("Stankey") was the CEO of WarnerMedia from June

2018 until the close of the Class Period.  His profile on AT&T's website says that in his capacity

as CEO of Warner Media, he is "responsible for the company's media and entertainment

business which includes WarnerMedia Entertainment."  His profile also says that he "led the

integration planning team in support of the [Acquisition]."  Prior to his role as CEO of Warner

Media, he was CEO of AT&T Entertainment Group and his profile states that "under [his]

leadership, AT&T created new mobile video experiences for consumers, including the launch of

the DirecTV Now streaming video service."

59.     Defendant John J. Stephens ("Stephens") was Senior Executive Vice President

and Chief Financial Officer of AT&T at all relevant times.  Defendant Stephens reviewed,

contributed to, and signed the Registration Statement.  Defendant Stephens received total

compensation from AT&T in 2016 of $11,581,940, total compensation in 2017 of $13,892,807,

and total compensation in 2018 of $15,642,304.

60.     Defendant Randall L. Stephenson ("Stephenson") was Chief Executive Officer

and Chairman of AT&T's Board at all relevant times.  Defendant Stephenson reviewed,

contributed to, and signed the Registration Statement.  Defendant Stephenson has served as

AT&T's CEO since 2007.  He served as the Company's Senior Executive Vice President and

Chief Financial Officer from 2001 to 2004, and from 2004 to 2007 he was Chief Operating

Officer.  During the Class Period he served on AT&T's executive committee, which committee

has the power to act on behalf of the Board during intervals between Board meetings.  AT&T's

Annual Proxy statements for Fiscal Years 2016-2018 state that his qualification for service as

CEO is premised, in part, on his intimate knowledge of our Company.  Defendant Stephenson

received total compensation from AT&T in 2016 of $28,433,716, total compensation in 2017 of

$28,720,720, and total compensation in 2018 of $29,118,118.

### (iii)   *Scheme Defendants*

61.     Defendant Brian J. Shay ("Shay") was AT&T's President of Retail Sales and

Service throughout the Class Period.  He disseminated sales directives related to DirecTV Now.[8]

During the Class Period Defendant Bentley reported to Defendant Shay and Defendant Shay

reported to Defendant Donovan.

62.     The term "Scheme Defendants" is used herein to refer to Brian Shay and the

Executive Defendants.

### (iv)   *Director Defendants*

63.     Defendant Richard W. Fisher ("Fisher") was a director on AT&T's Board at all

relevant times.  Defendant Fisher reviewed, contributed to, and signed the Registration Statement.

64.     Defendant Scott T. Ford ("Ford") was a director on AT&T's Board at all relevant

times.  Defendant Ford reviewed, contributed to, and signed the Registration Statement.

65.     Defendant Glenn H. Hutchins ("Hutchins") was a director on AT&T's Board at

all relevant times.  Defendant Hutchins reviewed, contributed to, and signed the Registration

Statement.

---

[8] Defendant Shay's LinkedIn Profile states that he was an Executive Vice President or "EVP" of Business
& Mobility Customer Service at A&T from October 2003 until 2015.

66.     Defendant William E. Kennard ("Kennard") was a director on AT&T's Board at all relevant times.  Defendant Kennard reviewed, contributed to, and signed the Registration Statement.

67.     Defendant Michael B. McCallister ("McCallister") was a director on AT&T's Board at all relevant times.  Defendant McCallister reviewed, contributed to, and signed the Registration Statement.

68.     Defendant Beth E. Mooney ("Mooney") was a director on AT&T's Board at all relevant times.  Defendant Mooney reviewed, contributed to, and signed the Registration Statement.

69.     Defendant Samuel A. Di Piazza, Jr. ("Di Piazza") was a director on AT&T's Board at all relevant times.  Defendant Di Piazza reviewed, contributed to, and signed the Registration Statement.

70.     Defendant Joyce M. Roché ("Roché") was a director on AT&T's Board at all relevant times.  Defendant Roché reviewed, contributed to, and signed the Registration Statement.

71.     Defendant Matthew K. Rose ("Rose") was a director on AT&T's Board at all relevant times.  Defendant Rose reviewed, contributed to, and signed the Registration Statement.

72.     Defendant Cynthia B. Taylor ("Taylor") was a director on AT&T's Board at all relevant times.  Defendant Taylor reviewed, contributed to, and signed the Registration Statement.

73.     Defendant Laura D'Andrea Tyson ("Tyson") was a director on AT&T's Board at all relevant times.  Defendant Tyson reviewed, contributed to, and signed the Registration Statement.

74.     Defendant Geoffrey Y. Yang ("Yang") was a director on AT&T's Board at all relevant times.  Defendant Yang reviewed, contributed to, and signed the Registration Statement.

### (3)     Confidential Witnesses

75.     Plaintiffs interviewed numerous former employees of AT&T and its affiliates, employed during the Class Period, who provided information in further support of the allegations herein.[9]

76.     CW-1 was a former Sales Representative for AT&T in Hawaii from before 2015 to June 2018.  CW-1 reported to an individual whose title was Director of Sales – Hawaii,[10] who reported to Fred Devereux, who reported to Defendant Shay.[11]

77.     CW-2 was employed by AT&T as a Senior Sales Consultant from before the start of the Class Period until December 2017.  He worked at three stores in Michigan the last few years of his tenure.  During the last few years of his tenure he reported to a Store Manager, who reported to an Area Manager, who reported to a Director of Sales, who reported to Vice President Brian Ducharme, who reported to a Regional President.  The Regional President reported to the more senior executive staff.

78.     CW-3 worked for AT&T as an Area Retail Sales Manager from before 2015 to January 2017. From prior to the Class Period until the end of his tenure, CW-3 oversaw eight retail store locations in the Northeast region of Pennsylvania. For the last six months of his

---

[9] Plaintiffs believe that the details of the responsibilities of the CWs contained herein are sufficient to satisfy the requirements of the PSLRA.  However, Plaintiffs can provide additional specificity to the Court through an *in camera* submission.

[10] The omission of an individual's name does not imply the witness was unable to identify the person, but for privacy reasons, those names have not been included herein.

[11] Fred Devereux was AT&T's Central Region President from October 2017 until the Present.  From May 2008 until 2017, he was West Region President.  According to Devereux's LinkedIn profile, he is responsible for the 13 states in West Region for AT&T Mobility.

employment with AT&T, CW-3 reported to Director of Sales Giovanni Quiros, who in turn reported to two Regional VPs, including Judy Cavalieri.

79.     CW-4 worked for a company that was hired by AT&T to provide quality assurance work for AT&T.  He worked on several campaigns for AT&T, including servicing for AT&T's U-verse TV, DirecTV, and most recently DirecTV Now, which he worked on from approximately February 2017 until the end of his tenure in May 2019.  He estimated that around 150 employees worked at his employer on the DirecTV Now campaign during his tenure.  His responsibilities included leading a team of 10 – 20 colleagues, at any given time, all of whom were handling AT&T customers' concerns through internet messages.

80.     CW-5 worked for AT&T from June 2013 to April 2018 as a Retail Sales Consultant at stores in New Jersey.  From December 2017 until the end of his tenure, he reported to a Store Manager, who in turn reported to Area Manager Jarinna Bazan, who in turn reported to Director of Sales and Indirect Distribution Paul Shisler, who in turn reported to Vice President and General Manager – New York/New Jersey, Bryan Gonterman.

81.     CW-6 worked for AT&T from the summer of 2017 until the spring of 2018, in DirecTV Now's headquarters in El Segundo, California.  His responsibilities included preparing and analyzing analytics about DirecTV Now, including working with a team of analysts to determine how well the product was doing and what could be improved, what was working in terms of marketing, and what was occurring with customer retention.  His team reported to Victor Tam, Director of Advanced Analytics, who reported to an AT&T Vice President named Pete Johnson.

82.     CW-7 worked at AT&T for about 20 years and left the Company in January of 2018.  Most recently and until the end of his tenure, CW-7 was the Assistant Vice President of Sales for AT&T's Northeast "Cricket" region.[12]

83.     CW-8 worked at AT&T from before the Class Period until August 2018.  From before the Class Period until the end of his tenure, CW-8 was a Lead Financial Analyst-Finance Entertainment Group for the Gulf Region and had broad responsibilities related to finances for that market.  CW-8's market included Alabama, Louisiana, and Mississippi.  CW-8 advised that during that time he reported to Regional Business Operations Director, Loren Mansell.

84.     CW-9 worked at AT&T from before 2015 until January 2018.  Throughout the Class Period, CW was a regional director of sales operations based in Atlanta, Georgia.  CW-9 was responsible for overseeing all television products and all devices for the Southeast Region, which spanned from Kentucky to Florida and included outlying states like North Carolina and Louisiana.  CW-9 reported to AT&T's Assistant Vice President of Sales Operations and Marketing, and at the end of his tenure his supervisor was Andrew Hearn.  CW-9' responsibilities included assisting with the launch of DirecTV Now.

85.     CW-10 worked at AT&T as an Assistant Retail Sales Manager from 2013 to about September 2017.  He reported directly to an Area Manager, who in turn reported to a District Manager.  CW-10's job involved managing sales staff and evaluating their performance.

86.     CW-11 worked at AT&T from before 2014 to early 2019.  From 2014 until December 2017, CW-11 was a Director of Sales in Oregon and then from December 2017 until the end of his tenure, he was the Director of Operations of the Rocky Mountain region.

---

[12] Cricket is a mobile phone product sold by AT&T on a pre-paid basis, rather than on a contract.  While working at Cricket, CW-7 was working for an AT&T affiliate rather than directly for AT&T.

87.     CW-12 worked for AT&T from before 2015 into 2019.  Throughout the Class Period his positions at AT&T involved product development.  He was involved in a targeted aspect of the DirecTV Now product launch.

88.     CW-13 worked for AT&T from before the start of the Class Period until May 2017, in a role that involved operations strategy.

89.     CW-14 worked at AT&T from before 2015 to November 2017.  CW-14 spent much of that time working as an Area Retail Sales Manager, and also held the positions of Director of Sales and Retail Sales Consultant.  CW-14 worked out of Boise, Idaho and managed the retail distribution across Western Idaho.  CW-14 reported directly to Scott Davis, a Director of Sales, who in turn reported to Amanda Harris, a Vice President General Manager.

90.     CW-15 worked at AT&T from before 2015 until the end of 2017.  Most recently, CW-15 worked at the Company's Atlanta, Georgia area office analyzing all of AT&T's product results and analytics.

91.     CW-16 worked for AT&T from mid-2015 until January 2018 as a retail Store Manager in California.  He reported to a District Manager.  His responsibilities included selling AT&T products.

92.     CW-17 worked for AT&T from 2013 to September 2018.  From September 2016 until leaving AT&T he worked as a Senior Financial Analyst in the Company's offices in Georgia.  He reported to the Director of Financial Reporting for Mobility, who in turn reported to an Assistant Vice President of Financial Reporting for Mobility, who in turn reported to Vice President Planning and Analysis - Mobility and Entertainment, Kelly Jonak, who in turn reported to a Senior Vice President of Finance - Mobility located at AT&T headquarters in Dallas, Texas,

who in turn reported to CFO John Stephens.  CW-17's responsibilities included gathering, reporting and communicating AT&T's Mobility financials with Dallas headquarters.

93.      CW-18 worked at AT&T from before 2015 until May 2018 out of AT&T's corporate offices in Atlanta.  His job title was Lead Strategic Pricing Manager, Customer Lifetime Value.

### C.      Background on AT&T's Business and Relevant Events

#### (1)      AT&T's Business

94.      Throughout the Class Period, AT&T was a telecommunications, media and technology company.  Among other businesses, it operated throughout the United States and abroad to provide service to mobile phones, broadband internet, and TV to consumers. Following the acquisition of Time Warner's operations, the Company grew to include one of the world's largest video production businesses, along with the rest of Time Warner's sprawling media businesses.

95.      At the start of the Class Period, AT&T reported four segments.[13]  Those segments were: (a) Business Solutions; (b) Entertainment; (c) Consumer Mobility; and (d) International.

(a)      The Business Solutions segment provided mobile phone services to consumers through employer-based plans as well as other networking infrastructure products to businesses and governments.  In AT&T's 2016 Annual Report, this segment accounted for 44% of its reported revenue across all segments.

(b)      The Entertainment segment offered video, internet, voice communication, and interactive and advertising services to U.S. customers.  In AT&T's 2016 Annual Report, this was AT&T's second largest reporting segment and accounted for 32% of its total reported

---

[13] AT&T has changed its reporting structure, and by the time it published its 2018 Annual Report, on February 20, 2019, its reporting segments were as follows: (a) Communications; (b) WarnerMedia; (c) Latin America; and (d) Xandr.

revenue across all segments.  This Action primarily relates to AT&T's DirecTV Now product which was operated out of its "Entertainment" segment throughout the Class Period.

(c)     The Consumer Mobility segment offered wireless services (*e.g.*, mobile phone products) to U.S. customers.  In AT&T's 2016 Annual Report, it was the third largest reporting segment and accounted for 20% of its total reported revenue across all segments.

(d)     The International segment provided entertainment and wireless services within Latin America.  In AT&T's 2016 Annual Report, it was the smallest reporting segment and accounted for 4% of its total reported revenue across all segments.

### (2)     AT&T's TV Business and the DirecTV Acquisition

96.     In June 2006, AT&T launched a video product called "U-Verse TV," which was a component in its suite of consumer broadband and telephone services.  U-Verse TV was similar to traditional over-the-air broadcast or cable TV, but was transmitted to users over the internet. The transmission was processed by a receiver device that was attached to the user's television. Thus, while U-Verse TV was internet based in its distribution, it provided a user experience that was intended to simulate cable TV, including by providing access to packages of live broadcast channels.

97.     In May 2014, AT&T announced that it was acquiring the publicly traded company DirecTV for $67.1 billion in total consideration, including cash, stock and assumption of DirecTV's net debt.  DirecTV's primary product was a satellite-based TV subscription. Unlike U-Verse TV, satellite-based TV does not send its signal over the internet, and instead transmits signal from satellites in orbit above the earth down to 18-36 inch receiver dishes that are typically affixed to a building (*e.g.*, the roof of house).  As a result, DirecTV Satellite faced challenges in trying to secure customers in multi-dwelling housing units ("MDUs") where

landlord or community approval may be necessary before installing a dish (*e.g.*, apartments and condos).

98.     The acquisition of DirecTV closed on July 24, 2015.  As a result of this acquisition, AT&T became the largest provider of paid-TV in the world.

99.     This purchase was peculiar because, by the time of the deal, it was well-documented that DirecTV and other Paid-TV providers were under enormous pressure, as consumers were rapidly moving to "cut the cord," in favor of more affordable and more flexible digital alternatives.  In fact, after the Class Period, Defendant Stephenson publicly stated that, when the DirecTV merger was proposed to AT&T's Board (the "Board"), the directors were shown "a business that was in decline."

100.     There was a well-documented trend that consumers were turning against traditional paid "linear TV."[14]  On March 11, 2013, Techcrunch, a leading technology news source, reported that Nielsen data showed that U.S. households ***without a*** linear TV subscription had increased to a total of 5 million, up from 3 million in 2007.  By April 5, 2016, *Fortune* published that the number of households ***without a*** linear TV subscription had increased to 24.6 million by the end of 2015.  The long-term viability of the traditional TV business was also challenged by the fact that younger customers were far more likely to primarily consume TV through non-linear means.  For example, on September 13, 2017, Pew Research reported that 59% of U.S. adults reported that they primarily viewed TV on cable, satellite, or digital antenna.  This figure essentially inverts for those 18-29 years old, with almost 61% primarily watching through streaming services.  The trend of cutting linear TV subscriptions is so pronounced that

---

[14] Linear TV is a loosely defined industry term that refers to TV with a linear broadcast schedule, as opposed to "non-linear" on-demand streaming platforms.  Paid TV is also an industry term that describes any subscription-based TV product, as opposed to TV that is freely accessible (*e.g.*, "over-the-air").

terminology has been developed to describe those participating in the trend. "Cord Nevers" is a term that refers to individuals who have never paid for linear TV. "Cord Cutters" refers to individuals who are abandoning linear TV.

101. Despite the abysmal long-term prospects of the main product that DirecTV offered, AT&T paid an enormous sum to acquire the company. The purchase had been made with a mix of cash and stock. The acquisition was heavily financed by debt and to complete the transaction, AT&T conducted (what was then) the third-largest corporate bond offering in history. The tremendous debt obligation generated by DirecTV, combined with an $18.2 billion investment in the rights to use certain bandwidths of relevant spectrum in a government sponsored auction in 2015, led to AT&T starting 2016 as the second most indebted company in the S&P 500.[15]

102. Following the DirecTV acquisition, credit ratings agencies downgraded AT&T's debt, recognizing the enormous risk that the Company had taken on with the purchase. For example, Moody's, a major credit rating agency that provides credit ratings for debt instruments including bonds, noted that AT&T's leverage was below the upper limit for AT&T's prior rating, and also noted that the Company had "weak organic free cash flow" that could "heighten credit risk." However, Defendant Stephenson reassured investors that the Company would "spend the next couple of years working the debt back down."

---

[15] Spectrum auctions are a process whereby the federal government auctions off the right to utilize certain wireless airwaves, which enables telecommunication companies like AT&T to provide mobile service to customers. AT&T's tremendous investment in spectrum was partially driven by a desire to increase its ability to provide mobile TV access, further emphasizing how important mobile video was to AT&T.

### (3)   Announcement of DirecTV Now

103.     Beginning in March 2016, roughly 7 months after AT&T had acquired DirecTV, it began discussing its plans to launch a new TV streaming product called DirecTV Now.[16] AT&T stated that DirecTV Now would be launched later in 2016 and that users would be able to access "a range of content packages, including much of what is available from DirecTV today – on-demand and live programming from many networks, plus premium add-on options."

104.     AT&T also explained that DirecTV Now would be an "over the top" ("OTT") product, meaning that users would be able to access DirecTV Now from laptops, tablets, mobile phones, as well as through certain internet enabled "Smart TVs" and through most other TVs through the use of a streaming device.  "Streaming" refers to sending video content over the internet to be promptly consumed by the user, as opposed to downloading content that the user saves to their computer for later viewing.  "Streaming devices" plug into a user's TV set and provide a user interface for selecting content to view, often through third-party applications, like Netflix, YouTube, Hulu, or DirecTV Now.  Popular video streaming devices include the Amazon Fire TV, Apple TV, Google Chromecast, or Roku.

105.     As an OTT streaming product, DirecTV Now was set apart from AT&T's legacy video products—DirecTV Satellite and U-Verse—which both required AT&T to set up physical equipment at the user's home.  Among streaming devices, DirecTV Now was promising to offer a (then) unique package of "live" TV programming (unusual for OTT platforms), as well as "on demand" products.  In the industry terminology, "linear TV" refers to providing TV programming in the sequential format traditionally seen in broadcast TV, and is contrasted with "on demand" content, in which the user selects particular content (*e.g.*, TV episodes or movies)

---

[16] DirecTV Now is also sometimes referred to as DTVN, DIRECTV NOW, or DirecTV NOW. Throughout this complaint the spelling DirecTV Now has been used for consistency, regardless of the spelling in the original source.

to watch.  Therefore, DirecTV Now was positioned as a hybrid "linear" and "non-linear" OTT

product.  Most OTT competitors of the time, such as Netflix, Hulu, Dish Network's Sling TV,

and Amazon Prime Video, were primarily "non-linear" and provided little, if any, "live" content.

106.    The unique position of DirecTV Now meant that it offered incredible upside for

AT&T.  If the product was a success, it could not only offer a solution to the long-term decline in

AT&T's DirecTV Satellite and U-Verse TV Products, but could challenge the dominance of

other OTT platforms.

107.    In further promotion of the DirecTV Now launch, AT&T announced on

September 7, 2016, that any data used for DirecTV products by AT&T mobile phone customers,

would not count against their monthly data usage.  This offering would require AT&T to have

the infrastructure to distinguish between DirecTV data on the mobile phone and other data on the

mobile phone, and therefore, necessarily meant that AT&T was able to measure usage of

DirecTV products.

### (4)    The Time Warner Acquisition

108.    On October 20, 2016, various news outlets began reporting that senior executives

at AT&T and Time Warner were in informal negotiations about a potential merger.  Time

Warner was a media company with both a large library of video content, intellectual property

assets, and video production capabilities.  It had three major divisions: (1) HBO, which consisted

of premium TV and streaming products including HBO Now and HBO Go; (2) Warner Bros.

Entertainment, which consisted of video production and distribution; and (3) Turner, which had

rights to certain content from major sports leagues (including the National Basketball

Association, college basketball and Major League Baseball), the CNN news business, Fandango

(a movie ticket purchasing business), and Hulu (a popular video streaming service).

109.     *Bloomberg* commented that Time Warner's CEO Jeff Bewkes may be a "willing seller," after recently rejecting an acquisition offer from Rupert Murdoch's 21st Century Fox Inc. in 2014, which had valued Time Warner at $75 billion.  However, it also stated that with only "$7.2 billion of cash on hand, AT&T doesn't have enough firepower to make a big deal with cash alone."  It added that AT&T's net debt was about $120 billion, its credit ratings were only a few ticks above "junk," and that Moody's had said that it could downgrade AT&T's debt further if it does not lower its debt to earnings ratio.

110.     Just two days later, on October 22, 2016, AT&T announced its Board had entered into a definitive merger agreement with Time Warner's board of directors to merge the two companies, and AT&T published that agreement.  AT&T would pay total estimated merger consideration of $107.50 per share of Time Warner stock, which valued Time Warner's equity at $85.4 billion, and because the deal also required AT&T to acquire Time Warner's net debt, the total deal was valued at $108.7 billion.  This made the Acquisition one of the biggest deals in history.  In fact, according to some estimates it was the 15th biggest merger in history.

111.     The estimated $107.50 per share merger consideration was composed of two parts.  First, Time Warner shareholders would receive $53.75 in cash per share.  Upon announcing the Acquisition, AT&T said that it would finance the cash portion of the purchase by taking on additional debt.  Second, it would pay Time Warner shareholders with shares of AT&T's stock.  The ratio of stock depended on the price of AT&T's stock **at the time the transaction closed**, with essentially three possible values:

(a)     If AT&T's stock price was below $37.411 per share at closing, then Time Warner shareholders would receive 1.437 AT&T shares per Time Warner share;

(b)     If AT&T's stock price was above $41.349 per share at closing, then Time Warner shareholders would receive 1.3 AT&T shares per Time Warner share;

(c)     For all prices in between $37.411 per share and $41.349 per share at close Time Warner shareholders would receive a floating ratio that would always equal $53.75 per share.

112.    This deal-term (the "Collar") provided some limits to the possibility of an extreme change in the exchange ratio, but otherwise preserved an economic relationship between AT&T's stock price and the amount it would need to pay for Time Warner stock.

113.    In addition to this Collar, various other customary deal terms preserved the economic relationship between AT&T's stock price and the price it would pay if the transaction closed.  For example, various deal terms prevented both companies from taking actions to dramatically change their number of outstanding shares to disrupt the mechanics or economic logic of the other merger terms.  Similarly, both companies were constrained in their ability to issue unusual dividends or divest assets.

114.    The companies also had the right to terminate the proposed merger in several situations, including: First, both parties could terminate the agreement, without paying a breakup fee, by mutual agreement.  Second, the agreement could be terminated if the transaction was not closed by October 22, 2017—though this date was subject to extension in certain situations.  Third, the merger could be terminated if the stockholders of Time Warner rejected the merger.  Fourth, the merger could be terminated if, in certain situations, there was a breach of any representation, warranty or covenant in the merger agreement.  Fifth, the merger could be terminated if Time Warner received a topping offer.

115.    The deal also included breakup fees in the event that either company did not follow through with the merger.  For example, if Time Warner pulled out of the merger, it would need to pay $1.725 billion to AT&T.  If AT&T backed out of the merger or i failed to secure regulatory approval for the deal, AT&T would need to pay Time Warner $500 million.  On October 24, 2016, the *New York Times* ran an article titled: "Why AT&T Isn't Sweating the Breakup Fee in Its Time Warner Deal," which quoted Defendant Stephenson as saying: "Breakup fees are not that relevant in a deal like this."  The article noted "[h]is response to the mention of termination fees was mild perhaps because the one for this deal is so small."

116.    From its initial announcement, commenters understood that the Acquisition would face a challenge on antitrust grounds.  The *Los Angeles Times* reported on October 22, 2016, that "[t]he sheer size of the proposed transaction has already become an issue in the presidential campaign." and that experts said that the transaction would "surely invite close scrutiny from the U.S. Department of Justice and Federal Communications Commission."  On October 24, 2016, *Forbes* ran an article titled: "Republicans And Democrats Unite Against $86 Billion AT&T-Time Warner Merger Deal."

117.    On February 15, 2017, Time Warner shareholders voted to approve the Time Warner Merger.  A total of 78% of shares outstanding voted with 99% of those shares voting in favor of the Acquisition.  However, at this point the deal was still unable to close due to the need to secure regulatory approval.

118.    On November 20, 2017, the DOJ had sued to block the merger (the "DOJ Lawsuit").  The DOJ argued that the transaction would harm consumers by giving AT&T inordinate bargaining power and influence.  Under the terms of the Acquisition agreement, the

transaction would not be closed until after the DOJ Lawsuit was resolved.  However, the pending

lawsuit would not delay the need for Time Warner shareholders to vote on the proposed deal.

119.    On June 12, 2018, Judge Richard J. Leon ruled in AT&T's favor in the DOJ

Lawsuit finding that the government had not established that the proposed vertical merger was

likely to substantially lessen competition.[17]  This ruling removed a major obstacle for AT&T and

Time Warner to close the merger, though there were still provisions by which they could call off

the deal if they so decided.  Two days after the District Court's decision, on June 14, 2018, it was

announced that the Acquisition had closed.  As a result of the merger closing, existing Time

Warner shareholders sold (*i.e.*, exchanged) their shares for the merger consideration of 1.437

shares of AT&T's stock and $53.75 in cash per share.  Thus, AT&T issued approximately 1.185

billion new shares of AT&T's stock directly to former shareholders of Time Warner common

stock.  Each of these new shares of AT&T's stock was issued pursuant to the Registration

Statement.  Each of these shares was sold pursuant to the Prospectus.  On June 14, 2018,

AT&T's stock closed at $32.52 per share.

## IV.    EXCHANGE ACT ALLEGATIONS

### A.    Substantive Allegations and the Context of Defendants' Fraud

#### (1)    AT&T Announces DirecTV Now as Core to its Business and Announces the Time Warner Acquisition

120.    On September 21, 2016, at a Goldman Sachs analyst event, Defendant Stephenson

boasted about the upcoming DirecTV Now product, stating that it would be launched in the

fourth quarter and that it was an "exciting product," which would be exclusively "over the top,"

meaning that it would not require any "set-top box" or "truck roll," to install physical equipment

at the user's home.  He added that the customers would be "pulling down an app" and "getting a

---

[17] *See generally United States v. AT&T, Inc.*, 310 F.Supp.3d 161 (D.D.C. 2018) *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

very robust platform." He also explained that it would have over 100 channels at a "very, very aggressive price point."

121. These remarks about the price point prompted an analyst to ask how the "math" works given that "programming is expensive." Defendant Stephenson explained that the product would have "thinner" margins than DirecTV Satellite, but that the margins would not be "thin," noting the "low capital intensity in the product." Stephenson added that the value for AT&T from the product would be "quite attractive and very positive." Furthermore, he explained that this was a "very, very low cost customer acquisition product"—first asking "how does the customer subscribe to the service?"—and then answering himself, "They download an app . . . [t]hey subscribe purely digitally, they select their content digitally . . . [t]hey interact with us digitally . . . [and the] billing is purely an online billing arrangement."

122. On September 22, 2016, *Bloomberg* ran an article stating that AT&T planned for DirecTV Now to be its "primary video platform in three to five years." Other news sources repeated this claim. On September 27, 2016, the *Dallas Business Journal* published an article titled "AT&T has set a timeline to phase out satellites and set-top boxes," in which Defendant Stankey stated that while some segments will continue to use satellite for "a period of time," the Company was "well-positioned for a move away from legacy hardware," a clear reference to moving away from U-Verse and DirecTV Satellite and moving to DirecTV Now.

123. On October 20, 2016, various news outlets began reporting that AT&T and Time Warner were in informal negotiations about a potential merger. Just two days later, on October 22, 2016, AT&T announced its Board had entered into a definitive merger agreement for the Acquisition. AT&T's press release announcing the proposed Acquisition articulated the Company's vision for the combination—the deal was about the future of TV. AT&T stated that

"[t]he future of video is mobile and the future of mobile is video," and claimed that through the merger it would combine "the world's best premium content with the networks to deliver it to every screen."  The launch specifically said that the combination "builds on Time Warner's HBO Now and the upcoming launch of AT&T's OTT offering DirecTV Now."

124.    Three days after the Acquisition was announced, on October 25, 2016, AT&T announced the launch price for DirecTV Now would be $35, which was far lower than its ordinary pricing for DirecTV, and revealed that the product would provide more than 100 channels of content.  *Wired*, a leading technology publication, commented that this unexpectedly low price was "very much a shot across the bows of cable companies" and that it was "a way of bolstering support for the company's $85.4 billion deal to acquire Time Warner."  This low price served the dual purposes of signaling that AT&T believed it could compete in the lower-cost business model of other streaming services (*e.g.*, Netflix and Hulu)[18] and signaling to the regulators evaluating the antitrust concerns arising from the merger that AT&T was willing to compete in offering consumer-friendly price points.

125.    On October 25, 2016, the *Wall Street Journal* broadcast an interview with Defendant Stephenson and Jeff Bewkes who was then the CEO of Time Warner.  In response to the very first question—Defendant Stephenson focused on the "20 million households who have lost the premium content system"—*i.e.*, the population segment DirecTV Now was focused on reaching—and then said:

> [T]hey've cut the cord and they're not even engaged in the premium ecosystem anymore.  And so we're going to launch, uh, at the end of next month, November, a product that we think does this.  And ***that's what this deal's about and I think it's important to understand it.  Direct TV Now is what we're calling it***, but this is for the first time a hundred plus premium channels, right?  This isn't the junk nobody wants.  ***This is an hundred plus premium channels purely over the top,***

---

[18] In October 2016, Hulu and Netflix each cost less than $10 a month.

*a mobile centric platform for $35 a month.* All right?  It has all Jeff's content.  It has all the premium content that you, you know and love.  You like to watch $35 a month and that includes your mobile streaming costs.  All right, streaming it over the mobile internet, so 35 bucks pretty much all in.  We think this is big.  We think it's a game changer.

126.    After explaining that the Acquisition is about DirecTV Now, Defendant Stephenson added that the product, and its $35 price point, is proof that the merger would be good for consumers, stating "this is a way to drive pricing down in the marketplace."  Defendant Stephenson then boasted about the centrality of DirecTV Now to AT&T's business plans, noting how AT&T "started trying to develop this product over a year ago" but that it would "not be possible" had AT&T not done the DirecTV Deal, because absent that deal AT&T could not "get the media companies to participate in this until we have scale."

127.    Anticipating the antitrust concerns that would come to cloud over the deal, the *Wall Street Journal* interviewer asked Mr. Stephenson, "you're vowing you're not going to take any price advantage," to which Defendant Stephenson responded, "[w]e're actually trying to bring prices down.  $35--you don't find that for a hundred channels in the marketplace with wireless streaming, right?"  He also stated that "anybody who characterizes this as a means to raise prices is ignoring the basic premise of what we're trying to do here.  Again, a $35 product we bring into the market to innovate on and find new ways of bringing content to customers.  That's not a medium for raising prices."

128.    He then further assured the market that the $35 pricing was sustainable by recognizing that "content costs are not going to be flat," but AT&T would "develop new ad models that will allow us to keep the price point in check offsetting the price increases on content," adding "I think that's really really important."  Later in the interview he commented on the pricing again, stating:

DirecTV Now, $35, how do you get to a $35 price point with the prices these guys charge for content, right?  The way you get there is you don't have a satellite dish on a roof.  You don't have a technician going out and spending four hours to install it.  You don't have a 5, 6, $700 set top box.  You go to the web, you download an app, you subscribe and you're streaming direct TV now and all of the content that these guys provide.  That's a radical concept, right?  That's how costs come down dramatically and that's how you hit a $35 price point in the marketplace.

129.    Next, the journalist asked if this was a "bet the company" deal, and Defendant Stephenson stated that it was not because "This, this isn't one of those you have to do a lot of guessing and, and swing for the fences and hope for the best.  We know what the customers want. It's really, really obvious.  They want premium content in a mobile environment."  Through this statement, he once again indicated that the deal was about AT&T's mobile TV product, DirecTV Now.

130.    On October 24, 2016, during an interview on CNBC's *SquawkBox*, Defendant Stephenson said, "as soon as we closed DirecTV, we went full out on developing this. . . it's a purely over the top video product DirecTV Now is what we're calling it."  He also said "it's going to be radically lower than what anybody has seen in the marketplace for a hundred channel product."  Then addressing the Acquisition, he said, "**Why put the two companies together?**" and answered "the world of distribution and content is converging and we need to move fast and if we want to do something truly unique, begin to curate content differently, begin to format content differently for these mobile environments, and this is all about mobility," and concluded "**think DirecTV Now**, the new product we're bringing to market."

131.    The significance of DirecTV Now to AT&T's future business plans, especially to its combination with Time Warner, was well understood by commentators.  For example, an article on the popular investing website *Seeking Alpha* wrote that the Acquisition "allows AT&T's DirecTV Now program to come at a cheaper cost."  The same article stated that "AT&T

42

is creating an ecosystem, and ***DirecTV Now is key in that effort.***"  That article also commented that negative reactions to the Time Warner acquisition "ignores, or at least underestimates, how it all connects with its DirecTV Now plan."

132.    Given the low price point offered on DirecTV Now, observers were concerned about the profitability of the product.  The *Wall Street Journal* reported on November 6, 2016, that while the "$35 price helps AT&T appeal to regulators concerned that its proposed deal for Time Warner will result in higher prices," analysts were projecting that, after deducting the cost of content licenses, there may only be "a dollar or two in gross margin."  Some analysts, such as UBS' John Hodulik estimated that the cost of programming for the new product would be $30 per month, meaning the $35 price would leave little room for profit.  Similarly, Michael Nathanson opined "they aren't going to make any money."  However, these public reports were not based on the actual licensing prices AT&T had negotiated paying, and did not account for revenue AT&T would receive from advertising.

133.    On November 9, 2016, at the Wells Fargo Technology, Media & Telecom Conference, an analyst asked whether the product was still going to be profitable given the $35 price point and whether AT&T was comfortable with the margins on the product.  Defendant Stephenson responded "yes," indicating that the product would be profitable, and added: "as we add features, as we add different content, you will see different price points."

134.    On November 20, 2017, the DOJ Lawsuit commenced, in which the DOJ sued to block the merger on antitrust grounds, alleging that the combination would be bad for consumers as AT&T would have greater leverage if the Acquisition went forward.  Under the terms of the Acquisition agreement, the transaction would not be closed until after the DOJ Lawsuit was

resolved.  However, the pending lawsuit would not delay the need for Time Warner shareholders to vote on the proposed deal.

135.    On November 28, 2016, AT&T announced that DirecTV Now would launch on November 30, 2016.  It would come with a 7-day free trial, but would otherwise cost between $35 and $80 per month, depending on the package.

136.    On November 30, 2016, AT&T hosted a highly publicized launch event to promote the product, complete with a guest speech from movie star Reese Witherspoon.  During this event, Defendant Stankey explained that the product was taking "costs out of the platform" and targeting segments of the market that did not warrant "high acquisition costs."  He also explained that the product was the future of AT&T's video plans and a "real game changer," because it would "bring in other parts of the ecosystem" onto the platform.  Enrique Rodriguez, an executive vice president and the Chief Technical Officer at AT&T's Entertainment segment, echoed this point, saying that AT&T would be bringing "more and more of the experiences . . . under this same platform."

137.    Defendant Bentley began his remarks at the launch event by telling the audience "the revolution is here."  He then boasted that AT&T was "incredibly excited" about the product because the business model provided a "compelling value proposition."  Bentley also showed the pricing for the product packages (starting at $35), and stated that these prices are "everyday prices, everyday simple prices," that are "not promotional and d[o] not roll off."  He explained the launch promotions available for DirecTV Now, which would include access to a free Apple TV (a streaming device that connects to a TV set, retailing for about $149 at the time) with a three month pre-paid subscription to DirecTV Now , or an Amazon Fire TV Stick (a streaming device that connects to a TV set, retailing at about $39) with a one month pre-paid subscription,

as well as a one year subscription to DirecTV Now with the purchase of certain high-end TV sets.

<strong>(2)   AT&T Boasts About DirecTV Now's Launch Despite Serious Technical Problems</strong>

138.   On December 6, 2016, at the UBS Global Media and Communications Conference, roughly one week after the launch of DirecTV Now, Defendant Stephenson boasted about DirecTV Now's initial release.  He said that it was too early to know the "churn characteristics" but that "early demand has been rather dramatic" and "***It has been really, really impressive, we have been pleased with it***."  While the single week of results was apparently not enough to provide "churn" data on the product, later in that presentation, Defendant Stephenson stated, "We have high expectations for churn reduction in this environment," before adding, if "you get a 10th of a percentage point improvement in churn, the profitability implications from that are rather significant in our industry."

139.   Stephenson also explained that the "attach rates" for the $5 per month additions of HBO and Cinemax have been "really good," adding, "bottom line, this thing is doing very, very well, it is exceeding expectations."  Further indicating the close attention he was paying to the analytics surrounding the product, Stephenson explained that "DirecTV Now is way over indexing to people who live in MDUs, apartment complexes.  So, we know we are hitting a demographic that we like here."  In responding to a question from an analyst about the profitability of DirecTV Now, Defendant Stephenson explained that because the product is "software centric" and because "there is no truck roll at the house, there is no satellite that goes on top of a house, there is no set-top box that goes in a house, there is very little capital required to launch a service like this" he was "perfectly content with lower, thinner margins in a product

45

like this.  We have the lowest content cost in the US, so we think we are uniquely positioned to offer a service, live video streaming, full array of content and to do it on a profitable basis."

140.    Further emphasizing the supposed organic interest in the product, Defendant Stephenson also told investors that "we expect virtually all of the subscribers to come to us via online, ***that is what has happened so far***.  And you subscribe, you put in a credit card and you begin viewing."

141.    The next day, on December 7, 2016, at the Barclays Global Technology Conference, these highly positive comments continued.  For example, an analyst commented that per AT&T's prior statements they were "already at or above plan when it comes to the types of subscribers on to [the DirecTV Now] service."  Defendant Stephens interjected agreeing, "That's a very good thing, by the way."  During this conference, Defendant Stephens also commented on how AT&T's mobile phone network was handling the load of DirecTV Now traffic, especially given that AT&T was offering AT&T mobile phone customers unlimited DirecTV Now data. He said, "It's still early but we are pleased.  And, quite frankly, we are pleased at the performance of the platform and the comments, most importantly the comments, the response we're getting from customers."  Defendant Stephens also said, "We will take in this information as you would in any product launch and continue to improve it and continue to make it easier for customers to use.  But we are real pleased about how it has gone so far."  He also commented on how the data plan is important because connecting DirecTV Now with AT&T mobile phone service would reduce overall churn, recognizing the immense significance of churn for AT&T generally: "When you are our size if you can reduce churn a few basis points you can have a significant economic advantage and do that."

142.     On December 7, 2016, Defendant Stephenson testified to a U.S. Senate committee regarding the Acquisition.  He stated that DirecTV Now was a "***real game changer***."  He described the product to the Senate committee, stating that it is "a subscription-based online video service designed for the more than 20 million U.S. households who have dropped traditional pay-TV or are flirting with cutting the cord."  He then represented that DirecTV Now offered 100 channels at "***prices starting at $35 per month.***"  He concluded: "Customers can sign up, download the app and start watching their favorite shows in minutes."

143.     Despite the extremely positive commentary from AT&T and its executives about the successful launch of DirecTV Now, it faced serious technical problems.  Looking back on the launch, *The Verge*, a popular online technology online publication, ran an article titled "DirecTV Now appears to be a complete mess," on January 13, 2017.  The article stated that "[u]sers report constant errors and a near-unusable service" and complain of being "unable to watch shows, frequent interruptions, missing features, billing issues, and more pretty much nonstop since the service's November 30th launch," concluding "[m]any say it's simply unusable."  The article also explained that the Twitter account for DirecTV Now had been "apologizing day after day and promising updates that seemingly haven't come."  Similarly, the *New York Post* ran an article on January 13, 2017, titled "DirecTV Now is a total disaster," stating that "every aspect of the service is a total disaster."

144.     On January 16, 2017, *TechCrunch*, another popular technology based online publication, wrote about issues surrounding the launch, noting complaints of the "service freezing and buffering, app crashes, being automatically logged out, and more."  The same article detailed that AT&T was not offering refunds to those upset with the performance problems, and that it had led some customers to lodge formal complaints with the Federal

Communications Commission.  On January 17, 2017, *Fortune* wrote an article titled: "DirecTV Now Customers Frustrated with Glitches and Lack of Refunds," which stated, "the complaints are mounting," as customers describe "problems such as unavailable video streams, features that don't work as expected, and incorrect billing."

145.   On January 18, 2017, Defendant Stephenson appeared on *CNN* to discuss the Acquisition.  The interviewer asked "why buy Time Warner?" and Defendant Stephenson responded "We're in an environment where our customers are demanding more and more video, more and more entertainment content, not only on the TV but on the mobile device.  And we have a really large customer base in, in a mobility.  And the ability to take really premium quality content to our customers in the mobile environment is huge for us."  Speaking to the possible antitrust concerns during the January 18, 2017 *CNN* interview, Defendant Stephenson touted DirecTV Now as proof of why the Acquisition would be consumer friendly, stating "one thing we've been working on since we closed on the DirecTV acquisition is a purely over the top content package.  We're calling it DirecTV Now" and explained that it would be at a "radically lower price point than what the consumer is expecting . . . [for] a hundred plus channels."  He punctuated the point by adding, "there'll be more choice I think better prices for consumers."  He also commented on how "having an anchor tenant like Time Warner" would further benefit the new platform.

### (3)   Time Warner Shareholders Vote to Approve the Merger while AT&T Continues Touting the Success of DirecTV Now

146.   On January 5, 2017, AT&T filed the Registration Statement and the next day the SEC declared the Registration Statement effective.  On January 9, 2017, AT&T filed a Form 424B3, which was the Prospectus AT&T would use to offer and sell AT&T's stock to Time Warner shareholders, as consideration in the Acquisition.  AT&T called on Time Warner

investors to vote on the Acquisition at a meeting on February 15, 2017.  The Acquisition would only go forward if a majority of Time Warner's outstanding shares, entitled to vote thereon, approved of the merger agreement.

147.    Continuing to boast about the importance of DirecTV Now to the Acquisition, Defendant Stephenson made several notable comments during a January 18, 2017 interview with *Bloomberg TV*.  He stated that "the reason we are so excited about" the Acquisition, "is that we want to change how content is delivered to the customer," and then clarified, "we think it's really important [that] the customers are using more and more content on mobile devices."  Then, when asked a question about the possible revenue benefits of the Acquisition, he focused on DirecTV Now stating:

> When you innovate and when you bring different capabilities to bear to the consumer, the consumer's reaction to it is profound.  We recently launched an over the top product [DirecTV Now], its live streaming of traditional premium content to a mobile device-mobile centric.  The customer receptivity to this has been over the top, really really strong.  That has given us more and more conviction that if you can take premium content and begin to innovate around it and deliver it in these formats, then you can have that same kind of impact and so that's what [the acquisition of] Time Warner is about.

148.    On January 20, 2017, AT&T published a Form 8-K previewing its 4Q16 financial results.  This filing stated that DirecTV Now had more than 200,000 paying net video "adds" that quarter "driven entirely by DirecTV Now," adding that the number includes "only paying customers."  On January 24, 2017, an article on *Seeking Alpha* called these results a "huge win" for AT&T and stated that this "demonstrated" to the market that customers were "ready, willing and able to switch from traditional content delivery to AT&T's streaming service.  And switch in unheard of volumes."

149.    On January 25, 2017, AT&T announced its 4Q16 financial results.  During the associated conference call, Defendant Stephens explained it was a "big quarter for the

Entertainment Group" with the "launch of DirecTV Now" getting "most of the headlines." Stephenson also represented that DirecTV Now was off to a "really fast start."

150.    More specifically, Stephens said that DirecTV Now "started strong adding more than 200,000 paid subscribers in its first month," which he said gave the Company "solid video sub[scription] growth in the quarter," thus indicating an equivalence between DirecTV Now subscriptions and AT&T's other TV products.  Defendant Stephenson emphasized this equivalence further by purporting to provide "perspective" on the 200,000 subscribers and "how attractive [DirecTV Now] was in the marketplace at $35 price point," by comparing it to U-Verse TV, which he said took "a year and a half to get to 200,000 subscribers," adding "so we're pretty excited about it."

151.    Defendant Stephens also commented that the "demographics" of the new subscribers tend to be "more urban, younger and apartment dwellers than a typical linear customer."  He added that DirecTV Now was reducing churn for AT&T's mobile phone services, but did not disclose that DirecTV Now itself was experiencing high churn rates or carried a high risk of resulting in high churn rates.

152.    The Company distributed a slide deck presentation associated with the 4Q16 financial results with a slide stating, "Strong DirecTV Now launch with more than 200,000 net adds" and this line was repeated in the press release associated with the 4Q16 financial results.

153.    The Form 8-K for the 4Q16 financial results reiterated the 200,000 subscribers figure and listed the net video subscriptions for AT&T's other platforms, "includ[ing] customers who migrated to DirecTV Now," indicating that the Company was carefully tracking the source of DirecTV Now subscribers, sufficiently to determine whether those customers "migrated" from one of its legacy platforms.

154.    On February 13, 2017, *Business Insider* published an interview with Defendant Stephenson that occurred during the publications Ignition conference, which was held from December 5-7, 2016.  In that interview Defendant Stephenson, once again, explained the central role of DirecTV Now within AT&T's business plans.  He said that AT&T had been "adamant believers" that customers would watch "premium long form content" on mobile devices.  He then said, "to that end we acquired DirecTV," but added, "we were not in love with the satellite technology . . . what we needed was scale in premium content and so we bought direct TV."  He continued to explain that DirecTV Now had launched the prior week, boasting that "DirecTV Now [has] a hundred channels" and is "$35 a month," even with "all of that content."  Defendant Stephenson then stated, "we launched that last week on Wednesday" and hit the "December forecast" for the product on the very first day.  He concluded by explaining that the Acquisition complete[s] this strategy" and that he was "convinced that this would be really powerful if we could put these two companies together, begin to innovate the content for a mobile centric environment and so we did this deal."

155.    On February 15, 2017, Time Warner held its shareholders meeting to vote on the Acquisition.  A total of 78% of shares outstanding voted with 99% of those shares voting in favor of the Acquisition.  Following the vote, the most significant step in the closing of the transaction was obtaining regulatory approval to close the transaction.  Although there were also other closing conditions, and under the terms of the merger agreement, the Acquisition could be terminated for a variety of reasons prior to close.  Obtaining regulatory approval primarily depended on the DOJ Lawsuit and its allegations that the Acquisition violated antitrust laws.

156.    One important consideration for AT&T while the DOJ Lawsuit was pending was the need to convince the courts and regulators that the merger would not be harmful to

consumers.  As a result, this lawsuit created an additional pressure to keep the price of AT&T's new centerpiece product—DirecTV Now—at the low prices it had presented during the launch event.  If AT&T increased prices, this may have been interpreted as evidence that allowing the Company to continue to grow in market dominance would be bad for consumers.

157.    As AT&T waited to close the merger, it continued to promote the success of the DirecTV Now product.  *See* Section IV(C).

### (4)    In May 2017, Bloomberg Reports That DirecTV Now's Growth Is Sputtering

158.    On May 4, 2017, during an interview on CNBC's *SquawkBox*, Defendant Stephenson continued to direct focus on DirecTV Now and said, "It's no surprise that people [are] either cutting the cord or never getting the cord. . . .  That's why we launched DirecTV Now." He then added, "It's had a terrific amount of success" and stated that products like DirecTV Now are "where I think the industry is going."

159.    However, on May 25, 2017, *Bloomberg* reported that, according to unnamed sources who were familiar with the matter, DirecTV Now had seen its growth stall in recent months, raising questions about consumer demand for the growing number of new web-TV services entering the market.  *Bloomberg* reported that, by the end of January 2017, two months after its debut, the streaming service had surged to about 328,000 subscribers.  Yet DirecTV Now lost 3,000 customers in February, and its subscriber growth was roughly flat in March, the sources said.  AT&T declined to comment when it was reached by *Bloomberg*.

160.    Based on information from these sources, *Bloomberg* reported that DirecTV Now's tepid growth is a sign of concern for a pay-TV industry that was counting on streaming services to attract subscribers who have fled to cheaper entertainment options like Netflix or Amazon.  This concern was heightened in light of what had become a crowded market, with

competing products being offered by AT&T, Dish Network Corp., Sony Corp., Hulu LLC, and Google's YouTube.  Reportedly, the new online TV packages were not succeeding in capturing all the people dropping pay-TV service.  Reportedly, while 477,000 signed up for online TV services including Sling TV, DirecTV Now, and Sony PlayStation Vue in the first quarter of 2017, traditional pay-TV providers lost 732,000 customers as cord cutting accelerated, according to an estimate by analysts at MoffettNathanson.

161.    *Bloomberg* said that in addition to these issues, DirecTV Now's $35-a-month initial price for more than 100 channels had expired.  According to *Bloomberg*, new subscribers were paying $60 for 100 channels, or $35 for more than 60 channels.  Meanwhile, additional online TV services had entered the market, increasing the competition, including services from YouTube and Hulu.  DirecTV Now also launched without the CBS broadcast network and local broadcasts in many cities, which *Bloomberg* speculated may have hurt demand.

162.    News agencies, including the *Dallas Morning News*, noted that the timing of the increase in the $35-a-month service was suspect, coming shortly after AT&T won approval of its merger from Time Warner shareholders.  *Variety* referred to what turned out to be a very limited time promotion offer as "theatrical flourish."

163.    In its earnings report issued in late April 2017, AT&T failed to provide a customer update on DirecTV Now.

164.    Defendants continued to tout the importance and success of DirecTV Now.  For example, on November 29, 2017, at the Economic Club of New York, Defendant Stephenson again explained the central role that DirecTV Now played in the Acquisition.  While describing why AT&T was buying Time Warner, he said "acquiring DirecTV gave us the ability and it gave us the position to go in and negotiate those rights that we'd been trying to get for years with all

the premium content players to distribute content to our mobile customers" adding that "within a year after acquiring DirecTV, we launch a product called DirecTV Now" and continued by stating "We're having great success with it."  Then he said "[w]e'll probably hit a million subscribers this quarter, within a year of launching the product, and so **that was what this [Acquisition] was all about.**"

           **(5)      The Acquisition Closes and AT&T Publishes 2Q18 Financial Results**

165.    On June 12, 2018, Judge Richard J. Leon ruled in AT&T's favor in the DOJ Lawsuit and found that the government had not established that the proposed vertical merger was likely to substantially lessen competition.[19]  This ruling removed a major obstacle for AT&T and Time Warner to close the merger, though there were still provisions by which the parties could call off the deal.  While the DOJ retained the right to appeal the agreement, the *New York Times* reported that the decision was "emphatically in favor of the companies."

166.    Two days after the District Court's decision, on June 14, 2018, it was announced that the Acquisition had closed.  As a result of the merger closing, existing Time Warner shareholders sold (*i.e.*, exchanged) their shares for the merger consideration of 1.437 shares of AT&T's stock and $53.75 in cash per share.  Thus, AT&T issued approximately 1.185 billion new shares of AT&T's stock directly to former shareholders of Time Warner common stock.  Each of these new shares of AT&T's stock was issued pursuant to the Registration Statement and sold pursuant to the Prospectus.  On June 14, 2018, AT&T's stock closed at $32.52 per share.

167.    While the DOJ announced an appeal on July 13, 2018, having closed the Acquisition, AT&T moved forward as the owner of Time Warner.  Defendant Stephenson stated that the appeal "changes nothing we'll be doing over the next 30 days or the next 12 months.

---

[19] *See generally United States v. AT&T, Inc.*, 310 F.Supp.3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

We're about executing our plan."  He also indicated that he believed that the "likelihood of this thing being reversed and overturned is really remote."  He concluded, "The merger is closed. We own Time Warner."

168.    On June 21, 2018, AT&T published a press release providing an update on the Company in light of the Acquisition closing.  That press release stated: "For the quarter, the company expects total video and broadband subscribers to increase, with ***DirecTV Now subscribers more than offsetting continued declines in traditional TV subscribers***."

169.    On July 24, 2018, AT&T published its 2Q18 financial results and hosted a conference call about those results.  During the conference call, Defendant Donovan boasted that "We had 80,000 total video net adds in the quarter with gains in DTV Now and U-verse more than offsetting losses in DirecTV."  He also described a new video offering called "WatchTV," which was offered at a low $15 per month price point to certain existing AT&T customers. Similarly, Defendant Donovan described plans to introduce a "premium product extension, which is a streaming product that will give the full DirecTV experience over any broadband." He also explained that when that product launched, AT&T would have "a whole series of price points" for its video products.  Curiously, Defendant Donovan also said that DirecTV Now had been a "placeholder in the market until the deal was finished," because the "product tried to do too much and too little."  The significance of this revelation would not be clear until the following quarter, when AT&T began disclosing the myriad problems facing DirecTV Now. The significance was also disguised by AT&T's assertion that "over time" they were going to be launching packages at "various price points" and that "[w]e just had a very strong quarter of DirecTV Now adds."

170.     Defendant Donovan also commented, "we watched cannibalization closely," and said that on any given month the "cannibalization rate," was 15% to 17%, meaning that these accounts were converting from DirecTV Satellite or U-Verse to DirecTV Now.  He then downplayed this cannibalization by noting that about "1/3 of those [converting to DirecTV Now] are listed in [AT&T's] linear TV product as very likely to churn because of their engagement and where the costs don't fit."  Thus, AT&T again demonstrated that it closely tracked metrics regarding subscriptions and subscribers' likelihood to discontinue service based on predictive factors, including engagement.

### B.     The True Situation Regarding DirecTV Now

#### (1)     Fraudulent Account Creation Practices

##### (i)     *Confidential Witness Testimony*

171.     CW-1 reported that he was "taught to manipulate" sales of DirecTV Now when customers were activating new mobile phones.  According to CW-1, when a wireless customer would come into the store to get a new phone, the customer traditionally had to pay an activation fee to upgrade their phones.  After the launch of DirecTV Now, CW-1 and his colleagues were taught to convert the activation fee into up to three subscriptions of DirecTV Now and covertly waive that fee.

172.     CW-1 explained the mechanics of this process as follows: The customers were told that there was a $35 activation fee.  CW-1 and his colleagues would tell the customers that their purchase came with one to three months of DirecTV Now for free.  They would then waive the activation fee on AT&T's system, but would not tell the customer they were doing this.  Instead, CW-1 and his colleagues would charge the amount of the activation fee to the customer, but apply that money to the DirecTV Now subscription.  CW-1 added that when DirecTV Now was running a promotion, Sales Representatives were taught to create up to three accounts with

that $35 activation fee, and would do so by using "bogus" email addresses for the extra accounts,

and "sneakily run" the customer's credit card for each account.  CW-1 added that AT&T's

system was designed to allow this and did not require the email accounts to be verified, so the

personnel in the store could "put any" email address into their systems and run the same credit

card for multiple accounts.

173.    CW-1 further advised that once the supposed trial period had passed, he and his

colleagues were supposed to manually cancel those subscriptions so the customer would not get

charged.  CW-1 explained that they would do this through a "back end" system, without the

customer ever knowing.  CW-1 added that they would keep a "log" which detailed the

customer's information, the fake email addresses, and the date that they needed to cancel.

According to CW-1, the log was kept on the notepad function on an iPad so he could manually

go in and cancel the accounts.  CW-1 added that sometimes the customers would continue to be

charged on their credit cards without their knowledge, but most times, CW-1 and his colleagues

would go into the accounts and cancel them manually to remove the recurring charge.

174.    CW-1 said that he heard from AT&T employees from both the west and east

coasts of the U.S. stating that they had been directed to create fake accounts in the same way that

he had.

175.    CW-1 recalled how this practice  began in earnest in 2017.  He said that he and his

colleagues were able to make the subscriber growth "explode" by using these sales tactics.  He

added that these tactics were used continuously, because they were consistently signing up

people who had upgraded their phones and thought they were getting DirecTV Now for free for

3 months as a perk related to that upgrade.  CW-1 recalled that sales representatives were

originally given 8-10 new DirecTV Now accounts as targets to reach each month and that those

targets were quickly increased to 20-30 new accounts per sales representative, each month.  He said that once management realized how easy it was to create fake accounts, the targets quickly increased and seemed to "double" or "triple" as the months went by.  CW-1 said that about half of the accounts he created were fake, which by his estimate, meant he was creating about 15 fake accounts per month.  CW-1 added that "at least half" of the DirecTV Now accounts were "bogus," based on what he was seeing internally.

176.     According to CW-1, every morning, his store had a meeting run by the store manager where the practice of creating bogus accounts was openly encouraged and "pushed" on a daily basis.  When asked who at AT&T above CW-1 was aware of these sales tactics, he responded that  everyone within the sales organization "totally knew."  According to CW-1, this included his boss,  whose title was Director of Sales – Hawaii, who reported to Fred Deveraux who reported to Defendant Shay.  CW-1 added that these sales tactics were encouraged by these members of management and added that he could "guarantee" that they all knew  what was going on.   When asked if the executives from corporate ever visited his location, CW-1 responded that they did frequently.  CW-1 stated that these practices "trickled down" from AT&T's Regional Sales Directors and above.  During his tenure, CW-1 observed Sales Managers encouraging these sales practice at the store level in order to hit and exceed their sales numbers.  CW-1 described the practice as a "creative" way to make it appear that there were additional subscribers of DirecTV Now.

177.     CW-2 said that they would try to pitch DirecTV Now but it was a "very hard sell" and that sometimes the customer would say that they did not want the product, but that they would go ahead and add it to the account anyways without telling them.  CW-2 said that one example of the ways sales representatives would sign up customers for DirecTV Now, without

the customer's knowledge, would be to apply a discount to an actual purchase and then apply the

extra payment to DirecTV Now.  CW-2 also said that sometimes they would put DirecTV Now

on the client's account from the back end of their computer system, without charging the

customer anything at the moment.  CW-2 added that the account would be setup with a fake

email address, so that the client would not receive notifications about it unless they noticed it on

their credit card.  He recalled that when customers noticed the charges they would often

complain.

178.    CW-2 further recalled witnessing that customers were unknowingly being signed

up for DirecTV Now at least at 2 of the 3 stores he worked at throughout 2017.  He also advised

that one of his responsibilities was handling bill reviews with customers.  He explained that

customers would come into the retail store to review their AT&T Mobility bills and charges.

CW-2 estimated that around 40 – 50% of the customers he dealt with, beginning in early 2017

and continuing throughout that year, complained about being charged for DirecTV Now, which

they told him they never signed up for.

179.    According to CW-2, there was a big push by January 2017 to get AT&T

customers signed up for DirecTV Now.  This push included bonuses for sales quotas met, and

the threat that those who did not meet the quota would be fired.  He added that sales

representatives were told "do whatever it takes, if you aren't selling it you are fired."  CW-2 also

said that AT&T used "big incentives" to push sales, such as offering customers free Apple TVs.

180.    CW-2 also recalled that it was around January 2017 when his Store Manager

came out of a monthly meeting, at one of the stores CW-2 worked in, with a Director of Sales,

and directed CW-2 and his colleagues that the instruction from the Director of Sales was to get

customers signed up for DirecTV Now any which way they could, including signing customers

up without their knowledge.  CW-2 further recalled the Store Manager saying "this was what they wanted," and that the Store Manager implied that this directive came down from those higher up the chain than the Director of Sales.  According to CW-2, the message from the Director of Sales was "just put it on there," referring to DirecTV Now, and "get the customer signed up, even if they don't know."  He referred to the Director of Sales as "pretty ruthless," adding that he would say "just do whatever it takes."  CW-2 advised that the Director of Sales oversaw around 27 stores in Michigan reporting to him, and that he visited them around once per month to meet with the Store and Area Manager.

181.   CW-4 said he and his team started fielding complaints from customers stating that they were being billed for DirecTV Now without having signed up for it starting around June 2017, and he said this continued through the end of his tenure in May 2019.  He recalled seeing multiple complaints per day from customers stating that they were being billed for DirecTV Now but that they had never signed up for it.  He said these complaints would come in "all the time." He estimated that he was seeing between 20-40 complaints per week about being billed despite not signing up for an account.  He recalled that often he and his colleagues would try to look up the customer's account, but that it would be associated with an email address the customer had never used.  He advised that other "red flags" related to these accounts were customers that were not using the product at all or multiple accounts affiliated with the customer's credit card number.

182.   CW-4 said that customers complaining about being billed for DirecTV Now despite not signing up for it, were from all over the United States, and he did not recall any region standing out as having more complaints than the others.  CW-4 went on to advise that he and his team would fill out a form tracking the fraudulent accounts that would be tracked within Excel.  He said that the information would be sent to a supervisor at AT&T, and that the

information would include data on which sales representative had been credited with the new account and the location that the sales representative was working at.  According to CW-4 an AT&T representative would often appear at his employer's office for team meetings, and that this representative had oversight of his team.  CW-4 advised that customer complaints would be discussed with the AT&T representative, including complaints about DirecTV Now.

183.    According to CW-4, his team dealt with hundreds of customers every week. According to CW-4, he and his team could access the customer's account in AT&T's Evergent system and see information such as their billing information, when they were signed up for DirecTV Now, which AT&T representative had signed them up and at which location, how often the customer used DirecTV Now, when they last used the product, what devices DirecTV Now was used on, and how many accounts the DirecTV Now subscriber was linked to.  He said that they used this account information when working with the customer and that they would pull it up after looking for the customer's account.  CW-4 estimated, based on the data he saw in Evergent, that around half of all DirecTV Now accounts he reviewed were not using the service at all.

184.    According to CW-3, AT&T "turned good people into bad people" because those people could not keep up unless they participated in the fraud.  He added that AT&T "makes Wells Fargo look like Angels."  CW-3 stated that the increased focus on selling DirecTV Now subscriptions created a ripple effect through AT&T's sales associates and sales managers whereby people began using any means necessary, even fraud, to meet AT&T's sales expectations.  He estimated that "more than seventy-percent" of sales employees felt like they had to take an unethical approach to selling the product in order to meet the internal goals.  CW-3 stated that adding DirecTV Now without a customer's permission was "common practice."

CW-3 explained that there were always sales metrics when something new like DirecTV Now launches.  He said that for years when people committed fraud, they would be looked upon as outstanding performers and even if it was brought to the Company's attention, they would just dismiss it.

185.    CW-5 reported that AT&T supervisors "made employees," including himself, conduct certain inappropriate sales practices for the purpose of increasing DirecTV Now subscribers.  CW-5 stated that in December 2017, a Store Manager sat him down and explained that management followed a certain sales pitch to get customers to sign up for DirecTV Now, even if the customer did not understand what they were signing up for.  CW-5 explained that this included telling the customer they were being charged for one thing, but in actuality assigning that charge in the system to DirecTV Now.  CW-5 added that the customer's email address would be attached to the new DirecTV Now account, and that fake email addresses were also added to create additional accounts to falsely boost subscriber numbers.  CW-5 further recalled the Store Manager adding that if he wanted to be successful, management would help him.  He also said that an Assistant Store Manager explained to him how to go about inappropriately boosting the DirecTV Now subscribers without the customer knowing.  CW-5 also said that one day when an Area Manager was in his store, the Area Manager congratulated him for around five recent DirecTV Now signups, and that when CW-5 explained to the Area Manager what he was doing, and had been instructed to do, to get those numbers, that the Area Manager's response to him was similar to, "do what you got to do."

186.    CW-5 gave a specific example of these practices using SIM cards for phones. CW-5 advised that replacement SIM cards were supposed to be free, but that he had been instructed to tell the customer that the charge for the SIM card was $10.50, for example.

Following what he was directed to do, CW-5 created a new DirecTV Now account assigned to that customer's email address, and applied that charge to it as a DirecTV Now charge, not a SIM card charge.  CW-5 then also created fake email addresses associated with that account to artificially increase the number of DirecTV Now subscribers.  He added that the customer just thought that they had paid for the SIM card only.  CW-5 said that AT&T had disabled their email verification process which allowed this practice to occur.  He said that since AT&T's email verification process was disabled, he created easy-to-remember email addresses, such as yankee123@gmail.com and red@gmail.com, and passwords that he could cancel subscriptions for when he needed to, and as he was directed to.

187.    CW-8 recounted how he heard that employees at the stores were able to manipulate DTV Now subscriber numbers by creating fake accounts.  CW-8 advised that this occurred through "different scenarios."  For instance, according to CW-8, a customer would come into the store and upgrade their account, and the sales person would then put DirecTV Now in their bundle, but the sales person would categorize it as the sale of a new installation, that way the representative could classify this as both a sale of DirecTV Now and as a brand-new customer.  CW-8 recalled that the Director of Gulf States told him this was happening.

188.    According to CW-10, sales representatives were being directed to sell as many subscriptions to DirecTV Now as possible, often without the customer's knowledge or understanding of what they were receiving, and often without giving the customer the option to decline the offer.  CW-10 said that he was aware of sales representatives lying to customers to sell the product.  CW-10 further recalled the way in which AT&T employees would use "bundling" to misleadingly drive sales.  CW-10 said that employees would get the customer to agree on a price point, and show them the forms describing the plan that the customer was trying

to sign up for.  After the customer agreed, the employee would add DirecTV Now to that bundle.
CW-10 said, "You could have saved them fifty bucks, but instead you slide it in as DirecTV
Now."  According to CW-10, once a price point was established, then it was up to the sales
representative to figure out how to include DirecTV Now and sometimes, the easiest route was to
convince the customer they were getting a "bundle" of services, including DirecTV Now, even if
all the customer wanted was a specific cell phone package that cost less.

190.    CW-10 reported that AT&T had created an environment where misleading sales
practices were normal by rewarding employees who made sales regardless of how they achieved
that sale.  CW-10 added that such practices were known to higher-level employees, and often
encouraged.  CW-10 stated that the "district manager would absolutely be aware," since they
would have been involved in teaching the employees these practices.

190.    While CW-14 said that he did not oversee the creation of fake accounts, "it was
widely known what was going on."  CW-14 heard that other directors and area managers were
basically instructing and/or allowing their sales associates to use a tactic known as "cramming."
According to CW-14, through this practice, employees would tell customers that DirecTV Now
was included in their bundle of services they were buying, when that was not actually true.  In
other words, according to CW-14, they would not tell the customer that DirecTV Now was a
subscription service that came with a monthly fee.  That was left up to the customer to figure out
before or after they began getting billed.

191.    CW-14 described that in the Spring of 2017, he and other employees at his level
received a directive from Vice President-General Manager Harris to instruct their sales associates
to begin aggressively pitching DirecTV Now as "an accessory sale."  CW-14 explained that this

was misleading because it was not a onetime purchase, but a recurring charge, but the customer thought it was just a onetime accessory purchase.

### (ii)    *Other Corroborative Accounts of Fraudulent Account Creation*

192.    The practice of fraudulent account creation is corroborated by online accounts of similar fraudulent activity.  AT&T maintains a web-based forum on its website "forums.att.com."  That forum includes an area where customers can post descriptions of billing issues that they have experienced in relation to their DirecTV Now subscription.  Sometimes AT&T employees respond to these posts in their personal capacity and sometimes AT&T representatives formally respond.  This forum includes dozens of reports of duplicate charges and illegitimate extra accounts that are highly corroborative of the testimony provided by the Confidential Witnesses.  A few examples of these posts are as follows:

(a)    March 19, 2017

Title: "Fraud"
Body: "I am being billed for 2 DTVNow Accounts and don't have access
        to any[.]"

(b)    August 1, 2017

Title: "Direct TV now app & over charge"
Body: "I was double charged for two accounts that are not active.  I need
        assistance in getting my money released."

(c)    November 30, 2017

Title: "AT&T Gave my info without me knowing!  Refund??"
Body: "I bought a new phone at the AT&T store, and no one mentioned
        anything about direct tv.  Checked my bank account and I've been
        charged monthly since getting my phone for direct tv now "live a
        little" package!  I don't even own a TV!  The charges come to
        $93.50!  I never authorized at&t to give out my credit card info,
        and direct tv has all of it.  Has this happened to anyone else??  And
        how did you go about getting your money back That much means a
        lot to me ☹ Lady on chat said she could only give me $35, then
        eventually said she could do $74, but I'd like to be able to actually

speak with someone instead of chat, and to get ALL back.  Help!
So frustrated."

(d)   April 15, 2018

Title: "Being Billed When i never signed up for service"
Body: "For 2 months I've been billed for Direct TV Now when i never
signed up for the service.  How can i stop that?"

(e)   July 5, 2018

Title: "Money drafted off debit card"
Body: "I have An Amount of 74$ coming off my credit card saying it is
from direct tv now I need to see why because I do not have an
account with you at all.  I need assistance please."

(f)   August 14, 2018

Title: "Never signed up for DirecTV Now"
Body: "I need Direct TV Now cancelled.  Your representative signed me
up without my consent, that's fraudulent.  Also please refund all
the payments you've taken from my account."

193.   Other internet communities have posts with similar stories of fraudulent account

creation.  For example, the website "pissedconsumer.com," which tracks complaints from

consumers about companies, has dozens of similar stories.  Among those stories are the

following:

(a)   February 14, 2018

Title: "Directv Now - Buyer Beware, Ver[y] Shady Business Practices"
Body: "I never opened a Direct TV Now account but $10.68 was debited
from my account.  There was absolutely no way to clear this up
because DirecTV Now does not have a real customer service
center."

(b)   September 23, 2018

Title: "Directv Now - Don't use the service but sure do get billed for it!!!"
Body: "Got suckered in to this Directv thing when I upgraded my phone at
AT&T.  It was supposed to be free.  Never used it.  Couldn't get it
to work.  No one would help.  Can't talk to anyone.  Getting billed
$40 / month.  Been trying to cancel but there seems to be no way to
do that!  The FAQ tells you exactly how to do that but guess what?

The directions do not line up with what is actually on the web site. This is the perfect crime!"

(c)     July 19, 2018

Title: "Directv Now - SCAM!!!"
Body: "I have never even signed up for this service and some how my account information was gotten and billed for Direct TV Now of which I had no idea what this even was until I saw charges via my debit card!  I do have U-verse in my home and my debit card is on file to pay my U-verse bill so it makes me wonder if my bank info was accessed through my U-verse account and fraudulently used for this Direct TV Now scam?  I will be cancelling my U-verse service because I no longer trust AT&T."

(d)     November 9, 2018

Title: "Directv Now - FREE TRIAL SCAM!!!  STAY AWAY!!!"
Body: "I WAS OFFERED A FREE 7 DAYS TRIAL OF DirecTVNow [THROUGH] AT&T COMPANY, WHEN I TRY TO CANCEL ON THE 5TH DAY. . . .  I NEVER GAVE DirecTVNow PERMISSION TO DEDUCT MONEY FROM MY BANK ACCOUNT WHITCH THEY DID GET MY BANK INFORMATION [THROUGH] AT&T AND WITHOUT MY PERMISSION THEY DEDUCT $147.24 TWO MONTHS WORTH OF SERVICE WITHOUT HAVING ANY SERVICE OR ACCOUNT WITH THEM!!!!"

(e)     December 29, 2018

Title: "DirecTV Now - I don't have an account for past few years and you keep charging my bank acct"
Body: "I've been dealing this for almost a year now and I last spoke to [an AT&T representative] last [month] and my acct is still getting charged he mentioned he removed my credit card but that's been a lie.  I need reversal charges has caused insufficient fees and you charging me twice because you caused my acct negative I'm getting close to going to a claim for this to court for all the damages.  It affected my credit as well"

(f)     December 26, 2018

Title: "DirecTV Now - Once they get your Credit card they never stop charging"
Body: "This company is a scam.  Someone got my card and did fraud this company been charging me for one year each month I challenge it.  Scam artist."

194.     Altogether these posts confirm that many customers were affected by the creation of fake and duplicate DirecTV Now accounts.  The posts also demonstrate that this conduct occurred for a prolonged portion of the Class Period.  As explained herein, Defendants never disclosed that DirecTV Now subscribers were obtained through improper and fraudulent sales practices, but instead insisted during the Class Period that the subscribers' growth was organic.

### (iii)     *AT&T Investigates the Fraudulent Activity*

195.     CW-14 added that he was aware of an investigation into the sales tactics, which he estimated as beginning around Summer of 2017.  CW-14 said he heard from others in other states that there was "quite a bit of transition" following the investigation.  Two states in particular that CW-14 heard referenced as having the most issues were Colorado and Utah.

196.     Prior to leaving AT&T in January 2018, CW-16 said he started hearing about an internal investigation that the Company had launched surrounding sales of DirecTV Now subscriptions.  He estimated that he first heard about the investigation near the midpoint of 2017.  He said that he had conversations with other store managers at different locations in California about the investigation.  He stated that he heard of managers who were offering bill discounts or bill credits or selling on top of other products.  He clarified that "selling on top" meant that a customer would sign up for one service and suddenly get a subscription for DirecTV Now in addition, without their knowledge.  With respect to "bill credits," CW-16 said that it meant AT&T was essentially paying people to sign-up for DirecTV Now just to increase the amount of subscriptions that the new service was accumulating.

197.     CW-11 described that in November or December of 2017, he and other directors were notified by AT&T's human resources office that an internal investigation was taking place into how the Company was making sales of DirecTV Now.  CW-11 said he was one of about two-dozen directors in the West region that were notified about the investigation.  According to

68

CW-11, the investigation was conducted by employee relations managers, as well as human resources business partners.  CW-11 said that following the investigation, around February, March or April of 2018, he was given a list of people who were terminated.  CW-11 said that the investigation found that people as high up as Director of Sales were aware of the problematic sales practices and even instructing people on those practices.  CW-11 recalled that several employees in the Oregon market were impacted by the investigation, and added that this was only one of many markets that was impacted by the investigation, which was "nationwide" and resulted in the termination of over a "hundred" employees.

198.    CW-1 explained that around 4Q17 AT&T began an investigation into sales practices being used to sell DirecTV Now.  CW-1 said that he was interviewed on the phone in January 2018 about the fake account activity by an employee focused on "asset protection" at AT&T.  CW-1 was not terminated after the first investigative interview, but was rather fired after a second investigation was launched after the first investigation was completed.  He said that some of the representatives who were interviewed were not fired, even if they admitted to the fraudulent account activity.  According to CW-1, even after his tenure with AT&T, his former colleagues who remained at the Company told him that these practices continued at least through the end of 2018.

199.    On June 21, 2018, *Hawaii News Now* published an article titled "Hawaii AT&T workers say company urged them to use unethical tactics—and then fired them."  Within this article, former and current AT&T employees corroborate the Confidential Witness testimony regarding unethical and improper sales tactics.  According to the article, current and former AT&T employees told the newspaper that retail managers at the Company took an aggressive approach to selling trial subscriptions to DirecTV Now.  Some AT&T sources told the

newspaper that if a customer agreed to purchase a trial subscription, sales representatives were able to use that credit card to start several trials.  This often happened during $10 promotional periods because representatives could squeeze three sales into one.  "My manager picked up my iPad, which was signed in under me, made a fake email and then activated a DirecTV Now subscription on that email and then said if I can do it, here you go, you can do the next one," an AT&T employee told the newspaper.

200.    Another source told the newspaper that if a customer was purchasing a cell phone, a sales representative might falsely say the purchase carries a fee.  The representative would then offer to waive the fake fee if the customer instead purchased a cheaper trial of DirecTV Now.  This tactic was encouraged by AT&T managers, who competed for top sales rankings.  The *Hawaii News Now* article recounted one employee confirming how once DirecTV Now officially became a ranked sales metric in June 2017, sales numbers tripled and stayed that way through the end of the year.  Sources told the newspaper that employees who didn't meet sales goals faced disciplinary action.

201.    Reportedly, Hawaii regularly had some of the best DirecTV Now sales numbers in the nation during this time.  According to the *Hawaii News Now* article, one employee estimating that 90 percent of the sales throughout that time were made unethically.  "Check your statements, I have no doubt that there are still people that are being charged," the employee was quoted saying.

202.    Shortly after the June 2018 story was reported in the newspaper, AT&T told *Hawaii News Now* in a statement: "Last fall, we detected some simultaneous customer orders and cancellations of a free product trial."  "We determined some employees had violated our policies and based on our findings we took appropriate action."  AT&T said that both

management and non-management employees were involved in these violations, but declined to comment on the allegations of unethical behavior and would not say how many people were terminated locally or nationally as part of the investigation.  As explained herein, the fraudulent account creation practices were not confined to Hawaii and were widespread nationally throughout the Class Period, and by at least the Summer of 2017, the Company knew (due to its investigation) that these practices were continuing to artificially inflate DirecTV Now subscription numbers by including within those numbers accounts that were not authorized by the customer and would likely be cancelled.

203.    Indeed, comments made after the *Hawaii News Now* article was published further describe the fraudulent activity.  For example, in a discussion related to the *Hawaii News Now* article, on the social media website "Reddit.com," the fraudulent activity was discussed:

(a)    "This is happening at least in that region, all the AT&T employees I know report the same.  Entire west coast operations is doing this, people are afraid of getting fired for things their managers are telling them they have to do."

(b)    "I can assure you, having worked for both AT&T and Verizon, and been present as a personal assistant at board-level management meetings, board-level management on down is *fully aware* of how much they are forcing their employees to do unethical things.  They don't care.  They know that, as long as everyone in management keeps their mouth shut, the unethical behavior will be limited to the employees that are forced to commit it.  Hell, they *budget* for the potential fines should they get caught."

(c)    "I can name 4 AT&T employees at different stores in one district that got Fired for this exact thing, its rampant in the company.  Stores are letting managers Go and the employees they made do it, its crazy.  Right now I know employees whose manager Made them

do it, Manager gets fired, Reps follow next.  West coast is definitely a hot bed of this and I am sure its the entire company."

(d)     "You're absolutely right.  Every single "Top performer" and Summit Winner that I know does so much shady stuff, I am downright ASTOUNDED this issue hasn't popped up publicly yet."

(e)     "Managers not being fired may have been unique to your market.  When DirecTV Now became part of the comp plan, I investigated some of this fraud myself and many managers were terminated as a result.  Investigations are still ongoing too so even if you think that some of your management team is going to get away with no consequences I can tell you that they probably won't."

(f)     "As an employee of AT&T, I can say that this is 100% happening and occurs daily in every market I have any relationship with."

204.    Another Reddit.com article published June 22, 2018, titled "Many AT&T customers may have been defrauded," stated that "In December [2017], an email was sent out to [AT&T] reps stating that the company [AT&T] was aware of what was going on and that they would not tolerate it anymore."  The same post explained that "as soon as the Time Warner deal went through, reps across the board were fired" and added that "[h]undreds of employees have [e]ither been fired or are slated to be fired within the coming days" and the fraud "could [a]ffect thousands of customers."

205.    Similarly, an account titled "atthumor" on the social media platform, "Instagram" that posted content of interest to AT&T employees had over 20,000 followers and multiple posts and comments describing the prevalence of fraud at AT&T.  One post from June 26, 2018 with over 2,000 "likes" showed the text, satirizing AT&T's slogan "It's our thing" with a fake

72

advertisement reading: "Firing people for doing the shady shit we told you to do [--] that's our thing."  One commenter on an atthumor post wrote: "Dude in Savannah had 32 DTV nows and didn't even get acknowledged on calls.  They know it's unethical."  And another post from June 13, 2018, showed the following image, which apparently shows a white board instructing employees to discount out the price of DirecTV Now as an account credit, functionally bringing the price down to nearly nothing:



### (2)  AT&T Artificially Inflated DirecTV Now Subscriber Numbers by Promoting and Rewarding Account Fraud

206.    CW-1 confirmed that the way AT&T set sales quotas and commissions incentivized sales representatives such as himself to utilize these aggressive and improper sales tactics.  CW-1 explained that each month, there were quotas set and for each new subscription of DirecTV Now, the employee would receive a "spiff," (*i.e.*, a commission or bonus) among other incentives.  CW-1 also said that if the employee met their quotas, their managers and above would receive commissions as well.  CW-1 confirmed that because of these unethical sales practices related to DirecTV Now, his store and region were constantly exceeding their quota numbers on sales of DirecTV Now so the quotas would go up.

207.    CW-7 reported that Cricket held daily meetings, sent out constant email reminders and offered incentives to employees to ramp up sales of DTV Now.  According to CW-7, there was a document circulated daily that ranked employees on their sales of DTV Now and compared them to their peers.

208.    CW-9 explained that the directive from the top was "we're going to push DirecTV Now" given that it was a "big focus."  He added that he heard this from his Regional President Mike Whittrock.[20]  According to CW-9, around February 2017, a few months after the launch of DirecTV Now, Defendant Shay put out a directive instructing managers and directors to tell their sales teams to prioritize DirecTV Now.  He recalled that typically Defendant Shay was on all leadership calls with the Regional Presidents and that the Regional Presidents typically had weekly calls with their vice president general managers.  CW-9 called this focus on DirecTV Now a "strong-arm" and explained that the message was: "everybody really needs to get behind this product, we're not doing well with it, push it."

209.    According to CW-3 shortly after launching the product AT&T began placing an extraordinary amount of pressure on its employees to push sales of DirecTV Now.  CW-3 explained that by December of 2016 there was "a tremendous focus to sign customers up on DirecTV Now."  He said that directive came from both the Regional Vice President Cavalieri and from Director of Sales Quiros, and there was "extreme pressure" to sell DirecTV Now that was "extremely intense."  CW-3 said that beginning in late November 2016, as DirecTV Now launched, he participated in multiple conference calls every week where the directive to sell the new service was hammered home.  He said that the conference calls were held twice a week, three times a week, from November 2016 until he left in January 2017.  CW-3 said that he

---

[20] According to publicly available sources, "Mr. Michael Wittrock, also known as Mike, has been the President of Southeast Region for AT&T Inc. and AT&T Mobility LLC since December 2016."

participated in those calls along with Quiros, and other executives like Area Retail Sales

Managers Christopher McCambridge and Mark Bonanni.  CW-3 explained that AT&T had an

internal dashboard to rank all the employees from sales reps to store managers to DM's to

directors, and that it included sales metrics that were important to the organization at the time.

CW-3-said that VPs and Regional VPs talked about the dashboard at times on regional calls.

210.    CW-10 recalled that when it launched, the promotion of DirecTV Now was a "big,

big deal" and that AT&T wanted to make sure that its sales representatives were "positioning it

to every client walking in through the door."  CW-10 stated that if a sales representative was not

"hitting their goals or their metrics," CW-10 was responsible for putting them on "a performance

improvement plan" to "scare them."

211.    CW-11 recalled that within six months of the launch of DirecTV Now he was on

a call with Defendant Shay where Defendant Shay stated that every store was expected to double

its subscription sales month to month.  He gave an example to explain this, that if a store sold 10

subscriptions the first month, the next month would net 20 subscriptions, followed the next

month by 40 subscriptions, followed the next month by 80 subscriptions.  He also recalled this

same message being communicated in other phone calls.  CW-11 stated that this was "not

sustainable" but that employees were told that they would be "held accountable" if they failed to

meet this target.  CW-11 said that the pressure prompted the sales force to resort to "unnatural

sales or flat-out fraudulent" sales tactics.  CW-11 said that well before June 2018, and prompted

by the internal investigation, AT&T shifted gears, and CW-11 was told that they should stop

trying to sell DirecTV Now.

212.    He added that he learned of these specific practices in early 2018 from AT&T

officials.  Specifically, CW-11 said that employees would use the customer's credit card

information and they would sign them up for the free service without telling the customer and then the customer would see it on their bill.  CW-11 also recalled situations where customers were told that they needed to sign up for DirecTV Now in order to upgrade their phones, when this was not true.

213.     According to CW-14, within about four months after the launch of DirecTV Now, a new, significantly more aggressive sales goal was announced by Scott Davis, a Director of Sales, and Amanda Harris, a Vice President General Manager.  He explained that some areas were tasked with increasing current sales projections by a 2X, month over month multiplier, while other areas were hit with an even higher target.  CW-14 said that these sales goals were not realistic.

214.     CW-16 said that shortly before AT&T launched DirecTV Now in November 2016, he and his sales employees received training related to the product.  He described how both Managers and Retail Sales Consultants received commissions for selling the product.  CW-16 said he was told to have his team withhold certain information and focus instead on other information related to the product, in an effort to facilitate a sale.  He recalled being "hounded on" by the District Manager to sell DirecTV Now.  He stated that the pressure to sell, coupled with the information he began hearing about from work colleagues related to fraudulent and deceptive practices, paved the way for him to consider a new career choice.  He added, "It was driving it or pushing it no matter what, and if you don't have high sales you're looked at as an underperformer or someone who's not fit to be in that position.

215.     CW-16 also described the promotions AT&T used to sell DirecTV Now.  He said it was no secret that many people would sign up for DirecTV Now just to get the free product and they had no intention of remaining a subscriber.

### (3) AT&T Artificially Inflated DirectTV Now Subscriber Numbers by Pushing DirecTV Now on its Own Employees

216.    CW-8 stated that the initial rollout of DirecTV Now was bolstered by the promotions offered to employees.  According to CW-8, the employees paid a "very low rate," and many of his colleagues participated in the promotion.

217.    CW-9 said that his own sales staff participated in this activity, buying DirecTV Now to get a free Apple TV, and then immediately cancelling their subscriptions as soon as the promotional period ended.  He stated that the employees did this, even if they got free DirecTV Satellite as a perk with their employment, because they could get a free Apple TV.

218.    CW-10 described how AT&T pressured its employee base to sign up for DirecTV Now.  CW-10 stated that when DirecTV Now first launched, "there was a really, really strong recommendation for all employees to buy DirecTV Now."  CW-10 added that managers were "trying to get reps to sign up and get their families to come in and sign up."  CW-10 said employees who didn't comply risked being penalized professionally.

### (4) DirecTV Now Subscriber Figures Reflected Aggressive Promotional Activity Resulting in High Customer Churn which AT&T Carefully Tracked

219.    CW-9  stated that AT&T used aggressive promotional activity to sell the product. CW recalled promotions where customers were given more value from AT&T than they were paying for their DirecTV Now product.  CW-9 stated that DirecTV Now had a "churn problem." CW-9 added that it was well known internally that a lot of customers were disconnecting DirecTV Now after their promotions expired and it was definitely more than the customers that subscribed to traditional DirecTV.  CW-9 recalled the problem starting in late 2017.  CW-9 recalled that around the third quarter of 2017, AT&T tasked an employee at the company's regional office in Atlanta, to look into issues surrounding the increasing loss of DirecTV Now

subscribers.  However, he said they found "the obvious," that people would sign up through a promotion and then cancel.  CW-9 added that the Company was just "outrunning the churn for a while."

220.    CW-7 said that beginning when DirecTV Now was first launched, AT&T offered DirecTV Now for free as a promotion when customers were buying other Cricket products.  CW-7 added that this was a "betting on forgetting" strategy.  CW-7 stated that he saw a 35% "take rate" for DirecTV Now, meaning that 65% of DirecTV Now subscribers on the promotion were cancelling before ever becoming paid DirecTV Now subscribers.

221.    CW-8 stated that he was very familiar with DirecTV and DirecTV Now churn and explained that it was part of his job responsibilities to analyze the data about churn on a monthly basis.  CW-8 confirmed that AT&T's sales reporting team had details of when the person signed up for the product and other information about the circumstances of the sign up and cancellation, such as the stated reason for cancellation.  CW-8 and his counterparts would have to detail in the system, as a "line item," why the subscriber cancelled their plan, which he also described as an "explanation" for the churn.  He said that he could see churn data for all markets.

222.    CW-8 further advised that on a monthly basis he and his counterparts in other markets would report the results entertainment products including DirecTV Now, traditional DirecTV and U-Verse.  CW-8 said that he could see churn data for all markets and prepared a "weekly forecast" for each product.  According to CW-8, this reporting was done using Smartview which had an excel add-in and they would get data from internal "financial data warehouses."  CW-8 advised that monthly forecasts were rolled-up to CEO of AT&T Entertainment Group Defendant Stankey, Executive Vice President, Marketing Defendant Bentley, and President of Retail Sales and Distribution Defendant Shay.

223.   CW-8 recalled seeing significant churn in DirecTV Now subscribers in all markets beginning in early 2018 and through the end of his tenure.  CW-8 also recalled monthly meetings that he participated in regularly where significant churn was discussed.  CW-8 stated that most of the DirecTV Now subscribers were on "some sort of promotion" and that subscribers would cancel their DirecTV Now subscriptions once the promotions ran out.  CW-8 recalled that there was a monthly reporting package and weekly analysis showing this churn, that was reported up the chain of command.  CW-8 explained that during the latter part of his tenure the monthly reporting packages and weekly analysis were showing that more than 40 - 50% of DirecTV Now customers in 2018 were cancelling their accounts once their promotion ended.

224.   CW-8 said that CEO Randall Stephenson and CFO John Stephens received Operational Review Packages, which would have included concerns for DirecTV Now and churn from all markets.  CW-8 further advised that he prepared packages for his group, just before his tenure ended, that was included in the Operational Review Package that went to CEO Stephenson and CFO Stephens.

225.   According to CW-12, during the entire first year of offering DirecTV Now, not one subscriber was profitable.  CW-12 further explained that the content that AT&T was offering was far too expensive for the price that they were charging subscribers.  He added that some DirecTV Now customers were profitable for AT&T overall, even though AT&T was losing money on their DirecTV Now subscription, because some of them were also buying other AT&T services.  CW-12 indicated that he had access to subscriber numbers and churn reports.  He also attended meetings where churn was regularly discussed.

226.   CW-6 said that his team of data analysts would analyze information including data on when customers signed up, what programming they would buy, if they would disconnect,

and when they would disconnect.  He said that he would compile the data analysis into a report

and present it to a business manager.  The report would show how the promotions were working

and how customers were behaving according to different promotions.  This would lead to

discussions on how to "structure the promotions so they're not just coming on and taking

advantage of the promotion and leaving."  CW-6 went on to say that he and his team pulled their

data from AT&T's Tableau and SaaS systems.  CW-6 advised that promotions were given at

least two-weeks to run before they started pulling reports on and analyzing it, in order to let the

promotion gain some traction in the field.  According to CW-6, these reports allowed business

managers to see how certain promotions were working, which promotions were more likely to

lead to churn, and how to restructure those offers to prevent churn.

227.     CW-6 said that his director supervisor Victor Tam, director of advanced analytics,

would work with the team to draft the reports.  He said that the reports were given to a variety of

business managers and named a few examples: one, who was responsible for customer

acquisition strategy related to DirecTV Now; a second who was the business manager

responsible for both acquisitions and working with the sales channel; and a third who was the

business manager responsible for retention and campaign promotions.

228.     According to CW-6 retention and promotion-based churn were already issues

being discussed as a priority when he joined the Company in July 2017.  He said that there were

internal discussions about whether promotions were "too rich," because a customer could sign up

and get a product like the Apple TV and then disconnect afterwards.  CW-6 recalled two

business managers, asking questions related to how AT&T could keep customers longer as

subscribers through DirecTV Now and how it could reduce the number of people that simply

signed-on for a promotion and immediately canceled once the promotional period ended.  He

added, when you looked at the math, you could get the Apple TV at a "pretty good discount" by

signing up for DirecTV Now.  He said AT&T was "giving away a lot but we weren't seeing

favorable results in terms of keeping customers on."  He said the customers were "leaving so

quickly," and that, as a result, the promotions were too rich.

229.    CW-6 said that the data he analyzed showed that a considerable number of

subscribers were churning away from DirecTV Now.  For example, he said they would sign up

for an Apple TV and then disconnect once the promotional period ended.  He added, "Not all of

them, of course, but definitely a high percentage of them" would not continue with the product.

CW-6 said AT&T appeared determined to keep using these promotions, in part, because the

Company was fixated on reaching certain subscriber number targets.  However, he said that there

was a discussion that the promotions were "not sustainable."  He added that two business

managers talked about finding a more sustainable way to attract and keep customers.

230.    CW-6 said that it was "always general knowledge" that DirecTV Now was

bringing on a bunch and losing a bunch of customers.  He said that "everybody knew it was

happening" and clarified that this included business managers.

231.    CW-10 described that every AT&T account displayed markings indicating how

valuable the customer was to AT&T.  CW-10 explained that, among these markings, was an

indicator of how likely the customer was to churn out of the program.

232.    CW-11 recalled that the dramatic loss of subscribers for DirecTV Now was

discussed in internal meetings, beginning around September or October 2017.  For example,

CW-11 said that the topic was discussed in bi-annual Ops Review meetings, which included

Directors, Vice Presidents and the Regional President, it was discussed on monthly execution

calls headed by the Regional President and his support team, and it was discussed by Vice

Presidents during regular sales force meetings.  CW-11 said he specifically recalled the loss of subscribers being talked about during a monthly execution call at the end of the third quarter for 2017 or the start of the fourth quarter 2017.  He recalled that the decline in DirecTV Now subscribers was discussed in one meeting couched in terms of how it was better for AT&T's bottom line to scale back the focus on DirecTV Now and re-emphasize satellite sales.

233.    According to CW-13, in late 2017 or early 2018, there was a cutback on certain DirecTV Now promotions, and CW-13 was told it was because "economically it did not make sense" to "continue to throw money at the problem."  According to CW-13, when "people fell off the promotional period," they would call into customer care and quit or cancel DirecTV Now. CW-13 recounted hearing from AT&T's call center leadership how they did not have the budget or capacity to field all of the customers who either wanted their promotions to continue or would cancel DirecTV Now.  CW-13 confirmed that AT&T's leadership at the corporate office knew "everything" about the customer churn in DirecTV Now because anyone at the Director level or above at AT&T had access to all of the churn numbers.  He advised that even at his level, he had visibility into all churn numbers through reports that were circulated on a regular basis as well as systems that detailed the numbers that were accessible at any time.

234.    According to CW-15, he worked on a project related to DirecTV Now shortly after it launched, tracking the rate at which DirecTV Now was cannibalizing DirecTV subscriptions.  CW-15 had access to a large Excel spreadsheet that was sent out on a regular basis from someone at AT&T headquarters in Dallas, Texas.  CW-15 described this Excel spreadsheet as "subscriber-based," and advised that it contained many types of data on subscribers for all AT&T products, including DirecTV Now.  According to CW-15, this spreadsheet included subscriber information from all regions.  The spreadsheet showed how

many subscribers were on the product at the beginning of the month, how many were on it at the

end of the month, and the difference between those two numbers.  The spreadsheet also showed

on-going promotional information, including the promotional period and the promotion being

offered, as well as information about customers on those promotions.  CW-15 recalled that

subscription numbers "spiked" based on promotions.  CW-15 also said that the spreadsheets

showed how subscribers came onto products, which he called the "channel" that they signed up

through, such as through a particular retail store or through the internet.

     235.    According to CW-15, he was aware that there was analysis on DirecTV Now that

was sent to senior executives, in the form of reports, that were pulled from a Tableau[21] dashboard.

CW-15 knew this because the marketing analytics group he worked with had created the

dashboard, which he referred to as a "marketing dashboard," so he was familiar with the type of

information contained in the reports.  CW-15 recalled that these reports for senior executives on

DirecTV Now showed how many subscribers signed-up and how many dropped, as just some

examples.

     236.    CW-17 stated that in early or mid-2017, he first started to hear from his

Entertainment group counterparts that DirecTV Now was not selling well in terms of subscribers,

that it was launched too early, that it was not working as expected, that major promotions were

needed to try to increase its number of subscribers, and that there were a lot of complaints from

subscribers.  CW-17 added that DirecTV Now was described by his finance team counterparts as

a "sinking ship" as early as 6-12 months after it was launched.

     237.    CW-17 explained that all of the financial departments for each AT&T division,

including Mobility and Entertainment Group as just two examples, pulled their respective

---

[21] Tableau provides software that enables interactive data analysis and visualization.

financial information from the same database.  He said that the financial teams in Georgia

worked hand-in-hand with their counterparts in AT&T's headquarters in Dallas.  This included

discussing monthly lookbacks at the previous month's financials while respective counterparts in

Atlanta and Dallas reviewed that information in reports drawn from the database at the same

time.  He further advised that the reports on these lookbacks at the previous month were reported

up his chain of command to the Senior Vice President of Finance - Mobility in Dallas, Texas,

who in turn discussed the information with CFO John Stephens.  He clarified that the

Entertainment Group and DirecTV Now finance teams followed the same process.  He stated

that the reports described, among other things, new subscribers, existing subscribers,

discontinued subscribers, information on promotions, and operations impacted by promotions

which he explained were used by sales teams to push more promotions.  CW-17 also explained

that in addition to these monthly reports, some weekly reports were generated for forecasting,

and that real-time snapshots could be viewed at any given time.

238.    CW-18 explained that all promotional activity was studied "very closely" and that

AT&T forecasted the "take rate," pricing and churn in evaluating all promotions.  He said that

AT&T had an analytics group that studied, reviewed and documented DirecTV Now customer

churn and that the results of these reports were given to David Christopher, who would have to

sign off on "everything" related to promotions and pricing.  He added that all promotions needed

CFO and CMO approval.  Then, he said, if a promotion was approved it was "baked into the

forecast."

239.    CW-18 advised that it was part of AT&T's culture to prepare reports and

forecasts and said that this practice was "hammered" into him and his colleagues.  He advised

that specifically John Stankey would have reviewed these analytics for DirecTV Now given

AT&T's practices.  He stated that "there was no way that John Stankey" did not know about forecasting and churn.  CW-18 added that if there was any advertising or promotional activity being directed at DirecTV Now, that reviewing "churn rate" was "part of the process" for approving the advertising or promotional campaign.  CW-18 also said that because AT&T paid for advertising of DirecTV Now, the churn rate was monitored on a weekly basis at a minimum and likely was monitored on a daily basis.

### C.    The Materially False and Misleading Statements and Omissions During the Class Period

240.    Plaintiffs allege that the statements highlighted in **_bold and italics_** within this Section were materially false, misleading, and omitted to disclose material information of which the Executive Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or artificially maintained the price of AT&T securities and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired AT&T securities during the Class Period.  Because AT&T and the Executive Defendants chose to speak on the issues described below, it was important that they not mislead investors or withhold material information.  As described below, the Executive Defendants created an impression of a state of affairs related to DirecTV Now that differed in a material way from the one that actually existed.

#### (1)    September 21, 2016 – Goldman Sachs Communacopia Conference

241.    On September 21, 2016, before markets opened,[22] at the Goldman Sachs Communacopia Conference, Defendant Stephenson and an analyst had the following exchange:

> **Brett Feldman**: [T]he math that we have trouble with as analysts is that the programming is expensive.  And so getting to an aggressive price point in the

---

[22] Where a statement is said to occur "before markets opened," this refers to statements made in a conference or event that began prior to 9:30am Eastern Time.

market suggests very thin margins and so I was hoping you could walk us through how you determined that this is the right pricing strategy for this product.

**Stephenson**: Sure.  An MVPD-like product.  So think 100 premium channels in a purely over-the-top platform with a completely different cost structure.  This is a very unique cost structure and a very unique platform.  We have built this from the ground up.  We spent the last year plus developing this platform and it starts with how does the customer subscribe to the service.  They download an app on their smartphone, their Smart TV or their tablet.  ***They subscribe purely digitally. They select their content digitally.  They interact with us digitally.  The billing is purely an online billing arrangement.  This is a very, very low-cost customer acquisition product.***  It is a very low-cost-to-install product meaning the customer has just done it once they downloaded the app.  There are no set-top boxes.  There are no truck rolls involved in this.

So we have replatformed all of the cost for this product and it's a very nominal incremental cost to provision this.  So to your point, we had to acquire content rights and being the largest scale TV provider in the US gave us a lot of opportunity to get a best-in-class cost structure around this content.  We've been very aggressive about this over the last year and we've been doing what I would consider some win-win arrangements with the content providers.  The content providers I believe -- I've heard Bob Iger refer to it that he's happy with the arrangement we struck.  ***And so you put the different cost structure, a unique position on content cost together and we can put together a product that is I'm going to call it thinner, not thin margin, but thinner than what we are accustomed to, but I'm always willing to take thinner margins when there's low capital intensity in the product.***

***So we think we are going to be able to meet a price point that's very, very aggressive in the marketplace.  And keep in mind, it's a product that is integrated with our wireless service and it's also integrated with our home broadband service.  And so to the extent that it's driving additional penetration or further penetration in wireless, or driving churn down in wireless, the lifetime value of a customer with this kind of product is actually quite attractive and very positive.  So that's why we are so excited about it.***

242.    Defendants' statements that DirecTV Now would be profitable were materially false and misleading and omitted to disclose that DirecTV Now was not going to be a profitable product with positive margins, but would instead be sold at irrationally low prices and with heavy and improper promotional activity.

### (2)   November 30, 2016 – DirecTV Now Launch Event

243.   On November 30, 2016, AT&T hosted a press event for the launch of DirecTV Now.  During this event, Defendant Bentley described the pricing of DirecTV Now, including a price point as low as $35.  Bentley represented that DirecTV Now provided AT&T a "***compelling value proposition***" and that the quoted prices were "***everyday prices, everyday simple prices***," He also stated that these prices were "***not promotional and does not roll off.***"

244.   Defendants' statements that DirecTV would be profitable and sold at prices that were not promotional were materially false and misleading and omitted to disclose that DirecTV Now was not a profitable product with positive margins and was being sold at irrationally low prices and with heavy and improper promotional activity.

### (3)   December 6, 2016 – UBS Global Media and Communications Conference

245.   On December 6, 2016, before markets opened, during the UBS Global Media and Communications Conference, Defendant Stephenson stated:

> Now it is early, we have no idea what the churn characteristics of this are going to look like so we are going to be cautious about putting numbers out.  ***But the early demand has been rather dramatic.  It has been really, really impressive, we have been pleased with it.***

246.   Defendants' statements concerning demand for DirecTV Now contained in the previous paragraph were materially false and misleading because DirecTV Now was not a viable product, was rolled out before it was ready for deployment and was experiencing severe technical issues during the Class Period including frequent interruptions, service freezing and buffering, app crashes, being automatically logged out, and both missing features and billing issues, leading one media source to report that the product was being characterized as "simply unusable."  The statements about demand for DirecTV Now were also false and misleading because the product was subject to aggressive promotional activity and improper sales tactics.

247.    On December 6, 2016, during the UBS Global Media and Communications

Conference, Defendant Stephenson also stated:

> *And so bottom line, this thing is doing very, very well, it is exceeding*
> *expectations.   And these two together, TV Everywhere with DirecTV and*
> *DirecTV Now, you sit back and you ask, is there demand for premium long*
> *form content on a mobile device?  We are of a mindset that ship has sailed, all*
> *right, yes there is significant demand for this kind of content.*
>
> \* \* \*
>
> This particular business, DirecTV Now, is unique.   *This is a software centric*
> *business, you order DirecTV Now you go online, in fact we expect virtually all*
> *of the subscribers to come to us via online, that is what has happened so far.*
> *And you subscribe, you put in a credit card and you begin viewing.*   There is no
> truck roll at the house, there is no satellite that goes on top of a house, there is no
> set-top box that goes in a house, there is very little capital required to launch a
> service like this.
>
> *So we are perfectly content with lower, thinner margins in a product like this.*
> *We have the lowest content cost in the US, so we think we are uniquely*
> *positioned to offer a service, live video streaming, full array of content and to do*
> *it on a profitable basis.  Early on I do expect the margins to be fairly thin.*   Over
> time as we scale this platform plus the TV Everywhere platform, and keep in
> mind we are on pace by year end where half of our DirecTV customers will be
> engaging in the over-the-top wireless mode, all right.

248.    Defendants' statements that DirecTV would be profitable and value proposition of

DirecTV Now were materially false and misleading and omitted to disclose that DirecTV Now

was not a profitable product with positive margins and was being sold at irrationally low prices

and with heavy and improper promotional activity.  Moreover, the statements in the previous

paragraph were materially false and misleading because they stated that virtually all customers

were signing up for DirecTV Now online when many accounts originated from within AT&T

stores.  By indicating that customers were signing up online, AT&T was overstating the interest

in the product and understating the role of promotional activity (especially in-store promotional

activity) in obtaining new DirecTV Now accounts.  Defendants' statements concerning demand

for DirecTV Now contained in the previous paragraph were materially false and misleading

because DirecTV Now was not a viable product, was being rolled out before it was ready for deployment and was experiencing severe technical issues during the Class Period including frequent interruptions, service freezing and buffering, app crashes, being automatically logged out, and both missing features and billing issues, leading one media source to report that the product was being characterized as "simply unusable."

249.   On December 6, 2016 AT&T's stock price increased in reaction to these positive statements about DirecTV Now from a previous close of $38.63 per share to $39.35 per share for a 1.86% gain.

> **(4)**     **December 7, 2016 – Barclays Global Technology Conference and Testimony to U.S. Senate**

250.   On December 7, 2016, beginning at about 10:00am Eastern Time, Defendant Stephenson testified to a U.S. Senate Judiciary Subcommittee on Antitrust Competition Policy and Consumer Rights.  He stated:

> ***Because of DirecTV we have been able to take the next step of offering DirecTV Now, which we think will be a real game changer***.  DirecTV Now is a subscription-based online video service designed for the more than 20 million U.S. households who have dropped traditional pay-TV or are flirting with cutting the cord.  ***DirecTV Now customers can stream up to 100 channels at prices starting at $35 per month, with no long-term contract, no credit check, no installation, and no set top box***.  And the price includes the data charges for AT&T Mobility customers.  Customers can sign up, download the app and start watching their favorite shows in minutes.

251.   Defendants' statements describing DirecTV Now as a "game changer" and concerning the pricing of DirecTV Now contained in the previous paragraph were materially false and misleading and omitted to disclose that DirecTV Now was not a profitable product with positive margins and instead was sold at irrationally low prices and with heavy and improper promotional activity.  Defendants' statements concerning demand for DirecTV Now contained in the previous paragraph were materially false and misleading because DirecTV Now was not a

viable product, was being rolled out before it was ready for deployment and was experiencing

severe technical issues during the Class Period including frequent interruptions, service freezing

and buffering, app crashes, being automatically logged out, and both missing features and billing

issues, leading one media source to report that the product was being characterized as "simply

unusable."

252.    On December 7, 2016, during a call that began at 3:30pm Eastern Time, as part of

the Barclays Global Technology Conference, an analyst asked Defendant Stephens a question, as

to whether AT&T was "***already at or above plan when it comes to the types of subscribers on to***

***[the DirecTV Now] service.***"  And Defendant Stephens interjected agreeing, "***That's a very good***

***thing, by the way.***"

253.    Defendants' statements concerning demand for DirecTV Now contained in the

previous paragraph were materially false and misleading because DirecTV Now was not a viable

product, was being rolled out before it was ready for deployment and was experiencing severe

technical issues during the Class Period including frequent interruptions, service freezing and

buffering, app crashes, being automatically logged out, and both missing features and billing

issues, leading one media source to report that the product was being characterized as "simply

unusable."  The statements about demand for DirecTV Now were also false and misleading

because the product was subject to aggressive promotional activity and improper sales tactics.

254.    On December 7, 2016, AT&T's stock price increased in reaction to these

statements from a previous close of $39.35 per share to $40.45 per share on December 7, 2016

for a 2.8% gain.

### (5)     January 20-25, 2017 – 4Q16 Financial Results

255.     On January 20, 2017, before markets opened, AT&T published a Form 8-K

stating that in 4Q16, there were "***More than 200,000 video net adds, entirely driven by DirecTV***

***Now.  This includes only paying customers.***"

256.     On January 25, 2017, at about 4:00pm Eastern Time, AT&T announced its 4Q16

financial results.  The Form 8-K for 4Q16 stated "***During the quarter, we introduced DirecTV***

***Now and added more than 200,000 subscribers***."

257.     During the conference on January 25, 2017, associated with AT&T's 4Q16

financial results, which began at 4:30pm Eastern Time, Defendant Stephens stated:

> It's a competitive market in a busy quarter but our wireless team turned in another
> solid performance.  It was also a big quarter for Entertainment Group.  The launch
> of DirecTV Now got most of the headlines.  ***This robust over-the-top offering***
> ***started strong adding more than 200,000 paid subscribers in its first month.***
> ***This gave us a solid video sub growth in the quarter.***
>
> \* \* \*
>
> ***In fact I'll tell you, if you want a perspective on 200,000 subscribers, and how***
> ***attractive this was in the marketplace at $35 price point, we launched U-verse***
> ***back in 2007.  It took us a year and a half to get to 200,000 subscribers on U-***
> ***verse.  So that's the elegance of this platform and the attractiveness of it to our***
> ***customers, so we're pretty excited about it.***

258.     During the conference on January 25, 2017, associated with AT&T's 4Q16

financial results, Defendant Stephenson stated:

> And as we pointed out and as Phil was probing on, we're starting to get real
> traction in the marketplace of integrating our products and solutions.  And ***our***
> ***churn rate goes down so precipitously when we get more than one product***
> ***bundled together***.  And particularly as we begin to do some creative things like
> DirecTV Now and the TV Everywhere app on DirecTV is proving to be
> incredibly powerful.

259.     During the conference on January 25, 2017, associated with AT&T's 4Q16

financial results, Defendant Stephenson stated:

And, as you also heard John say earlier, our 2G network has now been shut down. And that spectrum is being reformed for future use as well. And then if you look at our points of distribution, they are second to none. 147 million mobile customers across North America; that includes a leading IoT business. ***We have 46 million pay-TV subscribers in the US and Latin America, 16 million broadband subscribers and we have an OTT platform, DIRECTV NOW, that's off to a really fast start.***

260.    Defendants' statements in the prior five paragraphs, concerning demand for DirecTV Now, DirecTV Now subscriber numbers, and DirecTV Now's effect on churn were materially false and misleading and omitted the following material facts known or recklessly disregarded by the Executive Defendants:

(a)    DirecTV Now was not a viable product, it had been rolled out before it was ready for deployment and it was experiencing severe service issues during the Class Period including frequent interruptions, service freezing and buffering, app crashes, being automatically logged out, missing features and billing issues, leading some to say the product was "simply unusable."

(b)    DirecTV Now was being "sold" at heavily discounted promotional rates, which often included the giveaway of free products valued at up to $149 such as Apple TVs and Amazon Fire sticks in order to artificially inflate DirecTV Now subscriber numbers, despite the fact that those subscribers would not renew their DirecTV Now subscriptions when their promotions ended.

(c)    A large percentage of the DirecTV Now subscribers on promotions were not engaging with (using) the DirecTV Now product, a metric which AT&T and the Executive Defendants tracked on a regular basis and which strongly suggested that those subscribers would not renew their DirecTV Now subscriptions when their promotions ended.

(d)     DirecTV Now was being "sold" at unprofitable prices that were later revealed to be irrationally low, instead of rational pricing that would have allowed the product to provide profitable revenue for AT&T.

(e)     DirecTV Now's stated subscriber numbers were artificially inflated by improper sales practices such as "bundling" the product with other AT&T packages, without telling the customers that they were "purchasing" DirecTV Now, such that they would be unlikely to renew the subscription when they realized the truth, adding DirecTV Now to customers' accounts without telling them it was a paid subscription product, and adding one or more DirecTV Now subscriptions to customer accounts without telling the customer at all.

(f)     AT&T would not be able to mitigate the exodus of its high-margin DirecTV satellite subscribers with new DirecTV Now subscribers due to DirecTV Now's low acceptance rates (*i.e.*, low "take rates"), high churn rates, and low to negative margins.

### (6)     February 17, 2017 – 2016 Annual Report

261.     On February 17, 2017, at about 5:30pm Eastern Time, AT&T published its 2016 Annual Report on Form 10-K (including exhibits thereto) with the SEC.  That report stated that AT&T had more than ***200,000*** DirecTV Now subscribers.

262.     Defendants' statements concerning DirecTV Now subscriber numbers contained in the previous paragraph were materially false and misleading for the reasons described in ¶260.

263.     Additionally, AT&T was required to include certain information into this report under Regulation S-K.  Those requirements included the following:

(a)     Item 303 of Regulation S-K and the SEC's related interpretive releases thereto ("Item 303 Obligations"), required disclosure of events or uncertainties, including any known trends, that had caused, or are reasonably likely to cause, the registrant's financial information not to be indicative of future operating results.  17 C.F.R. §229.303.

(b)　　Item 503(c) of Regulation S-K and the SEC's related interpretive releases thereto ("Item 503 Obligations"), required in the "Risk Factors" section of AT&T's SEC filings "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  17 C.F.R. § 229.503.

264.　　The 2016 Annual Report purported to describe the factors that were a risk to AT&T's future financial performance, but AT&T did not disclose any risks tailored to the issues related to DirecTV Now, including those issues described in Paragraph [●].  This was a material omission and violated the Item 503 Obligations.

265.　　The 2016 Annual Report stated the following as a Risk Factor:

***The communications and digital entertainment industry has experienced rapid changes in the past several years.  The development of wireless, cable and IP technologies has significantly increased the commercial viability of alternatives to traditional Wired service and enhanced the capabilities of wireless networks. In addition, our customers continue to increase demand for services that can be accessed on mobile devices, especially video services.  While our customers can use their traditional video subscription to access mobile programming, an increasing number of customers are also using mobile devices as the primary means of viewing video and an increasing number of non-traditional video providers are developing content and technologies to satisfy that demand.  In order to remain competitive, we now offer a mobile TV service and continue to deploy sophisticated Wired and wireless networks, including satellites, as well as research other new technologies.  If the new technologies we have adopted or on which we have focused our research efforts fail to be cost-effective and accepted by customers, our ability to remain competitive could be materially adversely affected.***

266.　　This was materially misleading and incomplete because it only vaguely disclosed the possibility that AT&T's "new technologies" might have some impact "if" they "fail to be cost-effective and accepted by customers," without disclosing that AT&T was promoting a specific product—DirecTV Now—that was not profitable, needed heavy promotional activity to attract customers, was subject to high churn, was plagued by performance problems, which drove

away customers, and boosted by the usage of inappropriate sales practices, including the creation

of fake accounts.

267.    The 2016 Annual Report stated the following as a Risk Factor:

***Our operating costs, including customer acquisition and retention costs, could continue to put pressure on margins and customer retention levels.  In addition, virtually all our video programming is provided by other companies and historically the rates they charge us for programming have often increased more than the rate of inflation.  As an offsetting factor, we have announced an agreement to acquire Time Warner Inc., a global leader in media and entertainment content.  We also are attempting to use our increased scale and access to wireless customers to change this trend but such negotiations are difficult and also may result in programming disruption.  If we are unable to restrain these costs or provide programming desired by our customers, it could impact margins and our ability to attract and retain customers.***

268.    This was materially misleading and incomplete because it only vaguely disclosed

the possibility that operating costs could continue to put pressure on margins and customer

retention, without disclosing that AT&T was promoting a specific product—DirecTV Now—that

was subject to the issues described in ¶260.

269.    The 2016 Annual Report stated the following factor "could" cause "future results

to differ materially from those expressed in the forward-looking statements:"

***Our continued ability to maintain margins, attract and offer a diverse portfolio of wireless service and devices and device financing plans.***

270.    This was materially misleading and incomplete because it indicated that the

margins on AT&T's products were positive and future events "could" differ if AT&T did not

"continue" to maintain certain margins, without disclosing that DirecTV Now was not profitable,

and without disclosing the other issues that DirecTV Now was subject to as described in ¶260.

    **(7)    March 8, 2017 – Deutsche Bank Media, Internet and Telecom Conference**

271.    On March 8, 2017, before markets opened, at the Deutsche Bank Media, Internet

and Telecom Conference, Defendant Stephens stated:

*Secondly, when you bundle these things with things like DTV Now and other over-the-top services, the potential to bundle them in the future with other really high-quality over-the-top services, we are going to be in the unique position to differentiate our services from anybody else.  And so when you can do that you can not only gain customers and grow revenues but you can have a real quality experience for your existing loyal customers and make sure you treat them well. So all of that bids well for future opportunities for revenue growth and, quite frankly, continued quality margins and profit expansion.*

272.    On March 8, 2017, at the Deutsche Bank Media, Internet and Telecom

Conference, the following exchange occurred between Defendant Stephens and an analyst:

**Matthew Nikman**: On DirecTV Now, I believe you launched around December 1.  A couple of months in the marketplace, you talked about roughly 200,000 customers I think as of year-end.  Can you give us an update on any trends you've seen year to date?  I guess secondarily to that, cannibalization risk, has there been any that you've seen thus far?

**Stephens**: So I will stick with 12/31 numbers on specifics.  *What I will tell you is that generally the 200,000 was very exciting, very successful.*  We had some good offers out there between the Amazon Fire Stick and the Apple TV.

\*   \*   \*

With regard to the first-quarter activities I will not talk about customer accounts. I will tell you, as we said we were interested in generating a lot of activity to make sure we pressure tested the system.  We accomplished that.

*Now we have moved off those promotional prices and moved to more run rate prices which give us the opportunity to bundle wireless, to get into new customer areas, multiple dwelling units, some of the youth market.  That's proven really positive.*

273.    Defendants' statements concerning demand for DirecTV Now, DirecTV Now

subscriber numbers, and the success of DirecTV Now contained in the previous two paragraphs

were materially false and misleading for the reasons described in ¶260.  Moreover, the

statements in the previous paragraph stating that AT&T had stopped its promotional activity for

DirecTV Now were materially false and misleading because AT&T continued to aggressively

promote DirecTV Now.

### (8)      March 27, 2017 and April 2017 – Code of Conduct

274.     On March 27, 2017, the official AT&T YouTube account posted a video featuring

Defendant Stephenson, in which he described AT&T's Code of Conduct.  Defendant Stephenson

stated:

> *We're guided by a core set of values at AT&T.  That's who we are.  These values guide our mission, which is what we're all about.  And our strategy is how we fulfill that mission.  The Code of Business Conduct is the codification of our core values.  It lays out the guidelines and expectations for how we do business, how we operate, and how we interact with customers, suppliers, owners, and each other.  We hold ourselves to the highest standards.  That means always doing the right thing.  And it means operating with integrity, transparency, and honesty in everything we do.*
>
> \* \* \*
>
> *Our business has changed radically over the years.  And it will continue to change as we become a global leader in telecom, media, and technology.  But what will never change is our commitment to our core values and the Code of Business Conduct.  Consistently following the Code and doing the right thing has never been more important.  It's the foundation of who we are.*

275.     The statements in the previous paragraph were materially false and misleading

because AT&T and its employees did not consistently follow the code of conduct and it was not

the "foundation" of who AT&T was.

276.     At the time of making these statements, AT&T had published its code of conduct

to its website, which code was last updated in August 2015.  This code included a cover letter

from Defendant Stephenson and his portrait was displayed below that letter.  The letter was

addressed to AT&T employees, and the code also expressly discussed the interests of

"shareholders, creditors, and others."  This code of conduct stated:

> ### We follow ethical sales practices
>
> Our customers should always know we value them.  *We fairly represent our products and services to them.  We listen to our customers, and challenge ourselves to find new ways to offer the best solutions available to help them communicate efficiently, sustainably, and safely.*

*We earn and preserve their trust by treating them with honesty and integrity and in a professional, courteous manner. We deliver what we promise. We do not provide goods or services that customers did not authorize.*

277.    During April 2017, AT&T published an updated code of conduct.  This code included a cover letter from Defendant Stephenson and his portrait was displayed below that letter.  The letter was addressed to AT&T employees, and the code also expressly discussed the interests of "shareholders, creditors, and others."  This code of conduct stated:

*We follow ethical sales practices*

Our customers should always know we value them.  *We fairly represent our products and services to them.  We listen to our customers, and challenge ourselves to find new ways to offer the best solutions available to help them communicate efficiently, sustainably, and safely.*

*We earn and preserve their trust by treating them with honesty and integrity and in a professional, courteous manner. We deliver what we promise. We do not provide goods or services that customers did not authorize.*

278.    Defendants' statements concerning ethical sales practices, fairly representing products, acting with honesty and integrity, and not providing customers with services that customers did not authorize, contained in the previous two paragraphs, were materially false and misleading because AT&T aggressively promoted DirecTV Now, including by engaging in unethical sales practices such as misleading customers about the price of the product, providing customers the product without telling them, and misleading customers about the nature of subscriptions for DirecTV Now.

### (9)    April 25, 2017 – 1Q17 Financial Results

279.    On April 25, 2017, at about 4:00pm Eastern Time, AT&T announced its 1Q17 financial results.  In the Form 8-K that AT&T published regarding its 1Q17 results, it stated that "*DirecTV Now gains help offset linear TV subscriber decline.*"

280.   During the conference on April 25, 2017, associated with AT&T's 1Q17 financial results, which began before markets opened, Defendant Stephens commented on the declining subscription numbers in DirecTV Satellite, stating:

> *We're taking steps to address this situation, including simplifying offers and bundling with unlimited wireless.  At the same time, DirecTV Now is important part of our strategy and continues to add customers.*
>
> *We deliberately pulled back on marketing to give the platform time to mature and improve, and we're seeing just that.  You should expect us to be more aggressive with DirecTV Now in the second half of the year with additional features and content.*
>
> *Last week, we added 14 FOX affiliates to DirecTV Now.  You should expect we will be targeting those cities with additional marketing.  We're still only 5 months since the DTV Now launch, but we like what we see and feel very good about the service and where it's headed.*

281.   Defendants' statements concerning demand for DirecTV Now and DirecTV Now's ability to offset DirecTV subscriptions contained in the prior two paragraphs were materially false and misleading for the reasons described in ¶260.  Moreover, the statements in the previous paragraph stating that AT&T had stopped its promotional activity for DirecTV Now were materially false and misleading because AT&T continued to aggressively promote DirecTV Now.

### (10)   May 10, 2017 – Jefferies Technology Conference

282.   On May 10, 2017, before markets opened, during the Jefferies Technology Conference, Mr.  William Hogg, the President of Technology Operations at AT&T, stated:

> Yes.  I have to tell you that we were surprised at the volumes of DirecTV Now subscribers that we picked up initially, *it ramped up a lot faster than we ever thought it would, which is a great thing*, but also caught us a little flat-footed on a couple of things.  And our teams have been working through capacity, have been working through authentication issues and kind of streaming issues.  And I think what we're seeing is that the air rates are declining pretty fast and that the platform is stabilizing.  *We're still seeing good growth on the DirecTV Now platform, so we have a product that, obviously, people are interested in continuing to buy.  And I think it's -- for a launch of this size and the speed at*

***which it grew, we're pretty pleased with how it's performing.***  We strive for perfection, though, and so we're going to continue improving the product and reducing errors and improving the experience in a way that customers will continue to use, grow and stay with us on the product.  So I think all of these have a little bit of a bump in the road.  But we're getting past those, and I think the platform is pretty stable.

283.    Defendants' statements concerning demand for DirecTV Now and DirecTV Now subscription growth contained in the prior paragraph were materially false and misleading for the reasons described in ¶260.

### (11)    May 23, 2017 – JPMorgan Tech, Media and Telecom Conference

284.    On May 23, 2017, before markets opened, during the JPMorgan Tech, Media and Telecom Conference, Defendant Stephenson stated:

***And we launched this thing back in December, and it was supposed to be a soft launch.  Did it with no promotion, no advertisement, don't even hardly pay the reps to sell it, and the thing just caught fire.  We put 200,000 subscribers up in December, which was much faster than we were wanting to go, and so we've kind of pulled back.  But the reality was that the demand for premium content integrated with the mobile experience was really, really high, which gave us the conviction that we probably ought to just go ahead and go the full distance and just own a position in premium content.***

285.    Defendants' statements concerning demand for DirecTV Now and DirecTV Now subscription growth contained in the prior paragraph were materially false and misleading for the reasons described in ¶260.  Moreover, these statements also were materially false and misleading because they downplayed the prevalence and significance of promotional activity during DirecTV Now's initial release and indicated that AT&T had stopped its promotional activity for DirecTV Now, when in truth AT&T continued to aggressively promote the product throughout the Class Period.

### (12)    May 31, 2017 – Interview with Brad Bentley

286.    On May 31, 2017, the publication *Hollywood Reporter* published an interview with Defendant Bentley about DirecTV Now's first six months performance.  During the

*Hollywood Reporter* interview, the following exchange occurred between the interviewer and

Defendant Bentley:

> Q: You launched DirecTV Now six months ago.  There were reports of early tech challenges and recent suggestions of stalling user growth.  How do you feel about the service and the reaction from consumers so far?

> A (Defendant Bentley): **It's been great.  What I describe to the team is that we are really only in the first inning here.**  Because of the nature of the platform, you get so much data around what is working and what's not, how to fine-tune it.  We have had a really good response to the platform in terms of subscribers coming to it.  We have learned a lot in terms of that process and experience and how to optimize that and improve satisfaction and going after the right kind of customers.

> Like in any new business, you learn a lot.  **We have been very pleased, though, with the performance.  From the subscriber standpoint, we are ahead of our targets for the quarter and for the year.**

> **From the experiential standpoint, the platform continues to get better and better every day.  And from a value proposition standpoint, we have really gone out and done some things that are very aggressive and attractive for consumers.  We are now offering the ability to get DirecTV Now as part of our unlimited-plus [wireless] plan for only $10 [a month].  Consumers who are looking to cut the cord or looking for alternatives and still want premium content, but want greater choice and flexibility, are able to add 60-plus live channels for only $10, and it all comes with unlimited data where you don't have to worry about overages.**

> **That's a great value prop.  And on top of that, we include HBO at no additional cost [for unlimited-plus customers with or without an AT&T video product].  I think that value prop is beginning to really resonate.  It's really an easy offer to make available to customers across our 4,000-plus AT&T stores nationwide.**

> **So it's going good, with little bumps on the way like any new product.  But we feel good about where we are at.  We continue to optimize around the customer experience around the feedback, and we're really pleased where we are at this stage.**

> 287.    During the *Hollywood Reporter* interview, the following exchange occurred

between the interviewer and Defendant Bentley:

> Question:  Anything that has particularly surprised you about subscribers' DirecTV Now usage?  And what kind of customers take DirecTV Now?

Answer (Defendant Bentley): *I was surprised that we hit our entire fourth-quarter performance target in the first day or two.  So there was this huge groundswell of demand, which is great.  We are learning more and more about the importance of live television.*

*We have confirmed that we are getting a new customer that we don't have on our new platform today.  We are getting a younger customer and customers who live in apartments where we have always under-indexed given that we were a satellite product prior.  We can now give those consumers a product without the limitations that existed — such as "I can't put a satellite on my house," or "I can't sign up for a two-year commitment, because I got a 12-month lease."  So I've been excited to see it validated that we are truly reaching a new consumer.*

*I have been excited to see their viewership behavior and am surprised that live television, particularly the news channels, still do quite well.  Obviously there has been a swell of the importance of news in the fourth quarter and first quarter with all that's going on politically.  But live news is still a very important piece of this audience's life, and that shows in the numbers we see every day.*

288.    During the *Hollywood Reporter* interview, the following exchange occurred between the interviewer and Defendant Bentley:

Question: Any insight on whether DirecTV Now has been attracting cord-cutters, cord-nevers or other people you didn't reach before?

Answer (Defendant Bentley): *We knew from our data that there was a set of customers that, like I mentioned, we just weren't able to provide a solution for.  Or they couldn't afford $100-plus a month.  When we look at the data, that's the piece that has been really encouraging — that we are acquiring a different type of customer.*

There are subscribers that have traded down from satellite TV to this product.  But as we look at their profiles, we see that they probably were not on the right product to begin with.  They tend to be a one-room customer, a lower-end package, live in apartment buildings.  That just validates our strategy.  *And when we look at the churn, we see it is not truly incremental, and they would likely churn out anyway.  So we have been very pleased with this product reaching new customer segments.*

289.    During the *Hollywood Reporter* interview, the following exchange occurred between the interviewer and Defendant Bentley:

Question: Any subscriber number update or predictions for where DirecTV Now will end its first year in terms of subscribers?

Answer (Defendant Bentley): There's nothing I can share.  What I'll just reiterate is that this isn't a hobby, this is something that is a core part of our proposition. *We're putting the right pieces together to continue to play to win.  Our goal is to be at the top there.  We're excited about it, we have a great plan ahead of us and the product keeps getting better and better every day.*

290.    During the *Hollywood Reporter* interview, the following exchange occurred

between the interviewer and Defendant Bentley:

Question: What's been the biggest challenge for DirecTV Now for you so far?

Answer (Defendant Bentley):  I wouldn't say it's anything different than you would expect from any new platform.  As you begin operating that platform, you see elements of it that you would have done slightly differently or that you tweak. *What's been encouraging looking at the data every week in terms of customer satisfaction, the numbers for customers' intent to churn off the platform just go down and down every week as we continue to work through learnings.*

That's why I say we are in the first inning, because no one comes out to the market on day one with a perfectly flawless system.  You use the data to guide you on the things that matter to the customers and you make the appropriate adjustments. *Every week all those numbers are moving in the right direction and continue to give us more confidence that we really do have that product and experience that customers are looking for.  And that gives us confidence to invest more and marketing and pushing it.  For us to put DirecTV Now on our national advertising [this] week is a good sign that we are in a position and feel good about where we are.*

291.    Defendants' statements concerning demand for DirecTV Now, customer churn,

the value proposition of DirecTV Now, and DirecTV Now subscription growth contained in the

prior five paragraphs were materially false and misleading for the reasons described in ¶260.

### (13)    July 25, 2017 – 2Q17 Financial Results

292.    On July 25, 2017, at about 4:00pm Eastern Time, AT&T announced its 2Q17

financial results.  In the Form 8-K that AT&T published regarding its 2Q17 results, it stated that

AT&T had a total of *152,000* net subscriber additions for DirecTV Now and had a total of

*491,000* total subscribers for DirecTV Now.  The Form 8-K also stated that "*Total video losses*

***of 199,000 with DirecTV Now gains helping offset traditional TV subscriber decline; Total***

***video subscribers essentially flat year over year.***"

293.     During the earnings call on July 25, 2017, associated with AT&T's 2Q17

financial results, which began at 4:30pm Eastern Time, Defendant Stephenson stated:

> ***We continue to improve our traditional TV offers by simplifying the pricing and***
> ***bundling TV with broadband and wireless, but we also know that traditional TV***
> ***service is not for everyone.   Many are choosing our over-the-top offering,***
> ***DirecTV Now.   Half of our DTV Now subscribers are coming from traditional***
> ***pay TV, mainly from our competitors, and the other half had no pay TV service***
> ***at all.   We introduced this service at the end of last year and have now reached***
> ***nearly 0.5 million subscribers.   This has helped us keep our total video base***
> ***essentially flat from a year ago.***

294.     During the earnings call, Defendant Stephens stated: "***I will point out, we did***

***have some good growth in DTV Now.   And for the over-the-top product, pretty much offset the***

***DirecTV, the satellite base wireless customers.***"

295.     During the earnings call, Defendant Stephens also stated:

> ***In fact, if you look at any bundled customer, churn is lower when compared to***
> ***customers with just a single service.   These are our most valuable customers.***
> We use the combined appeal of wireless, video and broadband services to offer
> compelling packages that can't be easily replicated.   It's a great way to
> differentiate our services in the noisy and competitive wireless and video
> marketplace.

> *   *   *

> ***Yes, so the DTV Now customer base we're giving is paying customers.***  They're
> bundled with, in many cases, a large, large percentage are [inaudible].  But we can
> make sure we get that out appropriately in a [inaudible], but it's the vast majority
> of those are bundled with our wireless services.  But as you know, too, it gives us
> the opportunity.  ***A significant amount of these are -- 50% or so are customers***
> ***who've never had a paying video product before or don't have -- haven't had a***
> ***related TV product.   So we're getting the opportunity not only to provide them***
> ***video, but provide them wireless, in some cases, broadband, apartment dwellers***
> ***and others.   But we're counting paying customers, not promo customers.***

> *   *   *

And certainly, based on what the team has developed, what they've taken from customer insights and customer input, *we believe that DTV Now can certainly grow* and that the cloud DVR and a lot of the other features that are coming out are in response to the studies the team has done with regard to what customers want and what would make the product better.  And so absolutely, *we've grown 500,000 customers in 7 months, pretty dramatic growth*, particularly when we gave a couple or 3 months rest there while we tested the platform and really put it through performance testing.  *So I think there's clearly a demand for, an opportunity for it.*  And for us, it allows us to get to a lot of customers we don't normally serve today, MDUs, millennials, people who haven't bought or haven't been able to have the credit worthiness to buy our premium products. *So for us, it's a really attractive next step.*

296.    Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's effect on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions contained in the prior four paragraphs were materially false and misleading for the reasons described in ¶260.

297.    On July 26, 2017, AT&T's stock price increased in reaction to these statements from a previous close of $36.22 per share to $38.03 per share for a 5% gain.

### (14)    September 12, 2017 – Goldman Sachs Communacopia Conference

298.    On September 12, 2017, before markets opened, during the Goldman Sachs Communacopia Conference, Defendant Stephenson stated:

DirecTV Now that I just told you about, wireless-centric approach, it's a software-based solution for, let's call it cable TV for want of a better term, just to be descriptive about it.  That is going to be the platform for how we deliver all video in the future, software-centric.  We'll be ambivalent as to whose broadband the television service traverses.  And so a software-based platform we're delivering that will not require a satellite dish on the roof, and a very thin client in the home, rather than a big set-top box, a Big Bertha set-top box, a very thin client.  And all the DVR and all the replay capabilities will be largely cloud based.  *And so we're developing this very, very quickly, taking DirecTV Now and leveraging it into a scalable platform that goes into the home as the primary service.*  We are launching a beta of this in the fourth quarter of this year.  And you will see us begin to roll this service out as we get into 2018.  And we are actually really excited about this, because you suddenly take the customer acquisition costs of somebody having traditional video service in their home, you take that installation cost down dramatically, and again, you can begin to work the yields for the customer without destroying margins.

* * *

So if you're in a household and you have our wireless, there is an all-out push to make sure that you've one of our video products as well, whether it's our premium DirecTV product or DirecTV Now. And there has been an incredible push to make this a reality since we closed DirecTV and the success we're having has been really, really good. ***The number of people that walk into one of our stores and add wireless service, the percentage of those that add some form of video into their household is really high. I don't think we've given it publicly yet, but it's a significant number. And by the same token, we are starting to have really good success of the DirecTV base adopting our wireless service. And the whole point of this is multi-product households churn dramatically lower than single-product households. And the lifetime values are obviously far far greater for those kind of customers as well. What's been the byproduct of this? You saw last quarter, we had record low churn. Locking down the customer base has really happened. Our churn is at record low levels in our mobility business. And as a result, you know what happens when you drive churn down in the mobility business, profitability jumps.***

* * *

Yes. So you articulated very well. The lifetime value of that is really significant. And if you drive churn down in the mobile environment, the benefit of that is dramatic, it's significant. ***Add to that, if you have conviction that the data that's being generated on a DirecTV Now subscription with a mobile device is valuable. We actually believe that data is quite valuable and can you begin to monetize advertising revenues off of DirecTV Now at a much higher level, then you see a multiplier effect. You drive churn down, you drive customer satisfaction up and you drive an advertising revenue stream that we think is going to be very valuable over time. And so there is a synergistic value that goes with all of this. And I'll tell you what you should expect over the next couple of years is at AT&T, we have placed a high value on this data. And the ability to monetize that data through additional advertising revenue streams, which will allow us to be very aggressive on how we price our subscription services in the marketplace. And so that is a play we'll be running aggressively over the next couple of years.***

299.   Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's effect on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions, and DirecTV Now's value proposition contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had

conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.[23]

### (15)   October 24, 2017 – 3Q17 Financial Results

300.    On October 24, 2017, at about 4:00pm Eastern Time, AT&T announced its 3Q17 financial results.  In the Form 8-K that AT&T published regarding its 3Q17 results, it stated that AT&T had a total of ***296,000*** net subscriber additions for DirecTV Now and had a total of ***787,000*** subscribers for DirecTV Now.  The Form 8-K also represented that "***Nearly 300,000 DirecTV Now net adds helped offset traditional TV subscriber decline.***"

301.    During the earnings call on October 24, 2017, associated with AT&T's 3Q17 financial results, which began at about 4:30pm Eastern Time, Defendant Stephens stated:

> ***We added nearly 300,000 DirecTV Now customers in the third quarter and have nearly 800,000 subscribers in total.  That's incredible scale in less than a year of operation, and we expect that growth to continue.  And most of those customers are new to our TV service, new to AT&T, about 700,000.***
>
> \* \* \*
>
> ***And DirecTV Now is only getting better.  We've added live local channels in more than 75 markets with more than 30% of the country now receiving all 4 of the major networks.  And customer acquisition costs are a fraction of a traditional TV gross add.  And while we increase our capabilities and add reach even more, there will be some twists and turns along the way in this evolution, but we're confident in the direction we're heading.***
>
> \* \* \*
>
> ***The video model is evolving, but we're very encouraged by the rapid deployment of our DTV Now product.  Our bundling strategy is working and gives us a unique value-creating opportunity.  Our continued success with targeted data analytics in advertising is another positive sign.  And with the closing of our***

---

[23] For the avoidance of doubt, the allegation that the investigation found fraudulent account creation, does not imply that these fraudulent practices were not known to AT&T, Defendant Shay or any of the Executive Defendants prior to this investigation.

*Time Warner deal, we will gain significant scale in that business to build out new and innovative platforms and services.*

\* \* \*

*It has been more of a gross add engine more than -- I don't think we're giving out details, but I'll say this, more than half of those customers, for example, are not bundled with our wireless service. That's a real opportunity for us going forward, but they're not as of today. And I think 700,000 of the 800,000 are new -- what I would call new to AT&T. So this is definitely that opportunity.*

\* \* \*

*The bundling strategy, the video bundling with DTV is working. And we'll continue to use good judgment in providing customers what they want, and that's that. But that's how I think about the mobile business. It's really quite stunning results when you think about EBITDA margins, EBITDA service margins, churn. It's really quite encouraging.*

302.    Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's effect on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

### (16)    November 8, 2017 – Wells Fargo Media & Telecom Conference

303.    On November 8, 2017, before markets opened, during the Wells Fargo Media & Telecom Conference, Defendant Stephens stated:

*So we'd expect to get, whether they'll be at traditional margin levels, I'm not recommending -- I'm not advising that, but very solid margin levels on a very low-cost upfront product. Remember, when you buy DTV Now, you do it online. When you pay me, you pay me with a credit card. I don't have to hang a satellite dish. I don't have to roll a truck. It's a very low-cost subscriber add.*

\* \* \*

That's the same long-term process for DTV Now.  It's just that in DTV Now, we have some things like the data insights, which allow us to be much more effective on our multibillion-dollar internal marketing.  If we have these more insights, we can be more efficient with our own spend.  *We can be more efficient with how we market movies, television shows and so forth by getting this data and getting to those customers and having that opportunity to bundle, all tied together and making this a very, very attractive business.*  And one that's really low capital, which is a good thing in our mix of product sets.

304.    Defendants' statements concerning the profitability and value proposition of

DirecTV Now contained in the prior paragraph were materially false and misleading for the

reasons described in ¶260, and because they failed to disclose that by the time these statements

were made AT&T had conducted an internal investigation into fraudulent sales practices and

DirecTV Now which found widespread fraudulent account creation by AT&T employees, a

practice that was encouraged by Defendant Shay.

### (17)    November 16, 2017 – Morgan Stanley TMT Conference

305.    On November 16, 2017, at about 12:15pm Eastern Time, during the Morgan

Stanley TMT Conference, Defendant Stephens stated:

*We had great results on DTV right now.  We're up to 800,000.  Quite, frankly, I can tell you what, we're already up past 900,000 today.  So it continues to be successful.  And we are getting those customers.  About 10% or so of that 800,000 customers or ones that were formerly our customers, but 90% were either cord-nevers, cord-shavers where they still retain their cord -- their linear product, but added DTV Now, or there were somebody else's linear service that came to us.  So we've been doing exactly what we wanted it to do.  We wanted to grow this platform, but it's giving us an opportunity to serve a set of customers that we hadn't served before.*  It's much like what we did in prepaid.  Where we got in with the prepaid product, now we've grown that to 15 million, and we're serving a whole customer segment that we really didn't penetrate before.  And now we're doing that with DTV Now for millennials, high-income folks, people in multiple dwelling units who can't hang a satellite dish off the side of their apartment.  All of those things, this is giving us the opportunity.  In addition, it's giving us the opportunity to sell on wireless, which is as you know, is a good profitable product for us as well as in some cases, using our technologies to provide broadband.  So that's how we think about it, building this platform this past year, making this investment to get it to scale so we could test our platform.  This has been really important.  And now we're taking the next step with the new platform, a new platform that will have cloud DVR, that will have 4k capabilities,

that will have pay-per-view and -- for both movies and events.  It will have digital advertising insert capabilities.  We're testing that now internally.  We'd expect to release that platform next year.  ***We think that will give us the opportunity to generate some more revenue for charging for some of those features as well as generating revenue from advertisers, so our customers get this higher quality product without additional cost to them***.  It also has tremendous data insight capabilities.  So we'll understand what you're watching, what you like to watch. We may give you 50 channels, but we'll know which 20 channels you actually watch or maybe which 5.  And that will give us better information to make decisions on product offerings and in advertising and marketing cost going forward.

306.    Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's profitability and value proposition, DirecTV Now's effect on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

### (18)    December 5, 2017 – UBS Global Media and Communications Conference

307.    On December 5, 2017, at about 1:00pm Eastern Time, during the UBS Global Media and Communications Conference, Defendant Stephens stated:

Yes.  So think about -- let's go to that bigger question on what do we see the impacts of this over-the-top or the streaming.  ***Well, when you're the wireless provider and you're able to use -- to bundle your wireless service or provide that through your wireless service, you're seeing really strong impacts on churn, on -- quite frankly, as I think everyone saw in the third quarter, we had record margins and record-low postpaid churns.  And the ability to bundle some of our video products, our DTV Now or other offerings, was really important to that.*** So this evolution on the over-the-top or streaming side has an impact when you're a distributor on that business.  Likewise, we're seeing really good results from our fiber-to-the-prem.

308.     Defendants' statements concerning DirecTV Now's effect on customer churn contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

### (19)     January 31, 2018 – 4Q17 Financial Results

309.     On January 31, 2018, at about 4:00pm Eastern Time, AT&T announced its 4Q17 financial results.  In the Form 8-K that AT&T published regarding its 4Q18 results, it represented that AT&T had a total of ***368,000*** net additional subscriptions for DirecTV Now and had a total of ***1,155,000*** total subscriptions for DirecTV Now.

310.     Defendants' statements concerning demand for DirecTV Now and DirecTV Now subscription growth contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

311.     On February 1, 2018, AT&T's stock price increased in reaction to these statements from a previous close of $37.45 per share to $39.16 per share for a 4.57% gain.

### (20)     February 20, 2018 – Annual Report for 2017

312.     On February 20, 2018, at about 4:15pm Eastern Time, AT&T published its 2017 Annual Report on Form 10-K (including exhibits thereto) with the SEC.  That report stated that AT&T had more than ***1,155 million*** DirecTV Now subscribers.

313.     The 2017 AT&T Annual Report stated that:

*We are also seeing the impact of customers wanting mobile and over-the-top offerings, which is contributing to growth in DirecTV Now connections and partially offsetting linear video subscriber losses.  DirecTV Now connections continue to grow as we add eligible devices and increase content choices.  Our strategy to bundle services has positively impacted subscriber trends and churn, with customers who bundle our wireless and video services having nearly half the rate of churn as satellite customers with a single service.*

314.    The 2017 AT&T Annual Report stated that:

*During 2018, we will continue to develop and provide unique integrated video, mobile and broadband solutions.  In late 2017, we expanded our offering of DirecTV Now, an over-the-top video service; data usage from DirecTV Now will not count toward data limits for customers who bundle this product with our wireless service.  We believe this offering facilitates our customers' desire to view video anywhere on demand and encourages customer retention.*

315.    Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's effect on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions contained in the prior 3 paragraphs were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

316.    The 2017 Annual Report purported to describe the factors that were a risk to AT&T's future financial performance, but AT&T did not disclose any risks tailored to the issues related to DirecTV Now, including those issues described in Paragraph [●].  This was a material omission and violated the Item 503 Obligations.

317.    The 2017 Annual Report stated the following as a Risk Factor:

*The communications and digital entertainment industry has experienced rapid changes in the past several years.  The development of wireless, cable and IP technologies has significantly increased the commercial viability of alternatives to traditional Wired service and enhanced the capabilities of wireless networks. In addition, our customers continue to demand services that can be accessed on mobile devices, especially video services, and are increasingly sensitive to prices*

*for such services.   While our customers can use their traditional video subscription to access mobile programming, an increasing number of customers are also using mobile devices as the primary means of viewing video and an increasing number of non-traditional video providers are developing content and technologies to satisfy that demand.   In order to remain competitive, we now offer a mobile TV service and continue to upgrade our sophisticated Wired and wireless networks, including satellites, as well as research other new technologies.  We are spending significant capital to shift our Wired network to software-based technology and preparing to launch newer wireless technology (commonly called 5G) to address these demands.*

318.   This was materially misleading and incomplete because this statement did not disclose any risks tailored to the issues related to DirecTV Now, including those issues described in Paragraph [●], and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

319.   The 2017 Annual Report stated the following as a Risk Factor:

*Our operating costs, including customer acquisition and retention costs, could continue to put pressure on margins and customer retention levels.  In addition, virtually all our video programming is provided by other companies and historically the rates they charge us for programming have often increased more than the rate of inflation.  As an offsetting factor, we have announced an agreement to acquire Time Warner Inc., a global leader in media and entertainment content.  In late 2017, the DOJ filed a lawsuit challenging our proposed acquisition of Time Warner.  We also are attempting to use our increased scale and access to wireless customers to change this trend but such negotiations are difficult and also may result in programming disruption.  If we are unable to restrain these costs or provide programming desired by our customers, it could impact margins and our ability to attract and retain customers.*

320.   This was materially misleading and incomplete because this statement did not disclose any risks tailored to the issues related to DirecTV Now, including those issues described in Paragraph [●].  Furthermore, this statement was materially misleading and incomplete because it vaguely disclosed the possibility that operating costs could continue to put pressure on margins

and customer retention, without disclosing that AT&T was promoting a specific product—DirecTV Now—that was not profitable, needed heavy promotional activity to attract customers, was subject to high churn, and was plagued by performance problems, which drove away customers.

321.    The 2017 Annual Report stated the following factor "could" cause "future results to differ materially from those expressed in the forward-looking statements:"

> ***Our continued ability to maintain margins, attract and offer a diverse portfolio of video, wireless service and devices and device financing plans.***

322.    This was materially misleading and incomplete because it indicated that the margins on AT&T's products were positive and future events "could" differ if AT&T did not "continue" to maintain certain margins, without disclosing that DirecTV Now was not profitable, and not disclosing the other issues that DirecTV Now was subject to as described in ¶260.

323.    Additionally, the 2017 Annual Report was also deficient because it failed to comply with Item 303 Obligations, by failing to disclose known trends, that had caused, or were reasonably likely to cause, the registrant's financial information not to be indicative of future operating results.  The undisclosed trends were as follows: (a) a significant quantity of subscribers to DirecTV Now were signing up under aggressive promotional activity; (b) the subscriber numbers for DirecTV Now included fake accounts and accounts not representing intentional subscription to the product; and (c) DirecTV Now was a high-churn product with many customers cancelling as soon as their promotions expired.

### (21)    March 6, 2018 – Morgan Stanley Technology, Media & Telecom Conference

324.    On March 6, 2018, before markets opened, during the Deutsche Bank Media, Telecom and Business Services Conference Defendant Stephens stated:

Yes. Entertainment – we're going through a technology transition, and that's clearly what's going on. We're aware of that when we made that acquisition. Having the relationships they have, the scale, the scope, the opportunities that they had were really critical. ***And if you think about the success we had last year with DTV Now, just barely a year into it and having 1 million customers and learning so much from that experience***, the company learning and gathering data and gathering information from those customers and what they want, giving us this opportunity to come out with a new platform later in this first half of this year, a second-generation platform, giving customers cloud DVR, additional ability to pay per view most sporting events, movies and all kinds of other capabilities is what we're seeing there. ***That's what we want to do with regard to that entertainment business and transitioning it, and we're confident that we're on the right track and that it's going quite well.***

\* \* \*

Yes. So whenever you add 1 million customers to a new product, you're going to have pressures. It's just the way it is. Those are -- but those are great customers. And I do want to emphasize, a few years -- I'll say it this way, a few years ago, I think we surprised some people by buying a company called Leap and getting into the prepaid business through a product called Cricket. And it's been dramatically successful, and those record margins we had for 4 quarters in a row were with a significant prepaid business, both Cricket and our old AT&T GoPhone, now AT&T Mobile, product. We did that because we wanted to get into a different marketplace, to get into a market segment. We had this network we wanted to maximize the value, so we wanted to go and serve another customer segment. We're doing the same thing with DTV Now. It is millennial-focused. It is a multiple dwelling unit-focused. It gives us an opportunity to get into a, quite frankly, younger, different customer base that we underserve today. And if we can get in there, we can get -- and serve them with DTV Now, we can get their wireless business. If we can go in and do G.fast at their apartment complex and get fiber to the apartment, if you will, basement and then use our new technology to deliver gig speeds over the old copper network that's in the building to those customers, we can get those customers that we don't have today, we underserve today and then we can have them as they go through their life, as they move into a single-family home, as their things change. ***That's the thought process here. And as we develop the advertising business, as we develop the data insight, we're going to be able to get good margins on those over-the-top DTV Now product.*** We'll be able to do that. And you can say, "Well, how can you rely on us for that?" We just did it with prepaid. If you look at the last 4 -- last year and look at those margins we had in mobility, those were with a significant growth in prepaid. So we can do this. Actually, we've done it, and we're going to do it again. And that's the goal. This is normal transition for us. I say, whether it's frame ATM to strategic products and services, voice to VoIP, DSL to high-speed, fiber-based broadband, on and on again, it's kind of what is in our DNA.

\* \* \*

*Yes.  We haven't -- I'll say it this way.  We haven't given guidance on specific customer accounts for 2018.  But I will suggest that if you go back and look at the historical day we bought DTV -- merged with DTV, through the end of last year, you can see there's relative stability in that customer base from just what you said, the fact that, yes, there is pressure on the linear product, but we are making up for it, in a large part, from the DTV Now adds.*

325.     Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's profitability and value proposition, DirecTV Now's effect on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

### (22)     April 25, 2018 – 1Q18 Financial Results

326.     On April 25, 2018, at around 4:00pm Eastern Time, AT&T announced its 1Q18 financial results.  In the Form 8-K that AT&T published regarding its 1Q18 results, the Company represented that AT&T had a total of ***312,000*** Net Additions for DirecTV Now and had a total of ***1,467,000*** subscribers for DirecTV Now.  The Form 8-K also stated that there were "***125,000 total video net adds with DirecTV Now stabilizing total video customer base since DirecTV acquisition.***"

327.     Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's profitability and value proposition, and DirecTV Now's ability to offset declining linear TV subscriptions contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal

investigation into fraudulent sales practices and DirecTV Now which found widespread

fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant

Shay.

328.    During the earnings call on April 25, 2018, associated with AT&T's 1Q18

financial results, which began at 4:30pm Eastern Time, Defendant Stephens stated:

> I think we're going to continue to see challenges in the satellite in the linear pay-TV models we've talked about. ***We'll continue to see real opportunities to shift to the over-the-top, and continue to grow DTV Now. And then what we will see is, as we come out with our next -- our new platform, the one that's in beta and then, quite frankly, some updates that we would hope to have by the end of this year, where you'll start seeing things like DVR revenues, pay-per-view revenues, both sports and movies, some of the opportunities for additional streams and then eventually, revenues for advertising in data insights, we'll see a replacement of the margins and a growth in those margins on an extremely low capital expenditure basis. So we'll transition through that. That's what our expectation's on that. . . . And that's how -- that's the process we're going through. It'll be challenging. It's hard work. It'll take us some time, not expected to be completed this year. But we are optimistic about total video counts growing over 100,000 as a significant year-over-year improvement in total video, almost 300,000 improvement.***

329.    Defendants' statements concerning demand for DirecTV Now, DirecTV Now

subscription growth, DirecTV Now's profitability and value proposition, DirecTV Now's effect

on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions

contained in the prior paragraph were materially false and misleading for the reasons described

in ¶260, and because they failed to disclose that by the time these statements were made AT&T

had conducted an internal investigation into fraudulent sales practices and DirecTV Now which

found widespread fraudulent account creation by AT&T employees, a practice that was

encouraged by Defendant Shay.

**(23)    June 6, 2018 – Bank of America Merrill Lynch Global Telecom, Media & Technology Conference**

330.    On June 6, 2018, before markets opened, during the Bank of America Merrill

Lynch Global Telecom, Media & Technology Conference, David Christopher, President of

AT&T Mobility & Entertainment, stated:

> *So DirecTV Now, we launched in November of 2016, and we have about 1.5 million subscribers on it since that time, and it's going very, very nicely.  At the same time, the traditional linear video business is declining somewhat at the industry level.  And it's -- but if you look at the total video numbers that AT&T has, we're offsetting that decline with DirecTV Now at a subscriber level.  At the margin level, we've been treating DirecTV Now really as a start-up, and it's been a nascent product.  We've been growing it rapidly.  And what we realized is it's -- we think it's the best product in the marketplace.  And from a value perspective, we're frankly below market of where we should be in terms of price, if you look at our -- if you look at the competitive landscape.  And so the opportunity to start to move that product where it should be is really in front of us.  And so, the market price today is probably around $40 for the entry level, we're at $35.  That's one element.*

* * *

> *So look -- I mean, it's a great question.  This is a balance in which we're constantly navigating.  If you look at DirecTV Now today, about 50% of the subscribers on DirecTV Now come from people who do not have traditional television.  It could be cord cutters, could be cord nevers, et cetera.  And prior to DirecTV Now, we were not participating in that market at all, and so that's a critical factor.  About 35% come from our competitors and about 15% come from us.  And so that is -- that ratio, we feel good about.  We know there's an element of keep the cannibal in the family, if you will.  If somebody is going to cannibalize our linear business, it's better to be us.  And so that is an important, important quotient, especially if you look at the ARPU, this EBITDA transition of OTT and premium OTT and increasing the margin structure there.*

331.    Defendants' statements concerning demand for DirecTV Now, DirecTV Now

subscription growth, DirecTV Now's profitability and value proposition, DirecTV Now's effect

on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions

contained in the prior paragraph were materially false and misleading for the reasons described

in ¶260, and because they failed to disclose that by the time these statements were made AT&T

had conducted an internal investigation into fraudulent sales practices and DirecTV Now which

found widespread fraudulent account creation by AT&T employees, a practice that was

encouraged by Defendant Shay.

### (24)    July 24, 2018 – 2Q18 Financial Results

332.    On July 24, 2018, at about 4:00pm Eastern Time, AT&T announced its 2Q18

financial results.  In the Form 8-K that AT&T published regarding its 2Q18 results, the Company

stated that it had a total of ***342,000*** Net Additions for DirecTV Now and had a total of ***1,809,000***

subscribers for DirecTV Now.  The Form 8-K also stated: "***total video customer base stable with***

***DirecTV Now***."

333.    During the earnings call on July 24, 2018, associated with AT&T's 2Q18

financial results, which began around 4:30PM, Defendant Donovan stated: "***We had 80,000 total***

***video net adds in the quarter with gains in DTV Now and U-verse more than offsetting losses***

***in DirecTV.***"

334.    Defendant Donovan also stated:

> ***We just had a very strong quarter of DirecTV Now adds.  So a highlight for you***
> ***that when you net all of this drama out for a minute on sub counts, if we start***
> ***there, we were 25 million subscribers when we bought DirecTV.  We're at 25***
> ***million subscribers now.  Customers we lost in cord nevers and cord cutters, we***
> ***replaced with products that fit their affordability range.   We watched***
> ***cannibalization closely.***  Roughly 15% to 17% on every given -- in any given
> month is the cannibalization rate, but 1/3 of those are listed in our linear TV
> product as very likely to churn because of their engagement and where the costs
> don't fit.  So we are watching that very closely.  We're slotting these products
> into affordability and an engagement range where we get the value of it.  And I'll
> point out to you how we procure content on WatchTV.  And there's a variable
> nature to its cost.  ***It is profitable and reasonably comparable to the traditional***
> ***margins of the business on a percentage of revenue basis***.  And so the real
> question that we're learning as we go, once we get out of linear TV and get into
> open video, which is software-based TV, how much does the category grow
> because we're getting cord nevers, cord cutters, but also we're getting redundant
> accounts where it's becoming a personal video product, where a team with a more
> personalized approach can build a playlist and stack their favorites in a way that it
> becomes a one stream product that is a playlist that behaves much like music.  ***So***

*when you start to look at addressable markets, you look at the ARPU available, the margins and then you add the owner's economics, which is Brian Lesser getting higher CPMs and John Stankey having owner's economics on a portion of that video cost, now these margins start to blend up into much higher territory.*  So we look very closely at the blended margin and the movement between these rungs, all while keeping an eye to make sure our subscriber counts keep us at that 25% to 30% share player in the marketplaces.  So that's how we're thinking about the strategies in the margins.  And the last thing I'll point out is that on those lower-end products, on a revenue basis*, I'll remind you that the acquisition cost is much lower because it's much more heavily a digitally acquired product and also, the stacked costs are lower.  The cost to deploy, the cost to maintain is much lower.  So over time, as we build those volumes up, those are products that will get scalable margins.*  I'll stop there and see if I missed anything.

335.   Defendants' statements concerning demand for DirecTV Now, DirecTV Now subscription growth, DirecTV Now's profitability and value proposition, DirecTV Now's effect on customer churn, and DirecTV Now's ability to offset declining linear TV subscriptions contained in the prior paragraph were materially false and misleading for the reasons described in ¶260, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.  These statements also were materially false and misleading because AT&T's video subscriber base was not stable, but in fact was experiencing a dramatic trend of non-renewal among promotional customers.

**(25)   September 12, 2018 – Goldman Sachs Communacopia Conference**

336.   On September 12, 2018, before markets opened, during the Goldman Sachs Communacopia Conference, Defendant Stephenson stated that:

DirecTV Now, which is our other over-the-top product, which was significantly dilutive, as we brought new feature functionality to market on that platform this year, we moved price.  And we expected this to be a very price-sensitive customer segment that would lose a lot of subscribers in the third quarter.  *Actually, the customer base has been very resilient to the price moves as we put new functionality in the platform, cloud DVR and multiple streams.  And so we've*

***not seen the deterioration in subscribers that we anticipated. And in fact, we're continuing to grow through this. And so we're feeling very good about the ability to retain price and the customers feeling good about getting value for that. And us to really begin to think differently about how we align the video portfolio over the next few months.***

337.    Defendants' statements concerning demand for DirecTV Now contained in the prior paragraph were materially false and misleading for the reasons described in ¶260. Defendants' statements concerning the resiliency of AT&T's customers to price changes contained in the prior paragraph were materially false and misleading because DirecTV Now customers were churning off the platform rapidly and because AT&T's customers were not resilient to price changes but dropped their subscriptions to the product as promotional activity ended, and because they failed to disclose that by the time these statements were made AT&T had conducted an internal investigation into fraudulent sales practices and DirecTV Now which found widespread fraudulent account creation by AT&T employees, a practice that was encouraged by Defendant Shay.

338.    On September 12, 2018 AT&T's stock price increased in reaction to these positive statements about DirecTV Now from a previous close of $32.67 per share to $33.42 per share for a 2.30% gain.

## D.    AT&T Reveals the Truth Regarding DirecTV Now and the Materialization of the Previously Concealed Risks

339.    As AT&T began to disclose the truth about DirecTV Now and the issues that arose from the previously concealed risks associated with the product, its stock price fell dramatically.  This Section describes the truthful revelations and the disclosures of the previously concealed risks.  Text which is **bolded and underlined** indicates corrective information and/or information disclosing the materialization of previously undisclosed risks.  Text highlighted in

**bold and italics** continues to indicate statements alleged to be materially false and misleading. Text that is **bolded** but neither italicized nor underlined simply indicates emphasis.

### (1)      October 24, 2018

340.    On October 24, 2018, before the market the opened and in connection with AT&T's 3Q18 financial results (the first full quarter after the Acquisition closed), the Company announced a dramatic reversal in the DirecTV Now business which it claimed was the result of a decision to "rationalize" the pricing of the product.  These results and the related disclosures partially revealed the falsity of AT&T's prior statements about DirecTV Now and constituted a materialization of previously concealed risks regarding DirecTV Now.

341.    Specifically, Defendant Stephenson explained that net additions (or "net adds") to **DirecTV Now were only 49,000 within the quarter**.  This was far lower than the DirecTV Now net adds seen in every quarter since the product's launch in November 2016.

342.    The following table shows the DirecTV Now net additional subscriber numbers AT&T had provided to the market until that point:[24]

|          | 4Q16    | 1Q17   | 2Q17    | 3Q17    | 4Q17    | 1Q18    | 2Q18    | 3Q18   |
|----------|---------|--------|---------|---------|---------|---------|---------|--------|
| Net Adds | 200,000 | 72,000 | 152,000 | 296,000 | 368,000 | 312,000 | 342,000 | 49,000 |

343.    Defendant Stephens revealed that this massive deceleration of more than 85% in DirecTV Now new subscribers occurred when AT&T "**scaled back our promotions and special offers**" and moved toward "market pricing in the quarter."  Stephens revealed, "**We expected net adds to be impacted by these actions, and they were**," but then he shockingly added: "**but subscriber growth in the quarter exceeded our expectations**."  In other words,

---

[24] In this table, "Net Adds" refers to the number of new subscribers as disclosed by AT&T. AT&T did not necessarily disclose these numbers each quarter, though where data was not disclosed in a given quarter, it was retroactively disclosed in a later one.

the DTV Now deceleration in the quarter was notably less than AT&T and the Executive

Defendants had internally projected (but failed to disclose to the market).

344.    Defendant Donovan disclosed that AT&T "**made the strategic decision to**

**rationalize our promotions and special offers for DirecTV Now.  We're taking a more**

**tailored, data-driven approach.**"  Donovan added, "**we focused on reducing promotions for**

**low-value, high-churn customers**."  Relatedly, Donovan said, "**with our data, we will**

**continue to tweak our approach to optimize profitability and see our value proposition**

**stabilize.**"

345.    During the question and answer portion of the earnings call, analysts made their

frustration with these surprising revelations clear.  An analyst from JPMorgan asked the

following:

> Can you dig into more on the trends in linear and DirecTV Now this quarter?  **I
> think that we and other people were a little surprised by the numbers, given
> the commentary about resiliency in September in DirecTV Now.  But you
> said it was better than expected.**  Was the sequential slowdown a gross add or
> mostly a churn challenge?

346.    Doubling down on the disclosure that AT&T had anticipated the deceleration in

DTV Now subscriber growth, Defendant Donovan responded:

> Well, if you look within the portfolio of the base that we've got, a lot of you folks
> have done your analytics, done surveying, and have shown that DirecTV Now
> product generally we have tremendous engagement.  **But within DirecTV Now
> it's a tale of two cities.  It's folks that are just jumping from promotion to
> promotion and really spinning in the industry between us, Hulu Live,
> YouTube TV.   And so, what -- we're learning where and who those
> customers are, what people are viewing.  And so, we actually expected a far
> worse outcome than we had**.

347.    Donovan also disclosed that the fall-off in DTV Now subscribers would only

worsen, noting that "going forward, our own team forecasts the growth of the OTT category

lower than I think a lot of the analyst community does."

348.     On this shocking news, AT&T's stock fell on unusually heavy trading volume of approximately 118 million trades, dropping from a closing price of $33.02 per share on October 23, 2018 to a closing price of $30.36 per share on October 24, 2018, **a drop of more than 8% in a single day**.  AT&T's stock fell an additional $0.38 per share, or 1.25% and $0.89 per share, or 2.97%, on the following two trading days.

349.     The October 24, 2018 disclosures partially revealed the materialization of the previously undisclosed risks about DirecTV Now.  Specifically, the risks that the product was not profitable and would lose subscribers if prices were rationalized, the risks that the number of subscribers was highly susceptible to decrease or a reversal of the growth trend, as many accounts were the result of aggressive promotional activity and improper sales practices, and more generally, the risk that as a high-churn product DirecTV Now would not sustain its subscription growth.  These disclosures also partially revealed that Defendants' prior statements and omissions about DirecTV Now (summarized below, and set forth in detail in Section IV(C)) had been materially false and misleading:

(a)     AT&T had previously assured the market that, while DirecTV Now may have been lower margin than its traditional premium DirecTV offering, it was a rational profitable business.  Besides its prior direct statements addressing these points, it also perpetuated this narrative by describing DirecTV Now as a replacement for DirecTV.

(b)     AT&T had previously disclosed the use of certain promotional activity, but had never disclosed that these promotions were resulting in irrational pricing or that there was a trend of customers not subscribing after promotions ended.  In fact, Defendant Stephens had previously downplayed the significance of promotions as a force driving the subscription numbers for DirecTV Now.

(c)      AT&T had previously indicated to the market that DirecTV Now was a
product that reduced subscriber churn and had never disclosed the trend of "high-churn"
customers or the risks associated with relying on subscription numbers associated with a "high-
churn" product.

350.    Analysts were caught off guard and were disappointed by AT&T's unexpected
disclosures.  In report after report, the common theme was that analysts were "surprised," which
in this context, was analyst-speak for feeling misled.  For example:

(a)      Barclays published a report on October 24, 2018, stating: **"[t]he big
surprise was Entertainment,** which showed steep annual declines as both the linear DTV
product and DTV Now OTT product came in significantly worse than expected."  The same
report lamented that AT&T's "recent guidance on FY19 improvement in Entertainment EBITDA
(flat/slightly up vs. double-digit declines) and sub retention has been a tailwind for the stock.
Therefore, this miss is likely to be a bigger driver of stock performance today."

(b)      Cowen published a report on October 24, 2018, stating: "**Entertainment
was the big concern and largely drove today's sell-off** as the company lost -14K broadband
subs (vs. our +50K, the St: +36K), lost -359K DBS subs (vs. our -300K, St: -245K), gained
+13K U-Verse TV subs ( vs. our 0K, St: -13K), but **worst of all, added just +49K DTV Now
subs (vs. our +400K, St: +287K).**  The same reported stated: "On DTV Now, mgmt. noted it
turned off the promo machine and will largely focus on a more narrowed 'highly engaged'" OTT
subscriber whose **impact had been poorly messaged beforehand in our view.**"  The report
continued: "[the Sell-off] was largely driven by the Entertainment segment including the DTV
Now slowdown which suggests the linear to OTT pivot could be more difficult than expected as

the company is trying to balance profits with uptake at a point in the adoption curve when price is arguably a big factor for customers willing to make the change."

(c)     Deutsche Bank published a report on October 24, 2018, stating: "Entertainment Group subscriber trends **missed our expectations** (both OTT and linear), owing to competition and higher pricing (fee hikes for OTT, and roll off of promotions at linear)."

(d)     Scotiabank published a report on October 24, 2018, stating: "DTV Now adds were **much weaker than expected** driven by the price increases implemented in the quarter"

(e)     RBC Capital Markets published a report on October 24, 2018, stating: "Video subscribers in the Entertainment Group segment were soft across traditional and virtual platforms with AT&T pointing to an emphasis on improving profitability with its video strategy." The same report continued, "DirecTV Now added 49K subs vs. consensus at +287K though exceeded management's internal expectations – recall management had noted in September that it had seen a better-than-expected customer reaction to a recent price increase in the DirecTV Now."  The same report stated: "Management is focused on reducing promotions for low-value / high-churn DirecTV Now customers, and is evaluating the programming line-up to better align content costs with price."

(f)     SunTrust Robinson Humphrey published a report on October 24, 2018, stating: "More concerning, in our view, key performance indicators in the company's video business were much weaker than estimates, including significantly weaker-than-expected satellite subscriber loss and OTT net additions"  The report continued: "We believe much of the stock's negative reaction today can be attributed to these results, as they rekindle investor concerns regarding T's ability to deliver value from its DirecTV acquisition and/or overall execution."

(g)     JPMorgan published a report on October 25, 2018, stating: "Entertainment is a drag on numbers and (bigger) on sentiment."  The report continued: "Management commentary in September around flat entertainment margin in 2019 and 'resilient' DTV Now numbers only served to raise expectations into a soft 3Q.  As painful as it is, we believe management should instead have been highlighting the company's renewed discipline on promotions and profit, and lowering near-term subscriber expectations."

(h)     *The Motley Fool*, a popular online investment analysis publication, published an article on October 25, 2018, titled: "**AT&T Hit a Brick Wall When it Raised TV Prices**."

### (2)     November 2018

351.    On November 14, 2018, while speaking at the Morgan Stanley TMT Conference, Defendant Stephens reiterated the problematic disclosures from October 24, 2018.  He described the situation was a "shift to market pricing, the shift away from promotions to grow the base so we could test the systems."  He also repeated that he and other AT&T executives had expected the downturn, stating that: "we made the changes; our expectations were that we would not have added 50,000 new DTV customers in the quarter.  We would have expected more pressure than that because of the changes we're making."

352.    On November 29, 2018, AT&T hosted an analyst meeting and during that meeting Defendant Stephenson explained that "2018 has been all about getting that product and the pricing, the customer value proposition and the cost, the content cost dynamics right here." He added, "We've made a number of changes here in second half of the year."

353.    During the November 29, 2018, analyst meeting Defendant Donovan stated:

***We're in a unique position in that with DirecTV Now, we launched that 2 years ago.  We've had a lot of learnings about the OTT market.  We have an excellent product.  We have a stable total base.  Although that mix is shifting across***

***Watch and across the DirecTV Now and the linear product, we've learned how to innovate very quickly.***

354.   Defendants' statements in the prior paragraph were materially false and misleading because they indicated that DirecTV Now was continuing to have positive net adds, when in fact DirecTV Now subscribers were in decline.  This statement was also misleading because it stated that DirecTV Now was continuing to have positive net adds without disclosing the very risk that it remained a high-churn product, and without disclosing that many of the stated subscribers were procured through improper sales practices.

355.   During the November 29, 2018, analyst meeting Defendant Donovan stated that AT&T was working "content costs" on both DirecTV Now and their newer streaming product WatchTV so "so we can make a profit not overall -- not only overall but in each individual one." Once again, this reaffirmed that DirecTV Now had not actually been a profitable product, contrary to Defendant's prior statements.

356.   During the November 29, 2018, analyst meeting Defendant Donovan stated:

***In any given quarter, linear decline, we may be slightly above, slightly below where the industry is, but we're going to be focused in the long term of making sure we're catching customers with Watch to lower churn.  We're catching them with Now to make sure that we're getting new households, single-family, 2 streams, multi-dwelling units, and then just to keep lowering our cost.  So that's the strategy that we've got there.***

357.   Defendants' statements in the prior paragraph were materially false and misleading because they indicated that AT&T's strategy for DirecTV Now was to reduce costs while "catching" customers, while in truth AT&T's plan for DirecTV Now during the time period was to allow customers to leave the platform, which would improve overall profitability because the product was not profitable.

### (3)    December 4, 2018

358.    On December 4, 2018, AT&T participated in the UBS Global Media and Communications Conference.  During the conference, Defendant Stephenson said that:

> Our current product, DirecTV Now, thin the content out, get content that's really relevant to a particular customer segment that wants a lower price offering. We're talking $50 to $60 price offering here.  We've learned this product.  We think we know this market really, really well.  We had a lot of success.  **_We built a 2 million sub-base, but we're asking that DirecTV product_** – **DirecTV Now product to do too much work.  So we're thinning out the content, getting the price point right, getting it to where it's profitable, and that will be a different segment of the market.**

359.    The statement in the previous paragraph that AT&T had "built a 2 million sub-base" for DirecTV Now was materially false and misleading.  AT&T ended 3Q18 reporting 1.858 million DirecTV Now subscribers, which at that time was the highest number of subscribers the product reported.  By stating that the subscriber base had reached 2 million by December 4, 2018, this statement meant that AT&T had returned to a positive growth trajectory. As would later be disclosed, during 4Q18, AT&T actually lost 267,000 DirecTV Now subscribers.  Most important here, is not the precise numbers, but that Defendants were conveying to the market that DirecTV Now was continuing to grow while the opposite was true.

360.    The statement in ¶358, that AT&T was working to get DirecTV Now to where it was profitable revealed that the product was not profitable.  This directly contradicted the prior assurances that DirecTV Now was a profitable product.

361.    On these disclosures AT&T's stock declined by 3.09% from a closing price on December 3, 2018, of $31.71 per share, down to a closing price on December 4, 2018 of $30.73 per share.  However, it is alleged that this reaction was suppressed by the simultaneous release of positive but materially false and misleading statement regarding the continued growth of DirecTV Now subscriptions.

(4)     **January 2019**

362.    On January 9, 2019, at the Citi Global TMT West Conference, Defendant

Stephens further clarified that AT&T's prior subscription growth had only been obtainable due

to heavy promotional activity.  Stephens stated:

> [W]hat you've seen us, and I think we've proven it, kind of **move away from the very promotional.  And I think last year, about this time, we had about 1/3 of our customer base on kind of 3-month promotions in the 0.5 million customer range.  We stopped doing 3-month promotions for $10.  So you have a risk of those customers choosing not to renew or you have the hopes of those customers buying up and getting a full package.  But either way, you significantly improve your profitability by moving away from that intensely promotional environment.  You've seen us do that.  I think we just need to -- there will be impacts of that.**  There will be customer count impacts of that, but there's going to be profitability and we're certainly focused on that profitability piece.

363.    This statement further revealed the extent of the promotional activity for DirecTV

Now, the extent of the churn problem DirecTV Now was facing, and the fact that DirecTV Now

was not profitable.  In reaction to this news, AT&T's stock's price fell from a prior close of

$31.28 per share to a close on January 9, 2019, of $30.10 per share, which was a 3.77% fall.

364.    On January 30, 2019, before the market opened and in connection with AT&T's

announcement of its 4Q18 financial results, the Company revealed that "[i]ncluding losses from

our over-the-top (OTT) video service, DirecTV Now, total net video subscribers **decreased by**

**462,000 in the fourth quarter of 2018**."  More specifically, DirecTV Now **declined by a full**

**267,000 subscribers.**

365.    This decline in subscribers was a materialization of the previously undisclosed

risks associated with DirecTV Now and/or a corrective disclosure, specifically the risk that the

aggressive promotional activity and improper sales activity AT&T had engaged in would result

in huge customer churn, as well as the risks associated with the customer churn trend that AT&T

chose not to disclose.

366.     During the earnings call, Defendant Stephens emphasized the Company's "**data-driven approach with promotions is making an impact**" and revealed that:

> 6 months ago, we had 0.5 million customers on highly discounted DirecTV Now offers, generally offers that require the customer to pay $10 a month for the service.  **At the end of the year, essentially, none of these customers remained on those offers.  Eliminating these promotions for low-value, high-churn customers clearly elevated subscriber losses in the quarter**, but it had a positive impact on streaming ARPUs and lowered content costs.

Defendant Stephenson further clarified this point, by stating: "**there were 500,000 of those customers on the promotional pricing.  And we started allowing those customers to attrit out.**"  He added "we just looked at the customer segment, and there was a customer segment at the low-end, very promotional pricing, who were not engaging on the product."

367.     These disclosures further revealed the truth that AT&T had engaged in aggressive promotional activity and amassed a massive group of highly promotional customers that all but assured DirecTV Now would not be profitable.  That AT&T lost these customers was a further materialization of the previously concealed risks associated with carrying a large number of highly promotional customers and/or a corrective disclosure.

368.     These disclosures also revealed the falsity of Defendants' statement on December 4, 2018, that DirecTV Now subscribers had grown to reach 2 million, as AT&T had actually lost 267,000 subscribers during the quarter, rather than gaining 142,000 subscribers, as would have needed to be true for the December 4, 2018 statement to be correct.

369.     As a result of this negative news, AT&T's stock price plummeted from a close of $30.70 per share on January 29, 2019 to a close of $29.37 per share on January 30, 2019, a loss of $1.33 per share, or 4.3% on unusually high trading volume of approximately 93 million shares.

370.     SunTrust Robinson stated in its analyst report on AT&T's 4Q18 results that, "[m]anagement highlighted approximately 500k of such subscribers in the base in November -

and undoubtedly this promotion helped drive subscriber counts throughout 2018, in our opinion - and as of yearend, virtually none of those customers remain." *Seeking Alpha* published an article on January 30, 2019, stating: "DirecTV continues to crush AT&T and is hemorrhaging subscribers. Even worse is that the new DirecTV Now is losing subscribers just after two years of being in service. Not a good sign. The stock is likely dead money now[.]" On January 30, 2019, veteran media analyst Rich Greenfield tweeted: "Holy Sub Loss – in my 22 years covering media, never seen a stat like this in a single quarter."

> **(5)** **Post-Class Period Events Further Reveal the True Dire Condition of DirecTV Now**

371. Since January 30, 2019, AT&T has reported two additional quarters of financial results, and each time disclosed that subscribers were abandoning the DirecTV Now product.

(a) On April 24, 2019, AT&T announced its 1Q19 results, and revealed that an additional 83,000 customers had left the DirecTV Now platform.

(b) On July 24, 2019, AT&T announced its 2Q19 results, and revealed that another 168,000 subscirbers had left DirecTV Now, and that AT&T experienced a net drop of 946,000 TV subscribers. By this point, it was clear that the product was in terminal decline, and AT&T announced on July 30, 2019, that it was renaming DirecTV Now to AT&T TV Now.

372. Altogether, the quarterly net gain and net loss numbers for DirecTV Now were as follows:



373.    On September 9, 2018, two funds managed by a well-regarded investment

manager, announced that they had acquired a multi-billion position in AT&T's stock and after

interviewing hundreds of "former AT&T and industry executives" published a letter to AT&T's

Board of Directors sharing its "thoughts on how AT&T can improve its business."  The letter

stated that "AT&T has suffered from product issues in other business units that have hampered

its ability to remain competitive."  It then stated:

> AT&T's OTT offering, DirecTV Now (renamed AT&T TV Now), has been
> poorly executed with delays, technical mishaps, weak customer service and
> usability issues.  Despite describing DirecTV Now as a replacement for DirecTV,
> **the natural-substitution narrative has not played out.  While unsustainably
> low prices and aggressive promotion did initially help the product scale, the
> benefits turned out to be very short term in nature.  As AT&T raised prices
> to normalized levels, results rapidly deteriorated**.  After just two years of
> existence amidst an otherwise-booming OTT market, DirecTV Now's subscriber
> count is now declining.

374.    On September 11, 2019, at an investor conference hosted by Bank of America

Merrill Lynch, Defendant Stephens stated that AT&T anticipated losing 300,000 to 500,000

more video subscribers in 3Q19 than it lost in the previous quarter, across both streaming service and traditional TV subscriptions.

E.     **AT&T, the Executive Defendants, and Defendant Shay Acted with Scienter Throughout the Class Period**

375.     As alleged herein, AT&T and the Executive Defendants acted with scienter in that those Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt or access to information reflecting the true facts regarding AT&T and its DirecTV Now product, their control over, or receipt, or modification of AT&T's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

376.     AT&T and the Executive Defendants knew or recklessly disregarded the materially false and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity, or at least, the reckless disregard, of AT&T personnel at the highest levels of the Company.

377.     Moreover, AT&T is charged with the scienter of its agents and employees, including the scienter of the Executive Defendants, Defendant Shay and of those knowledgeable people at AT&T, including David Christopher, President of AT&T Mobility & Entertainment.

378.     As discussed in more detail below, the following allegations collectively support a strong inference of scienter:

(a)     The Executive Defendants and Defendant Shay had access to real-time metrics regarding DirecTV Now's engagement rates, churn rates, take rates, success and profitability during the Class Period (¶¶379-90);

(b)     The Executive Defendants had the motive and opportunity to artificially inflate the DirecTV Now subscriber rolls until the Acquisition closed (¶¶391-97);

(c)     The Executive Defendants and Defendant Shay had actual knowledge or reckless disregard of the pervasive and undisclosed improper sales practices detailed herein (¶398);

(d)     DirecTV Now was Promoted as the Core of AT&T's Business Plans and the Lynchpin of the Massive Time Warner Acquisition  (¶¶399-401); and

(e)     Admissions Reveal that the Misstatements and Omissions were Knowing and Intentional (¶¶402-05).

> **(1)     The Executive Defendants and Defendant Shay had Access to Real-Time Metrics For DirecTV Now During the Class Period**

379.     As alleged herein, the Executive Defendants and other managers of AT&T had access to real-time metrics regarding DirecTV Now's engagement rates, churn rates, take rates, success and profitability during the Class Period.  *See* Section IV(B).  In addition to tracking this information for its own purposes, AT&T also tracked data about its customers' usage of DirecTV Now for purposes of using that data to sell advertising.  Additionally, a multitude of other sources, including several of the CWs, confirm AT&T and the Executive Defendants' attention to tracking key performance metrics for the DirecTV Now product.

380.     For example, on August 18, 2016, the *Dallas Business Journal* published an interview with Defendant Stankey.  In that interview, Defendant Stankey stated that he has regular interaction with Defendant Stephenson.  Defendant Stankey was quoted as saying that

Stephenson "gets weekly checkpoints on how we're doing on weekly indicators of financial performance – subscriber counts, metrics, customer service, new results."  The article also stated that at month's end, Defendant Stephenson examines the books and pulls in Defendant Stankey for a discussion.

381.    During an October 26, 2016, *Wall Street Journal* interview, Defendant Stephenson stated: "we have the largest video distribution platform in the U.S. right now.  So we have some unique viewership data.  We anonymize that data.  We would never say Rebecca, send Rebecca an ad, but, there are, you know, 25, 50 Rebecca's out there who have a certain viewership pattern and that viewership pattern informs what type of advertising that individual would find interesting and relevant to them.  And so literally begin to direct and address advertising to a segment of the market who has, uh, a known viewing pattern or a discernible viewing pattern."

382.    On May 31, 2017, Defendant Bentley was interviewed by *Hollywood Reporter* and made a number of statements about his knowledge of AT&T's data tracking DirecTV Now.  For example, he said:

(a)    "Because of the nature of the platform, you get so much data around what is working and what's not, how to fine-tune it.  We have had a really good response to the platform in terms of subscribers coming to it.  We have learned a lot in terms of that process and experience and how to optimize that and improve satisfaction and going after the right kind of customers;"

(b)    "We continue to optimize around the customer experience around the feedback, and we're really pleased where we are at this stage."

(c)      "We are learning more and more about the importance of live television. . . .  We have confirmed that we are getting a new customer that we don't have on our new platform today.  We are getting a younger customer and customers who live in apartments where we have always under-indexed given that we were a satellite product prior."

(d)      "I have been excited to see their viewership behavior and am surprised that live television, particularly the news channels, still do quite well.  Obviously there has been a swell of the importance of news in the fourth quarter and first quarter with all that's going on politically.  But live news is still a very important piece of this audience's life, and that shows in the numbers we see every day."

(e)      When asked about what content has been "particularly popular" he said: "The headlines I'd say are that live news pops, live sports pops.  On the VOD side, it's the shows you would expect people to be bingeing.  They are bingeing the latest in Silicon Valley and the latest catching up on Game of Thrones as season seven comes along or they're bingeing through This Is Us."

(f)      "We knew from our data that there was a set of customers that, like I mentioned, we just weren't able to provide a solution for.  Or they couldn't afford $100-plus a month.  When we look at the data, that's the piece that has been really encouraging — that we are acquiring a different type of customer. . . .  There are subscribers that have traded down from satellite TV to this product.  But as we look at their profiles, we see that they probably were not on the right product to begin with."

(g)      "What's been encouraging looking at the data every week in terms of customer satisfaction, the numbers for customers' intent to churn off the platform just go down and down every week as we continue to work through learnings."

383.    On August 8, 2017, during the Oppenheimer Technology, Internet &

Communications Conference, Defendant Stephens spoke about the DirecTV platform generally

(not just DirecTV Now) and said that they were "[t]aking the viewership data, the data insights

that we know that comes off our networks because we're the delivery system" adding, "[w]e

deliver it, so we know what goes to the homes, what's there," and then using that data for

"addressable advertising."

384.    On August 15, 2017, Defendant Bentley testified at a trial conducted in

connection with a federal action brought on March 11, 2015 by the Federal Trade Commission

against DirecTV for false advertisement.[25]   At the time of his testimony in August 2017, Bentley

was Executive Vice President of Strategy and Business Development at AT&T and his

responsibilities included "develop[ing] strategies that continue to drive revenue and market share

growth as well as explor[ing] new business opportunities that continue to develop subscribers."

385.    DirecTV had a history of false and misleading advertisements, so AT&T

executives should have been on heightened alert as to the marketing and selling of DirecTV's

products.  Bentley testified that in 2005, DirecTV entered into an agreement with several states'

attorneys general entitled "An Assurance of Voluntary Compliance," whereby DirecTV

undertook to "in all advertising it creates, clearly and conspicuously disclose to consumers all

material terms and conditions associated with the specific offer or sale of DirecTV equipment or

DirecTV services as advertised."  Bentley said that DirecTV settled the deceptive advertising

cases with the attorneys general for all 50 states in 2010.  In connection with that settlement,

among other things, DirecTV executed a Consent Decree with the State of Washington on

---

[25] *See FTC v. DirecTV, Inc.*, No. 15-cv-01129-HSG, Dkt. Nos. 49, 367 (N.D. Cal.).

December 16, 2010, pursuant to which the Company committed to "clearly and conspicuously disclos[e] all material terms and conditions of an offer to sell or lease DirecTV goods or services."

386.    Bentley testified that "since we're a subscription-based business, the importance of having satisfied and happy customers is incredibly important to your bottom line."  He noted that his department regularly (*i.e.*, on a monthly basis) engaged in a review of DirecTV's sales and marketing practices.  Bentley testified that "when you're a subscription-based business, you have to measure every piece of data.  So you know exactly what they have ordered at point of sale, you know what channel distribution they came out on, you know what offer they've taken. . . .  And you can predict within the first kind of 90 days what the lifetime value of that subscriber is going to be."  Bentley testified that the Company's financial "models are incredibly accurate and get better over time."  With respect to the predictive models used for DirecTV products, Bentley testified that "[w]e have a really extensive database in house that tracks everything.  We even track — we can track viewership . . . There's [sic] hundreds of different variables that we have within our internal database that are predictors of churn and predictive of value.  And so we use that data to make informed business decisions."

387.    On February 15, 2018, during a public interview with Boston College's CEO Club, Defendant Stephenson said "we know what our customers are watching, we know what they like to watch, we know when they like to watch it and we know where they are when they like to watch certain things because they're now watching it on these mobile devices."  Adding that "we have the mobile data, we have the viewership data, we have all that information where we use that information and go to advertisers."

388.    At an event hosted by the Atlantic, on October 8, 2018, Defendant Stephenson spoke about the degree of data he had on what content their TV customers are viewing.  He

described how AT&T has "direct to consumer relationships" and "unique data."  Then he added,

"[w]e know what our customers are viewing, we know what they like to view where they are,

when they like to view it, what device they're on and how they like to view it."

389.    As alleged herein, the Executive Defendants spoke about DirecTV Now

frequently throughout the Class Period.  *See* Section IV(C).  In so doing, they demonstrated the

breadth of data that was available to them and their familiarity with that data.  They touted the

success of the product, and provided detailed commentary on various metrics about DirecTV

Now, including subscription numbers, churn numbers, cannibalization numbers, information

about the demographics of DirecTV Now subscribers, information about the effect of bundling

DirecTV Now on churn for other products, and information about the origin of DirecTV Now

subscriptions (*e.g.*, competitors, cord cutters, existing customers), among other statistics.  These

statements demonstrate that the AT&T and the Executive Defendants had access to detailed

metrics about DirecTV Now.

390.    It can be inferred that anyone with access to the metrics described in this section

would have seen (a) the high churn rates associated with DirecTV Now; (b) the extent of and

influence of promotional activity on the success of DirecTV Now; (c) the presence of many

duplicate accounts, which would have been apparent based on the presence of many accounts not

being used; and (d) the lack of rationality within the pricing of DirecTV Now as reflected in the

margins for the product.

### (2)    The Executive Defendants Had the Motive and Opportunity to Inflate DirecTV Now Subscriber Rolls Until the Acquisition Closed

391.    Defendant Stephenson has publicly admitted that DirecTV was known to be a

declining business at the time it was purchased by AT&T.  *See* ¶99.  However, AT&T had taken

on an enormous amount of debt to buy DirecTV, and has seen its creditworthiness downgraded

as a result.  Despite assuring the market that paying down that debt would be the Company's top priority, it quickly realized that it would need a media production business to complement its video broadcasting business, or else it would be revealed that it had made a massive mistake purchasing DirecTV, which would be revealed as a melting ice cube.  It therefore sought to buy Time Warner, in one of the biggest mergers in history.

392.    Defendants' statements throughout the Class Period make clear, a major part of the value proposition behind that deal was the possibility of integrating AT&T's video distribution assets with Time Warner's media production capabilities and vast video content library.  It launched DirecTV Now, which was an important aspect of the viability of AT&T's side of that bargain.  In convincing Time Warner shareholders that it made sense to trade their stock for AT&T's stock (notwithstanding the tremendous debt AT&T was straddled with), AT&T (and by extension the Executive Defendants) had a strong incentive to falsely tout its success and viability.

393.    Similarly, DirecTV Now and its low pricing were touted as proof that the Acquisition was not anti-competitive.  If AT&T admitted that the product was a failure, prior to the Acquisition being approved in the DOJ Lawsuit, it risked upsetting one of its primary narratives regarding the legitimacy of the merger.  Therefore, even though DirecTV Now was a money losing failure that required aggressive promotional activity to sustain, AT&T (and by extension the Executive Defendants) had a strong incentive to falsely tout its success and viability.

394.    Upon securing a victory in the DOJ Lawsuit and closing of the Acquisition, AT&T promptly allowed the DirecTV Now product to collapse by ending the promotional

activity that had been necessary to keep the product afloat, admitting it had been a "placeholder in the market until the deal [with Time Warner] was finished."

395.    Additionally, AT&T had a strong incentive to tell the public that it had high DirecTV Now subscriber numbers, regardless of the truth about those subscribers, because that number was used to promote DirecTV Now as a valuable advertising platform.  Throughout the Class Period, analysts recognized that AT&T needed to obtain a critical mass of subscribers before its platform would be at sufficient scale to generate substantial advertising revenue.  For example, Barclays wrote on November 17, 2017, that AT&T has "not been able to fully leverage the advertising opportunities with DirecTV Now largely because it is an early stage opportunity" and AT&T still needed to "get it to sufficient scale to draw in advertisers."  Thus, an additional motivation for AT&T to artificially inflate the subscriber numbers for DirecTV Now was in hopes of convincing the market that it had reached sufficient scale to attract sufficient advertising revenue.

396.    Several of the Executive Defendants had strong personal interests in promoting the success of DirecTV Now in order to persuade the market of the logic behind the Acquisition. The failure of this product prior to the closing of the Acquisition would have jeopardized the transaction, a result that would have been disastrous for the Executive Defendants' reputations, compensation, and positioning at AT&T.  The Executive Defendants were paid handsomely in their positions at AT&T during the Class Period, as reported in AT&T's Proxies:

(a)    Defendant Stephenson received total compensation in 2016 of $28,433,716, total compensation in 2017 of $28,720,720, and total compensation in 2018 of $29,118,118.

(b)     Defendant Stephens received total compensation in 2016 of $11,581,940, total compensation in 2017 of $13,892,807, and total compensation in 2018 of $15,642,304.

(c)     Defendant Donovan received total compensation in 2016 of $9,508,310, total compensation in 2017 of $15,193,700, and total compensation in 2018 of $14,585,867.

397.    Inversely, successfully closing the Acquisition was all but sure to generate enormous financial benefits for the Executive Defendants.  In fact, in the short time since the Acquisition closed, several of the Executive Defendants have been rewarded tremendously for closing the Acquisition.  The Company's 2019 Annual Proxy, dated March 11, 2019, described some of these benefits.  Defendants Stephens and Stankey saw increases in salary "Commensurate with the close of the Acquisition."  Defendant Stankey's salary more than doubled from $1.1 million to $2.9 million.  Defendants Stephens and Stankey both received $2 million cash bonuses "in recognition of [their] significant contributions that led to the structure and completion of the merger."

### (3)     The Executive Defendants and Defendant Shay Had Actual Knowledge, or Reckless Disregard, of the Pervasive and Undisclosed Improper Sales Practices Detailed Herein

398.    The Executive Defendants' actual knowledge of the truth can be inferred based on the allegations herein regarding their access to information, commentary on relevant topics, and post-Class Period disclosure.  AT&T and the Executive Defendants' direct knowledge is also alleged based on the statements of Confidential Witnesses in Section IV(B), the allegations regarding the Company's investigation into the fraudulent account creation practices, the *Hawaii News Now* article, and AT&T's response in Section IV(B)(1).  In the alternative, these allegations support that AT&T and the Executive Defendants recklessly disregarded the true situation regarding DirecTV Now.

### (4)   DirecTV Now was Promoted as the Core of AT&T's Business Plans and the Lynchpin of the Massive Time Warner Acquisition

399.   While DirecTV Now was not the core of AT&T's business when measured by pure financial metrics, it clearly was the core of AT&T's business in terms of its role at the center of AT&T's business plans.

400.   AT&T repeatedly touted the importance of DirecTV Now to the Company, explaining that it would be the platform that AT&T used for TV on a going-forward basis, as the Company worked to move customers off legacy TV technologies.  *See e.g.*, Section IV(A)(1).  Through the acquisition of DirecTV itself, and the acquisition of Time Warner, TV became the center of AT&T's business.  Thus, DirecTV Now practically became the focal point for AT&T's business.  This truth was reflected in the attention given to DirecTV Now, which was frequently discussed by AT&T and the Executive Defendants and analysts alike.

401.   Due to its role at the center of AT&T's business, AT&T and the Executive Defendants can be charged with either knowing, or recklessly disregarding, the true state of that business line, since the true state of that business line was readily understandable to those within AT&T.

### (5)   Admissions Reveal that the Misstatements and Omissions were Knowing and Intentional

402.   AT&T and the Executive Defendants have disclosed that AT&T priced DirecTV Now at irrationally low prices during the Class Period.  *See e.g.*, ¶¶344, 358, 362, 366, 371.  These statements reveal that AT&T and the Executive Defendants knew that their statements regarding the strong margins associated with AT&T were materially false and misleading at the time they were made.

403.   AT&T and the Executive Defendants described a trend of low engagement with DirecTV Now and high churn rates.  *See e.g.,* ¶344-47, 362, 366.  These statements reveal that

AT&T and the Executive Defendants knew that their statements regarding AT&T's subscriber numbers and DirecTV Now's ability to reduce churn were materially false and misleading at the time they were made.

404.    AT&T and the Executive Defendants admitted that DirecTV Now was launched as a "placeholder in the market until the deal [with Time Warner] was finished." ¶169.  This statement reveals that AT&T and the Executive Defendants knew that their positive statements about AT&T's viability, subscriber growth, role as replacement for DirecTV and margin were materially false and misleading at the time they were made.

405.    AT&T and the Executive Defendants admitted that they expected even lower results in 3Q18 for DirecTV Now.  ¶¶343, 346.  This statement reveals that AT&T and the Executive Defendants knew that their positive statements about AT&T's viability, subscriber growth, role as replacement for DirecTV, and margin were materially false and misleading at the time they were made.

### F.    Loss Causation

406.    As detailed herein, during the Class Period, the false representations and omissions of material facts about AT&T's business caused AT&T securities to trade at artificially inflated and, at times, artificially maintained prices, which misled purchasers of AT&T securities.  The statements identified in Section IV(C), individually and together, depicted DirecTV Now in a misleading way as explained herein.  Furthermore, several of those statements caused a corresponding increase in AT&T's stock price, including those statements on December 5, 2016; December 6, 2016; July 25, 2017; January 31, 2018; and September 12, 2018.  AT&T's stock price reached a Class Period high closing price of $43.02 per share on January 3, 2017 as a result of the false representations of the state of AT&T's DirecTV Now business.

407.    During the Class Period, AT&T misrepresented the true condition of DirecTV

Now and hid the associated risks.  The dramatic decline in DirecTV Now subscriber numbers

was a materialization of the risks associated, including: improper sales practices, such as the

creation of fake accounts, which predictably led subscribers to cancel these accounts, upon

realizing they were being billed for a service they did not use; the aggressive use of promotional

campaigns to artificially sustain subscriber levels; and selling the product at irrationally low

prices that would ultimately need to increase.

408.    The true condition of DirecTV Now was revealed through a series of

disclosures and materialization of risks:

(a)    On October 24, 2018, before the market opened and in connection with the

announcement of AT&T's third quarter 2018 financial results, the Company revealed a dramatic

reversal of its reported total subscriber "Net Additions" trends.  DirecTV Now net additional

subscribers plummeted more than 85% from 342,000 down to 49,000 for the quarter, compared

to DirecTV Now net additional subscriptions of more than 300,000 in each of the prior three

quarters (4Q17-2Q18).  The Company attributed this precipitous decline in DirecTV Now

subscriber growth to the decision to "scal[e] back our promotions and special offers" and move

toward "market pricing in the quarter."  On this news, AT&T's stock price plummeted on

unusually heavy trading volume of approximately 119 million shares dropping from a closing

price of $33.02 per share on October 23, 2018 to a closing price of $30.36 per share on October

24, 2018, a drop of more than 8% in a single day.  Throughout the Class Period, AT&T's

average daily trading volume was approximately 29 million shares traded.  AT&T's stock price

fell an additional $0.38 per share, or 1.25% and $0.89 per share, or 2.97%, on the following two

trading days.  This drop removed inflation from the price of AT&T's stock, causing real

economic loss to investors who had purchased AT&T securities during the Class Period. However, the Company's stock price remained artificially inflated after this announcement as Defendants failed to disclose the full truth about AT&T's DirecTV Now business, including the fact that DirecTV Now subscriptions would continue to decline as the Company allowed its heavy promotional activity and irrational pricing to lapse.

(b)     The second disclosure was on December 4, 2018, before the market opened, during the UBS Global Media and Communications Conference.  Defendant Stephenson further disclosed that DirecTV Now had not been profitable and would need to target a different segment of the market.  The effect of this disclosure on the price of AT&T's stock was muted by the simultaneous false assertion that DirecTV Now subscriber numbers had continued to grow—having reached 2 million subscribers—when in fact, DirecTV Now was losing subscribers and AT&T would never report a quarter with 2 million subscribers on the platform.  On these disclosures, AT&T's stock price declined by 3.09% from a closing price on December 3, 2018, of $31.71 per share, down to a closing price on December 4, 2018 of $30.73 per share.  This drop removed inflation from the price of AT&T's stock, causing real economic loss to investors who had purchased AT&T securities during the Class Period.  However, in addition to misleading investors with false information about the subscriber counts, the Company's stock price remained artificially inflated after this announcement as Defendants failed to disclose the full truth about AT&T's DirecTV Now business, including the fact that DirecTV Now subscriptions would continue to decline as the Company allowed its heavy promotional activity and irrational pricing to lapse.

(c)     The third disclosure was on January 9, 2019.  Around 1:30pm Eastern Time, at the Citi Global TMT West Conference, Defendant Stephens revealed that roughly one

147

year prior AT&T had 1/3 of the platform or about 500,000 subscribers on a $10 per month promotion.  This further revealed the extent of DirecTV Now was a heavily promoted and high churn product.  In reaction to this news, AT&T stock's price fell from a closing price on January 8, 2019 of $31.28 per share to a close on January 9, 2019, of $30.10 per share, which was a 3.77% fall.  This drop removed inflation from the price of AT&T's stock, causing real economic loss to investors who had purchased AT&T's stock during the Class Period.  However, the Company's stock price remained artificially inflated after this announcement as Defendants failed to disclose the full truth about AT&T's DirecTV Now business, including the fact that DirecTV Now subscriptions would continue to decline as the Company allowed its heavy promotional activity and irrational pricing to lapse.

(d)     The fourth disclosure was on January 30, 2019.  Before the market opened and in connection with the announcement of AT&T's fourth quarter 2018 financial results, the Company disclosed that at the end of 2018 essentially none of the 500,000 heavily discounted DirecTV Now subscribers remained on the service.  The Company also revealed that DirecTV Now subscriptions in the fourth quarter of fiscal year 2018 had declined by 267,000 subscribers – a stark reversal of net adds in 4Q17 through 2Q18.  In reaction to these disclosures, AT&T's stock price plummeted from a close of $30.70 per share on January 29, 2019 to a close of $29.37 per share on January 30, 2019, a loss of $1.33 per share, or 4.3% on unusually high trading volume of approximately 93 million shares.  This drop removed inflation from the price of AT&T's stock, causing real economic loss to investors who had purchased AT&T's stock during the Class Period.

409.    Plaintiffs and Class members who purchased AT&T's stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.  By failing to

disclose the adverse facts detailed herein, AT&T and the Executive Defendants presented a misleading picture of AT&T's business and prospects.  As the previously concealed adverse facts and associated risks began to be disclosed and/or the risks materialized, AT&T's stock fell dramatically.  This decline removed the artificial inflation from the price of AT&T's stock, causing economic loss to investors who had purchased AT&T's stock during the Class Period.

410.    The decline in the price of AT&T's stock following these revelations was a foreseeable result of the nature and extent of the misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the misleading conduct.

411.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a foreseeable result of the conduct that artificially inflated, and maintained, the price of AT&T's stock and the subsequent material decline in the value of AT&T's stock when the prior misrepresentations, misleading half-truths, and omissions were revealed.

### G.    Application of Presumptions of Reliance

412.    Throughout the Class Period, AT&T and the Executive Defendants omitted to disclose material information of which these defendants were aware of or were reckless in not knowing.  Such statements artificially inflated or artificially maintained the price of AT&T's stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise acquired AT&T securities during the Class Period.  Because AT&T and the Executive Defendants chose to speak as described in Section IV(C), they had a duty not mislead investors or withhold material information.  These Defendants also had affirmative obligations to disclose truthful information in accordance with their Item 503 Obligations and Item 303 Obligations.  To

the extent that these Defendants concealed or improperly failed to disclose material facts with respect to DirecTV Now's business, Plaintiffs and the Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

413.    The Scheme Defendants corrupted the market for AT&T securities through a course of conduct that misled the market as to the value of AT&T securities.  To the extent that these Defendants disrupted the integrity of the market for AT&T securities, Plaintiffs and the Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

414.    In the alternative, Plaintiffs and the Class members are entitled to a presumption of reliance on the material misrepresentations and omissions alleged herein pursuant to the fraud-on-the-market theory:

(a)    Throughout the Class Period, AT&T's stock met the requirements for listing on, and was traded on the NYSE, an informationally efficient market;

(b)    Throughout the Class Period, AT&T's stock traded at high volumes, and its weekly trading volume was about 145 million shares out of approximately 6.45 billion average total outstanding shares, the "float" or shares not owned by insiders comprised approximately 99% of outstanding shares, and the bid/ask spread median was $0.01.

(c)    Throughout the Class Period, the market capitalization of AT&T was between about $197 billion and $262 billion and institutional investors owned about 63% of AT&T's shares during the Class Period;

(d)    AT&T's stock was registered with the SEC.  Throughout the Class Period, AT&T filed annual and quarterly reports with the SEC;

(e)     AT&T communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)     The market reacted promptly to public information disseminated by AT&T;

(g)     AT&T's stock was covered by numerous securities analysts employed by major brokerage firms including Wells Fargo Securities, Jefferies Group, JPMorgan, RBC Capital Markets, Scotiabank, William Blair, HSBC Global Research, Barclays, and many others, who wrote reports that were distributed to the sales force and certain customers of their respective firms, and each of these reports was publicly available and entered the public marketplace;

(h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of AT&T's stock; and

(i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class bought AT&T's stock between the time AT&T and the Executive Defendants misrepresented or failed to disclose material facts and the end of the Class Period.

415.    As a result of the foregoing, the market for AT&T's stock promptly digested current information regarding AT&T from all publicly available sources and reflected such information in the Company's stock price.

**H.     No Safe Harbor**

416.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading

statements and omissions alleged in this Complaint.  The statements at issue are not protected by

the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons,

including the following.

417.    First, the statements and omissions alleged to be materially false and misleading

relate to historical facts or existing conditions and, therefore, are not protected by the safe harbor.

Second, to the extent any of the false and misleading statements alleged may be characterized as

forward-looking, they were not adequately identified as "forward-looking" statements when

made.  Third, any purported forward-looking statements were not accompanied by meaningful

cautionary language because risks that were warned of had already come to pass, and any

cautionary language did not mention important factors of similar significance to those actually

realized.  Fourth, to the extent that there were any forward-looking statements that were

identified as such, AT&T and the Executive Defendants are liable because, at the time each of

those forward-looking statements was made, the speaker knew the statement was false when

made.

**I.      Exchange Act Counts**

**(1)      Count I: Violation of § 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against AT&T and the Executive**
**Defendants**

418.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth in

Sections I-IV(H) herein.

419.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder by the SEC, on behalf of Plaintiffs and the Class, against AT&T

and the Executive Defendants.

420.    AT&T and the Executive Defendants, individually and in concert, directly and

indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or

the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

421.    AT&T and the Executive Defendants made materially false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

422.    AT&T and the Executive Defendants made materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased AT&T securities during the Class Period.

423.    AT&T and the Executive Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of AT&T's stock and other AT&T securities; and (iii) cause Plaintiffs and members of the Class to buy AT&T's stock and other AT&T securities at artificially inflated prices.

424.    AT&T and the Executive Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

425.    In ignorance of the materially false and misleading nature of AT&T and the Executive Defendants' statements and omissions, and relying directly or indirectly on those

statements or upon the integrity of the market price for AT&T's stock, Plaintiffs and other

members of the Class bought AT&T's stock at artificially inflated prices during the Class Period.

But for the fraud, Plaintiffs and members of the Class would not have purchased AT&T's

securities at such artificially inflated prices.  By buying AT&T's securities at these artificially

inflated and artificially maintained prices, the Class members suffered economic losses, which

losses were a direct and proximate result of Defendants' fraudulent conduct.

426.    By virtue of the foregoing, AT&T and the Executive Defendants are liable to

Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder.

> **(2)      Count II: For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against AT&T and the Scheme Defendants**

427.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth in

Sections I-IV(H) herein.

428.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a)

and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that each of

the Scheme Defendants made any misrepresentations or omissions of material fact for which

they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

429.    During the Class Period, the Scheme Defendants carried out a common plan,

scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing

public, including Plaintiffs and the Class; (ii) artificially inflate the market price of AT&T

securities; and (iii) cause Plaintiff to purchase AT&T securities at artificially inflated prices.

430.    In furtherance of this unlawful plan, scheme and course of conduct, the Scheme

Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly

engaged in acts, transactions, practices, and courses of business that operated as a fraud and

deceit upon Plaintiffs and the Class in connection with their purchases of AT&T stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

431.    The Scheme Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included encouraging and enabling the use of sales practices, by AT&T and its employees, that resulted in people being signed up for DirecTV Now without their permission or knowledge and the creation of fake DirecTV Now accounts.  This conduct resulted in AT&T dramatically overstating the success of DirecTV Now and making false statements to the market about DirecTV Now.

432.    Plaintiffs and the Class reasonably relied upon the integrity of the market in which AT&T securities traded.

433.    During the Class Period, Plaintiffs and the Class were unaware of the Scheme Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiffs and the Class known of the Scheme Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased AT&T securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

434.    As a direct and proximate result of the Scheme Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of AT&T securities during the Class Period.

435.    By reason of the foregoing, the Scheme Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of AT&T securities during the Class Period.

### (3)    Count III: Violation of § 20(a) of the Exchange Act Against the Executive Defendants

436.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth in Sections I-IV(H) herein.

437.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Plaintiffs and the Class, against the Executive Defendants.

438.    As alleged above, AT&T violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase of AT&T's stock.

439.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Executive Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, AT&T is primarily liable under Section 10(b) of the Exchange Act.

440.    As set forth above, the Executive Defendants were controlling persons of AT&T during the Class Period, due to their senior executive positions with the Company, positions on the Board, and significant control over the Company's stock.  Such positions meant that the Executive Defendants had direct involvement and influence over the Company's day-to-day operations.

441.    The Executive Defendants also were culpable participants in the conduct alleged herein, because they: (a) made materially false and misleading statements or omitted to disclose truthful information; (b) had knowledge of the wrongful conduct or were reckless in not having such knowledge and continued in the capacity of control persons of AT&T; (c) provided credibility to AT&T's public disclosures by appearing in public events on behalf of  AT&T

while the conduct alleged herein occurred; and/or (d) did not act to prevent the wrongful conduct alleged herein, despite an ability to do so.

## V.      SECURITIES ACT ALLEGATIONS

442.    This Section and the Counts herein expressly do not incorporate any of the allegations in Section II(A) and Section IV.  For purposes of this Section and the claims alleged herein, it is as though Section II(A) or Section IV are not part of this Complaint.  As stated herein, the allegations in this Section arise under strict liability and/or negligence, and none of the allegations herein shall be interpreted as alleging intentional or reckless misconduct or alleging that any of the Defendants acted with scienter or fraudulent intent.

### A.      <u>Substantive Allegations and Context of Misstatements and Omissions</u>

443.    This Subsection provides the factual context relevant to understanding the misstatements and omissions in the Registration Statement and Prospectus.  Section V(B), details the misstatements and omissions in the Registration Statement and Prospectus.

#### (1)      AT&T Touted DirecTV Now as Core to its Business and as the Reason for the Acquisition

444.    As described in Section III(C)(2), in 2015 AT&T closed the acquisition of DirecTV for $67.1 billion in total consideration, notwithstanding the fact that traditional linear TV was in decline.  Beginning in March 2016, roughly seven months after AT&T had acquired DirecTV, AT&T began publicly discussing its plans to launch DirecTV Now.

445.    On September 21, 2016, at a Goldman Sachs analyst event, Defendant Stephenson explained that DirecTV Now was "an exciting product" and that it would launch in 4Q16. Defendant Stephenson explained that the product would not require a "truck roll" to install, and customers would be "pulling down an app" and "getting a very robust platform."  He added that DirecTV Now would have "100 plus channels at a very, very aggressive price point."  An analyst

asked him about the economics of DirecTV Now and he stated that it would have "thinner" margins than traditional DirecTV, but that the margins would not be "thin." He added that this was fine because of the "low capital intensity" associated with the product, and its "very, very low cost customer acquisition product," which would mean that its value for AT&T was "quite attractive and very positive."

446. On September 22, 2016, *Bloomberg* ran an article stating that AT&T planned for DirecTV Now to be its "primary video platform in three to five years." Other news sources repeated this claim.

447. On September 27, 2016, the *Dallas Business Journal* published an article titled "AT&T has set a timeline to phase out satellites and set-top boxes," in which the then-CEO of AT&T's Entertainment segment, Defendant Stankey, stated that while some segments would continue to use satellite for "a period of time" that AT&T was "well-positioned for a move away from legacy hardware." Through these statements, AT&T made clear that DirecTV Now was at the absolute center of its long-term plans.

448. On October 22, 2016, AT&T issued a press release announcing that its Board had entered into a definitive merger agreement with Time Warner. This press release made clear that the merger was about the future of TV and in particular DirecTV Now. It stated that "[t]he future of video is mobile and the future of mobile is video," and claimed that through the merger it would combine "the world's best premium content with the networks to deliver it to every screen." The phrase "every screen" was a clear nod to DirecTV Now, AT&T's OTT product that provided content, not just to TV, but also to mobile phone screens and tablets. The press release also commented that the combination "builds on Time Warner's HBO Now and the upcoming launch of AT&T's OTT offering DirecTV Now."

449.    Three days after the Acquisition was announced, on October 25, 2016, AT&T announced that the launch price for DirecTV Now would be $35, which was far lower than its pricing for DirecTV, and revealed that the product would provide more than 100 channels of content.  *Wired*, a leading technology publication, commented that this unexpectedly low price was "very much a shot across the bows of cable companies" and that it was "a way of bolstering support" for the Acquisition.  This low price served the dual purposes of signaling that AT&T believed it could compete in the lower-cost business model of other streaming services (*e.g.*, Netflix and Hulu)[26] and signaling to the regulators evaluating the antitrust concerns arising from the merger that AT&T was willing to compete in offering consumer-friendly price points.

450.    On October 25, 2016, the *Wall Street Journal* broadcast an interview with Defendant Stephenson and Jeff Bewkes, who was then the CEO of Time Warner.  In response to the very first question, Defendant Stephenson focused on the "20 million households who have lost the premium content system"—*i.e.*, the population segment DirecTV Now was focused on reaching—and then said:

> [T]hey've cut the cord and they're not even engaged in the premium ecosystem anymore.  And so we're going to launch, uh, at the end of next month, November, a product that we think does this.  And ***that's what this deal's about and I think it's important to understand it.  Direct TV Now is what we're calling it***, but this is for the first time a hundred plus premium channels, right?  This isn't the junk nobody wants.  ***This is an hundred plus premium channels purely over the top, a mobile centric platform for $35 a month.***  All right?  It has all Jeff's content.  It has all the premium content that you, you know and love.  You like to watch $35 a month and that includes your mobile streaming costs.  All right, streaming it over the mobile internet, so 35 bucks pretty much all in.  We think this is big.  We think it's a game changer.

451.    After explaining that the Acquisition is about DirecTV Now, Defendant Stephenson added that the product, and its $35 price point, is proof that the merger would be

---

[26] In October 2016, Hulu and Netflix each cost less than $10 a month.  In contrast, the average cable TV bill was approximately $103.10, according to a September 23, 2016, article published in *Fortune*.

good for consumers, stating "this is a way to drive pricing down in the marketplace."  He then returned to talking about the centrality of DirecTV Now in AT&T's business plans, noting how AT&T "started trying to develop this product over a year ago" but that it would "not be possible" had AT&T not done the DirecTV Deal, because absent that deal AT&T could not "get the media companies to participate in this until we have scale."

452.    Anticipating the antitrust concerns that would come to cloud over the deal, the *Wall Street Journal* interviewer asked Defendant Stephenson, "you're vowing you're not going to take any price advantage," to which Defendant Stephenson responded, "[w]e're actually trying to bring prices down.  $35--you don't find that for a hundred channels in the marketplace with wireless streaming, right?"  He also said that "anybody who characterizes this as a means to raise prices is ignoring the basic premise of what we're trying to do here.  Again, a $35 product we bring into the market to innovate on and find new ways of bringing content to customers.  That's not a medium for raising prices."

453.    He then further assured the market that the $35 pricing was sustainable by recognizing that "content costs are not going to be flat," but AT&T would "develop new ad models that will allow us to keep the price point in check offsetting the price increases on content," adding "I think that's really really important."  Later in the interview he commented on the pricing again, asking the rhetorical question "how do you get to a $35 price point" and then stating "The way you get there is you don't have a satellite dish on a roof.  You don't have a technician going out and spending four hours to install it.  You don't have a 5, 6, $700 set top box," and then, driving the point home he said, "You go to the web, you download an app, you subscribe and you're streaming DirecTV Now and all of the content that these guys provide. . . that's how you hit a $35 price point in the marketplace."

454.    Next, the journalist asked if this was a "bet the company" deal, and Defendant Stephenson stated that it was not, because "[t]his, this isn't one of those you have to do a lot of guessing and, and swing for the fences and hope for the best.  We know what the customers want.  It's really, really obvious.  They want premium content in a mobile environment."  Through this statement, he once again indicated that the deal was about AT&T's mobile TV product, DirecTV Now.

455.    On October 26, 2016, during an interview on CNBC's *SquawkBox*, Defendant Stephenson said, "as soon as we closed DirecTV, we went full out on developing this. . . it's a purely over the top video product DirecTV Now is what we're calling it."  He also said "it's going to be radically lower than what anybody has seen in the marketplace for a hundred channel product."  Then addressing the Acquisition, he said, "**Why put the two companies together?**" and answered "the world of distribution and content is converging and we need to move fast and if we want to do something truly unique, begin to cure a content differently, begin to format content differently for these mobile environments, and this is all about mobility," and concluded, "**think DirecTV Now**, the new product we're bringing to market."

456.    The significance of DirecTV Now to AT&T's future business plans, especially to its combination with Time Warner, was well understood by the market.  For example, an article on the popular investing website *Seeking Alpha* stated that the Acquisition "allows AT&T's DirecTV Now program to come at a cheaper cost," and continued, "AT&T is creating an ecosystem, and DirecTV Now is ***key in that effort***."  That article also commented that negative reactions to the Time Warner acquisition "ignores, or at least underestimates, how it all connects with its DirecTV Now plan."

457.    On November 9, 2016, at the Wells Fargo Technology, Media & Telecom Conference, an analyst asked whether the product was still going to be profitable given the $35 price point, and whether AT&T was comfortable with the margins on the product.  Defendant Stephenson responded "yes," indicating that the product would be profitable, and added: "as we add features, as we add different content, you will see different price points."

458.    On November 28, 2016, AT&T announced that DirecTV Now would launch on November 30, 2016.  It would come with a 7-day free trial, but would otherwise cost between $35 and $80 per month, depending on the package.

459.    On November 30, 2016, AT&T hosted a highly publicized launch event to promote the product, complete with a guest speech from movie star Reese Witherspoon.  During this event, Defendant Stankey explained that the product was taking "costs out of the platform" and targeting segments of the market that did not warrant "high acquisition costs."  He also explained that the product was the future of AT&T's video plans and a "***real game changer***," because it would "bring in other parts of the ecosystem" onto the platform.  Enrique Rodriguez, an executive vice president and the Chief Technical Officer at AT&T's Entertainment segment, echoed this point, saying that AT&T would be bringing "more and more of the experiences . . . under this same platform."

460.    Defendant Bentley, an Executive Vice President of Marketing in AT&T's Entertainment segment, began his remarks at the launch event by telling the audience, "***the revolution is here.***"  He then boasted that AT&T was "incredibly excited" about the product because the business model provided a "compelling value proposition."  Defendant Bentley also showed the pricing for the product packages (starting at $35), and stated that these prices are "everyday prices, everyday simple prices," that is "not promotional and does not roll off."  He

also explained the launch promotions available for DirecTV Now, which would include access to a free Apple TV Now (a streaming device that connects to a TV set, retailing for about $149 at the time) with a three month pre-paid subscription to DirecTV Now, or an Amazon Fire TV Stick (a streaming device that connects to a TV set, retailing at about $39) with a one month pre-paid subscription, as well as a one year subscription to DirecTV Now with the purchase of certain high-end TV sets.

461.    On December 6, 2016, at the UBS Global Media and Communications Conference, roughly one week after the launch of DirecTV Now, Defendant Stephenson boasted about DirecTV Now's initial release stating that "***early demand has been rather dramatic***" and that "***It has been really, really impressive, we have been pleased with it***"  Stephenson also explained that the "attach rates" for the $5 per month additions of HBO and Cinemax had been "really good," adding, "***bottom line, this thing is doing very, very well, it is exceeding expectations***."  Further indicating the close attention he was paying to the analytics surrounding the product, Stephenson explained, "DirecTV Now is way over indexing . . . people who live in MDUs, apartment complexes.  So we know we are hitting a demographic that we like here."

462.    In responding to a question from an analyst about the profitability of DirecTV Now, Defendant Stephenson explained that because the product is "software centric" and because "there is no truck roll at the house, there is no satellite that goes on top of a house, there is no set-top box that goes in a house, there is very little capital required to launch a service like this" he was "perfectly content with lower, thinner margins in a product like this.  We have the lowest content cost in the US, so we think we are uniquely positioned to offer a service, live video streaming, full array of content and to do it on a profitable basis."  Further emphasizing the supposed organic interest in the product, Defendant Stephenson also told investors that "we

expect virtually all of the subscribers to come to us via online, ***that is what has happened so far***.
And you subscribe, you put in a credit card and you begin viewing."

463.     The next day, on December 7, 2016, at the Barclays Global Technology
Conference, these highly positive comments continued.  For example, an analyst commented that,
per AT&T's prior statements, they were "already at or above plan when it comes to the types of
subscribers on to [the DirecTV Now] service."  Defendant Stephens interjected, agreeing,
"[t]hat's a very good thing, by the way."  During this conference, Defendant Stephens also
commented on how AT&T's mobile phone network was handling the load of DirecTV Now
traffic, especially given that AT&T was offering AT&T mobile phone customers unlimited
DirecTV Now data.  He said, "It's still early but we are pleased.  And, quite frankly, we are
pleased at the performance of the platform and the comments, most importantly the comments,
the response we're getting from customers."  He also said, "We will take in this information as
you would in any product launch and continue to improve it and continue to make it easier for
customers to use.  But we are real pleased about how it has gone so far."  He also commented on
how the data plan was important because of a hope that connecting DirecTV Now with AT&T
mobile phone service would reduce overall churn, recognizing the immense significance of
churn for AT&T generally: "When you are our size if you can reduce churn a few basis points
you can have a significant economic advantage and do that."

464.     In yet another profound indication of the immense significance of DirecTV Now
to AT&T's operations, Defendant Stephenson touted the product while testifying before a U.S.
Senate committee about the Acquisition on December 7, 2016.  Defendant Stephenson stated:

> Because of DirecTV we have been able to take the next step of offering DirecTV
> Now, ***which we think will be a real game changer***.  DirecTV Now is a
> subscription-based online video service designed for the more than 20 million
> U.S. households who have dropped traditional pay-TV or are flirting with cutting

the cord.  DirecTV Now customers can stream up to 100 channels at prices starting at $35 per month, with no long-term contract, no credit check, no installation, and no set top box.  And the price includes the data charges for AT&T Mobility customers.  Customers can sign up, download the app and start watching their favorite shows in minutes.

465.    On January 18, 2017, Defendant Stephenson appeared on *CNN* to discuss the Acquisition.  The interviewer asked, "why buy Time Warner?" and Defendant Stephenson responded, "[w]e're in an environment where our customers are demanding more and more video, more and more entertainment content, not only on the TV but on the mobile device.  And we have a really large customer base in, in a mobility.  And the ability to take really premium quality content to our customers in the mobile environment is huge for us."

466.    On February 13, 2017, *Business Insider* published an interview with Defendant Stephenson that occurred during the publications Ignition conference, which was held from December 5-7, 2016.  In that interview he, once again, explained the central role of DirecTV Now within AT&T's business plans.  He said that AT&T had been "adamant believers" that customers would watch "premium long form content" on mobile devices.  He then said, "to that end we acquired DirecTV," but added, "we were not in love with the satellite technology . . . what we needed was scale in premium content and so we bought direct TV."  He continued to explain that AT&T had launched the prior week, boasting that ""DirecTV Now [has] a hundred channels" and is "$35 a month," even with "all of that content."  He then stated, "we launched that last week on Wednesday" and hit the "December forecast" for the product on the very first day.  He concluded by explaining that the Acquisition complete[s] this strategy" and that he was "convinced that this would be really powerful if we could put these two companies together, begin to innovate the content for a mobile centric environment and so we did this deal."

467.    On January 18, 2017, Defendant Stephenson was interviewed on *Bloomberg TV*, and stated that "the reason we are so excited about" the Acquisition, "is that we want to change

how content is delivered to the customer," and then clarified, "we think it's really important [that]

the customers are using more and more content on mobile devices."  Then, when asked a

question about the possible revenue benefits of the Acquisition, he focused on DirecTV Now

stating:

> When you innovate and when you bring different capabilities to bear to the
> consumer the consumer's reaction to it is profound.  We recently launched an
> over the top product [DirecTV Now], its live streaming of traditional premium
> content to a mobile device-mobile centric.  The customer receptivity to this has
> been over the top, really really strong.  That has given us more and more
> conviction that if you can take premium content and begin to innovate around it
> and deliver it in these formats, then you can have that same kind of impact and
> that's what [the acquisition of] Time Warner is about.

468.    AT&T and its leadership continued to publicly describe the connection between

DirecTV Now and the Acquisition.  For example, on February 15, 2018, during a public

interview with Boston College's CEO Club, which was posted online on Boston College's

website and on YouTube, Defendant Stephenson stated:

> We're trying to acquire Time Warner.  They are the parent company of Warner
> Brothers Studios and HBO and Turner Networks, so CNN, TBS, TNT, and so
> forth.  And we really thought it'd be a good idea.  We've been working over the
> last few years to build the capability to distribute video—premium video—over
> wireless technology, and we're investing a lot. . . .  We actually thought if you
> create this kind of distribution, media companies will probably become more
> valuable over time and we thought we should own some premium video.  And so
> we worked with Time Warner.

469.    On May 4, 2017, during an interview on CNBC's *SquawkBox*, Defendant

Stephenson said, "It's no surprise that people [are] either cutting the cord or never getting the

cord. . . .  That's why we launched DirecTV Now."  He then added, "It's had a terrific amount of

success" and stated that products like DirecTV Now are "where I think the industry is going."

470.    On November 29, 2017, at the Economic Club of New York, Defendant

Stephenson again explained the central role that DirecTV Now played in the Acquisition.  While

describing why AT&T was buying Time Warner, he said "acquiring DirecTV gave us the ability

and it gave us the position to go in and negotiate those rights that we'd been trying to get for years with all the premium content players to distribute content to our mobile customers" adding that "within a year after acquiring DirecTV, we launch a product called DirecTV Now" and continued by stating "We're having great success with it."  Then he said "[w]e'll probably hit a million subscribers this quarter within a year of launching the product and so **that was what this [Acquisition] was all about.**"

**(2)    DirecTV Now Suffered from Severe Product and Service Issues Creating Dramatic Risks and Problematic High Churn Trends**

471.    Through its entire existence the success of DirecTV Now faced a variety of dramatic risks, and due to DirecTV Now's core role within AT&T's business plans, these risks were among the most significant risks faced by AT&T.  Those risks and trends are described below.  Each heading below is provided for organizational purposes though the allegations in each Section are mutually reinforcing.[27]

**(i)    *DirecTV Now Was Not and Would Not Be a Profitable Product***

472.    From even before the launch of DirecTV Now, it carried one of the most significant risks to AT&T investors and to AT&T's business because it was not a profitable product and would not be a profitable product.

473.    The significance of the profitability of DirecTV Now was clear even before it launched.  On September 21, 2016, at a Goldman Sachs analyst event, an analyst asked how the "math" works, given that "programming is expensive."  Defendant Stephenson explained that the product would not have "thin" margins because it had "low capital intensity," adding that the value for AT&T from the product was "quite attractive and very positive."  At no point did

---

[27] The facts described herein are provided to describe the true situation regarding DirecTV Now and are not submitted for the purpose of alleging that any Defendant had any particular state of mind.

AT&T disclose the unique risk that the product at the core of its business plan was not and would not be profitable.

474.     The *Wall Street Journal* reported on November 6, 2016 that analysts were projecting that after deducting the cost of content licenses, there might only be "a dollar or two in gross margin."  Some analysts, such as UBS' John Hodulik, estimated that the cost of programming for the new product would be $30 per month, meaning the $35 price would leave little room for profit.  Similarly, Michael Nathanson opined "they aren't going to make any money."  However, these public reports were not based on the actual licensing prices AT&T had negotiated paying, and did not account for revenue AT&T would receive from advertising.

475.     As AT&T eventually disclosed—after the Acquisition closed—DirectTV Now had not been a profitable product.

476.     On October 24, 2018, in the conference call associated with AT&T's 3Q18 financial results, Defendant Donovan disclosed decelerating subscriber numbers, and attributed this subscriber decline to price increases – noting that: "made the strategic decision to rationalize our promotions and special offers for DirecTV Now.  We're taking a more tailored, data-driven approach."  This reference to "rationalizing" promotional activity was a revelation that until that point the product had not been priced rationally (*i.e.*, profitably).  He also stated, "**with our data, we will continue to tweak our approach to optimize profitability and see our value proposition stabilize.**"  That too, was a partial disclosure that the product had not previously had a sustainable or stable value proposition (*i.e.*, was not profitable).

477.     On November 14, 2018, while speaking at the Morgan Stanley TMT Conference, Defendant Stephens described the new situation with DirecTV Now pricing was a "**shift to market pricing, the shift away from promotions to grow the base so we could test the**

**systems**."  This reference to "market pricing" was juxtaposed to pricing or promotions set to grow the base to "test" the system, in this context; the disclosure makes clear that AT&T's prior pricing scheme had not been profitable.

478.    On November 29, 2018, AT&T hosted an analyst meeting, where Defendant Stephenson said that "2018 has been all about **getting that product and the pricing, the customer value proposition and the cost, the content cost dynamics right here**."  This statement indicated that the pricing and value proposition had not previously been "right" (*i.e.*, profitable).  During this conference, Defendant Donovan stated that AT&T was working "content costs" on both DirecTV Now and their newer streaming product WatchTV,[28] "**so we can make a profit not overall** -- not only overall but in each individual one."  Once again, this reaffirmed that DirecTV Now had not actually been a profitable product.

479.    On December 4, 2018, AT&T participated in the UBS Global Media and Communications Conference.  During the conference, Defendant Stephenson stated, "last half of 2018 has been about getting that product right and getting the dilution under control, getting the pricing right, getting the content cost right."  He then continued: "**we're thinning out the content, getting the price point right, getting it to where it's profitable, and that will be a different segment of the market**."  In this statement, Defendant Stephenson made clear that the product had not been profitable, as AT&T was making changes in hopes of "getting it to where it's profitable."

480.    These statements each indicate that DirecTV Now was not profitable.  This conclusion is further strengthened by the heavy promotional activity described in Section

---

[28] WatchTV was a very limited TV streaming service provided to AT&T mobile customers that launched around June 2018.

V(A)(2), since this activity resulted in many customers not paying even the full $35 price for DirecTV Now.

481.   According to CW-12, during the entire first year of offering DirecTV Now, not one subscriber was profitable.  He further explained that the content that AT&T was offering was far too expensive for the price that they were charging subscribers.  He added that some DirecTV Now customers were profitable for AT&T overall, even though AT&T was losing money on their DirecTV Now subscription, because some of them were also buying other AT&T services.

### (ii)   *Aggressive Promotional Activity and Improper Sales Practices*

482.   From the moment DirecTV Now launched onward, it posed one of the most significant risks to AT&T investors and to AT&T's business because it was core to AT&T's business plans.  However, its ability to secure users was heavily dependent on aggressive promotional activity and improper sales practices.

483.   CW-1 confirmed that the way AT&T set sales quotas and commissions incentivized sales representatives such as himself to utilize these aggressive and improper sales tactics.  CW-1 explained that each month, there were quotas set and for each new subscription of DirecTV Now the employee would receive a "spiff," (*i.e.*, a commission or bonus) among other incentives.  CW-1 also said that if the employee met their quotas, their managers and above would receive commissions as well.  CW-1 reported that he was "taught to manipulate" sales of DirecTV Now when customers were activating new mobile phones.  According to CW-1, when a wireless customer would come into the store to get a new phone, the customer traditionally had to pay an activation fee to upgrade their phones.  After the launch of DirecTV Now, CW-1 and his colleagues were taught to convert the activation fee into up to three subscriptions of DirecTV Now and covertly waive that fee.

484.   CW-1 explained the mechanics of this process as follows: The customers were told that there was a $35 activation fee.  CW-1 and his colleagues would tell the customers that their purchase came with one to three months of DirecTV Now for free.  They would then waive the activation fee on AT&T's system, but would not tell the customer they were doing this. Instead, CW-1 and his colleagues would charge the amount of the activation fee to the customer, but apply that money to the DirecTV Now subscription.  CW-1 added that when DirecTV Now was running a promotion, Sales Representatives were taught to create up to three accounts with that $35 activation fee, and would do so by using "bogus" email addresses for the extra accounts, and "sneakily run" the customer's credit card for each account.  CW-1 added that AT&T's system was designed to allow this and did not require the email accounts to be verified, so the personnel in the store could "put any" email address into their systems and run the same credit card for multiple accounts.

485.   CW-1 further advised that once the supposed trial period had passed, he and his colleagues were supposed to manually cancel those subscriptions so the customer would not get charged.  CW-1 explained that they would do this through a "back end" system, without the customer ever knowing.  CW-1 added that they would keep a "log" which detailed the customer's information, the fake email addresses, and the date that they needed to cancel. According to CW-1, the log was kept on the notepad function on an iPad so he could manually go in and cancel the accounts.  CW-1 added that sometimes the customers would continue to be charged on their credit cards without their knowledge, but most times, CW-1 and his colleagues would go into the accounts and cancel them manually to remove the recurring charge.  CW-1 said that he heard from AT&T employees from both the west and east coasts of the U.S. stating that they had been directed to create fake accounts in the same way that he had.

486.    CW-1 recalled how this practice began in earnest in 2017.  He said that he and his colleagues were able to make the subscriber growth "explode" by using these sales tactics.  He added that these tactics were used continuously, because they were consistently signing up people who had upgraded their phones and thought they were getting DirecTV Now for free for 3 months as a perk related to that upgrade.  CW-1 recalled that sales representatives were originally given 8-10 new DirecTV Now accounts as targets to reach each month and that those targets were quickly increased to 20-30 new accounts per sales representative, each month.  He said that once management realized how easy it was to create fake accounts, the targets quickly increased and seemed to "double" or "triple" as the months went by.  CW-1 said that about half of the accounts he created were fake, which by his estimate, meant he was creating about 15 fake accounts per month.  CW-1 added that "at least half" of the DirecTV Now accounts were "bogus," based on what he was seeing internally.

487.    According to CW-3 shortly after launching the product AT&T began placing an extraordinary amount of pressure on its employees to push sales of DirecTV Now.  CW-3 explained that by December of 2016 there was "a tremendous focus to sign customers up on DirecTV Now."  He said that directive came from both the Regional Vice President Cavalieri and from Director of Sales Quiros, and there was "extreme pressure" to sell DirecTV Now that was "extremely intense."  CW-3 said that beginning in late November 2016, as DirecTV Now launched, he participated in multiple conference calls every week where the directive to sell the new service was hammered home.  He said that the conference calls were held twice a week, three times a week, from November 2016 until he left in January 2017.  CW-3 said that he participated in those calls along with Quiros, and other executives like Area Retail Sales Managers Christopher McCambridge and Mark Bonanni.

488.     According to CW-3, AT&T "turned good people into bad people" because those people could not keep up unless they participated in the fraud.  He added that AT&T "makes Wells Fargo look like Angels."  CW-3 continued that the increased focus on selling DirecTV Now subscriptions created a ripple effect through AT&T's sales associates and sales managers whereby people began using any means necessary, even fraud, to meet AT&T's sales expectations.  He estimated that "more than seventy-percent" of sales employees felt like they had to take an unethical approach to selling the product in order to meet the internal goals.  CW-3 stated that adding DirecTV Now without a customer's permission was "common practice."  CW-3 explained that there were always sales metrics when something new like DirecTV Now launches.  He said that for years when people committed fraud, they would be looked upon as outstanding performers and even if it was brought to the Company's attention, they would just dismiss it.

489.     CW-2 said that they would try to pitch DirecTV Now but it was a "very hard sell" and that sometimes the customer would say that they did not want the product, but that they would go ahead and add it to the account anyways without telling them.  CW-2 said that one example of the ways sales representatives would sign up customers for DirecTV Now, without the customer's knowledge, would be to apply a discount to an actual purchase and then apply the extra payment to DirecTV Now.  CW-2 also said that sometimes they would put DirecTV Now on the client's account from the back end of their computer system, without charging the customer anything at the moment.  CW-2 added that the account would be setup with a fake email address, so that the client would not receive notifications about it unless they noticed it on their credit card.  CW-2 recalled that when customers noticed the charges they would often complain.

490.    CW-2 further recalled witnessing that customers were unknowingly being signed up for DirecTV Now at least at 2 of the 3 stores he worked at throughout 2017.  CW-2 also advised that one of his responsibilities was handling bill reviews with customers.  CW-2 explained that customers would come into the retail store to review their AT&T Mobility bills and charges.  CW-2 estimated that around 40 – 50% of the customers he dealt with, beginning in early 2017 and continuing throughout that year, complained about being charged for DirecTV Now, which they told him they never signed up for.

491.    According to CW-2, there was a big push by January 2017 to get AT&T customers signed up for DirecTV Now.  This push included bonuses for sales quotas met, and the threat that those who did not meet the quota would be fired.  CW-2 added that sales representatives were told "do whatever it takes, if you aren't selling it you are fired."  CW-2 also said that AT&T used "big incentives" to push sales, such as offering customers free Apple TVs.

492.    CW-2 also recalled that it was around January 2017 when his Store Manager came out of a monthly meeting, at one of the stores CW-2 worked in, with a Director of Sales, and directed CW-2 and his colleagues that the instruction from the Director of Sales was to get customers signed up for DirecTV Now any which way they could, including signing customers up without their knowledge.  CW-2 further recalled the Store Manager saying "this was what they wanted," and that the Store Manager implied that this directive came down from those higher up the chain than the Director of Sales.  According to CW-2, the message from the Director of Sales was "just put it on there," referring to DirecTV Now, and "get the customer signed up, even if they don't know."  He referred to the Director of Sales as "pretty ruthless," adding that he would say "just do whatever it takes."  CW-2 advised that the Director of Sales

oversaw around 27 stores in Michigan reporting to him, and that he visited them around once per month to meet with the Store and Area Manager.

493.    CW-5 said AT&T supervisors "made employees," including himself, conduct certain inappropriate sales practices for the purpose of increasing DirecTV Now subscribers. CW-5 said that in December 2017, a Store Manager sat him down and explained that management followed a certain sales pitch to get customers to sign up for DirecTV Now, even if the customer did not understand what they were signing up for.  He explained that this included telling the customer they were being charged for one thing, but in actuality assigning that charge in the system to DirecTV Now.  He added that the customer's email address would be attached to the new DirecTV Now account, and that fake email addresses were also added to create additional accounts to falsely boost subscriber numbers.  CW-5 further recalled a Store Manager adding that if he wanted to be successful, management would help him.  He also said that an Assistant Store Manager explained to him how to go about inappropriately boosting the DirecTV Now subscribers without the customer knowing.  CW-5 also said that one day when an Area Manager was in his store, the Area Manager congratulated him for around five recent DirecTV Now signups, and that when CW-5 explained to the Area Manager what he was doing, and had been instructed to do, to get those numbers, the Area Manager's response to him was similar to, "do what you got to do."

494.    CW-5 gave a specific example of these practices using SIM cards for phones. CW-5 advised that replacement SIM cards were supposed to be free, but that he had been instructed to tell the customer that the charge for the SIM card was $10.50, for example. Following what he was directed to do, CW-5 created a new DirecTV Now account assigned to that customer's email address, and applied that charge to it as a DirecTV Now charge, not a SIM

card charge.  CW-5 then also created fake email addresses associated with that account to artificially increase the number of DirecTV Now subscribers.  He added that the customer just thought that they had paid for the SIM card only.  CW-5 said that AT&T had disabled their email verification process which allowed this practice to occur.  CW-5 said that since AT&T's email verification process was disabled, he created easy-to-remember email addresses, such as yankee123@gmail.com and red@gmail.com, and passwords that he could cancel subscriptions for when he needed to, and as he was directed to.

495.    CW-4 said he and his team started fielding complaints from customers stating that they were being billed for DirecTV Now without having signed up for it starting around June 2017, and he said this continued through the end of his tenure in May 2019.  He recalled seeing multiple complaints per day from customers stating that they were being billed for DirecTV Now but that they had never signed up for it.  He said these complaints would come in "all the time." He estimated that he was seeing between 20-40 complaints per week about being billed despite not signing up for an account.  He recalled that often he and his colleagues would try to look up the customer's account, but that it would be associated with an email address the customer had never used.  CW-4 said that customers complaining about being billed for DirecTV Now despite not signing up for it, were from all over the United States, and he did not recall any region standing out as having more complaints than the others.

496.    According to CW-4, his team dealt with hundreds of customers every week. According to 4, he and his team could access the customer's account in AT&T's Evergent system and see information such as their billing information, when they were signed up for DirecTV Now, which AT&T representative had signed them up and at which location, how often the customer used DirecTV Now, when they last used the product, what devices DirecTV Now

was used on, and how many accounts the DirecTV Now subscriber was linked to.  He said that they used this account information when working with the customer and that they would pull it up after looking for the customer's account.  CW-4 estimated, based on the data he saw in Evergent, that around half of all DirecTV Now accounts he reviewed were not using the service at all.

497.    CW-6 said that the data he analyzed showed that a considerable number of subscribers were churning away from DirecTV Now.  For example, he said they would sign up for an Apple TV and then disconnect once the promotional period ended.  He added, when you looked at the math, you could get the Apple TV at a "pretty good discount" by signing up for DirecTV Now.  He said AT&T was "giving away a lot but we weren't seeing favorable results in terms of keeping customers on."  He said the customers were "leaving so quickly," and that, as a result, the promotions were too rich.

498.    CW-7 confirmed that Cricket held daily meetings, sent out constant email reminders and offered incentives to employees to ramp up sales of DTV Now.  According to CW-7, there was a document circulated daily that ranked employees on their sales of DTV Now and compared them to their peers.

499.    CW-9 explained that the directive from the top was "we're going to push DirecTV Now" given that it was a "big focus."  He added that he heard this from his Regional President Mike Whittrock.[29]  According to CW-9, around February 2017, a few months after the launch of DirecTV Now, Defendant Shay put out a directive instructing managers and directors to tell their sales teams to prioritize DirecTV Now.  He recalled that typically Defendant Shay was on all leadership calls with the Regional Presidents and that the Regional Presidents

---

[29] According to publicly available sources, "Mr. Michael Wittrock, also known as Mike, has been the President of Southeast Region for AT&T Inc. and AT&T Mobility LLC since December 2016."

typically had weekly calls with their vice president general managers.  CW-9 called this focus on DirecTV Now a "strong-arm" and explained that the message was: "everybody really needs to get behind this product, we're not doing well with it, push it."

500.    CW-10 recalled that when it launched, the promotion of DirecTV Now was a "big, big deal" and that AT&T wanted to make sure that its sales representatives were "positioning it to every client walking in through the door."  CW-10 stated that if a sales representative was not "hitting their goals or their metrics," CW-10 was responsible for putting them on "a performance improvement plan" to "scare them."

501.    CW-10 also described how AT&T pressured its employee base to sign up for DirecTV Now.  CW-10 stated that when DirecTV Now first launched, "there was a really, really strong recommendation for all employees to buy DirecTV Now."  CW-10 added that managers were "trying to get reps to sign up and get their families to come in and sign up."  CW-10 said employees who didn't comply risked being penalized professionally.

502.    CW-11 recalled that within six months of the launch of DirecTV Now he was on a call with Defendant Shay where Defendant Shay stated that every store was expected to double its subscription sales month to month.  He gave an example to explain this, that if a store sold 10 subscriptions the first month, the next month would net 20 subscriptions, followed the next month by 40 subscriptions, followed the next month by 80 subscriptions.  He also recalled this same message being communicated in other phone calls.  CW-11 stated that this was "not sustainable" but that employees were told that they would be "held accountable" if they failed to meet this target.  CW-11 said that the pressure prompted the sales force to resort to "unnatural sales or flat-out fraudulent" sales tactics.  Specifically, CW-11 said that employees would use the customer's credit card information and they would sign them up for the free service without

telling the customer and then the customer would see it on their bill. CW-11 also recalled situations where customers were told that they needed to sign up for DirecTV Now in order to upgrade their phones, when this was not true.

503.    According to CW-14, within about fourt months after the launch of DirecTV Now, a new, significantly more aggressive sales goal was announced by Scott Davis, a Director of Sales, and Amanda Harris, a Vice President General Manager. He explained that some areas were tasked with increasing current sales projections by a 2X, month over month multiplier, while other areas were hit with an even higher target. CW-14 said that these sales goals were not realistic.

504.    CW-14 heard that other directors and area managers were basically instructing and/or allowing their sales associates to use a tactic known as "cramming." According to CW-14, through this practice, employees would tell customers that DirecTV Now was included in their bundle of services they were buying, when that was not actually true. In other words, according to CW-14, they would not tell the customer that DirecTV Now was a subscription service that came with a monthly fee. That was left up to the customer to figure out before or after they began getting billed.

505.    CW-16 said that shortly before AT&T launched DirecTV Now in November 2016, he and his sales employees received training related to the product. He described how both managers and retail sales consultants received commissions for selling the product. CW-16 said he was told to have his team withhold certain information and focus instead on other information related to the product, in an effort to facilitate a sale.

506.    CW-16 recalled being "hounded on" by the district manager to sell DirecTV Now. He stated that the pressure to sell, coupled with the information he began hearing about from

work colleagues related to fraudulent and deceptive practices, paved the way for him to consider a new career choice.  He added, "It was driving it or pushing it no matter what, and if you don't have high sales you're looked at as an underperformer or someone who's not fit to be in that position."

507.    CW-8 recounted how he heard that employees at the stores were able to manipulate DTV Now subscriber numbers by creating fake accounts.  CW-8 advised that this occurred through "different scenarios."  For instance, according to CW-8, a customer would come into the store and upgrade their account, and the sales person would then put DirecTV Now in their bundle, but the sales person would categorize it as the sale of a new installation, that way the representative could classify this as both a sale of DirecTV Now and as a brand-new customer.  CW-8 recalled that the Director of Gulf States told him this was happening.

508.    CW-8 stated that the initial rollout of DirecTV Now was bolstered by the promotions offered to employees.  According to CW-8, the employees paid a "very low rate," and many of his colleagues participated in the promotion.

509.    According to CW-10, sales representatives were being directed to sell as many subscriptions to DirecTV Now as possible, often without the customer's knowledge or understanding of what they were receiving, and often without giving the customer the option to decline the offer.  CW-10 said that he was aware of sales representatives lying to customers to sell the product.  CW-10 further recalled the way in which AT&T employees would use "bundling" to misleadingly drive sales.  CW-10 said that employees would get the customer to agree on a price point, and show them the forms describing the plan that the customer was trying to sign up for.  After the customer agreed, the employee would add DirecTV Now to that bundle.  CW-10 said, "You could have saved them fifty bucks, but instead you slide it in as DirecTV

Now."  According to CW-10, once a price point was established, then it was up to the sales representative to figure out how to include DirecTV Now and sometimes, the easiest route was to convince the customer they were getting a "bundle" of services, including DirecTV Now, even if all the customer wanted was a specific cell phone package that cost less.

510.    CW-16 stated that he first heard of an investigation into DirecTV Now sales practices and fraudulent behavior by sales associates in mid-2017.  He recalled discussing the investigation with other store managers in other parts of California.  He stated that he heard of managers who were offering bill discounts or bill credits or selling on top of other products.  He clarified that "selling on top" meant that a customer would sign up for one service and suddenly get a subscription for DirecTV Now in addition, without their knowledge.  With respect to "bill credits" he said that it meant AT&T was essentially paying people to sign up for DirecTV Now just to increase the amount of subscriptions that the new service was accumulating.

511.    The practice of fraudulent account creation is corroborated by online accounts of similar fraudulent activity.  AT&T maintains a web-based forum on its website "forums.att.com."  That forum includes an area where customers can post descriptions of billing issues that they have experienced in relation to their DirecTV Now subscription.  Sometimes AT&T employees respond to these posts in their personal capacity and sometimes AT&T representatives formally respond.  This forum includes dozens of reports of duplicate charges and illegitimate extra accounts that are highly corroborative of the testimony provided by the Confidential Witnesses.  A few examples of these posts are as follows:

> (a)    March 19, 2017
>
> Title: "Fraud"
> Body: "I am being billed for 2 DTVNow Accounts and don't have access
> to any[.]"
>
> (b)    August 1, 2017

Title: "Direct TV now app & over charge"
Body: "I was double charged for two accounts that are not active.  I need assistance in getting my money released."

(c)     November 30, 2017

Title: "AT&T Gave my info without me knowing!  Refund??"
Body: "I bought a new phone at the AT&T store, and no one mentioned anything about direct tv.  Checked my bank account and I've been charged monthly since getting my phone for direct tv now "live a little" package!  I don't even own a TV!  The charges come to $93.50!  I never authorized at&t to give out my credit card info, and direct tv has all of it.  Has this happened to anyone else??  And how did you go about getting your money back That much means a lot to me ☹ Lady on chat said she could only give me $35, then eventually said she could do $74, but I'd like to be able to actually speak with someone instead of chat, and to get ALL back.  Help!  So frustrated."

(d)     April 15, 2018

Title: "Being Billed When i never signed up for service"
Body: "For 2 months I've been billed for Direct TV Now when i never signed up for the service.  How can i stop that?

(e)     July 5, 2018

Title: "Money drafted off debit card"
Body: "I have An Amount of 74$ coming off my credit card saying it is from direct tv now I need to see why because I do not have an account with you at all.  I need assistance please."

(f)     August 14, 2018

Title: "Never signed up for DirecTV Now"
Body: "I need Direct TV Now cancelled.  Your representative signed me up without my consent, that's fraudulent.  Also please refund all the payments you've taken from my account."

512.     Other internet communities have posts with similar stories of fraudulent account creation.  For example, the website "pissedconsumer.com," which tracks complaints from consumers about companies, has dozens of similar stories.  Among those stories are the following:

182

(a)   February 14, 2018

Title: "Directv Now - Buyer Beware, Ver[y] Shady Business Practices"
Body: I never opened a Direct TV Now account but $10.68 was debited
from my account.  There was absolutely no way to clear this up
because DirecTV Now does not have a real customer service
center.

(b)   September 23, 2018

Title: "Directv Now - Don't use the service but sure do get billed for it!!!"
Body: "Got suckered in to this Directv thing when I upgraded my phone at
AT&T.  It was supposed to be free.  Never used it.  Couldn't get it
to work.  No one would help.  Can't talk to anyone.  Getting billed
$40 / month.  Been trying to cancel but there seems to be no way to
do that!  The FAQ tells you exactly how to do that but guess what?
The directions do not line up with what is actually on the web site.
This is the perfect crime!"

(c)   July 19, 2018

Title: "Directv Now - SCAM!!!"
Body: "I have never even signed up for this service and some how my
account information was gotten and billed for Direct TV Now of
which I had no idea what this even was until I saw charges via my
debit card!  I do have U-verse in my home and my debit card is on
file to pay my U-verse bill so it makes me wonder if my bank info
was accessed through my U-verse account and fraudulently used
for this Direct TV Now scam?  I will be cancelling my U-verse
service because I no longer trust AT&T."

(d)   November 9, 2018

Title: "Directv Now - FREE TRIAL SCAM!!!  STAY AWAY!!!"
Body: "I WAS OFFERED A FREE 7 DAYS TRIAL OF DirecTVNow
[THROUGH] AT&T COMPANY, WHEN I TRY TO CANCEL
ON THE 5TH DAY. . . .  I NEVER GAVE DirecTVNow
PERMISSION TO DEDUCT MONEY FROM MY BANK
ACCOUNT WHITCH THEY DID GET MY BANK
INFORMATION [THROUGH] AT&T AND WITHOUT MY
PERMISSION THEY DEDUCT $147.24 TWO MONTHS
WORTH OF SERVICE WITHOUT HAVING ANY SERVICE
OR ACCOUNT WITH THEM!!!!"

(e)   December 29, 2018

Title: "DirecTV Now - I don't have an account for past few years and you
keep charging my bank acct"

Body: "I've been dealing this for almost a year now and I last spoke to [an
AT&T representative] last [month] and my acct is still getting
charged he mentioned he removed my credit card but that's been a
lie.  I need reversal charges has caused insufficient fees and you
charging me twice because you caused my acct negative I'm
getting close to going to a claim for this to court for all the
damages.  It affected my credit as well"

(f)     December 26, 2018

Title: "DirecTV Now - Once they get your Credit card they never stop
charging"

Body: "This company is a scam.  Someone got my card and did fraud this
company been charging me for one year each month I challenge it.
Scam artist."

513.    Altogether these posts confirm that many customers were affected by the creation

of fake and duplicate DirecTV Now accounts.  The posts also demonstrate that this conduct

occurred for a prolonged portion of the Class Period.  As explained herein, Defendants never

disclosed that DirecTV subscribers were obtained through improper sales practices but instead

insisted during the Class Period that the subscribers' growth was organic.

514.    Other former and current AT&T employees corroborate the Confidential Witness

Testimony regarding unethical and improper sales tactics.  According to a report issued by

*Hawaii News Now*, current and former AT&T employees told the newspaper that retail managers

at the Company took an aggressive approach to selling trial subscriptions to DirecTV Now.[30]

Some AT&T sources told the newspaper that if a customer agreed to purchase a trial, sales

representatives were able to use that credit card to start several trials.  This often happened

during $10 promotional periods because representatives could squeeze three sales into one.  "My

manager picked up my iPad, which was signed in under me, made a fake email and then

---

[30] *Hawaii News Now*, Hawaii AT&T workers say company urged them to use unethical tactics—and then
fired them, August 13, 2018.

activated a DirecTV Now subscription on that email and then said if I can do it, here you go, you

can do the next one," an AT&T employee told the newspaper.

515.    Another source told the newspaper that if a customer were purchasing a cell

phone, a sales representative might falsely say the purchase carries a fee.  The representative

would then offer to waive the fake fee if the customer instead purchased a cheaper trial of

DirecTV Now.  This tactic was encouraged by managers, who competed for top sales rankings.

The *Hawaii News Now* article recounted one employee recounting how once the service

officially became a ranked sales metric in June 2017, sales numbers tripled and stayed that way

through the end of the year.  Sources told the newspaper that employees who didn't meet sales

goals faced disciplinary action.

516.    Reportedly, Hawaii regularly had some of the best DirecTV Now sales numbers

in the nation during this time.  According to the *Hawaii News Now* article, one employee

estimated that 90 percent of the sales throughout that time were made unethically.  "Check your

statements, I have no doubt that there are still people that are being charged," the employee was

quoted saying.

517.    Shortly after the story was reported in the newspaper, AT&T told *Hawaii News

Now* in a statement: "Last fall, we detected some simultaneous customer orders and cancellations

of a free product trial."  "We determined some employees had violated our policies and based on

our findings we took appropriate action."  AT&T said that both management and non-

management employees were involved in these violations, but declined to comment on the

allegations of unethical behavior and would not say how many people were terminated locally or

nationally as part of the investigation.  As explained herein, the fraudulent account creation

practices were not confined to Hawaii and were widespread nationally throughout the Class Period.

518.   Indeed, comments made after the *Hawaii News Now* Article was published further describe the fraudulent activity.  For example, in a discussion focused related to the *Hawaii News Now* article, on the social media website "Reddit.com," the fraudulent activity was discussed:

(a)   "This is happening at least in that region, all the AT&T employees I know report the same.  Entire west coast operations is doing this, people are afraid of getting fired for things their managers are telling them they have to do."

(b)   "I can assure you, having worked for both AT&T and Verizon, and been present as a personal assistant at board-level management meetings, board-level management on down is *fully aware* of how much they are forcing their employees to do unethical things.  They don't care.  They know that, as long as everyone in management keeps their mouth shut, the unethical behavior will be limited to the employees that are forced to commit it.  Hell, they *budget* for the potential fines should they get caught."

(c)   "I can name 4 AT&T employees at different stores in one district that got Fired for this exact thing, its rampant in the company.  Stores are letting managers Go and the employees they made do it, its crazy.  Right now I know employees whose manager Made them do it, Manager gets fired, Reps follow next.  West coast is definitely a hot bed of this and I am sure its the entire company."

(d)   "You're absolutely right.  Every single "Top performer" and Summit Winner that I know does so much shady stuff, I am downright ASTOUNDED this issue hasn't popped up publicly yet."

(e)    "Managers not being fired may have been unique to your market.  When DirecTV Now became part of the comp plan, I investigated some of this fraud myself and many managers were terminated as a result.  Investigations are still ongoing too so even if you think that some of your management team is going to get away with no consequences I can tell you that they probably won't."

(f)    "As an employee of AT&T, I can say that this is 100% happening and occurs daily in every market I have any relationship with."

519.    Another Reddit.com article published June 22, 2018, titled "Many AT&T customers may have been defrauded," stated that "In December [2017], an email was sent out to [AT&T] reps stating that the company [AT&T] was aware of what was going on and that they would not tolerate it anymore."  The same post explained that "as soon as the Time Warner deal went through, reps across the board were fired" and added that "[h]undreds of employees have [e]ither been fired or are slated to be fired within the coming days" and the fraud "could [a]ffect thousands of customers."

520.    Similarly, an account titled "atthumor" on the social media platform, "Instagram" that posted content of interest to AT&T employees had over 20,000 followers and multiple posts and comments describing the prevalence of fraud at AT&T.  One post from June 26, 2018 with over 2,000 "likes" showed the text, satirizing AT&T's slogan "It's our thing" with a fake advertisement reading: "Firing people for doing the shady shit we told you to do [--] that's our thing."  One commenter on an atthumor post wrote: "Dude in Savannah had 32 DTV nows and didn't even get acknowledged on calls.  They know it's unethical."  And another post from June 13, 2018, showed the following image, which apparently shows a white board instructing

employees to discount out the price of DirecTV Now as an account credit, functionally bringing the price down to nearly nothing:



      **(iii)**   *DirecTV Now Posed a Severe Risk to AT&T's Business Because It Faced Serious Technical Problems*

521. Upon launch, DirecTV Now faced severe technical problems that threatened the success of the product and AT&T's business plans.

522. Looking back on the launch, *The Verge*, a popular online technology online publication, ran an article titled "***DirecTV Now appears to be a complete mess***," on January 13, 2017. The article stated that "[u]sers report constant errors and a ***near-unusable service***" and that users complain of being "unable to watch shows, frequent interruptions, missing features, billing issues, and more pretty much nonstop since the service's November 30th launch," concluding "[m]any say it's simply unusable." The article also explained that the Twitter account for DirecTV Now had been "apologizing day after day and promising updates that seemingly haven't come." Similarly, the *New York Post* ran an article on January 13, 2017, titled, "DirecTV Now is a total disaster," stating that "every aspect of the service is a total disaster."

523. On January 16, 2017, *TechCrunch*, another popular technology based online publication, wrote about issues surrounding the launch, noting complaints of the "service freezing and buffering, app crashes, being automatically logged out, and more." The same

article detailed that AT&T was not offering refunds to those upset with the performance

problems, and that it had led some customers to lodge formal complaints with the Federal

Communications Commission.  On January 17, 2017, *Fortune* wrote an article titled: "DirecTV

Now Customers Frustrated with Glitches and Lack of Refunds," which stated, "the complaints

are mounting," as customers describe "problems such as unavailable video streams, features that

don't work as expected, and incorrect billing."

524.    Yet, during the Class Period, Defendants boasted DirecTV Now's success and

failed to disclose that pervasive technical problems, among other issues, were driving down

demand for the product.

### (iv)    *DirecTV Now Was a High Churn Product That Would Not Retain Subscribers*

525.    By no later than late 2017, AT&T faced the trend that DirecTV Now customers

were cancelling their accounts, making DirecTV Now a high-churn product.  DirecTV Now's

status as a high-churn product was highly material because it indicated that product was not

going to sustain its subscriber numbers or subscriber growth.

526.    CW-9 also recalled that AT&T used aggressive promotional activity to sell the

product.  CW-9 recalled promotions where customers were given more value from AT&T than

they were paying for their DirecTV Now product.  CW-9 stated that DirecTV Now had a "churn

problem."  He added that the Company was just "outrunning the churn for a while."  CW-9 said

that even his own sales staff participated in this activity, buying DirecTV Now to get a free

Apple TV and then immediately cancelling their subscriptions as soon as the promotional period

ended.  He stated that the employees did this, even if they got free DirecTV Satellite as a perk

with their employment, because they could get a free Apple TV.

527.    CW-7 said that beginning when DirecTV Now was first launched, AT&T offered DirecTV Now for free as a promotion when customers were buying other Cricket products.  CW-7 added that this was a "betting on forgetting" strategy.  CW-7 stated that he saw a 35% "take rate" for DirecTV Now, meaning that 65% of DirecTV Now subscribers on the promotion were cancelling before ever becoming paid DirecTV Now subscribers.

528.    CW-8 stated that he was very familiar with DirecTV and DirecTV Now churn and explained that it was part of his job responsibilities to analyze the data about churn on a monthly basis.  CW-8 recalled seeing significant churn in DirecTV Now subscribers in all markets beginning in early 2018 and through the end of his tenure.  CW-8 stated that most of the DirecTV Now subscribers were on "some sort of promotion" and that subscribers would cancel their DirecTV Now subscriptions once the promotions ran out.

529.    CW-11 recalled that the dramatic loss of subscribers for DirecTV Now was discussed in internal meetings, beginning around September or October 2017.  For example, CW-11 said that the topic was discussed in bi-annual Ops Review meetings, which included Directors, Vice Presidents and the Regional President, it was discussed on monthly execution calls headed by the Regional President and his support team, and it was discussed by Vice Presidents during regular sales force meetings.  CW-11 said he specifically recalled the loss of subscribers being talked about during a monthly execution call at the end of the third quarter for 2017 or the start of the fourth quarter 2017.  He recalled that the decline in DirecTV Now subscribers was discussed in one meeting couched in terms of how it was better for AT&T's bottom line to scale back the focus on DirecTV Now and re-emphasize satellite sales.

530.    According to CW-13, in late 2017 or early 2018, there was a cutback on certain DirecTV Now promotions, and CW-13 was told it was because "economically it did not make

sense" to "continue to throw money at the problem."  According to CW-13, when "people fell off the promotional period," they would call into customer care and quit or cancel DirecTV Now. CW-13 recounted hearing from AT&T's call center leadership how they did not have the budget or capacity to field all of the customers who either wanted their promotions to continue or would cancel DirecTV Now.

531.     CW-17 stated that in early or mid-2017 he first started to hear from his Entertainment group counterparts that DirecTV Now was not selling well in terms of subscribers, that it was launched too early, that it was not working as expected, that major promotions were needed to try to increase its number of subscribers, and that there were a lot of complaints from subscribers.  CW-17 added that DirecTV Now was described by his finance team counterparts as a "sinking ship" as early as 6-12 months after it was launched.

532.     CW-9 said that even his own sales staff participated in this activity, buying DirecTV Now to get a free Apple TV and then immediately cancelling their subscriptions as soon as the promotional period ended.  He stated that the employees did this, even if they got free DirecTV Satellite as a perk with their employment, because they could get a free Apple TV.

533.     In addition to these statements by Confidential Witnesses, the problematic high churn rate was disclosed by AT&T after the close of the Acquisition.

534.     On October 24, 2018, during the conference call for AT&T's 3Q18 financial results, Defendant Donovan stated that: AT&T "**made the strategic decision to rationalize our promotions and special offers for DirecTV Now.  We're taking a more tailored, data-driven approach.**"  Donovan added, "**we focused on reducing promotions for low-value, high-churn customers**."  Then, during the Q&A portion of the event, he stated: **"within DirecTV Now it's**

**a tale of two cities.  It's folks that are just jumping from promotion to promotion and really spinning in the industry between us, Hulu Live, YouTube TV."**  These statements disclosed that there was a trend of high churn among those using DirecTV Now.

535.    On November 29, 2018, at an analyst event hosted by AT&T, Defendant Donovan revealed stated that AT&T had launched the paired down video platform "Watch" to "lower churn," this itself indicated that DirecTV Now was a higher churn product.

536.    On January 9, 2019, at the Citi Global TMT West Conference, Defendant Stephens stated that AT&T was moving "away from the very promotional" and that "last year, about this time" AT&T had "**about 1/3 of [its] customer base on kind of 3-month promotions in the 0.5 million customer range.**"  He also revealed that AT&T had stopped those promotions, and this increased the risk of those customers cancelling.  On January 30, 2019, AT&T hosted a conference where Defendant Stephens reiterated that "6 months ago, we had 0.5 million customers on highly discounted DirecTV Now offers, generally offers that require the customer to pay $10 a month for the service," and then added, "**[a]t the end of the year, essentially, none of these customers remained on those offers.  Eliminating these promotions for low-value, high-churn customers clearly elevated subscriber losses in the quarter**."  He concluded, "**there were 500,000 of those customers on the promotional pricing.  And we started allowing those customers to attrit out.**"[31]  He added that "**there was a customer segment at the low-end, very promotional pricing, who were not engaging on the product.**"  These statements directly revealed that DirecTV Now had "high-churn customers," and corroborate the CW testimony that this high churn was connected with the aggressive use of promotions.

---

[31] SunTrust Robinson stated in its analyst report on AT&T's 4Q18 results that, "Management highlighted approximately 500k of such subscribers in the base in November - and undoubtedly this promotion helped drive subscriber counts throughout 2018, in our opinion - and as of yearend, virtually none of those customers remain."

537.    That DirecTV Now was a high churn product can also be inferred from the dramatic decrease in reported net subscribers beginning in 3Q18.  Because net additional subscribers reflect total additions minus total cancellations, a dramatic decline in net additional subscribers is indicative of high churn.  In 3Q18 AT&T reported an over 85% deceleration in net DirecTV Now subscribers, from 342,000 to 49,000.  In subsequent quarters the subscriber numbers for DirecTV Now have continued to decline.  On April 24, 2019, AT&T announced its 1Q19 results, and revealed that an additional 83,000 customers had left the DirecTV Now platform.  On July 24, 2019, AT&T announced its 2Q19 results, and revealed that another 168,000 had left DirecTV Now.  Altogether, the quarterly net gain and net loss numbers for DirecTV Now were as follows:



**B.**     **The Materially False and Misleading Statements and Omissions in the Registration Statement and Prospectus**

538.     During the Class Period, AT&T published a Registration Statement and the Prospectus in connection with the offering and sale of AT&T's stock to Time Warner shareholders.  The Director Defendants, Defendant Stephenson, and Defendant Stephens are responsible for the statements in the Registration Statement to the full extent permitted by law, due to their role as directors and/or signatories of the Registration Statement.  Defendants Stephens and Stephenson are also responsible for these statements as signatories of the documents.  The Executive Defendants are responsible for the statements in the Registration Statement to the full extent permitted by law, due to their role as control persons of AT&T.

**(1)     Regulatory Duties**

539.     The Registration Statement and Prospectus were subject to certain disclosure obligations.  Some of these regulations were found in Title 17, Part 229 of the Code of Federal Regulations, and are known as "Regulation S-K."

540.     Item 503(c) of Regulation S-K and the SEC's related interpretive releases thereto ("Item 503 Obligations"), required in the "Risk Factors" section of the Registration Statements and Prospectus, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."  17 C.F.R. § 229.503.

541.     Item 408 of Regulation C ("Item 408 Obligations"), required that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."   17 C.F.R. § 230.408.

### (2)   The Deficient Registration Statement

542.   On November 18, 2016 AT&T published its initial registration statement with the

SEC on Form S-4 regarding the shares that would be registered for use in the Acquisition.  The

purpose of the registration statement was to register shares that would be sold to Time Warner

shareholders when and if the Acquisition was closed.  On December 23, 2016, AT&T filed the

first amendment to that registration statement.  On January 5, 2017, AT&T filed its Second

Amended Registration Statement with the SEC on Form S-4; references herein to the

"Registration Statement" refer to this Second Amended Registration statement and all documents

incorporated by reference therein, because it is the one that was ultimately declared effective by

the SEC.  This Registration Statement was signed by Defendant Stephens in his capacity as

Senior Executive Vice President and Chief Financial Officer, Defendant Stephenson in his

capacity as Chairman of the Board and Chief Executive Officer, and by each of the Director

Defendants in their capacity as directors of AT&T.

543.   The Registration Statement listed certain "risk factors."  These risk factors did not

discuss DirecTV Now or any of the risks associated with the product.

544.   This was a material omission because risks associated with DirecTV Now were

among the "most significant factors that make an investment in a registrant's securities

speculative or risky," and therefore disclosure of these risks was required under AT&T's Item

503 Obligations.  The significance of the risks associated with DirecTV Now are demonstrated

by the statements in Sections V(A)(1), establishing that DirecTV Now was core to AT&T's

business plans, that it was "what this deal's about," and by the ability of news about DirecTV

Now to influence AT&T's stock price as described in Section V(C)(1).  Among the risks

associated with DirecTV Now were: (a) that it was not and would not be a profitable product,

contrary to AT&T's prior statements; (b) that the subscribers it had developed were acquired

through the use of aggressive promotional activity and improper sales tactics; (c) that the ability

to accumulate subscribers going forward would depend on the continued use of aggressive

promotional activity and improper sales tactics; and (d) that DirecTV Now was facing serious

technical problems that would threaten its viability as a product and could tarnish its reputation

going forward.

545.    The registration statement also expressly incorporated by reference certain

documents that had previously been filed with the SEC.  Besides AT&T's articles of

incorporation and bylaws, and certain documents filed by Time Warner, the documents

incorporated by reference were as follows: (a) AT&T's 2015 Annual Report; (b) AT&T's 1Q16,

2Q16, and 3Q16 quarterly reports on Form 10-Q; (c) the 8-K filings AT&T made on January 22,

2016, January 26, 2016, February 9, 2016, February 19, 2016, March 22, 2016, April 26, 2016,

May 2, 2016, May 12, 2016, May 12, 2016, June 2, 2016, June 24, 2016, July 21, 2016, August

5, 2016, August 19, 2016, September 2, 2016, September 8, 2016, October 24, 2016, October 24,

2016, November 15, 2016, December 2, 2016, December 8, 2016 and December 16, 2016; and

(d) AT&T's Proxy Statement for its 2016 Annual Meeting filed on March 11, 2016.

546.    None of these documents disclosed any of the risks described in Paragraph 544

regarding DirecTV Now.  Only the following of these documents even reference DirecTV Now:

(a)    The 8-K AT&T published on July 21, 2016 stated that, "***Cost synergies
are ahead of target, we've added nearly 1 million DirecTV subscribers since the acquisition,
and our new video streaming services are scheduled to roll out later this year.  We plan to
serve every segment of the video industry and offer customers their favorite content virtually
wherever and whenever they want it.***"  This failed to disclose any of the risks associated with

DirecTV Now described in Paragraph 544 and only vaguely mentioned the product as "our new video streaming service."

(b)      The 8-K AT&T published on October 24, 2016 announced that AT&T had entered into the definitive agreement with Time Warner.  It stated that AT&T would "deliver more innovation with new forms of original content built for mobile and social, *which builds on Time Warner's HBO Now and the upcoming launch of AT&T's OTT offering DirecTV Now.*" This failed to disclose any of the risks associated with DirecTV Now described in Paragraph 544. Furthermore, this statement itself was misleading because it disclosed that the merger would build on DirecTV Now without disclosing the risks associated with DirecTV Now described in Paragraph 544.

(c)      AT&T's 10-Q for 3Q16 stated that fourth quarter 2016 margins would be pressured by "*start-up costs for DirecTV Now.*"  This failed to disclose any of the risks associated with DirecTV Now described in Paragraph 544.

(d)      The 8-K AT&T published on October 24, 2016 was a press release associated with AT&T's 3Q16 financial results.  It stated that AT&T had, "*[e]ntered into 10 key DirecTV Now content agreements with program providers whose premium brands will be part of the company's new streaming platform, planned to launch in the fourth quarter of 2016,*" listed some of these brands, and then said there would be "*more than 100 channels included on DirecTV Now.*"  This failed to disclose any of the risks associated with DirecTV Now described in Paragraph 544.  Furthermore, this statement itself was misleading because it disclosed the breadth of content AT&T planned to provide through DirecTV Now without disclosing that the product would not be able to turn a profit while offering that content.  The press release also

stated that 4Q16 margins would be pressured by "***start-up costs for DirecTV Now.***"  This failed

to disclose any of the risks associated with DirecTV Now described in Paragraph 544.

547.     The Registration Statement also incorporated certain subsequently filed

documents by reference.  The Registration Statement stated that, "any documents subsequently

filed by [AT&T] pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act and before

the date of the special meeting" were incorporated by reference.  The special meeting referred to

in the prior sentence was a reference to the meeting in which Time Warner shareholders would

vote on the Acquisition.  That meeting occurred on February 15, 2017, and therefore, the

Registration Statement also incorporated the documents discussed in the following paragraphs:

548.     On January 20, 2017, AT&T published an 8-K related to its 4Q16 financial results.

This filing was made pursuant to Section 15(d) of the Exchange Act and therefore was

incorporated by reference into the Registration Statement.  This filing stated that there were

"***[m]ore than 200,000 video net adds, entirely driven by DirecTV Now.  This includes only***

***paying customers.***"  This statement did not include any cautionary language aside from a generic

boilerplate statement that pertained only to "forward looking statements."

549.     This statement was misleading because it failed to disclose that DirecTV Now's

subscriptions were driven by aggressive promotional activity and improper sales practices.  It

was also misleading because it failed to disclose that AT&T's subscription numbers were

artificially inflated by bogus sales that AT&T employees were strong-armed into making.  The

statement was also misleading because it indicated to investors that "video net adds" was a

significant metric—without disclosing that DirecTV Now subscriptions were not profitable and

would not be able to offset the negative financial consequences of declining subscription

numbers in AT&T's other video products such as satellite TV.  This statement also failed to disclose any of the risks associated with DirecTV Now described in Paragraph 544.

550.    On January 25, 2017, AT&T published an 8-K related to its 4Q16 financial results. This filing was made pursuant to Section 15(d) of the Exchange Act and therefore was incorporated by reference into the Registration Statement.  This filing stated that "***During the quarter, we introduced DirecTV Now and added more than 200,000 subscribers.***"[32]

551.    This statement was materially false and misleading for the reasons stated in Paragraphs 544 and 549.

552.    On January 25, 2017, AT&T published an 8-K related to its 4Q16 financial results, which attached a press release.  This filing was made pursuant to Section 15(d) of the Exchange Act and therefore was incorporated by reference into the Registration Statement.  This filing included a bullet point that stated: "***Strong DirecTV Now launch with more than 200,000 paid net adds***."  It also stated that AT&T reported "2.8 million North American wireless net adds, ***strong DirecTV Now growth*** and solid adjusted operating margin and earnings gains, with continued free cash flow growth for the fourth quarter."  Summarizing the events of the year, Defendant Stephenson was quoted as saying: "***We launched DirecTV Now, our innovative over-the-top streaming service.***"

553.    These statements were materially false and misleading for the reasons stated in Paragraph 544 and 549.

554.    Additionally, within the Registration Statement, AT&T made an undertaking to amend the Registration Statement in certain circumstances, including as follows:

---

[32] This filing also mentioned DirecTV Now several additional times while describing how other video subscription numbers were reported.

> To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement . . . to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement.

555.    The undisclosed risks related to the issues described in Paragraph 544 and the false and misleading nature of the statements described in this Section existed at the time the Registration Statement was deemed effective by the SEC and at the time each of the statements were made.

556.    In the alternative, Plaintiffs allege that between the February 15, 2017 shareholder vote where the securities were offered pursuant to the Registration Statement and the June 14, 2018 closing where the securities were sold pursuant to the Registration Statement, the deficiencies in the Registration Statement continued to grow as the risks and sales practices related to DirecTV Now continued to escalate, and that, AT&T failed to comply with the above-described undertaking by failing to disclose the issues described herein and how those issues rendered the statements described herein materially false and misleading.

### (3)    The Deficient Prospectus

557.    As part of the Acquisition, AT&T offered and ultimately sold shares to Time Warner shareholders.  On January 9, 2017, AT&T filed a Prospectus on Form 424B3, which incorporated the Registration Statement, and other documents described below.  The Prospectus did not mention DirecTV Now and did not include any disclosures regarding the risks associated with DirecTV Now described in Paragraph 544.

558.    The failure to describe any of the risks associated with DirecTV Now was a material omission because risks associated with DirecTV Now were among the "most significant factors that make an investment in a registrant's securities speculative or risky" and therefore

disclosure of these risks was required under AT&T's Item 503 Obligations.  The significance of the risks associated with DirecTV Now are demonstrated by the statements in Sections V(A)(1) establishing that DirecTV Now was core to AT&T's business plans, that it was "what this deal's about," and by the ability of DirecTV Now to influence AT&T's stock price as described in Section V(C)(1).  Among the risks associated with DirecTV Now were (a) that it was not and would not be a profitable product, contrary to AT&T's prior statements; (b) that the subscribers it had developed were acquired through the use of aggressive promotional activity and improper sales tactics; (c) the ability to accumulate subscribers going forward would depend on the continued use of aggressive promotional activity and improper sales tactics; and (d) DirecTV Now was facing serious technical problems that would threaten its viability as a product and could tarnish its reputation going forward.

559.    The Prospectus incorporated "any documents subsequently filed by [AT&T] pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act and before the date of the special meeting."  The special meeting referred to in the prior sentence was a reference to the meeting in which Time Warner shareholders would vote on the Acquisition.  That meeting occurred on February 15, 2017, and therefore, the Prospectus incorporated the document discussed in the following paragraphs:

560.    On January 25, 2017, AT&T filed a Form 425 prospectus excerpting a letter to employees from the Chairman and Chief Executive Officer.  The letter did not discuss DirecTV Now or describe any of the risks related to DirecTV Now described in Paragraph 544.

561.    On January 26, 2017, AT&T filed a Form 425 prospectus containing an excerpt of the conference call that it hosted regarding its 4Q16 results on January 25, 2017.  In this excerpt, Defendant Stephens is quoted mentioning that DirecTV Now "startup and launch costs" had put

pressure on AT&T's fourth quarter margins.  This failed to disclose any of the risks associated with DirecTV Now described in Paragraph 544.  This excerpt also included the following quote from Defendant Stephenson:

> *And you saw us execute on that last year with our new TV Everywhere application and our Data Free TV and DirecTV Now.  And that integrated experience helped drive our best ever fourth-quarter churn for our US postpaid mobility business.  Now bringing Warner Bros., HBO and all the Turner networks under the AT&T umbrella is going to allow us to expand this strategy beyond just simple connectivity to deep integration of premium content for our customers.*
>
> *And so, if you look ahead, the strategy has expanded to create the best entertainment and communications experiences in the world.  And I am very convinced this foundation has been laid for us to deliver exactly that.  And so, with that, what I want to do is turn it over to Mike and be glad to take your questions on the quarter or anything else you'd like to talk about.*

562.    This statement failed to disclose any of the risks associated with DirecTV Now described in Paragraph 544.  This statement was also misleading and incomplete because it stated that DirecTV Now was a product that reduced churn, without disclosing that DirecTV Now was dependent on heavy promotional activity and improper sales tactics and therefore could not reduce churn on a sustained basis or at a reasonable cost.  Furthermore, the statement was misleading because it touted DirecTV Now as the foundation for AT&T's business, when in fact it was a "placeholder" that AT&T knew was not sustainable.

563.    On February 3, 2017, AT&T published a prospectus supplement on Form 424B3. This supplement disclosed the existence of three lawsuits against AT&T related to the Acquisition.  None of these lawsuits make allegations about DirecTV Now or the material risks associated with that product.  This filing did not disclose any of the risks associated with DirecTV Now described in Paragraph 544.

### (i)    *The Shareholder Vote*

564.    On February 15, 2017, Time Warner shareholders voted to approve the Time

Warner Merger.  A total of 78% of shares outstanding voted, with 99% of those shares voting in

favor of the Acquisition.  One element of the decision to vote in favor of the Acquisition was the

question of whether to accept AT&T's offer of AT&T's stock.  Thus, on and prior to February

15, 2017, AT&T used the Prospectus to offer the sale of securities.  As alleged in Section

V(B)(3)(i), the Prospectus was deficient at this time.  Plaintiffs contend that the sale of the

AT&T's stock occurred on June 14, 2018, when the Time Warner Merger was closed.  However,

in the alternative, Plaintiffs allege that the sale occurred when the shareholders voted to approve

the Acquisition on February 15, 2017.

### (ii)    *The Stock Sale*

565.    Following the vote of Time Warner shareholders in favor of the Acquisition, the

most significant step in the closing of the transaction was obtaining regulatory approval to close

the transaction.  As discussed in Section III(C)(4), there were also other closing conditions and

under the terms of the merger agreement, the Acquisition could be terminated for a variety of

reasons prior to close.  Obtaining regulatory approval depended primarily on the DOJ Lawsuit

and its allegations that the Acquisition violated antitrust laws.

566.    On June 12, 2018, Judge Richard J. Leon ruled in AT&T's favor in the DOJ

Lawsuit and found that the government had not established that the proposed vertical merger was

likely to substantially lessen competition.[33]  This ruling removed a major obstacle for AT&T and

Time Warner to close the merger, though there were still provisions by which they could call off

the deal if they so decided.  Two days after the District Court's decision, on June 14, 2018, it was

---

[33] *See generally United States v. AT&T, Inc.*, 310 F.Supp.3d 161 (D.D.C. 2018) *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

announced that the Acquisition had closed.  As a result of the merger closing, existing Time

Warner shareholders sold (*i.e.*, exchanged) their shares for the merger consideration of 1.437

shares of AT&T's stock and $53.75 in cash per share.  Thus, AT&T issued approximately 1.185

billion new shares of AT&T's stock directly to former shareholders of Time Warner common

stock.  Each of these new shares of AT&T's stock was issued pursuant to the Registration

Statement.  Each of these shares was sold pursuant to the Prospectus.  On June 14, 2018,

AT&T's stock closed at $32.52 per share.

567.    Therefore, on June 14, 2018, AT&T used the prospectus to sell the AT&T's stock

and, on that date, Plaintiffs and other Time Warner shareholders bought the AT&T's stock

pursuant to the Prospectus.  Because the Prospectus was not updated between February 15, 2017

and June 14, 2018, it remained deficient for those reasons identified in Section V(B)(3)(i).

568.    Additionally, on June 14, 2018, AT&T closed the Time Warner merger.  At this

point, AT&T and the Director Defendants used the Prospectus to sell AT&T's stock and, despite

the passage of time and the intensification of the risks DirecTV Now faced, AT&T did not

update the Prospectus to provide further risk disclosures.  Therefore, at the time that AT&T sold

AT&T shares as part of the Acquisition the Prospectus it used to market the AT&T's stock were

deficient, incomplete and misleading.

## C.    Decline in AT&T's Stock Price and Revelations Following the Sale of AT&T's Stock

### (1)    AT&T's Stock Price Drops Corresponding to Negative Revelations About DirecTV Now

569.    Following the close of the Acquisition, AT&T made several disclosures about the

true situation regarding DirecTV Now and reported decelerating and ultimately declining

performance from the product as a result.  In response, AT&T's stock price declined

significantly.  This Section briefly summarizes the analyst and market reaction to these

revelations, primarily for the purpose of further demonstrating the significance of DirecTV Now, and the significance of the undisclosed risks and trends related thereto.

570.    On October 24, 2018, before the market opened and in connection with AT&T's 3Q18 financial results (the first full quarter after the Acquisition closed), the Company announced a dramatic reversal in the DirecTV Now business which it claimed was the result of a decision to "rationalize" the pricing of the product, indicating that the prior pricing scheme was not "rational" and heavily suggesting that it was not and had not been profitable.  Specifically, Defendant Stephens explained that net additions (or "net adds") to **DirecTV Now were only 49,000 within the quarter**.  This was far lower than the DirecTV Now net adds seen in every quarter since the product's launch in November 2016, and dramatically lower than the net adds of over 300,000 in each of the prior three quarters.

571.    Defendant Stephens revealed that this massive deceleration of more than 85% in DirecTV Now new subscribers occurred when AT&T "scaled back our promotions and special offers" and moved toward "market pricing in the quarter."  Defendant Donovan disclosed that AT&T "made the strategic decision to rationalize our promotions and special offers for DirecTV Now.  We're taking a more tailored, data-driven approach."  Donovan added, "we focused on reducing promotions for low-value, high-churn customers."  Relatedly, Donovan said, "with our data, we will continue to tweak our approach to optimize profitability and see our value proposition stabilize."  Defendant Donovan also explained "within DirecTV Now it's a tale of two cities.  It's folks that are just jumping from promotion to promotion and really spinning in the industry between us, Hulu Live, YouTube TV."

572.    On this shocking news, AT&T's stock fell on unusually heavy trading volume of approximately 118 million trades, dropping from a closing price of $33.02 per share on October

23, 2018 to a closing price of $30.36 per share on October 24, 2018, **a drop of more than 8% in**

**a single day**.  AT&T's stock fell an additional $0.38 per share, or 1.25% and $0.89 per share, or

2.97%, on the following two trading days.

573.    Analysts reacted strongly to this disappointing news, further indicating that the

drop was causally related to the news about DirecTV Now.  For example:

(a)    Barclays published a report on October 24, 2018, stating: "**[t]he big**

**surprise was Entertainment,** which showed steep annual declines as both the linear DTV

product and DTV Now OTT product came in significantly worse than expected."  The report

added "**this miss is likely to be a bigger driver of stock performance today.**"

(b)    Cowen published a report on October 24, 2018, stating: "**Entertainment**

**was the big concern and largely drove today's sell-off . . . but worst of all, added just +49K**

**DTV Now subs (vs. our +400K, St: +287K).**"  The report continued: "[the Sell-off] was largely

driven by the Entertainment segment including the DTV Now slowdown which suggests the

linear to OTT pivot could be more difficult than expected as the company is trying to balance

profits with uptake at a point in the adoption curve when price is arguably a big factor for

customers willing to make the change."

(c)    Deutsche Bank published a report on October 24, 2018, stating:

"Entertainment Group subscriber trends **missed our expectations** (both OTT and linear), owing

to competition and higher pricing (fee hikes for OTT, and roll off of promotions at linear)."

(d)    Scotiabank published a report on October 24, 2018, stating: "DTV Now

adds were **much weaker than expected** driven by the price increases implemented in the quarter"

(e)    RBC Capital Markets published a report on October 24, 2018, stating:

"Video subscribers in the Entertainment Group segment were soft across traditional and virtual

platforms with AT&T pointing to an emphasis on improving profitability with its video strategy." The same report continued, "DirecTV Now added 49K subs vs. consensus at +287K"

(f)     SunTrust Robinson Humphrey published a report on October 24, 2018, stating: "More concerning, in our view, key performance indicators in the **company's video business were much weaker than estimates, including significantly weaker-than-expected satellite subscriber loss and OTT net additions**"  The report continued: "We believe much of **the stock's negative reaction today can be attributed to these results**, as they rekindle investor concerns regarding T's ability to deliver value from its DirecTV acquisition and/ or overall execution."

(g)     JPMorgan published a report on October 25, 2018, stating:

"**Entertainment is a drag on numbers and (bigger) on sentiment.**"

(h)     *The Motley Fool*, a popular online investment analysis publication, published an article on October 25, 2018, titled: "**AT&T Hit a Brick Wall When it Raised TV Prices**."

574.    On December 4, 2018, AT&T participated in the UBS Global Media and Communications Conference.  During the conference, Defendant Stephenson revealed that AT&T was "thinning out the content, getting the price point right, **getting it to where it's profitable,**" which would require it to reach a "different segment of the market."

575.    In response to this revelation that the product had not been profitable, the price of AT&T's stock **declined by 3.09%** from a closing price on December 3, 2018, of $31.71 per share, down to a closing price on December 4, 2018 of $30.73 per share.[34]

---

[34] Simultaneously to this disclosure, Defendant Stephenson also falsely indicated that DirecTV Now subscriber numbers were increasing (and had reached 2 million subscribers), when in fact they were not increasing during 4Q18.  While these false statements are not alleged as actionable for purposes of the

576.    On January 9, 2019, at the Citi Global TMT West Conference, Defendant Stephens revealed that AT&T had about 1/3 of its DirecTV Now subscribers (i.e., about 500,000 accounts) on "3-month promotions" for $10 and that it had ceased offering those promotions.  He acknowledged that there was a risk these customers would choose not to renew.  This statement further revealed the extent of the promotional activity for DirecTV Now, the extent of the churn problem DirecTV Now was facing, and the fact that DirecTV Now was not profitable.  In reaction to this news, AT&T's stock's price fell from a prior close of $31.28 per share to a close on January 9, 2019, of $30.10 per share, which was a **3.77% fall**.

577.    On January 30, 2019, before the market opened and in connection with AT&T's announcement of its 4Q18 financial results, the Company revealed that it had lost 267,000 DirecTV Now subscribers.  During the earnings call, Defendant Stephens revealed that six months prior, AT&T had 500,000 subscribers on "highly discounted DirecTV Now offers" generally requiring them to pay only $10 a month, but that "[a]t the end of the year, essentially none of those customers remained on those offers" and as AT&T eliminated these "promotions for low-value, high-churn customers" this "clearly elevated subscriber losses in the quarter." Defendant Stephenson then further clarified that they had allowed those customers to "attrit out" and that he looked at that customer segment as "low-end, very promotional" and "not engaging on the product."

578.    In reaction to this negative news, AT&T's stock price plummeted from a close of $30.70 per share on January 29, 2019 to a close of $29.37 per share on January 30, 2019, a loss of $1.33 per share, or **a decline of 4.3%** on unusually high trading volume of approximately 93 million shares.

---

Securities Act claims, they served to partially maintain AT&T's price—*i.e.*, it minimized the effect of the price decrease caused by this false statement.

579.    SunTrust Robinson stated in its analyst report on AT&T's 4Q18 results that,

"[m]anagement highlighted approximately 500k of such subscribers in the base in November -

and undoubtedly this promotion helped drive subscriber counts throughout 2018, in our opinion -

and as of yearend, virtually none of those customers remain." *Seeking Alpha* published an article

on January 30, 2019, stating: "DirecTV continues to crush AT&T and is hemorrhaging

subscribers.  Even worse is that the new DirecTV Now is losing subscribers just after two years

of being in service.  Not a good sign.  The stock is likely dead money now[.]"  On January 30,

2019, veteran media analyst Rich Greenfield tweeted: "Holy Sub Loss – in my 22 years covering

media, never seen a stat like this in a single quarter."

580.    In subsequent quarters, the subscriber numbers for DirecTV Now have continued

to decline.  On April 24, 2019, AT&T announced its 1Q19 results, and revealed that an

additional 83,000 customers had left the DirecTV Now platform.  On July 24, 2019, AT&T

announced its 2Q19 results, and revealed that another 168,000 had left DirecTV Now, and that

AT&T experienced a net drop of 946,000 TV subscribers.  By this point, it was clear that the

product was in terminal decline, and AT&T announced on July 30, 2019, that it was renaming

DirecTV Now to AT&T TV Now.

### (2)    Plaintiffs and Class Members are Damaged

581.    Since the completion of the Acquisition, AT&T's stock has traded as low as

$26.80 per share, or more than 17% below the $32.52 price per share on June 14, 2018, the

exchange date for the Acquisition.  This Action was filed on April 1, 2019, and on that date

AT&T's stock closed at $31.95 per share, or about 1.75% below the $32.52 price per share on

June 14, 2018, the exchange date for the Acquisition.  On February 15, 2017, the date that Time

Warner shareholders voted on the Acquisition, AT&T's stock closed at a price of $41.12 per

share, with reference to this date, the stock price declined by over 35% when it reached a low of

$26.80 per share following the close of the Acquisition, and was down by over 22% by the date this Action was filed.

D.   **Securities Act Counts**

(1)   **Count IV: Violation of § 11 of the Securities Act Against AT&T, the Director Defendants, and Defendants Stephenson and Stephens**

582.   These claims are brought under Sections 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Lead Plaintiff Local 449, additional named plaintiff Gross, and Class Members who purchased or otherwise acquired AT&T's stock pursuant or traceable to the materially false and misleading Registration Statement and documents incorporated therein.  This Count does not sound in fraud.  With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based on strict liability.  Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims.  Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in Section II(A) and Section IV.

583.   These Securities Act claims are brought by Plaintiffs on behalf of persons who purchased or otherwise acquired AT&T's stock pursuant or traceable to the materially false and misleading Registration Statement and documents incorporated therein.  For the avoidance of doubt, this includes those who received AT&T's stock in exchange for shares of Time Warner stock.

584.   At all times, including when it was declared Effective, the Registration Statement was misleading and incomplete because it omitted information that was required to be disclosed. Among the undisclosed risks associated with DirecTV Now were: (a) that it was not and would

not be a profitable product, contrary to AT&T's prior statements; (b) that the subscribers it had developed were acquired through the use of aggressive promotional activity and improper sales tactics; (c) the ability to accumulate subscribers going forward would depend on the continued use of aggressive promotional activity and improper sales tactics; and (d) DirecTV Now was facing serious technical problems that would threaten its viability as a product and could tarnish its reputation going forward.  At the time that the Registration Statement became effective, that Registration Statement was materially misleading and incomplete because it failed to disclose the risks associated with DirecTV Now, which were among the most significant reasons investment in AT&T's stock was risky or speculative, and therefore failed to comply with the Item 503 Obligations.  As explained in Section V(B)(2), AT&T made statements within the Registration Statement that were materially false and misleading.  For all of these reasons, the Registration Statement failed to comply with Item 408 Obligations to ensure statements in the Registration Statement are not misleading.

585.    AT&T, the Director Defendants, and Defendants Stephenson and Stephens, are strictly liable to Plaintiffs and Class members for the material misstatements and omissions as they issued or signed the Registration Statement or were directors of the Company at the relevant time.

586.    The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration

Statement contained misrepresentations of material facts and omissions of material facts

necessary to make the statements therein not misleading.

587.    None of the untrue statements or omissions of material facts in the Registration

Statement alleged herein was a forward-looking statement.  Rather, each such statement

concerned existing facts.  Moreover, the Registration Statement did not properly identify any of

the untrue statements as forward-looking statements and did not disclose information that

undermined the putative validity of those statements.

588.    Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class

members acquired AT&T's stock due to the conversion of their Time Warner stock in the

Acquisition in which shares were offered and/or sold pursuant to the Registration Statement.

Plaintiffs and the Class members have sustained damages.  The value of AT&T's stock

purchased or otherwise acquired pursuant or traceable to the materially false and misleading

Registration Statement and documents incorporated therein, has declined substantially

subsequent to and due to violations by AT&T, Defendant Stephenson, Defendant Stephens, and

the Director Defendants.

589.    At the time of their purchases Lead Plaintiff Local 449, additional named plaintiff

Gross, and the Class members were without knowledge of the facts concerning the omissions

alleged herein and could not have reasonably discovered those facts prior to the disclosures

herein.

590.    Less than one year has elapsed from the time that Plaintiffs discovered or

reasonably could have discovered the facts upon which this complaint is based to the time that

Plaintiffs commenced this action.  Fewer than three years have elapsed between the time that the

AT&T's stock upon which this Count is brought were offered to the public and the time

Plaintiffs commenced this action.

591.    By reason of the conduct herein alleged, AT&T, Defendant Stephenson,

Defendant Stephens, and the Director Defendants violated §11 of the Securities Act are liable to

Plaintiffs and the Class members purchased or otherwise acquired AT&T's stock pursuant or

traceable to the materially false and misleading Registration Statement and documents

incorporated therein.

### (2)    Count V: Violation of § 12(a)(1) of the Securities Act Against AT&T

592.    These claims are brought under Section 12(a)(2) of the Securities Act, 15 U.S.C.

§ 77l(a)(2), on behalf of Lead Plaintiff Local 449, additional named plaintiff Gross, and Class

members who purchased or acquired AT&T's stock in the Acquisition, through which the

Prospectus was used to offer and sell AT&T's stock.  This Count does not sound in fraud.  With

respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional or

reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This

claim is based on strict liability.  Plaintiffs expressly disclaim any allegations of scienter or

fraudulent intent in these non-fraud claims.  Plaintiffs repeat, incorporate, and reallege each of

the allegations set forth above as if fully set forth herein, except these Securities Act claims

expressly do not make any allegations of fraud or scienter and do not incorporate any of the

allegations contained in Section II(A) and Section IV.

593.    These Securities Act claims are brought on behalf of persons who purchased

AT&T's stock in the Acquisition, through which the Prospectus was used to offer and sell

AT&T's stock.  For the avoidance of doubt, this includes those who received AT&T shares in

exchange for shares of Time Warner stock.

594.     Section 12(a)(1) grants a private right of action against any person who offers or

sells a security in violation of Section 5 of the Securities Act.  15 U.S.C. § 77l(a)(1).  Section 5(b)

states that it shall be unlawful:

> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a Registration Statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or (2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

15 U.S.C.A. § 77(e).  Therefore, AT&T violated Section 12(a)(1) if it utilized a prospectus that

did not comply with 15 U.S.C.A. § 77(j) (*i.e.,* Section 10 of the Securities Act) at the time of the

offer or sale.  Section 10 required that the Prospectus contain all the information required of a

registration statement and all such information the SEC requires by rules or regulation, and

among those requirements are the Rule 503 Obligations and Rule 408 Obligations.

595.     At all times, the Prospectus was misleading and incomplete because it omitted

information that was required to be disclosed.  Among the undisclosed risks associated with

DirecTV Now were: (a) that it was not and would not be a profitable product, contrary to

AT&T's prior statements; (b) that the subscribers it had developed were acquired through the use

of aggressive promotional activity and improper sales tactics; (c) the ability to accumulate

subscribers going forward would depend on the continued use of aggressive promotional activity

and improper sales tactics; and (d) DirecTV Now was facing serious technical problems that

would threaten its viability as a product and could tarnish its reputation going forward.  The

Prospectus was materially misleading and incomplete because it failed to disclose the risks

associated with DirecTV Now, which were among the most significant reasons investment in

AT&T's stock was risky or speculative, and therefore failed to comply with the Item 503

Obligations.  As explained in Section V(B)(3)(i), AT&T made statements within the Prospectus that was materially false and misleading.  For all of these reasons, the Prospectus failed to comply with Item 408 Obligations to ensure statements in the Registration Statement are not misleading.

596.     At the time the Prospectus was used in the sale of AT&T's stock on June 14, 2018, the Prospectus was also deficient because, despite the passage of time and the intensification of the risks DirecTV Now faced, AT&T did not update the Prospectus to provide further risk disclosures.  AT&T also did not update the Prospectus to correct any of the materially false and misleading statements described in Section V(B)(3)(2).  Therefore, the Prospectus was deficient, incomplete and misleading at the time it was used to sell AT&T stock.

597.     AT&T is a seller, offeror, and/or solicitor of purchasers of its common stock pursuant to the defective Prospectus and AT&T directly solicited the purchase of its common stock through the means of the Prospectus.  Therefore, AT&T is strictly liable to Plaintiffs for the material misstatements and omissions in the Prospectus.

598.     Lead Plaintiff Local 449, additional named plaintiff Gross, and Class members acquired AT&T's stock due to the conversion of their Time Warner stock in the Acquisition in which shares were offered and/or sold pursuant to the Prospectus.  Plaintiffs and the Class have sustained damages.  The value of AT&T's stock has declined substantially subsequent to and due to violations by AT&T.

599.     At the time of their purchases Lead Plaintiff Local 449, additional named plaintiff Gross, and Class members were without knowledge of the facts concerning the omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

600.    None of the untrue statements or omissions of material fact in the Prospectus alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Prospectus did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

601.    Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action.  Fewer than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

602.    By reason of the conduct herein alleged, AT&T violated §12(a)(1) of the Securities Act is liable to Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class members.  Accordingly, Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class members, who hold the common stock issued pursuant to the defective Prospectus, have the right to rescind and recover the consideration paid for their shares and hereby tender their common stock to Defendants sued herein.  Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class members who have sold their common stock issued pursuant to the defective Prospectus seek damages to the extent permitted by law.

### (3)    Count VI: Violation of § 12(a)(2) of the Securities Act Against AT&T

603.    These claims are brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Lead Plaintiff Local 449, additional named plaintiff Gross, and Class members who purchased or acquired AT&T stock when their Time Warner shares were converted into AT&T stock as part of the Acquisition.  This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Defendants committed

216

intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based on strict liability.  Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims.  Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in Section II(A) and Section IV.

604.    These Securities Act claims are brought on behalf of persons who purchased AT&T's stock in the Acquisition, through which the Prospectus was used to offer and sell AT&T's stock.  For the avoidance of doubt, this includes those who received AT&T shares in exchange for shares of Time Warner stock.

605.    Section 12(a)(2) grants a private right of action against any person who offers or sells a security "by means of a prospectus . . . which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  Section 12(a)(2) is violated where the prospectus fails to comply with the Rule 503 Obligations and Rule 408 Obligations.

606.    At all times, the Prospectus was misleading and incomplete because it omitted information that was required to be disclosed.  Among the undisclosed risks associated with DirecTV Now were: (a) that it was not and would not be a profitable product, contrary to AT&T's prior statements; (b) that the subscribers it had developed were acquired through the use of aggressive promotional activity and improper sales tactics; (c) the ability to accumulate subscribers going forward would depend on the continued use of aggressive promotional activity and improper sales tactics; and (d) DirecTV Now was facing serious technical problems that would threaten its viability as a product and could tarnish its reputation going forward.  The

Prospectus was materially misleading and incomplete because it failed to disclose the risks associated with DirecTV Now, which were among the most significant reasons investment in AT&T's stock was risky or speculative, and therefore failed to comply with the Item 503 Obligations.  As explained in Section V(B)(3), AT&T made statements within the Prospectus that were materially false and misleading.  For all of these reasons, the Prospectus failed to comply with its Item 408 Obligations to ensure statements in the Registration Statement are not misleading.

607.    At the time the Prospectus was used in the sale of AT&T's stock on June 14, 2018, the Prospectus was also deficient because, despite the passage of time and the intensification of the risks DirecTV Now faced, AT&T did not update the Prospectus to provide further risk disclosures.  AT&T also did not update the Prospectus to correct any of the materially false and misleading statements described in Section V(B)(3)(ii).  Therefore, the Prospectus was deficient, incomplete and misleading at the time it was used to sell AT&T stock.

608.    AT&T is a seller, offeror, and/or solicitor of purchasers of the its common stock pursuant to the defective Prospectus and AT&T directly solicited the purchase of its common stock through the means of the Prospectus.  Therefore, AT&T is strictly liable to Plaintiffs for the material misstatements and omissions in the Prospectus.

609.    Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class members acquired AT&T's stock due to the conversion of their Time Warner stock in the Acquisition in which shares were offered and/or sold pursuant to the Prospectus.  Plaintiffs and the Class have sustained damages.  The value of AT&T's stock has declined substantially subsequent to and due to violations by AT&T.

610.    At the time of their purchases Lead Plaintiff Local 449, additional named plaintiff Gross, and securities members were without knowledge of the facts concerning the omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

611.    None of the untrue statements or omissions of material fact in the Prospectus alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Prospectus did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

612.    Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action.  Fewer than three years have elapsed between the time that the AT&T's stock upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

613.    By reason of the conduct herein alleged, AT&T violated §12(a)(2) of the Securities Act is liable to Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class members.  Accordingly, Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class members, who hold the common stock issued pursuant to the defective Prospectus, have the right to rescind and recover the consideration paid for their shares and hereby tender their common stock to Defendants sued herein.  Lead Plaintiff Local 449, additional named plaintiff Gross, and the Class members who have sold their common stock that was issued pursuant to the defective Prospectus seek damages to the extent permitted by law.

### (4)   Count VII: Violation of § 15 of the Securities Act Against the Executive Defendants

614.   These claims are brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff Local 449, additional named plaintiff Gross, and Class members who purchased or acquired AT&T stock pursuant or traceable to the materially false and misleading Registration Statement and documents incorporated therein or pursuant to the defective Prospectus.  This Count does not sound in fraud.  With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based on strict liability. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims.  Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in Section II(A) and Section IV.

615.   The Executive Defendants were controlling persons of AT&T by virtue of their positions as directors or senior officers of AT&T and Time Warner.  The Executive Defendants each had a series of direct or indirect business or personal relationships with other directors, officers, or major shareholders of AT&T and Time Warner.  The Executive Defendants controlled the Company and all of AT&T and Time Warner's employees.

616.   AT&T and the Executive Defendants were each culpable participants in the violations of §§ 11, 12(a)(1), and 12(a)(2) of the Securities Act alleged in Counts I-III above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the Acquisition to be successfully completed.

## VI.    CLASS ACTION ALLEGATIONS

617.    Plaintiffs bring this federal securities class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of themselves and all persons or entities who: (a)

acquired AT&T common stock pursuant or traceable to the SEC Form S-4 registration statement

and prospectus issued in connection with AT&T's June 2018 acquisition of and merger with

Time Warner, Inc. ("Time Warner"), and/or (b) purchased or otherwise acquired AT&T publicly

traded securities during the period from September 21, 2016 through January 30, 2019, inclusive

(the "Class Period"), and were damaged thereby.  Excluded from the Class are: (i) Defendants;

(ii) members of the immediate family of any Individual Defendant; (iii) any person who was an

officer or director of AT&T during the Class Period; (iv) any firm, trust, corporation, or other

entity in which any Defendant has or had a controlling interest; (v) affiliates of AT&T, including

its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent

they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs,

successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph, in their

capacities as such.

618.    The members of the Class are so numerous that joinder of all members is

impracticable.  During the Class Period, AT&T had approximately 7.3 billion common shares

outstanding.  Thus, the disposition of their claims in a class action will provide substantial

benefits to the parties and the Court.

619.    While the exact number of Class members is unknown to Plaintiffs at this time

and can only be ascertained through appropriate discovery, it is likely that the proposed Class

numbers in the thousands and is geographically widely dispersed.  Record owners and other

members of the Class may be identified from records maintained either by AT&T or by other

customary means and may be notified of the pendency of this action by mail, using a form of notice as is customary in securities class actions.

620.     Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

621.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.

622.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)     whether AT&T and the Executive Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)     whether AT&T and the Executive Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)      whether, for the Exchange Act Claims, AT&T and the Executive

Defendants' knew or recklessly disregarded that their statements were materially false and

misleading;

(f)      Whether, for the Exchange Act Claims, the Scheme Defendants engaged

in a fraudulent scheme;

(g)      whether, the Exchange Act Claims, AT&T and the Executive Defendants'

acted with the intent to defraud Class members regarding the true value of AT&T's stock;

(h)      whether, for the Exchange Act Claims, AT&T and the Executive

Defendants' fraudulent conduct inflated the price of AT&T's stock during the Class Period;

(i)      whether the Executive Defendants were controlling persons of AT&T;

(j)      whether reliance may be presumed pursuant to the fraud-on-the-market

doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United

States*, 406 U.S. 128 (1972); and

(k)      whether and to what extent the shareholders of AT&T suffered losses

and/or experienced injury due to acts and omissions alleged herein.

623.   A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy because, among other things, joinder of all members of the Class

is impracticable.  Furthermore, because the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it impossible for

members of the Class to individually redress the wrongs done to them.  There will be no

difficulty in the management of this action as a class action.

## VII.   PRAYER FOR RELIEF

624.   WHEREFORE, Lead Plaintiffs respectfully prays for judgment against the

Defendants as follows:

(a)     Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Labaton Sucharow LLP and Pomerantz LLP as co-lead class counsel pursuant to Rule 23(g);

(b)     Determining and declaring that Defendants violated the Securities Act and/or the Exchange Act, as charged in Counts I-VI, by reason of the acts, omissions and, status of control alleged herein;

(c)     Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(d)     As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

(e)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Lead Plaintiffs' consulting and testifying expert witnesses; and

(f)     Granting such other and further relief as the Court deems just and proper.

## VIII.   JURY DEMAND

625.    Plaintiffs demand a trial by jury of all issues so triable.

DATED:  September 17, 2019[*]

Respectfully submitted,

/s/ Carol C. Villegas

Carol C. Villegas
Christine M. Fox
Domenico Minerva
Jake Bissell-Linsk
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com
dminerva@labaton.com
jbissell-linsk@labaton.com

*Counsel for Court-Appointed Lead Plaintiff*
*Steamfitters Local 449 Pension Plan, and*
*Co-Lead Counsel for the Class*


/s/ Emma Gilmore

Jeremy A. Lieberman
Emma Gilmore
Villi Shteyn (S.D.N.Y. Admission Pending)
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
egilmore@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Court-Appointed Lead*
*Plaintiffs Iron Workers Locals 40, 361*
*& 417 Union Security Funds, Iron*
*Workers Local 580 Joint Funds,*
*Local 295 IBT Employer Group*
*Pension Fund, Melvin Gross, and*
*Co-Lead Counsel for the Class*

---

[*] The Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws was originally filed on September 13, 2019.  ECF No. 76.  The only changes between this document and that filing are the revised case caption on front page, this footnote, and the date on the signature line.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 17, 2019, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by email to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

By:  _____*/s/ Carol C. Villegas*_____
*Carol. C. Villegas*