USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/18/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
 IN RE AT&T/DIRECTV NOW SECURITIES                           :
 LITIGATION                                                  :
                                                             :
------------------------------------------------------------ X

19-CV-2892 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

In this securities class action, Plaintiffs accuse AT&T Inc. and its senior management of

misleading shareholders about the performance and potential of AT&T's video streaming

service, DirecTV Now (DTVN).  From September 21, 2016, through January 30, 2019,

Defendants allegedly trumpeted subscriber growth without disclosing that the figures were

propped up by unsustainable promotions and fraudulent sales practices, which rendered the

subscriber base susceptible to high rates of customer attrition (or "churn") and low or nonexistent

profit margins.  Plaintiffs also allege that Defendants misled investors about the potential for

DTVN to compensate for losses in traditional satellite TV and failed to disclose technical

problems that plagued the digital platform during its initial launch, all in violation of federal

securities laws.  Substantially similar allegations of misstatements and omissions underlie

Plaintiffs' claims that Defendants' registration statement and prospectus, which were issued in

connection with AT&T's acquisition of Time Warner, Inc., were materially misleading.

Although Plaintiffs offer a smorgasbord of what appears to be every statement that

Defendants ever made about DTVN during the class period, they have failed to plead material

misstatements or omissions of fact or other deceptive conduct, which is fatal to all seven counts

alleged in the amended complaint; as to the Exchange Act claims, Plaintiffs also failed to plead

scienter.  Defendants' motion to dismiss all claims is GRANTED; Plaintiffs may move for leave

to amend if they can allege additional facts that could support a plausible inference that DTVN

was, in fact, an entirely unprofitable product and that the alleged fraudulent sales practices were widespread and known to AT&T's executives.

## BACKGROUND

Plaintiffs bring this action on behalf of all persons who purchased publicly traded AT&T shares during the period from September 21, 2016, through January 30, 2019 ("Class Period"), and all Time Warner shareholders who received AT&T stock as a result of AT&T's acquisition of Time Warner.[1]  Am. Compl. (Dkt. 79) ¶ 3.

## I.    DTVN and the Time Warner Acquisition

AT&T is a telecommunications and media company.  *Id.* ¶ 94.  During the relevant period, it was organized into four business segments: (i) Business Solutions, (ii) Entertainment, (iii) Consumer Mobility, and (iv) International.  *Id.* ¶ 95.  The Entertainment segment housed a variety of services, including video, internet, and advertising.  *Id.* ¶ 96.  On July 24, 2015, AT&T expanded its video business by acquiring a satellite-based TV provider, the DirecTV Group, Inc. ("DirecTV"), for $67.1 billion.  *Id.* ¶¶ 97–98.  In 2016, the Entertainment segment represented AT&T's second largest segment and amounted to 32% of AT&T's business.  *Id.* ¶ 95.

The satellite TV market, however, was in long-term decline as consumers increasingly "cut the cord."  *Id.* ¶ 100.  In part because of that trend, in March 2016 AT&T announced a new internet-based TV service known as DTVN.  *Id.* ¶ 100.  At the time, DTVN was touted as a unique "hybrid" product that offered both live programming and on-demand content, without the

---

[1]      The Amended Complaint divides its allegations between counts under the Securities Exchange Act of 1934 ("Exchange Act") and counts pursuant to the Securities Act of 1933 ("Securities Act").  Am. Compl. ¶ 442.  For brevity, because most of the allegations overlap or are duplicative, the Court draws from both parts of the pleading to set forth the background of the case.  The discussions of the respective claims will rely only on the factual allegations pertinent to each count.

need for physical installation of satellites or other equipment.  *Id.* ¶¶ 103–04, 120.  If successful, DTVN could help offset losses of traditional satellite customers.  *Id.* ¶ 106.

On October 22, 2016, AT&T announced that it had agreed to acquire Time Warner, a media company with a vast amount of video content and video production capacity.  *Id.* ¶¶ 108, 110.  When explaining the acquisition, AT&T's CEO and Chairman Randall Stephenson discussed combining Time Warner's content library with AT&T's distribution platforms, including DTVN.  *Id.* ¶ 130.  AT&T agreed to compensate Time Warner shareholders in both cash and AT&T stock.[2]  *Id.* ¶ 111.  The agreement included penalties if either AT&T or Time Warner unilaterally withdrew from the merger; AT&T would have had to pay $500 million, and Time Warner would have been penalized $1.725 billion.  *Id.* ¶ 115.  Among other scenarios, the agreement could be terminated if Time Warner's shareholders voted against it.[3]  *Id.* ¶ 114.

On November 30, 2016, two-and-half months before the Time Warner shareholders' vote, AT&T launched DTVN.  *Id.* ¶ 117.  At launch, AT&T offered a free 7-day trial, data exemptions for AT&T mobile customers, plus a free Apple TV or Amazon Fire TV Stick—all of which were publicly announced promotional strategies.[4]  *Id.* ¶¶ 106, 137.  Monthly prices ranged from $35 to $80.  *Id.* ¶ 135.  Media reports indicated that the streaming service encountered significant technical problems in the first month or two of its launch, prompting customer complaints.  *Id.* ¶¶ 143–44, 522–23.

---

[2]    The amount of AT&T stock that a Time Warner shareholder would receive depended on the value of AT&T stock at the time of closing; the greater the value, the fewer shares that Time Warner shareholders would receive.  *See* Am. Compl. ¶ 111.

[3]    The merger agreement could also be terminated by mutual consent, if there was a breach of a representation or covenant, if Time Warner received a higher offer, or if the closing did not occur by a specified date.  Am. Compl. ¶ 114.

[4]    Contrary to what its name might suggest, an Apple TV is not a television set but is instead a device that allows users to display internet video content on a television.  Am. Compl. ¶ 137.

On January 5, 2017, AT&T filed its registration statement for the Time Warner acquisition, and four days later, it filed the prospectus that would be used to offer AT&T stock to Time Warner's shareholders.  *Id.* ¶ 146.  Neither filing contained any reference to DTVN, though the filings incorporated certain subsequently filed documents, including Forms 8-K that referenced DTVN.  On January 20, 2017, AT&T filed a Form 8-K previewing its fourth quarter 2016 results, noting that DTVN added 200,000 subscribers in its first month.  *Id.* ¶ 148.  On January 25, 2017, AT&T filed a second Form 8-K, announcing the same subscriber figure.  *Id.* ¶ 256.

Time Warner's shareholders voted to approve the AT&T acquisition on February 13, 2017.  *Id.* ¶ 155.  The closing of the transaction was delayed, however, due to the Department of Justice's effort to enjoin the merger on antitrust grounds.  *Id.* ¶¶ 118, 155.  On June 14, 2018, two days after the United States District Court for the District of Columbia ruled in favor of AT&T, the deal closed.  *Id.* ¶ 119.  In total, AT&T paid $108.7 billion to acquire Time Warner. *Id.* 110.

For each quarter during the relevant period, AT&T reported the net gain or loss ("net additions") of DTVN subscribers, in addition to total subscribers:

| 4Q16 | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 |
|------|------|------|------|------|------|------|------|
| +200,000 | +72,000 | +152,000 | +296,000 | +368,000 | +312,000 | +342,000 | +49,000 |

*Id.* ¶ 342.  The "net additions" metric refers to the difference between the total number of subscribers at the end of the prior quarter and the total at the end of the reporting quarter.[5]  As a

---

[5]     Plaintiffs contend that this definition of "net additions," which is explained in AT&T's memorandum of law, is factually unsupported.  Pl. Opp. (Dkt. 89) at 16 n.24 (citing Defs. Br. (Dkt. 85) at 8–9).  The Court disagrees. First, the only plausible interpretations of "net" subscriptions for a quarter is the number of accounts gained minus the accounts lost during that quarter, which, as a matter of arithmetic, must equal the quarter-to-quarter difference.

result, a subscription that was both created and cancelled within a quarter would not appear in the quarterly data.

In third quarter 2018, AT&T "scaled back promotions and special offers," which caused a marked decline in the growth of subscribers, although growth remained positive. *Id.* ¶ 343. According to Defendant John Donovan, who was the CEO of AT&T Communications and was responsible for the Entertainment segment, AT&T had decided to reduce the number of "low-value, high-churn customers" who were taking advantage of special offers. *Id.* ¶ 344. Defendant Stephenson similarly stated that the reduction in promotions had been expected to lead to a decline in net additions of subscribers; he also said that the 3Q18 figure was nevertheless more positive than had been expected. *Id.* ¶ 343. Plaintiffs allege that those remarks prove that AT&T was aware of the significant risk of promotion-related churn but failed to disclose that information until the 3Q18 announcement, which surprised the market and caused an 8% drop in AT&T's share price on October 24, 2018. *Id.* ¶¶ 348–49.

## II.   Alleged Misrepresentations and Omissions

Plaintiffs cite 25 statements made between September 21, 2016, and September 12, 2018, that were allegedly misleading about the success and potential of DTVN and that allegedly violated the Exchange Act. *Id.* ¶¶ 241–336. Although these allegations span nearly 100 paragraphs, Plaintiffs argue, in essence, that every time AT&T or its senior management spoke about the success or potential of DTVN or mentioned its subscriber figures or margins, Defendants failed to disclose that:

---

Second, a review of AT&T's 10-Q filings confirms that method of calculation. According to AT&T's 2Q17 filing, for instance, the company ended with 491,000 DTVN subscribers on June 30, 2017. *See* Monahan Decl., Ex. 13 (Dkt. 86-13) at 28. Next, according to AT&T's 3Q17 filing, the company ended the following quarter on September 30, 2017, with 787,000 DTVN subscribers. Monahan Reply Decl., Ex. 35 (Dkt. 93-1) at 28. The net additions figure for 3Q17 is then 296,000, the difference between 787,000 and 491,000. *Id.*

A.  The streaming service experienced severe technical issues as a result of being launched before it was ready, which rendered the service unusable at times and—presumably—affected the retention of customers;

B.  DTVN was being sold at promotional rates, including with free giveaways, which caused subscribers not to renew at the end of their promotional periods;

C.  DTVN suffered from a low usage rate and a high risk of churn, meaning that subscribers were likely to discontinue their subscriptions;

D.  DTVN was being sold at unprofitable rates;

E.  DTVN's subscriber figures were artificially inflated by improper sales practices, which meant that the reported subscriber numbers contained an unusually high number of customers who did not want the product and were likely to discontinue; and

F.  DTVN was not a viable means of offsetting the loss of satellite subscribers.

*See id.* ¶ 260.

### A.  Technical Problems with DTVN

Plaintiffs allege that DTVN experienced "serious technical problems" during approximately the first two months of its launch.  *Id.* ¶ 143.  Plaintiffs lack direct knowledge of the technical issues; they instead rely on four news articles dated January 13 to 17, 2017.  *See id.* ¶¶ 143–44, 522–23.  The articles described performance issues with the DTVN app, including missing features, service interruptions, and billing issues as some subscribers demanded refunds. *Id.*  According to Plaintiffs, those technical problems rendered Defendants' touting of a successful launch misleading.  *See, e.g.*, *id.* ¶¶ 245–46 (Defendant Stephenson: "[T]he early demand has been rather dramatic.  It has been really, really impressive, we have been pleased with it.").

Although one article reported that "many" subscribers described the app as "unusable," the pleading does not make clear the actual scale of the technical problems or how long they

6

persisted.  *Id.*  Nor is there any allegation as to which, if any, of the Defendants were aware of the magnitude of the technical issues and if so, when they discovered those issues.

### B.  DTVN's Promotions

AT&T launched DTVN with several promotions designed to attract subscribers.  Those promotions included an Apple TV device with a three-month pre-paid subscription to DTVN, or an Amazon Fire TV Stick with a one-month prepaid subscription.  *Id.* ¶¶ 137, 460.  A purchase of certain high-end TV sets included a free one-year subscription to DTVN.  *Id.*  All of those promotional offers were publicly announced during the launch event on November 30, 2016.  *Id.* A week later, Defendant Stephenson announced at a technology conference that AT&T was giving mobile customers access to unlimited data when using DTVN.  *Id.* ¶¶ 141, 463.

At launch, subscribers could access 100 channels for $35 a month.  *Id.* ¶¶ 142, 449. Defendant Brad Bentley, who was the Executive Vice President of Marketing for Entertainment, stated that the launch price was "not promotional and does not roll off."  *Id.* ¶¶ 56, 137, 243, 460. By May 2017, however, the prices had been adjusted to $35 per month for 60 channels and $60 per month for 100 channels.  *Id.* ¶¶ 161, 449.  At some point during the class period, as part of AT&T's bundling strategy, AT&T mobile customers with unlimited data plans could add DTVN for $10 a month.  *Id.* ¶ 286.

During the first and second quarter of 2018, AT&T offered three-month promotional periods during which subscribers could enroll for $10 per month.  *Id.* ¶¶ 362, 366, 536.  AT&T disclosed in January 2019 that approximately 500,000 subscribers had been enrolled in those plans in 2018, until the promotion was eliminated in the third quarter; AT&T's subscriber growth slowed when the promotions ended.  *Id.* ¶¶ 32–33, 362, 536.

Plaintiffs allege that Defendants, when discussing subscriber numbers, failed to mention those promotions and the risk of attrition after their expiration. *See, e.g.*, *id.* ¶ 365. Defendant Stephenson also allegedly suggested, falsely, that AT&T achieved a successful launch without significant promotional activity. *Id.* ¶ 284 (Defendant Stephenson: "And we launched this thing back in December, and it was supposed to be a soft launch. Did it with no promotion, no advertisement, don't even hardly pay the reps to sell it, and the thing just caught fire."); *see also id.* ¶ 280 (Defendant Stephens: "We deliberately pulled back on marketing to give the platform time to mature and improve, and we're seeing just that . . . . We're still only 5 months since the DTVN launch, but we like what we see and feel very good about the service and where it's headed.").[6]

### C.  Risk of Churn and Low Engagement Rates

According to Plaintiffs, Defendants failed to disclose that a "large percentage of the DTVN subscribers on promotions were not engaging with (using) the DTVN product, a metric which AT&T and the Executive Defendants tracked on a regular basis and which strongly suggested that those subscribers would not renew their DTVN subscriptions when their promotions ended." *Id.* ¶¶ 170, 260, 379, 403. On October 24, 2018, Defendant Donovan disclosed during a quarterly conference call that AT&T had decided to "rationalize [its] promotions and special offers," because it had discovered a group of "low-value, high-churn customers." *Id.* ¶¶ 344, 534. Donovan referred to the phenomenon as a "tale of two cities"—a split between subscribers who had "tremendous engagement" with DTVN and others who were "just jumping from promotion to promotion and really spinning in the industry between us, Hulu Live, YouTube TV." *Id.* ¶¶ 28, 346, 534. Similarly, during a January 2019 earnings call,

---

[6]     All references to DirecTV Now throughout this opinion, including in quotations, are abbreviated as DTVN.

Defendant Stephens described the existence of a subset of subscribers who were on promotional

plans and were low-frequency users.  *Id.* ¶¶ 366, 536 ("[W]e just looked at the customer

segment, and there was a customer segment at the low-end, very promotional pricing, who were

not engaging on the product.").  Although Plaintiffs do not make this clear, they appear to be

alleging that Defendants should have disclosed the existence of disengaged subscribers earlier

because AT&T was tracking those metrics in real time.

Defendants also allegedly misrepresented their ability to reduce churn.  First, Defendants

touted their ability to cross-sell AT&T wireless and TV customers, and the potential to use

bundling to reduce churn.[7]  Second, Defendants repeatedly expressed optimism about the value

proposition of DTVN, including their ability to retain customers by adding more features or

functionalities.  *Id.* ¶ 305 (Defendant Stephens statement on November 16, 2017).  Plaintiffs do

not appear to contest Defendants' claims that bundling and added features could generally reduce

churn but instead allege that those claims are misleading given AT&T's fraudulent sales

practices that created inherently transient accounts.  *See id.* ¶ 299.

### D.  DTVN's Profitability

Plaintiffs allege that Defendants misled investors by suggesting that DTVN would be

profitable despite its aggressive pricing.  At various points, Defendant Stephenson stressed that

DTVN would generate profits despite low prices because, unlike traditional satellite TV, there

were no installation or hardware costs associated with new subscribers, which meant that growth

would not be subject to traditional physical constraints and costs.  *See, e.g.*, *id.* ¶¶ 139

("Defendant Stephenson explained that because the product is 'software centric' and because

---

[7]        Am. Compl. ¶¶ 295 (Defendant Stephens on July 25, 2017: "[I]f you look at any bundled customer, churn is lower when compared to customers with just a single service . . . . We use the combined appeal of wireless, video and broadband services to offer compelling packages that can't be easily replicated."), 298 (Defendant Stephenson statement on September 12, 2017).

'there is no truck roll at the house, there is no satellite . . . , there is no set-top box . . . , there is very little capital required to launch a service like this' he was 'perfectly content with lower, thinner margin."), 241 ("This is a very, very low-cost customer acquisition product."). Stephenson also stated that AT&T had "the lowest content cost in the US," which "uniquely positioned [AT&T] to offer [video streaming] on a profitable basis." *See id.* ¶¶ 139 (statement from December 6, 2016), 247 (same).  Stephenson further explained that AT&T was willing to accept thinner margins than what it was accustomed to because of the "low capital intensity in the product." *Id.* ¶ 241.  In AT&T's 2016 annual report, AT&T identified its ability "to maintain margins" as a risk factor.  *Id.* ¶¶ 269–70.  On March 8, 2017, Defendant Stephens stated that AT&T was well-positioned to build brand loyalty and create future opportunities for "continued quality margins and profit expansion."  *Id.* ¶ 271.  Similarly, Stephens emphasized on November 8, 2017, that DTVN had "very solid margin levels" with "a very low-cost upfront."  *Id.* ¶ 303.  AT&T's 2017 Annual Report warned that "operating costs, including customer acquisition and retention costs, could continue to put pressure on margins."[8]  *Id.* ¶¶ 319, 321 (again noting AT&T's "continued ability to maintain margins" as a risk factor).  Plaintiffs argue that such statements contained an implied factual assertion that existing margins for DTVN were at least positive.  *Id.* ¶¶ 242, 248, 270.

That implied assertion of positive margins, according to Plaintiffs, was false.  CW-12, who held an unspecified position in "product development," allegedly told Plaintiffs that "during the entire first year of offering DTVN, not one subscriber was profitable."  *Id.* ¶¶ 87, 225, 481.  CW-12 reportedly "had access to subscriber numbers and churn reports," but the pleading does not make clear whether CW-12 was in a position to understand AT&T's national profit and loss

---

[8]     It should be noted that the risk factor relied on by Plaintiffs from the 2016 and 2017 annual reports was not focused on the operating costs and margin specifically associated with DTVN but was a company-wide risk factor.

picture, how CW-12 was defining profitability, when the unprofitability became apparent to CW-12 or to senior management, or the specific time periods for which CW-12 had reviewed the relevant data.  *See id.* ¶ 225.  Plaintiffs also point to Defendants' statements on October 24, 2018, when AT&T announced that it was going to "rationalize" or "scale back" promotions and special offers to "optimize profitability."  *Id.* ¶¶ 343–44.  According to Plaintiffs, the explicit effort to "rationalize" prices is an implicit admission that previous prices were irrationally low.  *Id.* ¶ 402.

### E.  Fraudulent Sales Tactics

Plaintiffs allege that Defendants' statements regarding the success of DTVN were misleading because Defendants failed to disclose that subscriber figures were inflated by overly aggressive and sometimes fraudulent sales tactics, which resulted in a significant number of subscriptions being created without the customers' knowledge.  CWs who were sales representatives and managers described selling DTVN subscriptions as a top priority in their respective AT&T retail stores, areas, or regions.  *See, e.g., id.* ¶¶ 208–10.  According to various CWs, AT&T set unreasonably high sales targets, which then prompted sales representatives to adopt overly aggressive and improper tactics in order to obtain sales incentives.  *See, e.g., id.* ¶¶ 206–07 (explaining the existence of sales quotas and commissions for sales representatives and managers).

Virtually all of Plaintiffs' CWs were several levels removed from any contact with AT&T's senior management.  CW-11, the lone exception, recalled a conversation with Defendant Brian Shay, who was AT&T's President of Retail Sales and Service.  *Id.* ¶¶ 61, 211.  CW-11, who was Director of Sales in Oregon until December 2017 and then Director of Operations of the Rocky Mountain Region until early 2019, reported that at some point during the first six months following the launch, Shay instructed stores to double subscription sales

month-to-month. *Id.* ¶¶ 86, 211. The pleading does not specify the duration of the expected exponential growth. Sales representatives were allegedly informed that they would be "held accountable" for failing to meet sales targets, but the pleading does not provide the origin of the threat, nor does it specify the consequences associated with any failure to meet sales quotas. *See id.* ¶ 211 ("[E]mployees were told that they would be 'held accountable' if they failed to meet this target.").

According to CW-11, he learned, in early 2018, about sales representatives using a variety of fraudulent sales tactics to meet quotas and incentives. *Id.* ¶ 212. Those strategies allegedly involved using AT&T customers' credit card information to sign up for free DTVN subscriptions without their knowledge, or telling mobile customers that they needed to sign up for DTVN before upgrading their phones. *Id.*

A June 2018 article published in *Hawaii News Now* described sales representatives in Hawaii utilizing similar fraudulent tactics. *Id.* ¶¶ 199, 515. First, sales associates would sometimes sign up a customer for multiple free trials instead of one. *Id.* ¶ 199. Second, sales representatives in Hawaii would also fabricate certain fees that would be "waived" if the customer signed up for DTVN.[9] *Id.* ¶ 200. CW-1, who was a sales representative in Hawaii, explained that he would tell wireless customers that there was a $35 activation fee for a new

---

[9]     Plaintiffs attempt to extrapolate these practices nationwide, citing anonymous comments posted on www.reddit.com and other internet forums. *Id.* ¶¶ 192–94, 203–04. None of those posters appears to be known to Plaintiffs, and the bases for their claims cannot be ascertained. *See Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) ("A complaint may rely on information from confidential witnesses if they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." (citation omitted)). Nor is it sufficient for CW-1 to allege, with no specificity, "that he heard from AT&T employees from both the west and east coasts of the U.S. stating that they had been directed to create fake accounts in the same way that he had." Am. Compl. ¶ 174. The pleading simply does not make clear whether "employees from both the west and east coasts" meant one sales representative in one store on each coast or something more significant. Similarly, CW-1 alleged that the fraudulent practices were known not only to his immediate boss, but to his boss's boss, and his boss's boss's boss, Defendant Shay. *Id.* ¶ 176. Despite CW-1's "guarantee," the pleading does not explain how CW-1, as a sales representative in Hawaii, could have ascertained the thinking of senior management three levels removed from him. *See id.* ¶ 176.

phone; the "activation fee" would then be diverted to one or more DTVN subscriptions, depending on the existence of promotional pricing. *Id.* ¶¶ 76, 171–72. To avoid detection, the sales representative would track the end of the promotional period and cancel the subscription before the customer received a bill. *Id.* ¶ 173. CW-1 alleged that these practices "began in earnest in 2017" and that half of the accounts he created were "fake." *Id.* ¶ 175. Such practices reportedly caused Hawaii to have some of the best sales figures in the nation; DTVN sales figures allegedly became a ranked performance metric in June 2017. *Id.* ¶¶ 201, 516. In response to the Hawaii news article, AT&T acknowledged that it had conducted an internal investigation after noticing a pattern of simultaneous subscriptions and cancellations and determined that some employees had violated company policy. *Id.* ¶ 202. CW-1 alleged that he heard from unidentified former colleagues that the fraudulent practices continued until the end of 2018, though he appears to lack any direct knowledge. *Id.* ¶ 198.

CW-2, who worked as a sales representative in Michigan in 2017, similarly reported that he created DTVN subscriptions without customers' knowledge. *Id.* ¶¶ 77, 177. He described a practice of secretly applying a discount to a customer's bill and then diverting the overpayment towards a subscription. *Id.* ¶ 177. He alleged that some 40–50% of customer complaints he handled involved customers who were charged for subscriptions that they did not purchase; the amended complaint does not disclose the number of complaining customers that he handled. *Id.* ¶ 178. He further alleged that in early 2017 his store manager told him that an unnamed Director of Sales, who was responsible for 27 stores in Michigan, had instructed the employees at CW-2's location to sign up as many customers as possible, even if that meant doing so without the customers' knowledge. *Id.* ¶ 180.

13

Sales representatives and managers in three other states reported being aware of similar practices.  CW-3, who worked as a sales manager in Pennsylvania until January 2017, stated that adding a DTVN subscription without the customer's knowledge was "common practice" and had been utilized for other new products prior to DTVN.  *Id.* ¶¶ 78, 184.  CW-5, a sales representative, described similar practices in New Jersey starting in December of 2017.  *Id.* ¶¶ 80, 185–86 (diverting SIM card charge to subscription fee), 493.  CW-14, an area manager in Idaho, did not have direct knowledge of fraudulent account creation but allegedly heard from unidentified others that such practices were occurring.  *Id.* ¶¶ 79, 89, 190.  CW-4, who appears to have worked as an online customer services representative, recalled receiving complaints from customers who were billed for DTVN even though they had not signed up for it, as well as noticing that the email addresses associated with those accounts were unknown to the customers.  *Id.* ¶¶ 79, 181–82.  CW-4 alleged that he began receiving such complaints around June 2017 and that such complaints continued through May 2019.  *Id.* ¶ 181.

Sometime in 2017, AT&T began conducting an internal investigation into the fraudulent sales tactics.  CW-14 estimated that he heard about an investigation sometime around summer of 2017, *id.* ¶ 195; CW-16 reported learning about an investigation in the middle of 2017, *id.* ¶ 196.  CW-11 was allegedly notified of an investigation in November or December of 2017, which resulted in over a hundred terminations across the country sometime between February and April 2018.  *Id.* ¶ 197.  According to CW-11, the investigation concluded that employees as high as a Director of Sales were aware of and had instructed the use of the fraudulent practices.  *Id.* AT&T reportedly confirmed the existence and conclusion of the investigation in response to the Hawaii News Now article published on June 21, 2018.  *Id.* ¶ 199.  Plaintiffs do not allege what prompted the investigation, nor do they allege any other findings or results of the investigation,

14

such as the scale of the fraudulent practices uncovered or the extent of the individual defendants' knowledge of the investigation or its conclusions.

### F.  DTVN's Ability to Offset Losses in Satellite TV

Finally, Plaintiffs allege that Defendants painted a misleading picture of their ability to use DTVN to offset the loss of satellite customers.  *Id.* ¶ 299.  At various points in 2017 and 2018, Defendants announced that growth in DTVN subscribers largely, if not entirely, offset its loss of DirecTV satellite customers.[10]  Plaintiffs do not appear to dispute that the growth of DTVN subscriptions was comparable in magnitude to the decline in traditional TV viewers. They instead argue that the offset claim is misleading because DTVN subscribers were not profitable and were likely to churn off the platform.  *See, e.g.*, *id.* ¶ 302.

### III.   Procedural History

On June 24, 2019, the Court appointed Steamfitters Local 449 Pension Plan, Iron Workers Locals 40, 361 & 417 Union Security Funds, Iron Workers Local 580 Joint Funds, and Local 295 IBT Employer Group Pension Fund as co-lead plaintiffs.  Dkt. 53.  In their Amended Complaint, Plaintiffs claim that the 25 aforementioned statements violated § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder.  Defendants move to dismiss those claims for failure to plead a material misrepresentation or the requisite mental state.

Plaintiffs also allege that AT&T's registration statement and prospectus violated the Securities Act by failing to disclose certain of the aforementioned risks: likely unprofitability,

---

[10]     Am. Compl. ¶¶ 168 (Press release on June 21, 2018: "For the quarter, the company expects total video and broadband subscribers to increase, with DTVN subscribers more than offsetting continued declines in traditional TV subscribers."), 169 (Second quarter results on July 24, 2018: "We had 80,000 total video net adds in the quarter with gains in DTV Now and U-verse more than offsetting losses in DirecTV."), 279 (First quarter results on April 25, 2017: "DTVN gains help offset linear TV subscriber decline."), 292 (Second quarter results on July 25, 2017: "Total video losses of 199,000 with DTVN gains helping offset traditional TV subscriber decline; Total video subscribers essentially flat year over year."), 324 (Defendant Stephenson on September 12, 2017: "[T]here is pressure on the linear product, but we are making up for it, in a large part, from the DTV Now adds."), 300 (Third quarter results on October 24, 2017: "Nearly 300,000 DTVN net adds helped offset traditional TV subscriber decline.").

aggressive promotional and sales tactics, and technical problems with the platform.  *Id.* ¶¶ 584,

595, 606.  Defendants move to dismiss the Securities Act claims for failure to plead any material

misrepresentation or omission and, as to one claim, because the statute of limitations has expired.

## DISCUSSION

On a Rule 12(b)(6) motion to dismiss, the court asks "whether the complaint contains

'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"

*Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)).  "The court accepts as true all well-pleaded factual allegations in the

complaint, draws all reasonable inferences in favor of the nonmoving party, and considers, in

addition to the complaint, and written instruments attached, statements incorporated by

reference, and public disclosure documents filed with the SEC."  *Id.*

"To satisfy the pleading standard for a misleading statement or omission under Rule 9(b),

a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent.'"  *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,

794 F.3d 297, 305 (2d Cir. 2015).  Pursuant to the Private Securities Litigation Reform Act

(PSLRA), claims alleging violations of the Exchange Act "must specify 'the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is

made on information and belief, the complaint shall state with particularity all facts on which

that belief is formed.'"  *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)(B)).

## I.   Exchange Act Claims

Counts I through III allege violations of the Exchange Act.  Count I alleges misleading

statements and omissions in violation of § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule

10b–5 (b) (17 C.F.R. § 240.10b–5 (b)).  Count II alleges so-called "scheme liability," which is premised on deceptive conduct apart from misstatements or omissions.  *See* 17 C.F.R. § 240.10b–5 (a), (c).  Count III seeks to hold AT&T's senior executives (Bentley, Donovan, John Stankey, Stephens, and Stephenson) liable as "control persons" under § 20(a) of the Exchange Act.  15 U.S.C. § 78t.

As explained below, Counts I and II are dismissed because Plaintiffs have not pleaded a material misstatements or omission or other deceptive conduct.  Without a primary violation under the Exchange Act, Count III must also be dismissed.

### A.  Count I: Misleading Statements or Omissions

Under Rule 10b–5(b), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).  "To state a claim under Rule 10b–5 for misrepresentations, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  *Blanford*, 794 F.3d at 305.  Defendants' motion to dismiss argues that Plaintiffs have not adequately pleaded material misstatements or omissions or scienter.  *See* Defs. Br. (Dkt. 85) at 22–43.

### 1.  Plaintiffs have not identified any material misstatements or omissions.

The first clause of Rule 10b–5(b) prohibits the making of "any untrue statement of a material fact."  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020).  "The materiality of a misstatement depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *ECA, Local 134*

*IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)

(cleaned up).  "Generic, indefinite statements of corporate optimism typically are not actionable"

because reasonable investors do not place "substantial reliance on generalizations regarding a

company's health or the strength of a company's product."  *Abramson*, 965 F.3d at 173 (citing

*JP Morgan Chase Co.*, 553 F.3d at 206).  "People in charge of an enterprise are not required to

take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they

can be expected to be confident about their stewardship and the prospects of the business that

they manage."  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted).

Accordingly, standard puffery, such as statements describing a product as "encouraging"

or "an improvement," are not actionable unless the speaker "disbelieved" his or her own pitch.

*Abramson*, 965 F.3d at 173.  Vague, rosy predictions that have been held to be non-actionable

include claims that a business is "uniquely positioned to win market share" and possesses

"significantly enhanced capabilities,"[11] has "competitive advantage[s],"[12] is known for its

"integrity,"[13] and is on a path to "continued prosperity."[14]

Non-actionable puffery comprises the overwhelming majority of the alleged

misstatements (set in bold) in the amended complaint.  *See, e.g.*, Statement 1[15] (touting "unique

---

[11]    *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 314 (S.D.N.Y. 2010).

[12]    *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

[13]    *JP Morgan Chase Co.*, 553 F.3d at 205; *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them." (citation omitted)).

[14]    *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

[15]    For brevity and readability, the Court uses "Statement #" to refer to each of the 25 allegedly misleading statements cited and numbered in the amended complaint.  *See* Am. Compl. at ¶¶ 241–338.

position on content cost" and "quite attractive and very positive" product that AT&T was "so excited about"); Statement 2 (describing DTVN as "compelling value proposition" for customers); Statement 3 ("[T]he early demand has been rather dramatic . . . really, really impressive, we have been pleased with it.") ("This thing is doing very, very well, it is exceeding expectations."); Statement 4 ("DTVN . . . we think will be a real game changer."); Statement 5 (describing DTVN as "attractive" and "starting strong" and "really fast" in the first month); Statement 6 (referencing "continued ability to maintain margins"); Statement 7 (citing "unique position" potentially to bundle DTVN with other services to "gain customers and grow revenues" and "continue[] quality margins and profit expansion") (describing first month growth as "very exciting, very successful"); Statement 8 (touting AT&T's "core set of values," set forth in its "Code of Business Conduct," and its commitment to "the highest standards" and "operating with integrity, transparency, and honesty in everything" it does); Statement 9 (claiming that DTVN was "important part of [AT&T's] strategy and continues to add customers"); Statement 10 (claiming that DTVN "ramped up a lot faster than we thought it would" and describing it as "a product that, obviously, people are interested in continuing to buy"); Statement 11 (downplaying the significance of promotional activity and describing DTVN as having "just caught fire" and growing "much faster than we were wanting to go"); Statement 12 ("We have been very pleased . . . the platform continues to get better and better every day . . . . [A] great value prop.") (citing "huge groundswell of demand" at launch and asserting that AT&T was "putting the right pieces together to continue to play to win"); Statement 13 (claiming "pretty dramatic growth" and citing "really attractive" potential to expand to non-satellite TV viewers); Statement 14 (citing "very high" percentage of wireless customers who add video and claiming that bundling has enabled AT&T to "[l]ock[] down the customer base"); Statement 15 (claiming

to be "very encouraged by rapid deployment of our DTVN" and citing "continued success and "unique value-creating opportunity"); Statement 16 (describing DTVN as having "very solid margin levels" and being "a very, very attractive business"); Statement 17 ("We had great results . . . . [I]t continues to be successful."); Statement 18 (citing "really strong impact" of bundling on reducing customer attrition); Statement 20 (claiming that bundling "has positively impacted subscriber trends and churn" and referring to "continued ability to maintain margins"); Statement 21 ("[W]e're confident that we're on the right track and that it's going quite well."); Statement 22 (anticipating "real opportunities" and "growth in [] margins"); Statement 23 ("We've been growing [DTVN] rapidly . . . . [W]e think it's the best product in the marketplace."); Statement 24 ("We just had a very strong quarter . . . . [A]s we build those volumes up, those are products that will get scalable margins."); Statement 25 (describing the customer base as having been "very resilient to" changes in price and "feeling very good about the ability to retain price and the customers feeling good about getting value").

Amidst that deluge of non-actionable statements are a few nuggets of factual assertions that might have been actionable if Plaintiffs had adequately pleaded falsity and materiality. The Second Circuit has observed that opinion statements can be actionable if they "contain[] one or more embedded factual statements that can be proven false." *Abramson*, 965 F.3d at 175. In addition, a statement of opinion can be actionable if it "implies facts or the absence of contrary facts" that are capable of verification. *Id.* Here, the allegedly actionable statements contain factual assertions or implications that: (i) DTVN subscriptions yielded positive margins; (ii) subscribers predominantly enrolled online; (iii) the reported subscription numbers reflected real customers and not fraudulently created accounts; (iv) subscriber churn was being reduced; and

(v) DTVN subscriptions were offsetting losses in satellite TV customers.[16]  *See* Am. Compl. ¶ 260.  Plaintiffs have not, however, adequately alleged that those assertions were untrue or misleading or that any inaccuracy would have been material to reasonable investors.

      *(i)*     *Positive Profit Margins*

Accepting Plaintiffs' position that several of Defendants' statements conveyed the notion that DTVN's margin was positive (if somewhat thin), Plaintiffs must still plausibly plead falsity with particularity.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  The only allegation as to unprofitability comes from CW-12, who allegedly told Plaintiffs that "not one subscriber was profitable during the first year" of DTVN's launch.  Am. Compl. ¶¶ 87, 225, 481.  The basis for that sweeping and conclusory claim, however, is unknown, and it is not at all clear whether CW-12 was referring to the nationwide market or to some sub-market of unknown size or how he was defining profitability.  As the Second Circuit has held, a complaint may rely on statements from confidential witnesses, but the complaint must describe the witness with sufficient particularity to enable the court to determine the probability that the witness would have known the information asserted.  *Blanford*, 794 F.3d at 305.  Here, the only facts known about CW-12 are that he was in "product development," that he had access to subscriber information and churn reports, and that he attended meetings at which churn was discussed.[17]  Am. Compl. ¶¶ 87, 225.  He does not purport to have been a senior member of

---

[16]      The Amended Complaint also alleges that Defendants failed to disclose technical issues that plagued the DTVN platform, but Plaintiffs' briefing largely ignores that argument for purposes of the Exchange Act claims.  *See* Pls. Br. at 14 n.20, 39.  Accordingly, the Court discusses the materiality of the technical issues in the context of the claims made under the Securities Act, which, in any event, utilizes the same materiality standard.

[17]      Although CW-12 asserted that he had access to churn data and reports, he did not recount the frequency at which he actually viewed such information.  *See* Am. Compl. ¶ 225.

management.  Although he reportedly "had access to subscriber numbers and churn reports," the

pleading does not allege that CW-12 had access to nationwide cost and profit data, let alone that

he ever reviewed such data for DTVN's  entire subscriber base.  *See id.* ¶ 225.  Indeed, the

amended complaint provides no hint of how he would have known about the profitability of the

product as a whole.

Plaintiffs also attempt to rely on Defendants' statements made on October 24, 2018,

nearly two years after the launch of DTVN, that AT&T was going to "rationalize" or "scale

back" promotions and special offers to "optimize profitability."  *Id.* ¶¶ 343–44.  That effort is

unavailing.  At best, those statements suggest that two years into selling the product, AT&T had

determined that prices and profits were lower than they could have been because of a segment of

"low-value, high-churn customers"—those statements neither state nor imply that overall profits

were zero or that the product was losing money.  The fact that AT&T may have been overly

optimistic about its ability to convert promotional customers into loyal subscribers and then

decided to cut bait after experimenting with promotions does not state a claim for fraud.

In short, Plaintiffs have failed to allege adequately that Defendants' statements regarding

its profit margins on DTVN were false or misleading at the time the statements were made.

(ii)     *Low-Cost, Online Enrollment*

Next, Plaintiffs take issue with Defendants' claim that DTVN, unlike traditional satellite

TV, could and did enroll subscribers online and through low-cost means.  *See, e.g.*, Am. Compl.

¶¶ 241–42.  Plaintiffs appear to argue that the claim was misleading because many customers

were enrolled in AT&T stores as a result of heavy promotion.  *See id.*  The Court disagrees.

Read in context, the only plausible conclusion from the relevant statements is that DTVN, as an

internet-based TV platform, did not require the installation of a satellite dish, a visit from a

technician, or the need for a set-top box, which meant that start-up costs were much lower than for satellite TV and that growth would not be subject to traditional physical constraints and costs. *See, e.g.*, *id*. ¶ 241.  Those physical and cost-savings advantages undoubtedly existed, *id.* ¶¶ 97, 105, and were not undermined or contradicted by the fact that some customers enrolled in physical stores or that AT&T utilized promotions.

      *(iii)*     *Fraudulent Sales Practices and Fake Subscriptions*

      Plaintiffs' allegations that accounts were fraudulently created come the closest to pleading a misrepresentation or omission of material fact, but even they fall short.  Plaintiffs assert that Defendants provided misleading subscriber numbers, which were allegedly driven by rampant fraud committed by AT&T sales associates and managers nationwide.  *See* Pls. Br. (Dkt. 89) at 14–15.  On that theory, according to Plaintiffs, Defendants violated Rule 10b–5 every time they reported, repeated or discussed DTVN subscription figures because Defendants failed to disclose that some of the accounts were fraudulent.  The Court accepts as true Plaintiffs' allegations that at least some sales associates created accounts without customers' knowledge.  Nevertheless, Plaintiffs have not plausibly alleged that the fraudulent practices were widespread or systemic; none of the CWs on whom Plaintiffs rely had a companywide view of AT&T's business, and the ones with direct knowledge of fraudulent practices were limited to a tiny fraction of AT&T's 5,000-plus retail stores.[18]  The amended complaint, therefore, fails plausibly

---

[18]      According to CW-11, over 100 employees were terminated after an internal investigation.  Am. Compl. ¶ 197.  The Court will assume for these purposes that all of the terminated employees were directly involved in the creation of fraudulent accounts, even though CW-11 did not state that (it is not clear whether he would have known exactly why the employees were terminated) and even though it is entirely plausible that the investigation revealed unrelated misconduct for which at least some of the employees were terminated.  In all events, one hundred employees in a sales force that easily numbered well over 10,000 is a very small percentage of misbehaving employees.

to allege that the practice of some employees of fraudulently creating accounts would have been material to a reasonable investor's decision to purchase or sell AT&T stock.

As a threshold matter, there is no general duty under the securities laws for a corporation to disclose its use of aggressive or fraudulent sales tactics. *See In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[A]bsent a duty to cure prior misleading statements, ESI was under no duty to disclose its hyper-aggressive sales tactics and quota system."). Nor do the securities laws impose "a duty to disclose uncharged criminal conduct," unless such disclosure is "necessary to ensure that their [other] statements are not misleading." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (citations omitted); *see also Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) (explaining three scenarios under which non-disclosure of uncharged criminal conduct would be materially misleading). In other words, a corporation is required to disclose improper sales tactics only if the absence of such disclosure would be materially misleading in light of other statements made. *See id.*

Courts have generally held that failure to disclose anecdotal incidents of improper sales tactics or other isolated employee misconduct is not material.[19] Instead, the alleged improper

---

[19]     *See, e.g., City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127 (E.D. Wash. 2013) (holding that plaintiff did "not allege that the practices identified by CW1 were anything other than a local, isolated practice, or how CW1 would have personal knowledge of whether the alleged practices were widespread or a matter of corporate policy"), *aff'd*, 691 F. App'x 393 (9th Cir. 2017); *Karam v. Corinthian Colleges, Inc.*, No. 10-CV-6523, 2012 WL 8499135, at *11 (C.D. Cal. Aug. 20, 2012) ("[T]he anecdotal accounts of the CWs are insufficient to demonstrate that Corinthian had a materially widespread practice of enrolling unqualified students."); *Boca Raton Firefighters' & Police Pension Fund v. DeVry Inc.*, No. 10-CV-7031, 2012 WL 1030474, at *4 (N.D. Ill. Mar. 27, 2012) ("Even concrete allegations of wrongdoing may be deficient if they do not allege a problem of sufficient magnitude to undermine the defendants' public statements about [Defendant's] policies and practices."); *In re Zumiez Inc. Sec. Litig.*, No. 07-CV-1980, 2009 WL 901934, at *9 (W.D. Wash. Mar. 30, 2009) ("However, [CW] statements hardly raise an inference that the alleged problems were widespread throughout the Company. By the end of 2007, [Defendant] operated 285 stores across the country; it is hardly surprising that some of these stores suffered operational difficulties."); *Milano v. Perot Sys. Corp.*, No. 02-CV-0031, 2006 WL 929325, at *17 (N.D. Tex. Mar. 31, 2006) ("[A] company's limited violation of the law, or its narrow participation in unethical behavior, by a handful of employees in one market may not of itself indicate that the

activity must be widespread or otherwise of a sufficient magnitude as to be capable of affecting a reasonable investor's decision to buy or sell the company's stock. *See Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) ("Put another way, a fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.").

Here, it is important to contextualize the scale of AT&T's business, and the relative significance of DTVN and the alleged fraudulent accounts. According to Plaintiffs, AT&T, during the relevant period, had four main business segments, one of which was Entertainment, which, in turn, includes video, internet, and advertising. DTVN is just one of several products within video. As of June 2017, AT&T had approximately 260,000 employees. Monahan Decl., Ex. 13 (Dkt. 86-13) at 39. AT&T also had over 5,000 retail stores as of November 16, 2017. Monahan Decl., Ex. 19 (Dkt. 86-19) at 2. And, within the Entertainment segment alone, AT&T had over 50 million subscribers at the end of 2016, including over 25 million in video, not including DTVN subscriptions. Monahan Decl., Ex. 8 (Dkt. 86-8) at 4.

According to the amended complaint, Plaintiffs are aware of only three sales associates (CW-1, CW-2, and CW-5), plus an unspecified number of the CWs' unnamed co-workers, who helped create fake DTVN accounts at a small handful of store locations. Am. Compl. ¶¶ 175, 178, 185. Of those three, only CW-1 tried to quantify the number of affected subscriptions, reporting that he created approximately 15 fake accounts per month. Am. Compl. ¶ 175. CW-1 worked in Hawaii, which allegedly had "some of the best DTVN sales numbers in the nation." *Id.* ¶¶ 200, 201. Plaintiffs also allege that, following AT&T's internal investigation, over a

---

unlawful and unethical behavior has become so commonplace as to represent a material change in how it does business.").

hundred employees—including both sales representatives and managers—were terminated in March or April of 2018; no CW reported any direct knowledge of fraudulent sales practices continuing beyond that point.[20]  *See id.* ¶¶ 197–98.  Even assuming, in Plaintiffs' favor, that there were 100 sales representatives nationwide who each generated 15 fake accounts per month, the result would have been approximately 1,500 fake accounts per month, at a time when AT&T was averaging about 100,000 monthly net gains.  *See id.* ¶ 342.  Moreover, the allegations indicate that only a fraction of the fake accounts would have appeared in the quarterly figures.  According to the *Hawaii News Now* article relied on by Plaintiffs, AT&T reportedly began investigating fraudulent activity after seeing a pattern of same-day opening and closing of accounts.[21]  *Id.* ¶ 202.  Those accounts would have had no effect on AT&T's reported net additions for DTVN, because every such account opening was accompanied by an immediate account closing, which, by definition, nets zero for the quarter.  Thus, even assuming that AT&T's investigation identified only a subset of the unethical sales associates, Plaintiffs have not plausibly alleged that employee misconduct affected more than a tiny percentage of AT&T's subscription figures for DTVN, a product that is, in turn, only a slice of AT&T's video business, which is a subset of the Entertainment segment, which is, in turn, less than a third of AT&T's overall business.  Even assuming this misconduct was known within the upper reaches of AT&T, a fact not adequately pleaded, Plaintiffs have not plausibly pleaded that the failure to disclose improper tactics of some of AT&T's sales personnel would be material to a reasonable investor.

---

[20]     Although Plaintiffs allege that customer service complaints of unauthorized charges continued, the scale of those complaints is not alleged.  Am. Compl. ¶ 79.  Given that DTVN subscriptions reached as high as 1.86 million during the Class Period, Plaintiffs cannot rely on the vague recounting of a single customer service representative to allege plausibly a widespread fraudulent sales practice.  *See* Monahan Reply Decl., Ex. 37 (Dkt. 93-3) at 42.

[21]     The existence of such a pattern is also consistent with Plaintiffs' allegations regarding the incentive structure—sales performance was measured in terms of the number of new accounts created per month but not in terms of the longevity of those accounts or whether those accounts survived long enough to affect quarterly figures.

Thus, to the extent that AT&T's subscriber figures contained an implicit assertion that the figures represented genuine and legally procured accounts, Plaintiffs have not shown that any deviation from that factual assertion was material.  Plaintiffs do not otherwise appear to dispute that the subscription numbers accurately reflected the number of accounts created or closed.

### (iv)    DTVN's Churn Rate

Plaintiffs argue that, unbeknownst to investors, DTVN had a "major churn problem." Pls. Br. at 6.  Nowhere in the memorandum of law is there any legal authority or argument supporting Plaintiffs' claim that AT&T was required to disclose real-time churn or low engagement rates in addition to providing quarterly subscription totals and net gains or losses, which are the end results notwithstanding intra-quarter churn.  At best, Plaintiffs' argument appears to be that, as a result of high churn rates and the heavy use of promotions, DTVN's business model was "unsustainable," because, at some point, AT&T would presumably run out of new subscribers in the video market to replace the ones they would lose.  *See id.* at 16 (acknowledging that Defendants never promised that subscription figures would continually increase).  Even assuming Plaintiffs adequately pleaded plausible facts as to unsustainability, courts in this circuit have "easily rejected" attempts to impose Rule 10b–5 liability on a corporation's failure to "acknowledge the long-term unsustainability of its business model."  *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 35, 38 (2d Cir. 2012); *see also In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) ("As a matter of law, no statements regarding [Defendant's] accurately reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'"); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived

from 'unsustainable and illegitimate sources' violated section 10(b) is likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing."), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006).

Nor have Plaintiffs adequately alleged that Defendants' specific statements about the churn rate were false or misleading.  First, Plaintiffs take issue with Defendant Bentley's statement on May 31, 2017, that churn was "go[ing] down and down every week as [AT&T] continue[s] to work through learnings."  Am. Compl. ¶ 290.  But Plaintiffs do not allege any facts that would allow the Court to infer that churn rates were not, in fact, declining *circa* May 2017; they instead point to a drop in subscriber growth when prices were raised more than a year later in the third quarter of 2018.  *See id.* ¶ 343; Pls. Br. at 1.  That connection simply is too remote to support an allegation of falsity at the time the statement was made; indeed, the claim smacks of hindsight.  Finally, Plaintiffs cite numerous statements concerning the potential for bundling multiple AT&T products as a strategy to reduce churn.  *See, e.g.*, Am. Compl. ¶¶ 295, 298.  But efforts to reduce churn are consistent with Bentley's statement that churn was being reduced as AT&T learned more about the product.  And none of the allegations in the voluminous pleading contradicts the common-sense notion that selling multiple products to a consumer increases brand loyalty and reduces the risk of attrition.

In short, Plaintiffs have not explained why Defendants were required to disclose real-time churn rates when they were already reporting total and net subscription figures.  Nor have the Plaintiffs adequately alleged any false or misleading assertion about churn rates.

       (v)     *Offsetting DirecTV Satellite Losses*

Finally, Plaintiffs allege that Defendants misled investors by claiming that new DTVN subscriptions were offsetting cancellations by DirecTV satellite viewers.  *See, e.g.*, Am. Compl.

¶ 299.  Plaintiffs do not appear to dispute that net DTVN subscriptions were comparable in magnitude to declines in satellite TV, nor do they dispute that some portion of satellite customers were switching to DTVN.  Instead, they allege that Defendants' claim was misleading because DTVN subscribers, unlike traditional TV viewers, were not profitable and were likely to churn off the platform.  Pls. Br. at 8.  Because the Court has already addressed Plaintiffs' deficient pleading as to profit margins and churn, no further discussion is necessary on this point, except to note that Plaintiffs also have not alleged that DTVN had higher churn than DirecTV satellite.

### 2.  Plaintiffs have not pleaded a strong inference of scienter.

Plaintiffs have also failed to allege the requisite state of mind.  "To meet the scienter requirement in a 10b–5 action under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Blanford*, 794 F.3d at 305 (quoting 15 U.S.C. § 78u–4(b)(2)(A)).  The plaintiff must generally allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  "[I]f Plaintiffs cannot make the 'motive' showing, then . . . the strength of the circumstantial allegations must be correspondingly greater."  *JP Morgan Chase Co.*, 553 F.3d at 198–99 (cleaned up).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."  *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007)).  "For an inference of scienter to be strong, a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged."  *Id.* (emphasis in original)

29

(cleaned up).  Here, Plaintiffs have not pleaded a personal motive to defraud and have failed to make a strong showing of circumstantial evidence.

As to motive, Plaintiffs summarily allege that "[s]everal of the Executive Defendants had strong personal interests in promoting the success of DTVN" because its failure would have undermined the wisdom of AT&T's decision to acquire Time Warner.  Am. Compl. ¶ 396.  They also allege that, if the product had failed prior to the Time Warner acquisition, the transaction could have been terminated, which would have devastated Defendants' professional reputations and threatened their ability to continue as highly compensated AT&T executives.  *Id.*  Such allegations are insufficient as a matter of law.  As the Second Circuit has held, "a generalized desire to achieve a lucrative acquisition proposal," "maximize the corporation's profits," or earn "bonuses based on corporate earnings and higher stock prices" cannot support an inference of fraud.  *JP Morgan Chase Co.*, 553 F.3d at 201.

Moreover, Plaintiffs' allegations as to motive do not make much sense.  Time Warner's shareholders voted to approve the acquisition on February 13, 2017, which predated the effects of the alleged fraudulent sales tactics by several months.  If Defendants had wanted to pump up subscriptions to promote the acquisition, then one would have expected the sales practices to have occurred in time for inflated figures to be reported before the shareholders' vote, not after.  Similarly, if that had been the goal, one would have expected AT&T to have prominently featured DTVN in the registration statement and prospectus ahead of the acquisition, which it did not do.[22]

---

[22]    As discussed further in the Securities Act section, neither the registration statement nor prospectus initially contained any mention of DTVN, although certain documents incorporated by reference contained brief statements about DTVN's launch and the bundling of DTVN with AT&T's mobile service.

Having failed to demonstrate a remotely plausible, personalized motive, Plaintiffs must

make an even stronger showing of intent using other facts.  *See id.* at 198–99.  Plaintiffs attempt

to plead scienter by alleging that:

(1) Defendants had access to data regarding customers' engagement with DTVN and customers' churn rates and margins, all of which were closely tracked by the company and, according to Plaintiffs' CWs, regularly monitored by Defendants, Am. Compl. ¶ 379;

(2) Defendants must have been aware of widespread, improper sales tactics allegedly employed by retail associates, which were the subject of an internal investigation, *id.* ¶ 398;

(3) Defendants allegedly admitted to having prior knowledge of AT&T's irrationally low prices and margins and the risk of subscriber decline, *id.* ¶¶ 402–05;

(4) DTVN was allegedly a core aspect of AT&T's business plans after the DirecTV and Time Warner acquisitions, *id.* ¶ 399.[23]

That circumstantial evidence, however, is not as compelling as the obvious, non-culpable

explanation: AT&T invested heavily in a product that it believed could have been the next

generation of TV but was ultimately unsuccessful despite aggressive sales targets, efforts to

bundle AT&T's other services, and the acquisition of Time Warner for its streaming content and

to lower content costs.

First, Plaintiffs allege that Defendants had access to various real-time, performance

metrics about DTVN subscribers, including churn statistics.  "Where plaintiffs contend

defendants had access to *contrary* facts, they must specifically identify the reports or statements

containing this information."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (emphasis

---

[23]     Plaintiffs also attempt to plead scienter based on DirecTV's "history of false and misleading advertising," citing a 2005 incident that appeared to involve DirecTV failing to disclose conspicuously the fine print on its products and services.  Pl. Br. at 34; Am. Compl. ¶¶ 384–85.  No further explication is required except to say that unrelated advertising misconduct by a company other than AT&T occurring more than a decade before the events of this case is wholly irrelevant, particularly when none of the individual defendants allegedly engaged in the earlier misconduct.

added).  At best, Plaintiffs have pleaded that Defendants Stephenson and Stephens, at some

unspecified points in time in 2018, received "operational review packages" that contained

nationwide churn data and performance metrics for various promotions; other defendants who

spoke about profit margins and churn rates also presumably reviewed such data.[24]  *See* Pls. Br. at

31–32.  Assuming Defendants reviewed such information and assuming that it showed a "high"

churn rate, Plaintiffs do not adequately explain how such information contradicted or

undermined any of AT&T's reported figures or Defendants' public statements.  *See* Am. Compl.

¶ 224; *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir.

2011) ("Appellants have not alleged any facts indicating that the content of the reports or data to

which Appellees were privy was inconsistent with their statements in the class period.").  The

fact that churn rates may have been "high" is not inconsistent with the subscription figures

reported by AT&T, absent a specific statement from Defendants that churn was low.

In fact, Defendants' public statements disclosed that they believed churn to be an issue,

albeit one that they believed AT&T could address by adding features, gathering more user data

to improve targeting, and using bundling as a strategy to lock in customers.  *See, e.g.*, Am.

Compl. ¶¶ 267 ("If we are unable to restrain these costs or provide programming desired by our

customers, it could impact margins and our ability to attract and retain customers."), 298

(referencing need to "drive down churn"), 303 (discussing using data to market content to users

more efficiently), 205 (same), 307 (explaining positive effect of bundling on churn), 313 (same),

334 (acknowledging concern about identified group of high-churn customers), 319 (reiterating

risk of non-retention of customers), 336 (citing increased customer "resilience" after

---

[24]     CW-8 is the source of the allegation that detailed churn data was contained in the Operation Review
Packages and that Stephenson and Stephens received the reports.  Am. Compl. ¶¶ 223–24.  CW-8 left AT&T in
August 2018, *id.* ¶ 83, and asserted that he only began to see what he viewed as "significant churn" in early 2018.
*Id.* ¶ 223.

implementation of additional functionalities).  While Defendants' optimism may have proven to

be unwarranted, Plaintiffs have not alleged that Defendants reviewed any contemporaneous

information that should have undermined the optimism in their strategies.  *See Abuhamdan v.*

*Blyth, Inc.*, 9 F. Supp. 3d 175, 202 (D. Conn. 2014) (rejecting claim based on non-disclosure of

mere "possibility" of transient growth due to temporary promotions and related churn).

Second, for the reasons already discussed, Plaintiffs have failed to allege the existence of

widespread fraudulent sales practices.  Nor can Plaintiffs rely on the existence of the internal

investigation, the dimensions of which are largely unspecified, to prove scienter.  The amended

complaint does not allege the investigation's origins (*i.e.*, whether it was ordered by Defendants

or other senior management), its conclusions (*i.e.*, whether the investigators found widespread or

only isolated fraud), or the recipients of the investigative report (*i.e.*, whether Defendants

received or reviewed the report or its findings).  Plaintiffs' CWs also do not know when the

investigation began.  *See* Am. Compl. ¶¶ 196–97.  Thus, as is the case with Defendants' alleged

access to performance metrics, Plaintiffs have failed to plead scienter based on access to

information about fraudulent sales practices.  Although one of the CWs estimated that over 100

employees were fired in 2018 as a result of the investigation, AT&T had over 260,000

employees.  The inference that Defendants must have known about the firing of 0.038% of its

employees, over the period of some months, is not as compelling as the opposing inference that

the investigation ran its course well below the C-suite officers who are the defendants in this

case.

Next, Plaintiffs claim that certain Defendants admitted knowing facts that contradicted

their expressions of corporate optimism.  In particular, Plaintiffs point to a sequence of

statements by Defendants Stephenson and Stephens.  On September 12, 2018, after AT&T ended

33

some of its promotional prices and almost two years after the launch of the product, Stephenson said that "the customer base has been very resilient to the price moves," such that DTVN has "not seen the deterioration in subscribers that [AT&T] anticipated" and has instead "continued to grow."  Am. Compl. ¶ 336.  Then, on October 24, 2018, after reported quarterly growth declined from 342,000 net new subscriptions in 2Q18 to 49,000 net additions in 3Q18, Stephens stated that AT&T had "expected net adds to be impacted by" the price increases but that "subscriber growth in the quarter exceeded [AT&T] expectations."  *Id.* ¶ 343.  According to Plaintiffs, Stephens' statement makes clear that, prior to the disclosure of third quarter results, Stephenson was already aware of a substantial decline in growth but nevertheless misled investors by talking about "resilience" and continued growth.

Stephenson's statement on September 12, 2018, is, however, entirely consistent with what Stephens said a month later.  Like Stephens, Stephenson said that AT&T had been anticipating a "deterioration in subscribers" for the third quarter but was instead seeing continued net growth (of what turned out to be a modest 49,000 net subscribers).  *Id.* ¶ 336.  Stephenson then expressed his view that DTVN was able to grow in the third quarter because increased functionality, such as cloud DVR, made customers more "resilient" to price changes.  *Id.*  Nothing revealed in Stephens' later statement is contrary to Stephenson's earlier assessment, nor have Plaintiffs alleged any other facts inconsistent with Stephenson's statements from which the Court could infer scienter.[25]

---

[25]    The amended complaint does not contain any other statement about DTVN's 3Q18 performance.  Beyond the obligation to avoid omissions that would render an affirmative statement misleading, Plaintiffs have not explained why AT&T was obligated to disclose pessimistic, internal models about the expected impact of price increases.  Plaintiffs also attempt to link Stephens' statement to Defendants' much earlier statements about churn— but there are no factual allegations from which the Court can infer that AT&T anticipated a deterioration of subscribers at the time the earlier statements were made.

Finally, Plaintiffs attempt to plead scienter by alleging that DTVN is a core part of AT&T's business plans.  Under the "core operations" doctrine, "where alleged misstatements concern information critical to the core function of a business, knowledge of such information is properly attributable to the company and its senior executives."  *Medis Inv'r Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 145 (S.D.N.Y. 2008) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)), *aff'd*, 328 F. App'x 754 (2d Cir. 2009).  Courts within and beyond this circuit have cast doubt on the continued viability of the doctrine, which pre-dates the PSLRA by several years.  *See, e.g.*, *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 n.209 (S.D.N.Y. 2006) (collecting cases); *Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) ("assuming arguendo that the 'core operations' doctrine survived the PSLRA's enactment without alteration").  Although the Second Circuit has not explicitly rejected the doctrine, courts in this circuit have generally invoked the doctrine only to bolster other evidence of scienter, rather than relying on it as an independently sufficient basis.  *Hou Liu v. Intercept Pharm., Inc.*, No. 17-CV-7371, 2020 WL 1489831, at *19 & n.194 (S.D.N.Y. Mar. 26, 2020) (collecting cases).  Here, because the Amended Complaint does not contain other allegations of scienter, plaintiffs' core operations theory fails as well.[26]  *Id.*

---

[26]    Putting aside the legal problems with this theory, factually Plaintiffs' "core operations" argument is less than compelling.  As Plaintiffs acknowledge, "DTVN was not the core of AT&T's business when measured by pure financial metrics."  Am. Compl. ¶ 399.  Instead, Plaintiffs argue that it was "core" in the sense that it was at the center of AT&T's business plans, including the Time Warner acquisition.  *Id.*  Plaintiffs' argument that DTVN was central to AT&T's plans undermines their argument that AT&T knew from the beginning that the product would not be profitable.  *See, e.g.*, *id.* ¶ 242 ("Defendants' statements that DTVN would be profitable were materially false and misleading and omitted to disclose that DTVN was not going to be a profitable product with positive margins, but would instead be sold at irrationally low prices and with heavy and improper promotional activity.").  It certainly would make no economic sense for AT&T to have acquired Time Warner for over $100 billion, to have fought off a DOJ antitrust challenge to the merger, and to have invested in promotions, including sales commissions, if it did not genuinely believe that DTVN would be a successful and profitable product.  *See Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." (cleaned up)); *Ross v. Lloyds Banking Grp., PLC*, 546 F. App'x 5, 8 (2d Cir. 2013) ("Because it would hardly make economic sense for defendants to consummate an acquisition detrimental to [Defendant] Lloyds, a strong inference of fraudulent intent cannot be drawn.").

35

In short, viewing Plaintiffs' allegations as a whole, they have not pleaded a strong inference of scienter.

### B. Count II: Scheme Liability

Plaintiffs' second count alleges a violation of Rule 10b–5(a) and (c), relying largely on the same allegations as those underlying Count I, except adding Shay as a defendant.  *See* Am. Compl. ¶ 427.  "To state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'"  *Menaldi*, 164 F. Supp. 3d at 577. Unlike a misrepresentation or omission claim under Rule 10b–5(b), scheme liability claim is aimed at "inherently deceptive conduct" and does not require a misleading statement or omission.  *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 160–61 (S.D.N.Y. 2012).  That said, Rule 10b-5(a) and (c) are not backdoors to liability for those who facilitate the preparation of false statements.  "[W]here the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the SEC's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"  *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011).  The addition of Shay as a defendant does not change the fact that Plaintiffs have failed to plead scienter; Plaintiffs have also failed to plead any deceptive conduct that is separate from the inadequately pleaded misstatements and omissions underlying Count I.

Although Plaintiffs allege, in conclusory terms, that Defendants "encourag[ed] . . . the use of sales practices . . . that resulted in people being signed up for DTVN without their

permission or knowledge and the creation of fake DTVN accounts," the only relevant conduct is

the setting of aggressive sales goals, which is not inherently deceptive. *See* Pls. Br. at 37; Am.

Compl. ¶ 431; *Abuhamdan*, 9 F. Supp. 3d at 211 (dismissing scheme liability claim because

temporary and aggressive promotion strategy "may carry some level of risk and may even be a

poor strategy for long-term growth [but it] is not a deceptive or manipulative act"). Shay

allegedly issued a directive to sales managers "to prioritize DTVN." *Id.* ¶ 208. According to

CW-11, Shay also communicated his expectation that new subscriptions should double month-

to-month for some unspecified period of time.[27] *Id.* ¶ 211. Plaintiffs do not allege with any

particularity that Shay knew or had reason to believe (or willfully disregarded the risk) that high

quotas were causing sales associates to engage in fraudulent sales practices, nor do Plaintiffs

allege that Shay directed, instructed, or suggested that sales associates employ dishonest tactics

to generate subscriptions. Although Plaintiffs argue in their brief that Rule 10b–5(c) is

"expansive," Pls. Br. at 37, they have failed to identify any case holding that setting aggressive

sales targets is a deceptive act.

 Because Plaintiffs have failed to plead either scienter or a deceptive act separate from

alleged misrepresentations or omissions, their scheme liability claim fails.[28]

---

[27]  Plaintiffs' failure to plead the specific time period during which Shay allegedly expected exponential
growth is particularly jarring, because exponential growth for "months on end" is not merely unsustainable but
demographically impossible, not to mention wholly absurd if publicly reported as truth. If every AT&T retail store
sold only two subscriptions in the first month, the approximately 5,000 AT&T stores would have generated more
DTVN subscriptions during the Class Period than the number of human beings on the planet. Clearly, even
accepting that Shay once expressed a desire to see doubling growth, the only plausible explanation is that Shay was
speaking in hyperbole or that the growth target was intended only during the ramp-up period when subscriber
numbers were low enough that the multiplier would not have been absurd. *See, e.g.*, Am. Compl. ¶¶ 210 (CW-10
alleging that DTVN was a "big, big deal" when it was first launched), 211 (CW-11 reporting hearing about growth-
doubling goal within the first six months and that pressure to sell ended "well before June 2018").

[28]  Because the Court finds that Plaintiffs have not pleaded a requisite deceptive act necessary for scheme
liability, no extensive discussion of the other elements, including reliance, is necessary. The Court notes, however,
that the Supreme Court held, in *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, that the causal connection between
defendants' alleged misconduct and the public's reliance is too attenuated if the defendants neither intentionally

C.      **Count III: Control Person Liability**

Because Plaintiffs have failed to plead a primary violation of the Exchange Act, Count

III, which seeks to hold control persons liable for any violations, must also be dismissed.  *See JP*

*Morgan Chase Co.*, 553 F.3d at 206–07.

**II.      Securities Act Claims**

Counts IV through VII pertain to alleged misrepresentations or omissions in AT&T's

registration statement and prospectus, which were issued in connection with the Time Warner

acquisition.  Plaintiffs contend that both documents (including documents incorporated therein)

failed to disclose a subset of the risks discussed above, namely (1) that DTVN was not and

would not be profitable, (2) that DTVN subscribers were acquired and maintained through

aggressive promotions and improper sales practices, (3) and that DTVN was facing severe

technical issues that interfered with customers' use of the platform.  Am. Compl. ¶¶ 584, 595,

606.

Because the parties dispute the window of liability, the Court briefly recounts the relevant

timeline.  AT&T filed its registration statement on January 5, 2017, which was approved by the

SEC the next day, and filed its prospectus on January 9, 2017.  Am. Compl. ¶¶ 542, 557.  The

registration statement incorporated "any documents subsequently filed by [AT&T] pursuant to

---

deceived investors nor took any action that rendered deception a "necessary or inevitable" consequence.  *See* 552 U.S. 148, 161 (2008); *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) (applying *Stoneridge* and rejecting argument that reliance can be found based on fruits of fraud being conveyed in financial statements); *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-MD-2017, 2013 WL 5730020, at *2 (S.D.N.Y. Oct. 22, 2013) ("[T]he operative analysis for the purposes of determining whether a defendant is subject to Section 10(b) liability is whether the defendant's conduct 'made it necessary or inevitable' that 'any falsehood will be contained in the statement.'").  Here, virtually all of Plaintiffs' allegations as to AT&T's or Shay's instructions to retail employees are non-specific and consist of amorphous allegations of a "big focus" on DTVN, "extreme pressure to sell," or treating DTVN as a "big, big deal."  Am. Compl. ¶¶ 208–10.  There can be no serious dispute that the Exchange Act does not categorically forbid companies from setting high or even overly optimistic sales targets.  Nor can there be any argument that aggressive sales targets always lead to fraud.  In short, Plaintiffs do not allege enough facts to differentiate Defendants' conduct from standard business practice for a product launch.

Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act and before the date" of Time Warner's shareholders' meeting to vote on the acquisition, which was February 15, 2017. *Id.* ¶ 547. Prior to the shareholders meeting, AT&T filed Forms 8-K on January 20 and January 25, 2017, each time reporting AT&T's 4Q16 results and disclosing a net gain of 200,000 subscribers between DTVN's launch on November 30, 2016, and the end of 2016. *See id.* ¶¶ 548 ("[M]ore than 200,000 video net adds, entirely driven by DTVN. This includes only paying customers."), 550 ("During the quarter, we introduced DTVN and added more than 200,000 subscribers."), 552 ("Strong DTVN launch with more than 200,000 paid net adds . . . . We launched DTVN, our innovative over-the-top streaming service."). Time Warner shareholders voted to approve the acquisition on February 15, 2017. *Id.* ¶ 564. The transaction did not close until June 12, 2018, due to DOJ's antitrust lawsuit. *Id.* ¶ 566.

As set forth below, the Court finds that Plaintiffs have failed to plead any material misstatements or omissions in the registration statement or prospectus.

### A. Count IV: Misleading Registration Statement

Plaintiffs allege that AT&T's registration statement violated Section 11(a) of the Securities Act. Specifically, every signatory of the registration statement, along with the company's directors, is liable if, at the time the statement "became effective," it "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Although both sides dance around the timing issue without formally conceding their agreement, there is no serious dispute that the SEC declared the registration statement effective on January 6, 2017, Am. Compl. ¶ 146, and that the registration statement incorporated subsequent filings dated before the shareholders' vote on February 15, 2017, *id.* ¶ 547. *See* Defs. Br. at 17

(acknowledging effective date and incorporation by reference); Pls. Br. at 36 (acknowledging

effective date of January 6, 2017, and that incorporation ended by February 15, 2017).  Although

Plaintiffs argue that Defendants' liability extends "at a minimum" until February 15, 2017, they

have abandoned any effort to explain why liability should be extended beyond that date.  *See id.*

at 41–42.  Accordingly, the Court need only consider whether Plaintiffs have adequately alleged

that the registration statement and the incorporated Form 8-K filings contained untrue statements

or omissions of material fact that existed at the time of the relevant statement.[29]  *See Hutchison*

*v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011).

The first two facts that Defendants allegedly failed to disclose—unprofitability and the

use of aggressive promotional and sales tactics—are virtually identical to the alleged

misstatements or omissions that the Court considered and rejected for failure to plead falsity or

materiality under the Exchange Act.  *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249–

50 (2d Cir. 2014) ("Sections 11 and 12 of the 1933 Securities Act and Section 10(b) of the 1934

Securities Exchange Act . . . each . . . imposes liability for a material misstatement of fact or an

omission to state a fact that renders a statement made materially misleading."); *In re Proshares*

*Trust II Sec. Litig.*, No. 19-CV-886, 2020 WL 71007, at *8 (S.D.N.Y. Jan. 3, 2020) ("Materiality

under Section 10(b) of the Exchange Act is measured by the same standard as Section 11.").

Plaintiffs do not plead any additional facts in the Securities Act counts that could support a

---

[29]     Although Plaintiffs do not brief the issue, the amended complaint invokes Item 408, 17 C.F.R. §
230.408, as the source of a disclosure obligation.  *See* Am. Compl. ¶ 541.  Item 408 does not alter the Court's
analysis as it only requires the disclosure of *material* information necessary to make other statements not
misleading.

Similarly, Plaintiffs also attempt to locate a duty to disclose under Item 105 (formerly Item 503) of
Regulation S-K, 17 C.F.R. § 229.105.  Plaintiffs argue that the undisclosed risks are to be evaluated under the same
materiality standard as alleged misstatements under Rule 10b–5.  *See* Pls. Br. at 38.  Defendants argue that
undisclosed risks under Item 105 must meet the "most significant factors" standard, which is "considerably higher"
than mere materiality.  *See* Defs. Br. at 12.  That dispute is academic because Plaintiffs fail to satisfy even the lower
standard that they urge.  Accordingly, the Court need not engage in a separate analysis for Item 105.

finding in their favor as to unprofitability and promotional and sales tactics—indeed, Plaintiffs'

ability to allege a material misstatement or omission of fact is even weaker given a dearth of

contemporaneous facts applicable to late 2016 and early 2017.

As to profitability, Plaintiffs do not dispute that the registration statement and subsequent

filings were devoid of any affirmative misstatement of fact as to DTVN's profit margins.

Instead, Plaintiffs attempt to allege that Defendants' description of a "strong" launch of 200,000

subscribers was materially misleading because those subscriptions were allegedly not profitable

and were never going to be.  *See* Am. Compl. ¶ 584.  Plaintiffs, however, have failed to

adequately allege that DTVN was, in fact, an unprofitable product as of early 2017.  As with the

Exchange Act allegations, Plaintiffs misconstrue Defendants' statements in order to allege that

DTVN was unprofitable.  In the second half of 2018 (almost two years after the registration

statement was effective), Defendant Donovan stated that AT&T was changing its price structure

in order to "optimize profitability" and "shift to market pricing."  *See id.* ¶¶ 476–77.  While those

statements could suggest that AT&T determined in 2018 that its prices, as to at least some

customers, were too low to be adequately profitable, they do not support an inference that DTVN

was unprofitable as a whole.  Indeed, in one of the statements that Plaintiffs argue is an

admission that DTVN was unprofitable, Donovan indicated that AT&T was changing the pricing

strategy for DTVN so that it can make a profit "not only overall but in each individual one."  *Id.*

¶ 478.  Although Plaintiffs do not provide the entire context of Donovan's statement,[30] he

appeared to be explaining to analysts that although DTVN was profitable as a product, there

---

[30]     To the extent the Plaintiffs do provide context, they ignore it.  From the quoted portions of Stephenson's statement it appears that he was explaining to market analysts that AT&T had struggled to find the right pricing model for DTVN.  But difficulty in figuring out the optimal pricing model for a product does not, Plaintiffs' *ipse dixit* notwithstanding (*i.e.*, Am. Compl. ¶ 478 ("This statement indicated that the pricing and value proposition had not previously been 'right' (*i.e.* profitable).")), mean that the product was not profitable during the period prior to the company's recalibration of the pricing model.

were some subscribers for whom content costs were higher than subscription fees—and for those customers, AT&T needed to adjust pricing in order to turn a profit on their subscriptions.  *See id.*  Even assuming that DTVN was not profitable in 2018, Plaintiffs have not alleged with particularity that it was not profitable in early 2017, the relevant time period for Section 11 liability.  For the reasons already discussed for Count I, CW-12's blanket statement that "not one subscriber was profitable" is conclusory and devoid of context, in addition to being entirely unsupported by any specific facts or even any foundational details about CW-12's access to or review of companywide data.  *See id.* ¶ 481.  Because Plaintiffs have not plausibly alleged the existence of the fact (unprofitability) that they argue should have been disclosed, they have not pleaded a Section 11(a) violation.[31]

Next, Plaintiffs fail to plead a material omission of fact based on AT&T's alleged promotions and fraudulent sales tactics.  As to the promotions, DTVN's low price points and other subscription incentives, such as the Apple TV and Amazon Fire TV Stick, were constantly repeated by Defendants and widely advertised and reported, including at the launch event for DTVN.  *See, e.g.*, Am. Compl. ¶¶ 6 (alleging that Defendants were "publicly boasting about" "very, very aggressive price point"), 460 (Defendant Donovan discussing incentives at publicized launch event), 474 (Wall Street Journal reporting on various analysts' assessment of DTVN's pricing).  The registration statement need not include publicly available information.

---

[31]      Nor can Plaintiffs save their argument by framing unprofitability as a risk, rather than as an existing fact.  Under 17 C.F.R. § 229.105, the registrant is instructed not to disclose risks that "could apply generically to any registrant or any offering."  The alleged unprofitability risk is essentially that AT&T could have trouble earning profits on DTVN if content costs are too high or if customers do not maintain their subscriptions.  Plaintiffs have not explained why AT&T should be required to disclose that kind of basic, universal fact of business: every company stands to lose profits if customers switch to a competitor or if the costs of providing the product are too high relative to the revenue received.  *See* Am. Compl. ¶ 474 (citing news articles questioning AT&T's ability to make a profit given high content costs in the industry).  Moreover, DTVN had been in existence for less than three months when the Time Warner shareholders' vote took place; Plaintiffs have not explained how any risk of non-retention of customers could have materialized at that early stage.

*See Rubinstein v. Credit Suisse Grp. AG*, No. 19-CV-1069, 2020 WL 2036850, at *6 (S.D.N.Y. Apr. 28, 2020) (collecting cases).

As for the undisclosed fraudulent sales tactics, for the reasons already stated in the Court's assessment of Count I, Plaintiffs have failed to plead that any fraudulent practices (particularly during the first month of the product's existence) were of such a magnitude as to affect the subscription data reported by AT&T.[32]  If anything, Plaintiffs' ability to plead materiality as of February 2017 for purposes of Count IV is even weaker than their ability to plead materiality as to Count I.  CW-1 reported that fraudulent account creation "began in earnest in 2017," which suggests that the reported 200,000 figure for 4Q16 was unaffected.  *Id.* ¶¶ 486, 550, 552.  Similarly, CW-2 reported "a big push by January 2017" to get sign-ups and witnessed fraudulent tactics used "throughout 2017."  *Id.* ¶¶ 491, 492 (recalling a January 2017 meeting when a store manager instructed sales representatives to use any means necessary to sign up subscribers).  CW-5 reported being told of the fraudulent sales practices in December of 2017, almost a year after the registration statement became effective.  *Id.* ¶ 493.  Thus, even according to Plaintiffs' own witnesses, there are no facts to suggest that DTVN's "strong" launch in December 2016 was tainted by the alleged fraudulent practices.

Finally, Plaintiffs have failed to allege facts from which the Court can infer that Defendants' failure to disclose the technical problems initially experienced by DTVN subscribers was material.  Lacking direct knowledge of the technical issues and any CWs who could speak to their impact on subscribership, Plaintiffs rely exclusively on four news articles dated January 13 to 17, 2017.  *See id.* ¶¶ 522–23.  The articles do not make clear the scale of the problems or their duration, although one article reported that "many" subscribers described the

---

[32]     An immaterial fact is, by definition, "not among 'the most significant factors' rendering" an investment in the registering company risky or speculative.  *See Hutchison*, 647 F.3d at 484 n.4 (discussing Item 503).

app as "unusable" and that some number of them sought refunds.  *Id.*  Assuming that a significant number of subscribers cancelled after discovering DTVN to be unusable and that some prospective customers declined to subscribe after learning about the technical issues, Defendants' launch figures were nonetheless not misleading.  As previously explained, cancelled accounts would not have appeared as net additions, unless the opening and cancellation happened to straddle the end of the quarter, and notably, none of Plaintiffs' array of CWs reports having learned of cancellations due to technical difficulties.  Furthermore, AT&T was able to acquire over 200,000 subscribers in 4Q16, notwithstanding any customer unhappiness caused by early technical problems associated with the service.  To the extent that there may have been some customers whose eventual cancellation of their subscription was caused by technical issues associated with the product, Plaintiffs have not alleged that such customers were sufficiently numerous as to significantly affect the 200,000-subscriber figure and to warrant disclosure.  Further undermining Plaintiffs' claim of materiality is that the alleged technical debacle was covered by at least four popular news outlets around the time of the shareholder vote.[33]  *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 38 (2d Cir. 2017) ("The materiality of an omission must be assessed in light of the total mix of information in the public domain."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249–50 (S.D.N.Y. 2003) ("Sections 11 and 12(a)(2) do not require the disclosure of publicly available information."); *White v. H&R Block, Inc.*, No. 02-CV-8965, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004) (citing press coverage of publicly available information).

---

[33]     The immateriality of the technical issues, which were apparently short-lived (the amended complaint contains no relevant allegations beyond January 2017), also precludes any violation of Item 105.  *See Hutchison*, 647 F.3d at 484 n.4.

Because Plaintiffs have failed to plead a material misstatement or omission in either the registration statement or its incorporated documents, Count IV is dismissed.

## B.  Count V: Deficient Prospectus

Plaintiffs argue that AT&T's prospectus for the Time Warner acquisition was "grossly deficient," Pls. Br. at 45, and therefore in violation of Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77*l*(a)(1).  "15 U.S.C. § 77*l*(a)(1) makes liable any person who offers or sells a security in violation of § 77e, and § 77e prohibits the offer or sale of securities for which there is no registration statement" or prospectus.  *See* 15 U.S.C. § 77e; *Fragin v. Mezei*, No. 09-CV-10287, 2012 WL 3613813, at *7 (S.D.N.Y. Aug. 22, 2012).  Plaintiffs argue that the prospectus, due to the same omissions as alleged in the registration statement, was so deficient that it might as well have been nonexistent.  *See* Am. Compl. ¶ 595; Pls. Br. at 45.  Defendants move to dismiss the claim as time-barred[34] and on the merits.  Because the Court finds that the claim is meritless, it declines to reach the limitations issue.

Although Plaintiffs contest Defendants' limitations defense, their argument on the merits is, at best, a halfhearted string cite.  First, as Defendants point out, Plaintiffs invoke a district court case (from 1973), which stated that "material omissions and mi[s]statements would give rise to a claim under § 12 based on a violation of § 5 of the 1933 Act"—a statement that clearly did not differentiate between Section 12(a)(1) and Section 12(a)(2), the subsection underlying Count VI.  *See* Pls. Br. at 45 (quoting *Jefferies & Co. Inc. v. Arkus-Duntov*, 357 F. Supp. 1206, 1215 (S.D.N.Y. 1973)).  The same is true of *Nelson v. Paramount Commc'ns, Inc.*, 872 F. Supp.

---

[34]     Section 12(a)(1) has a one-year statute of limitations running from the date of the violation.  *See* 15 U.S.C. § 77m ("No action shall be maintained . . . if the action is to enforce a liability created under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based.").  The parties dispute whether the clock runs from the date of the Time Warner shareholder vote or the date of the closing of the acquisition.  *See* Defs. Br. at 44–45.

1242, 1247 (S.D.N.Y. 1994) ("The express cause of action for violations of Section 5 is instead provided by Section 12.").

Finally, Plaintiffs cite to a district court holding that a Section 12(a)(1) claim might stand if an omission is "so tremendous" that it "could be deemed an utter failure to provide a prospectus." *Byrnes v. Faulkner, Dawkins & Sullivan*, 413 F. Supp. 453, 466 (S.D.N.Y. 1976) (interpreting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)), *aff'd*, 550 F.2d 1303 (2d Cir. 1977). Plaintiffs, however, make no effort to meet that standard or explain why the omissions in AT&T's prospectus were so fundamental as to make the document effectively worthless. Nor could they—as is apparent from the Court's discussion of Counts I, IV, and VI, the misstatements and omissions alleged do not even cross the bar of being materially false or misleading. *See Meyer*, 761 F.3d at 249–50 (identity of materiality standard across Exchange Act and Securities Act).

In short, Plaintiffs conjured a "gross deficiency" standard for Section 12(a)(1) claims and then failed to meet it. Indeed, as further discussed in connection with Count VI, Plaintiffs have failed to allege a material omission or falsity in the prospectus. Count V is accordingly dismissed.

### C. Count VI: Misleading Prospectus

Plaintiffs allege that the prospectus violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2). "Section 12(a)(2) imposes liability on the issuer or seller of securities if the securities were sold using a prospectus that contained a material misstatement or omission." *Hutchison*, 647 F.3d at 484. The standard is identical to a Section 11(a) claim, except that it is applied to the prospectus, rather than to the registration statement. *Id.* As with the Section 11(a) claim, there are three potential bases for liability: "(1) a material misrepresentation; (2) a

46

material omission in contravention of an affirmative legal disclosure obligation; or (3) a material

omission of information that is necessary to prevent existing disclosures from being misleading."

*Hutchison*, 647 F.3d at 484.  Thus, the failure to allege a material misstatement or omission

precludes liability.  "The definition of materiality is the same for [Section 12(a)(2)] as it is under

section 10(b) of the Exchange Act: Whether the defendants' representations, taken together and

in context, would have misled a reasonable investor."  *In re Morgan Stanley Info. Fund Sec.*

*Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  For substantially the same reasons that Count I and

Count IV fail to state a claim, Plaintiffs have failed to plead any material misstatement or any

material fact that should have been disclosed.

  Plaintiffs' Section 12(a)(2) claim alleges that the prospectus suffers from the same

alleged misstatements and omissions as those in the registration statement: unprofitability,

aggressive promotions and fraudulent sales tactics, and technical problems with the DTVN

platform.  Am. Compl. ¶ 606.  The prospectus incorporates the registration statement, *id.* ¶ 557; a

letter dated January 25, 2017, which did not discuss DTVN, *id.* 560; an excerpt of a conference

call on January 25, 2017, at which DTVN and AT&T's 4Q16 results were discussed, *id.* ¶ 561;

and a supplement dated February 3, 2017, which disclosed certain litigation risks unrelated to

DTVN, *id.* ¶ 563.  Other than the call excerpt and the Forms 8-K contained within the

incorporated registration statement, neither the prospectus nor its incorporated documents

contain any reference to DTVN, whether about its profitability, promotions, or otherwise.  Thus,

except for the call excerpt, the analysis of the prospectus for Count VI is completely identical to

the Court's analysis of the registration statement for Count IV, and the Court again finds that

Plaintiffs have not adequately alleged any material misstatement or omission of fact.

The call excerpt does not save Plaintiffs' claim.  Plaintiffs identified the following

quotation, which they allege to have been misleading:

> And you saw us execute on that last year with our new TV Everywhere
> application and our Data Free TV and DTVN.  And that integrated
> experience helped drive our best ever fourth-quarter churn for our US
> postpaid mobility business.  Now bringing Warner Bros., HBO and all the
> Turner networks under the AT&T umbrella is going to allow us to expand
> this strategy beyond just simple connectivity to deep integration of
> premium content for our customers.
>
> And so, if you look ahead, the strategy has expanded to create the best
> entertainment and communications experiences in the world.  And I am
> very convinced this foundation has been laid for us to deliver exactly that.

*Id.* ¶ 561 (Defendant Stephens on January 26, 2017).  The first sentence is a factual statement

about the launch of DTVN in the prior year, which is objectively true and not misleading.  The

second sentence states that bundling DTVN with other services helped reduce churn in AT&T's

postpaid *mobility* business; as discussed previously, Plaintiffs have not pleaded any facts to

contradict or undermine AT&T's basic theory that bundling reduces customer attrition.  That

claim is also untethered from any discussion of the profitability of DTVN, promotions or sales

practices, or technical issues with the platform, all of which are unrelated to churn in AT&T's

mobility services.  The next three sentences are generic expressions of corporate optimism and

puffery, predicting future expansion and the creation of the "best entertainment" experience "in

the world."  Accordingly, none of the statements in the call excerpt required Defendants to make

any further disclosure in order to avoid rendering the statements as a whole misleading.

For those reasons, Count VI is dismissed.

### D.   Count VII: Control Person Liability

Finally, Plaintiffs seek to hold the defendant executives liable as controlling persons for

violations of the Securities Act, Counts IV to VI.  *See* 15 U.S.C. § 77*o*.  Because Plaintiffs have

not pleaded a primary violation, Count VII must also be dismissed.  *See In re Lehman Bros.*

*Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to all claims.

The Court, however, cannot rule out the possibility that Plaintiffs may be able to plead additional

facts as to the unprofitability of DTVN, or the results and recipients of AT&T's internal report

on fraudulent sales practices.  No later than **September 25, 2020**, Plaintiffs may move for leave

to file a second amended complaint.  Consistent with the Court's Individual Practices, Plaintiffs

must file a redlined version of the pleading reflecting the changes made with the motion.  By the

same date, Plaintiffs must file a letter brief of no longer than ten pages in support of the second

amended complaint, explaining how the revisions address the defects identified in this Opinion.

Defendants may file a response brief of ten pages to Plaintiffs' submissions no later than

**October 16, 2020**.  Plaintiffs may file a reply of no longer than five pages by **October 28, 2020**.

The Clerk of Court is respectfully directed to terminate docket entry 84.

**SO ORDERED.**

**Date:  August 18, 2020**                             **VALERIE CAPRONI**
**New York, New York**                     **United States District Judge**