USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/27/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
MELVIN GROSS, *individually and on behalf of all* :
*others similarly situated*, :
                                        Plaintiff, :
                                                          :
              -against-                                    :
                                                          :
AT&T INC., RANDALL L. STEPHENSON, :
JOHN J. STEPHENS, SAMUEL A. DI :               19-CV-2892 (VEC)
PIAZZA, JR., RICHARD W. FISHER, SCOTT T. :
FORD, GLENN H. HUTCHINS, WILLIAM E. :                   ORDER
KENNARD, MICHAEL B. MCCALLISTER, :
BETH E. MOONEY, JOYCE M. ROCHÉ, :
MATTHEW K. ROSE, CYNTHIA B. TAYLOR, :
LAURA D'ANDREA TYSON, and GEOFFREY :
Y. YANG, :
                                                          :
                                       Defendants. :
------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

    In this putative securities class action, Plaintiffs allege that AT&T Inc. ("AT&T") and

certain members of its senior management made false and misleading statements about AT&T's

video streaming service, DirectTV Now ("DTVN"). The Court granted Defendants' motion to

dismiss the first amended complaint ("FAC"), *see In re AT&T/DirecTV Now Sec. Litig.*, 480 F.

Supp. 3d 507 (S.D.N.Y. 2020), and Plaintiffs moved for leave to file a second amended

complaint, Ltr. Br., Dkt. 97. Because Plaintiffs' proposed second amended complaint ("PSAC")

does not cure the deficiencies that the Court previously identified, Plaintiffs' motion for leave to

amend is DENIED, and this case is DISMISSED with prejudice.

## BACKGROUND

    The Court assumes familiarity with the Court's prior opinion and will not recount the full

background of this matter. *See generally In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d

at 513–22 (providing a detailed overview of DTVN, AT&T's acquisition of Time Warner, and

the alleged misrepresentations and omissions).  The Court will summarize only the facts most pertinent to Plaintiffs' motion for leave to amend.

Except for a claimed violation of § 12(a)(1) of the Securities Act that was abandoned, the PSAC alleges the same violations of the Exchange Act and the Securities Act that were asserted in the FAC.[1]  The claimed false statements and omissions deal with whether DTVN was profitable in its two plus years of operation and whether reported numbers of subscribers to the service were materially misleading.

The Court granted Defendants' motion to dismiss the FAC, finding that Plaintiffs had failed to plead material misstatements or omissions or other deceptive conduct, which was fatal to all the counts.  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 513.  With respect to the Exchange Act claims, the Court further held that Plaintiffs had failed to plead scienter.  *Id.* Because the Court could not rule out the possibility that Plaintiffs might be able to cure those deficiencies, the Court allowed Plaintiffs to move for leave to amend their complaint.  *See id.* at 513–14, 541; *see also id.* at 536 (finding that Plaintiffs' Securities Act claims based on unprofitability and fraudulent sales tactics "are virtually identical to the alleged misstatements or omissions . . .  under the Exchange Act" (citations omitted)).[2]  Plaintiffs moved for leave to file a

---

[1]    Counts I through III allege violations of the Exchange Act: Count I alleges misleading statements and omissions in violation of § 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b–5 (17 C.F.R. § 240.10b–5(b)); Count II alleges "scheme liability" premised on alleged deceptive conduct apart from misstatements or omissions, *see* 17 C.F.R. § 240.10b–5(a), (c); and Count III seeks to hold certain AT&T senior executives liable as "control persons" under § 20(a) of the Exchange Act (15 U.S.C. § 78t).  *See* PSAC, Dkt. 97-2 ¶¶ 586–609.  Counts IV through VI (the PSAC omitted a Count V; the Court renumbered the counts to account for that error) assert violations of the Securities Act: Count IV alleges a misleading registration statement and incorporated documents in violation of § 11 of the Securities Act (15 U.S.C. § 77k); Count V alleges a material misstatement or omission in a prospectus in violation of § 12(a)(2) of the Securities Act (15 U.S.C. § 77*l*(a)(2)); and Count VI seeks to hold certain AT&T senior executives liable as "control persons" under § 15 of the Securities Act (15 U.S.C. § 77o).  *See id.* ¶¶ 683–705.

[2]    Other claims in the FAC were not likely to be curable.  Those claims included alleged violations of the Exchange Act based on allegedly misleading statements or omissions that (1) DTVN experienced severe technical issues which affected the retention of customers; (2) DTVN was being sold at promotional rates which caused subscribers not to renew at the end of their promotional periods; (3) DTVN suffered from a low usage rate and a high risk of churn, meaning that subscribers were likely to discontinue their subscriptions; and (4) DTVN was not a

2

second amended complaint, and included their proposed pleading.  *See* Ltr. Br., Dkt. 97.

Defendants opposed the motion.  *See* Ltr. Resp., Dkt. 98.[3]

### LEGAL STANDARD

"Leave to amend, though liberally granted, may properly be denied for . . . futility of

amendment."  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (citing *Foman v. Davis*,

371 U.S. 178, 182 (1962) (cleaned up)).  "Proposed amendments are futile if they would fail to

cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil

Procedure.   The standard for denying leave to amend based on futility is therefore the same as

the standard for granting a motion to dismiss."  *NECA-IBEW Pension Tr. Fund v. Lewis*, 607 F.

App'x 79, 80 (2d Cir. 2015) (cleaned up).  "It is within the sound discretion of the district court

to grant or deny leave to amend."  *Franconero v. UMG Recordings, Inc.*, 542 F. App'x 14, 17

(2d Cir. 2013).

### DISCUSSION

**I.      Plaintiffs Have Not Adequately Alleged that Defendants Made False or
        Misleading Statements Regarding the Profitability of DTVN**

The PSAC alleges that Defendants violated the Exchange Act by making false and

misleading statements that DTVN would be and was a profitable product, *see* PSAC, Dkt. 97-2 ¶

479, and violated the Securities Act by failing to disclose in AT&T's registration statement,

prospectus, and incorporated documents the risks that DTVN would not be profitable, *id.* ¶ 615.

---

viable means of offsetting the loss of satellite subscribers.  *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp.
3d 507, 516 (S.D.N.Y. 2020) (detailing Plaintiffs' Exchange Act claims).

Similarly, the Court concluded that Plaintiffs could not cure deficiencies in the FAC as to AT&T's
purported failure to disclose risks of technical problems with DTVN in its registration statement, prospectus, or
incorporated documents.  *See id.* at 522.

[3]      Four letters discussing supplemental authority were also filed.  *See* Letters, Dkts. 103–106.  Because the
Court does not rely on either decision referenced in the letters, the Court does not discuss the parties' arguments as
to the relevance of those decisions.

The PSAC alleges that six statements regarding the profitability of DTVN were false or misleading.  *See id.* ¶¶ 484, 486, 488, 490, 493, 495.  The PSAC does not state a claim as to any of the six because it does not adequately allege that any statement was material, that any was false at the time it was made, or that Defendants acted with the requisite scienter.  As to the Securities Act claims, the PSAC does not adequately allege that DTVN was an unprofitable product as of the date of AT&T's registration statement and prospectus.

### A.  DTVN's Profitability *vel non* in Late 2016 and Early 2017

DTVN was launched on November 30, 2016.  *Id.* ¶ 11.  The PSAC alleges that a handful of statements made around the time of the launch were false and misleading.[4]

None of this group of statements is actionable because none is a statement of fact.  All involve what AT&T expected vis-à-vis the profitability of the product.  Statements about future profitability "typically are not actionable," because "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future."  *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 523 (citing *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) (cleaned up); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (cleaned up)).  Moreover, statements about future profitability are unlikely to be material because "reasonable investors do not place substantial reliance on generalizations regarding . . . the strength of a company's product."  *Id.* (citing Abramson, 965 F.3d at 173 (cleaned up)).

But even if Plaintiffs were correct that the complained-of statements are statements of fact that falsely stated or implied that DTVN would be or was a profitable product, Plaintiffs

---

[4]     *See* PSAC ¶ 484 (Defendant Stephenson stated on September 21, 2016, that "we can put together a product that is I'm going to call it thinner, not thin margin"); *id.* ¶ 486 (Stephenson stated on October 25, 2016, that by avoiding installation costs, "that's how you hit a $35 price point in the marketplace"); *id.* ¶ 488 (Defendant Bentley stated on November 30, 2016, that DTVN had a "compelling value proposition" with "everyday prices" that were "not promotional"); *id.* ¶ 490 (Stephenson stated on December 6, 2016, that "we are perfectly content with lower, thinner margins," that AT&T has "the lowest content cost in the US," and that "[e]arly on, I do expect the margins to be fairly thin").

have not cured the deficiency identified in the FAC; the PSAC does not allege facts from which the Court can reasonably infer that the statements were false at the time they were made.  The only "factual" support for Plaintiffs' claim that, at the time of its launch, AT&T did not expect DTVN to be profitable is four statements by analysts that questioned whether DTVN would have positive margins.  *See* PSAC ¶¶ 37, 178, 500, 647.  There is no allegation that the analysts had inside information reflecting the actual profit and loss for DTVN.  Quite the contrary, the PSAC makes clear that the analysts were not stating facts — they were giving their opinions that, based on their assumptions about costs, the product was unlikely to be very profitable, if it would be profitable at all.  *Id.* ¶ 178.[5]  Additionally, it appears that all four analysts reached their opinions based on the assumption that all subscriptions would be sold for $35 per month.  Plaintiffs' allegations demonstrate that assumption did not reflect what AT&T was saying about its pricing.  Far from selling all subscriptions for $35 per month, the pricing model called for subscription packages to "start at $35 a month," clearly indicating that some subscriptions would be sold for more than $35 per month.[6]  Having alleged no other facts that would support an inference that AT&T knew at the time of its launch that DTVN would not be profitable, the PSAC does not adequately allege that Defendants' statements were false when made.

---

[5]      *See* PSAC ¶¶ 37, 178, 500, 647 (quoting a *Wall Street Journal* analyst that there might only be "a dollar or two in gross margin"); *id.* ¶¶ 178, 500, 647 (detailing that John Hodulik of UBS said there would be "little room for profit"); *id.* ¶ 178 (noting that Michael Nathanson stated "they aren't going to make any money"); *id.* ¶¶ 500, 647 (quoting Craig Moffet's estimation of costs and his conclusion that "voila, margins are already negative").

[6]      *See* PSAC ¶ 180 (noting that at the launch event, Defendant Bentley "showed the pricing for the product packages (starting at $35)"); *id.* ¶ 185 (detailing that on December 7, 2016, Defendant Stephenson testified before the Senate that DTVN offered 100 channels at "prices starting at $35 per month").  *See also* FAC, Dkt. 79 ¶ 135 ("On November 28, 2016, AT&T announced that DirecTV Now would launch on November 30, 2016.  It would come with a 7-day free trial, but would otherwise cost between $35 and $80 per month, depending on the package.").  Although Plaintiffs decided to delete that last quotation when they drafted the PSAC, the Court may still consider it.  *See Kilkenny v. L. Off. of Cushner & Garvey, L.L.P.*, No. 08-CV-588, 2012 WL 1638326, at *5 (S.D.N.Y. May 8, 2012).

Nor have Plaintiffs pled the requisite scienter.  As discussed at length in the Court's prior opinion, to allege scienter, "[t]he plaintiff must generally allege facts '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'"  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 530 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).  "For an inference of scienter to be strong, a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged."  *Id.* (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198–99 (2d Cir. 2009) (emphasis in original)).

The PSAC adds no new factual allegations regarding Defendants' motive[7] and so the Court looks to the allegations of circumstantial evidence and whether the inferences Plaintiffs urge are at least as compelling as opposing ones.  In the PSAC, Plaintiffs double down on their theory that DTVN was "the centerpiece of AT&T's strategy and the main justification for its acquisition of Time Warner."  PSAC at p. 43.  They further claim that launching the product at a low price point was essential to closing the acquisition of Time Warner because it "demonstrated the pro-consumer posture of the company" at a time when regulators were concerned about

---

[7]    In its prior opinion, the Court explained why Plaintiffs' proffered motive — that certain Defendants had strong personal interests in promoting the success of DTVN because its failure would have undermined the wisdom of AT&T's decision to acquire Time Warner and threatened their ability to continue as highly compensated AT&T executives — was "insufficient as a matter of law" and did "not make much sense."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 530 ("As the Second Circuit has held, 'a generalized desire to achieve a lucrative acquisition proposal,' 'maximize the corporation's profits,' or earn 'bonuses based on corporate earnings and higher stock prices' cannot support an inference of fraud." (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009)).

In the PSAC, Plaintiffs rephrase their motive-related contentions, but despite the change in language, they still rely on the same motive that the Court previously rejected.  *See* PSAC ¶ 512 (alleging that Defendants' were motivated "to gain[] support and/or approval for the Acquisition"); *id.* ¶ 513 (contending that failure to close the deal "would have jeopardized the positions and significant compensation of the Executive Defendants"); *see also id.* ¶¶ 512–516 (detailing Defendants' purported motive); Ltr. Br., Dkt. 97 at 10 (same).

antitrust issues.  *Id.* ¶ 45.  *See also Id.* ¶¶ 4–5, 199, 215, 518–522 (making the same point).  But Plaintiffs explanation is not nearly "as compelling" as the much more apparent one: at the time of launch, Defendants "genuinely believe[d] that DTVN would be a successful and profitable product."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 533 n.26.  Plaintiffs allege no facts from which the Court could infer that Defendants did not believe their own statements that the product would be profitable, despite an expectation of initially thin margins, or that AT&T's internal predictions contradicted what Defendants said publicly.

Because the complained-of statements are not actionable statements of fact and because, even if they were, the PSAC does not adequately allege that they were false when made or that Defendants acted with scienter, as to those statements, filing the PSAC would be futile.

### B.  The November 28, 2017 Statement

The PSAC alleges that on November 28, 2017, while at a conference hosted by Wells Fargo, Defendant Stephens said about DTVN, "we'd expect to get, whether they'll be at traditional margin levels, I'm not recommending – I'm not advising that, but very solid margin levels on a very low-cost upfront product."  PSAC ¶ 493.  The same statement was alleged to be misleading in the FAC.  FAC, Dkt. 79 ¶ 303.  Plaintiffs have done nothing to address the Court's prior holding that the statement was non-actionable puffery.  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 524 (finding 'Statement 16' to be puffery).  Moreover, although the fits and starts of the statement make it somewhat difficult to parse, the most natural reading is that it is not a statement of current profitability but is a statement of what he expects in the future.  For the reasons previously explained, statements expressing corporate optimism about the future strength of a company's product are not actionable as false statements of fact.

Even if the statement were not puffery and even if it could be tortured into being a statement of current fact, the PSAC does not allege facts from which the Court can infer that the

statement was false at the time it was made.  Plaintiffs continue to rely on the vague statement by

Confidential Witness ("CW") 12 that "during the entire first year of offering DTVN, not one

subscriber was profitable."  PSAC ¶¶ 42, 94, 498, 645; Ltr. Br. at 9.  In its prior opinion, the

Court laid out in detail why this representation was conclusory.  *In re AT&T/DirecTV Now Sec.*

*Litig.*, 480 F. Supp. 3d at 525.  Although the PSAC adds that CW-12 did not qualify his

declaration by geography or subscription type, *see* PSAC ¶ 42, 498, according to Plaintiffs, the

data to which CW-12 had access were subscriber numbers and churn reports, *id.*  No fact alleged

in the PSAC allows the Court to infer that he would have had access to profit and loss data, such

that his conclusory assertions regarding profitability are plausible.[8]  Moreover, like the FAC, the

PSAC "does not make clear . . . when the unprofitability became apparent to CW-12 or to senior

management, or the specific time periods for which CW-12 had reviewed the relevant data."  *In*

*re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 519.

In a further attempt to allege facts from which the Court could infer that Stephens's

statement was false, the PSAC adds allegations attributed to CW-68, who purportedly attended a

meeting in "mid-2017" at which Defendants Stephenson, Stankey, and Stephens were present.

PSAC ¶¶ 649–650.  According to CW-68, at that meeting, Defendant Stephenson explained "that

the content costs for DTVN were too high to be profitable, that it was 'costing shareholders' for

AT&T to lose money on the product, and that they needed to move to something less expensive."

*Id.* ¶ 503.  As a threshold matter, the statement reported by CW-68 was made in "mid-2017,"

several months before the November 2017 statement at issue.

Even if temporal proximity were not an issue, the context of the alleged mid-2017

statement casts further doubt on whether it is sufficient to allege falsity plausibly.  CW-68 was a

---

[8]       Indeed, the PSAC essentially concedes that CW-12 did not have access to actual profit and loss data as he
could only estimate the loss per subscriber in 2017.  PSAC ¶ 42.

senior performance engineer who was working on "a new technical backend" for DTVN "that was being developed" to help lower costs. *Id.* ¶ 501. But if the impediment to profitability was high content costs, it would have made little sense for AT&T to continue to pour additional resources into developing a new technical backend for the product, which would not affect content costs — a point Plaintiffs appear to concede. *See id.* ¶ 43 n.7 (noting that the technical backend "would have potentially reduced costs, but one would not expect this to have significantly changed the underlying content costs that AT&T had to pay to content providers"). Nor is it plausible that Stephenson would make general declarations about the profitability of the product to his engineers. It is more plausible that his statement about profitability was not intended to be taken literally but was aimed at motivating his technical staff to produce a quality backend that could decrease costs and improve profitability than it is that Stephenson was revealing to his engineers a fact that he was lying about in public.[9] In short, both because CW-68's information does not sync with the timing of the alleged actionable statement,[10] and because the Court cannot infer from CW-68's information that Stephens's subsequent statement was false, the PSAC does not adequately allege that the November 28, 2017 statement was false.

In short, the November 2017 statement is non-actionable puffery that does not purport to state the current level of profitability of DTVN. But even if it were a statement of current fact,

---

[9]     Plaintiffs further claim that Defendants "later admissions that DTVN was not a profitable product" corroborate CW-12 and CW-68's accounts. Ltr. Br. at 10 (quoting Defendant Stephenson's December 4, 2018 remark about "getting [DTVN] to where it's profitable"). But statements made more than one year after the statement in question cannot support the contention that the statement was false at the time it was made. *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 529 (holding that a similar claim does not support an allegation of falsity because it "smacks of hindsight").

[10]     Plaintiffs argue that "it strains credulity that DTVN was profitable before [November 28, 2017], unprofitable in November, and again miraculously turned the corner immediately thereafter." Ltr. Reply, Dkt. 100 at 3. But far from straining credulity, the fact that profit margins of a new product can fluctuate is hardly noteworthy.

the PSAC does not cure the previously-identified deficiencies and, therefore, as to this statement, filing the PSAC would be futile.

## C. The July 24, 2018 Statement

Plaintiffs allege that on a July 24, 2018 earnings call, Defendant Donovan made three statements about DTVN that were misleading: "It is profitable and reasonably comparable to the traditional margins of the business on a percentage of revenue basis;" "these margins start to blend up into much higher territory;" and "[s]o over time, as we build those volumes up, those are products that will get scalable margins." *Id.* ¶ 495. Like the November 2017 statement, those statements were previously included in the FAC. FAC ¶ 334. And, here too, the Court has previously found those statements to be non-actionable puffery. *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 524 (finding 'Statement 24' to be puffery).[11] Moreover, when the statements are read in the context of Donovan's entire statement, it is entirely unclear whether he is referring to the profits associated (i) with DTVN on its own, (ii) with DTVN and Watch TV (another streaming product), or (iii) with "open video" streaming products more generally. PSAC ¶ 495. Because it is unclear whether the statements were even about DTVN and because, even if they were, they are non-actionable puffery, Plaintiffs cannot rely on those statements to state a claim under the Exchange Act.[12]

---

[11]     Other than the ambiguous statement, "[i]t is profitable," all of those statements were clearly aspirational, and aspirational statements are not actionable. "It is profitable" is a statement of fact that could be actionable, but, as discussed in text, in context, "it" is ambiguous. *See* PSAC ¶ 495.

[12]     In a further attempt to shore up their contention that Defendants' statements about DTVN's profitability are actionable, Plaintiffs point to Defendants' access to data analyzing DTVN user activity. *See, e.g.*, Ltr. Br. at 10; PSAC ¶¶ 25, 234, 527, 533, 536, 542, 547. But Plaintiffs do not allege with particularity that user activity data and other metrics indicated that the product was not profitable. Because of Defendants' aggressive use of promotions, *see id.* ¶ 673, it is just as compelling that AT&T expected low engagement by customers who signed up just to get promotions, that AT&T expected a high degree of churn due to those types of customers, but that there were sufficient other customers to make the product marginally profitable. Without additional facts parsing the data and expressly linking churn to profitability, those allegations do not rescue these claims. *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 525. The insufficiency of allegations regarding access to data as a basis to allege scienter is further discussed below.

Case 1:19-cv-02892-VEC Document 107 Filed 09/27/21 Page 11 of 21

Because the PSAC does not cure the FAC's deficiencies as to claims about DTVN's profitability *vel non*, Plaintiffs' motion for leave to amend their Exchange Act and Securities Act claims as to those statements is denied.

## II.     The PSAC Does Not Cure the Deficiencies Previously Identified with Regards to the Alleged Fraudulent Sales Practices

Plaintiffs allege that Defendants' statements about the numbers of DTVN subscribers violated both the Exchange Act and the Securities Act because Defendants failed to disclose that those numbers were artificially inflated by "ghost accounts,"[13] by which Plaintiffs mean accounts that had been fraudulently opened by AT&T staff without the customers' knowledge.  *See* PSAC ¶¶ 214–216 (Exchange Act); *id.* ¶¶ 614–615 (Securities Act).  The Court gave Plaintiffs a clear roadmap of what Plaintiffs needed to do to cure the deficiencies in the FAC: Plaintiffs would need to allege additional facts to support a plausible inference "that the alleged fraudulent sales practices were widespread *and* known to AT&T executives." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 514 (emphasis added).  One way to do that would be to plead additional facts as to "the results and recipients of AT&T's internal report on fraudulent sales practices." *Id*. at 541.  The PSAC alleges nothing new about the findings or distribution of the results of the internal investigation and does not otherwise allege facts from which the Court can infer that the fraudulent sales practices were so widespread that they had to have been known to upper management.

Plaintiffs added no facts about the formal companywide results of the purported internal investigation of fraudulent sales practices.  The Court finds it hard to square the dozens of confidential witnesses who speak in hyperbolic terms of a "massive" "large-scale" investigation

---

[13]     Although the term "ghost accounts" made its debut in the PSAC, the creation of fake DTVN accounts through fraudulent sales tactics was discussed at length in the FAC.  *See, e.g.*, FAC ¶¶ 171–218, 482–520.

that led to "hundreds" or "thousands" of firings, *see* PSAC ¶¶ 422, 427, 450; *see also id.* ¶¶ 422–473, with the fact that there is not a single factual allegation attributed to even a single CW regarding the contents of the investigative report or the formal findings of the investigation. Although it is conceivable that AT&T did not prepare such a report or did prepare a report but managed to keep it from the sort of low-level employees being used as CWs by Plaintiffs, the Court finds it much more plausible that what individual salespeople view as a "massive" investigation was, in fact, a pedestrian investigation of misconduct by some low level-employees that "ran its course well below the C-suite officers who are the defendants in this case." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 532.

### A. Plaintiffs Have Not Adequately Alleged that the Fraudulent Sales Practices Were Widespread

Plaintiffs' Exchange Act and Securities Act claims require that Plaintiff adequately allege that Defendants made "a material misstatement of fact or an omission to state a fact that renders a statement made materially misleading." *Id.* at 537 (citing *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 249–50 (2d Cir. 2014)). As the Court previously explained, "[c]ourts have generally held that failure to disclose anecdotal incidents of improper sales tactics or other isolated employee misconduct is not material." *Id.* at 527; *see also id.* at 527 n.19 (collecting cases with that holding). To try to get beyond anecdotes and isolated conduct, Plaintiffs take a kitchen sink — or what Defendants call a "more is more" — approach by adding 52 additional confidential witnesses on top of the 18 in the FAC for a whopping total of 70 CWs. *See* Ltr. Resp. at 1; PSAC ¶¶ 83–152; FAC ¶¶ 76–93. But the allegations attributed to the additional confidential witnesses are not qualitatively different than those the Court found to be insufficient

in the FAC.[14]  Just like in the FAC, "none of the CWs on whom Plaintiffs rely had a

companywide view of AT&T's business."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp.

3d at 526.[15]  The allegations by the additional CWs only serve to reaffirm the point which was

more than adequately alleged in the FAC: some sales associates created accounts without

customers' knowledge, there was an internal investigation, and employees who had engaged in

misconduct were disciplined and some were fired.  *Id.* at 528.

For the existence of fraudulent accounts to be relevant to whether Defendants' statements

about the number of DTVN subscribers are actionable, Plaintiffs must plausibly allege that the

fraudulent "ghost" accounts affected AT&T's DTVN subscriber numbers at "a sufficient

magnitude as to be capable of affecting a reasonable investor's decision to buy or sell the

---

[14]     Like in the FAC, many of the contentions attributed to confidential witnesses are not alleged with sufficient particularity.  *See Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) ("A complaint may rely on information from confidential witnesses if they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." (cleaned up)).  For example, Plaintiffs allege that CW-3, an area retail sales manager who oversaw eight retail stores in northeast Pennsylvania, stated that "adding DTVN without a customer's permission was 'common practice.'"  PSAC ¶¶ 85, 262.  The PSAC alleges no facts from which the Court could infer that someone in his position would have had access to sufficient information to deduce that the fraud was "common practice" beyond the stores he supervised, across a company that operates on a national basis.  Moreover, according to the PSAC, CW-3 left his job as a sales manager in January 2017, *see id.* ¶ 85, just three months after the launch of the product, further eroding the plausibility of him knowing what was happening nationwide in the AT&T sales force after the initial launch and further undercutting the weight of his assertions.

The Court will not go confidential witness by confidential witness; suffice it to say, that many of the allegations attributed to CWs are rife with conclusory allegations not moored to a particular location during a particular time, with no accompanying facts that would allow the Court to reasonably infer that the CW would have been in a position to know the facts relayed, let alone accurately to generalize his or her observations to the rest of AT&T.

[15]     Most of the confidential witnesses were involved in retail sales at AT&T stores and had titles like "retail sales consultant," "retail sales associate," "store manager," and "sales representative."  *See* Chart, Dkt. 97-3.  In the FAC, the highest-ranking confidential witnesses were CW-11, who was a Director of Sales in Oregon from 2014 to December 2017 and the Director of Operations of the Rocky Mountain region from December 2017 "until the end of his tenure," and CW-14, who held positions including Retail Sales Consultant, Area Retail Sales Manager, and Director of Sales across western Idaho.  *See* FAC ¶¶ 86, 89.  The PSAC adds one more Director of Sales, CW-19, who was "responsible for overseeing a territory in northern New Jersey."  *See* PSAC ¶ 101.  None of those witnesses had a companywide perspective.

company's stock." *Id.* at 527 (citing *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010)).

Plaintiffs contend that "the startling number of dormant accounts would directly correlate to the number of ghost accounts." PSAC ¶ 524; *see also id.* ¶ 25. But the assertion that dormant accounts correlate to fraudulent ghost accounts is not logical. As Plaintiffs allege, many subscribers (including the first 200,000) "were essentially 'bought' by AT&T by paying customers for their subscriptions with products that were worth more than the subscription." *Id.* ¶ 674; *see also id.* ¶ 673 (noting that promotions included a free Apple TV or Amazon Fire TV Stick). Such customers, who may have entered an AT&T store seeking to purchase one of the promoted products and left with a "free product" and a subscription to DTVN, may have never used their DTVN accounts; such a subscriber would have shown up in the data as a "dormant account." But those accounts were hardly fraudulent. Moreover, anyone who has ever subscribed to a streaming service only to realize months later that she has used it only once or twice to watch the movie or TV series that triggered the subscription knows all too well that a dormant account is not, by any stretch of the imagination, necessarily a fraudulently created account. With no facts alleged that would allow the Court to parse how many dormant accounts were attributable to fraud, how many were attributable to aggressive but not fraudulent promotions, and how many were attributable to subscribers finding more compelling content elsewhere, the Court cannot infer the existence of a widespread fraud from the fact that there were a number of dormant accounts.

Additionally, AT&T reported net quarterly subscriber numbers, and it is those net numbers that Plaintiffs are alleging were materially misleading. *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 515, 516, 519. Because AT&T reported net numbers, "a subscription that was both created and cancelled within a quarter would not appear in the quarterly data." *Id.*

at 515.  For that reason, allegations in the PSAC about "ghost accounts" that were canceled soon after they were opened, *see, e.g.*, PSAC ¶ 33, 475; FAC ¶¶ 217, 228, 526, 532, and about accounts that were only canceled months later, *see, e.g.*, PSAC ¶¶ 319, 332, 350, 476, would have to be differentiated.  Because the FAC has no allegations about how to do that, it is entirely unhelpful in allowing the Court to infer that a significant number of cancellations due to fraud straddled AT&T's reporting periods, making the reported numbers materially misleading.

But even if Plaintiffs had adequately alleged that employee fraud had artificially inflated DTVN subscriber numbers to a considerable degree and in a way that straddled reporting periods, there are no facts in the PSAC from which the Court could infer that inflated DTVN subscriber numbers would have been material to an AT&T investor.  DTVN is "a product that is, in turn, only a slice of AT&T's video business, which is a subset of the Entertainment segment, which is, in turn, less than a third of AT&T's overall business."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 528.

Plaintiffs argue that even if the subscription numbers are not quantitatively material, "materiality must also be considered in light of the conduct's impact on the company's reputation and integrity, 'wholly apart from the statistical impact on a company's reported earnings' and the impact on the Company's stock price.'"  Ltr. Br. at 5 (citing *Hill v. State St. Corp.*, No. 09-CV-12146, 2011 WL 3420439, at *15 (D. Mass. Aug. 3, 2011)); *id.* (collecting cases, including from this district, that hold that materiality must be assessed with the impact on a company's reputation and integrity in mind).  Plaintiffs argue that reasonable investors would find the fact that AT&T salespeople created accounts without customers' knowledge to be important to their investment decision and that "[m]anipulation of the customer base and wide-reaching fraud are materially significant beyond the raw numbers."  *Id.* (citations omitted).  But that argument rests on two key assumptions, neither of which is supported by well pled factual

15

allegations in the PSAC.  First, for a *company's* integrity or reputation to be affected, the alleged

fraud must be either be financially significant to the company's bottom line (there is no

allegation that this one was) or widespread — an allegation Plaintiffs have not adequately made

for the reasons previously discussed.[16]  Moreover, taking Plaintiffs' allegations in the complaint

as true, Defendants carried out a widespread investigation that led to hundreds, if not thousands,

of terminations.  Far from seeing this set of facts as indicative of a company without a moral

compass, a reasonable shareholder would conclude that AT&T has no tolerance for rogue

employees who engage in unethical behavior and that the terminations and other disciplinary

consequences indicate that AT&T values its integrity and reputation above employee retention.

Without additional factual allegations regarding the extent of the fraudulent behavior, Plaintiffs

have not adequately pled that the alleged fraud or its corresponding effect on the DTVN

subscriber numbers was material to the perception of AT&T's business integrity.[17]

Because the PSAC does not adequately plead that statements regarding DTVN subscriber

numbers were false or that the falsity was material, Plaintiffs' motion for leave to file an

amended complaint with respect to those statements is denied as futile.

---

[16]     Even if the Court were to infer that fraudulent sales practices occurred at all of the stores as claimed by the confidential witnesses, that still does not come out to a companywide problem.  Liberally construed, the confidential witnesses report problems at approximately 500 or so stores (excluding, of course, conclusory and unsupported claims that fraudulent activity "was rampant nationwide," *see* PSAC ¶ 311, and the like).  Defendants have thousands of stores and distributors of DTVN.  *See* Monahan Decl., Ex.19, Dkt. 86-19 at 2 (quoting Defendant Stephens as saying, in the context of DTVN, that "we have a distribution model of over 5,000 retail stores as well as thousands of other distributors"); PSAC ¶ 406 (quoting a June 25, 2020 article in *Forbes* that states that AT&T has "16,000 company-owned and authorized franchise locations").  Although the number of confidential witnesses supports Plaintiffs' claim that fraud was occurring, when considering the enormous size of the company and its approximately 260,000 employees, *see* Monahan Decl., Ex. 13, Dkt. 86-13 at 39, Plaintiffs have not adequately pled the sort of widespread fraud that would influence a reasonable investor's investment decision.

[17]     Just like with the FAC, Plaintiffs' ability to plead materiality of number of subscribers as of February 2017 for purposes of their Securities Act claim is even weaker than their ability to plead materiality as to their Exchange Act claim.  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 538.  There is no way to get around the fact that most of the confidential witnesses discuss alleged fraudulent activity that purportedly occurred after February 2017. *See* Ltr. Reply at 5 (noting that only seven confidential witnesses speak to the creation of "ghost accounts" around the time of DTVN's launch).

**B. Plaintiffs Have Not Adequately Alleged that the Fraudulent Sales Practices Were Known by Defendants**

The Court also gave Plaintiffs leave to move to amend only if they could allege additional facts that could support a plausible inference that widespread fraudulent sales practices were "known to AT&T's executives." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 514. The Court required such allegations because the FAC had failed to plead adequately that Defendants acted with the scienter, a requirement under the Exchange Act. *See id.* at 523. Just as with materiality, Plaintiffs have failed to cure the deficiencies in the FAC as to scienter.

Plaintiffs first argue that the PSAC's allegations of "widespread and systemic fraudulent account creation, resulting in a massive internal investigation and thousands of terminations" constitute "powerful circumstantial evidence that senior management must have known of the practice or, at a minimum, were reckless when touting the numbers of DTVN subscribers." Ltr. Br. at 5–6 (collecting cases finding scienter when misconduct is widespread). But here too, Plaintiffs' argument is premised on their *ipse dixit* that fraudulent activity was "widespread and systemic." Because the Court has found that the well pled factual allegations in the PSAC do not support that inference, that argument collapses.

In the FAC, to allege Defendants knew the statements they were making about the number of subscribers were false, Plaintiffs relied on CW-11, who relayed a conversation he had with Defendant Brian Shay, the President of Retail Sales and Service. *See* FAC ¶¶ 61, 211. CW-11 reported that Shay had instructed stores to double subscription sales each month and that sales representatives would be "held accountable" for failing to meet sales targets. *Id.* ¶¶ 86, 211. The PSAC adds more facts about Defendant Shay's actions, notably that he pressured sales representatives to sell DTVN in high numbers and that he distributed materials, including videos,

articles, and emails, about proper sales practices and the importance of "doing things the right way."  *See* PSAC ¶¶ 13, 263, 275, 324, 433, 434, 467.  Somewhat paradoxically, Plaintiffs argue that evidence that Shay regularly reminded sales staff to act ethically supports "a strong inference of scienter by Shay."  Ltr. Reply at 5; *see also* PSAC ¶ 559.

The Court disagrees.  Shay was the President of Retail Sales so it is not at all surprising that he would set aggressive sales goals.  Pushing representatives to sell does not, on its own and without more, suggest that Shay was encouraging or was aware of widespread fraud.  *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 534.  Nor can the Court infer from the fact that Shay reminded his staff regularly to "do things the right way" that Shay was aware of widespread fraud.  There is a much more compelling opposing inference: Shay became aware of isolated incidents or rumors of fraudulent activity and sought to nip the misconduct in the bud by reminding employees to act ethically while still exhorting them to sell the product.  Plaintiffs cannot satisfy their pleading burden vis-à-vis scienter by alleging facts that, at best, tend to show that Shay knew anecdotally that fraud was occurring with respect to DTVN.  To allege scienter, Plaintiffs must plead that Shay was aware of sufficiently widespread fraud that he knew the DTVN subscriber numbers that were being reported publicly by AT&T would mislead investors.[18]

CW-57, who was a retail sales consultant in Pennsylvania and a union chapter president, PSAC ¶ 427, asserts that the internal investigation and fake accounts were discussed "at length"

---

[18]    It is for this same reason that Count II, scheme liability, fails.  As the Court explained previously, "[t]o state a claim for scheme liability, a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 534 (citing *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (cleaned up)).  The Court noted that Plaintiffs "have failed to identify any case holding that setting aggressive sales targets is a deceptive act."  *Id.* at 535.  Although the PSAC retains this count, the PSAC contains no new factual allegations and Plaintiffs' letter brief includes no new legal arguments supporting their position that aggressive sales tactics is a deceptive or manipulative act under the securities laws.

at three labor relations meetings that he attended in 2018 and that union representatives were assured that the unethical practices would cease and that those caught would be disciplined. *See* PSAC ¶¶ 433–435; Ltr. Br. at 6. CW-57 contends that AT&T sent management-level officials to the meetings, including Judy Cavalieri, a Vice President and General Manager, who was the highest-ranking attendee at the meetings. PSAC ¶ 435; Ltr. Br. at 6. But Cavalieri, who Plaintiffs claim oversaw the sales and operations of more than 1,500 employees at 270 stores, *see* PSAC ¶ 434 n.24, is not a Defendant and was clearly junior to Defendant Shay. Moreover, here too, the opposing inference is more compelling: Cavalieri was aware of fraud, was acting to stop it in stores under her purview, and was putting the union on notice that its members who engaged in misconduct would be disciplined. Plaintiffs have not adequately pled that Cavalieri was aware of fraud that was so widespread that it would have a material impact on subscriber numbers. Having a mid-level manager promote good governance does not translate into scienter by the company and its C-suite level employees.[19] *See also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 532 (noting that the opposing inference that the "investigation ran its course well below the C-suite officers" is much more compelling).

The PSAC includes factual allegations about the viewership data that "senior executives in the corporate offices could access." Ltr. Br. at 7 (citing PSAC ¶ 535). Plaintiffs allege that "knowledge of the massive ghost account issue would have been unavoidable to Defendants, since these accounts had zero activity, and Defendants' admitted publicly multiple times that they vigorously tracked and analyzed DTVN user activity." PSAC ¶ 25. For the reasons already

---

[19]     For the same reasons, Plaintiffs' new allegations attributed to CW-39 fare no better. CW-39, a store manager in California, claims that he was placed at a table with West Region President Jeff Bradley at an AT&T conference in summer 2018. PSAC ¶¶ 121, 438. CW-39 reports that Bradley was familiar with the internal investigation. *Id.* ¶ 438. But the fact that mid-level management was familiar — or even involved in — the internal investigation says little about whether the fraud was widespread or known to the Executive Defendants.

explained, Plaintiffs' assumption that all accounts with zero activity are fraudulently-opened "ghost accounts" is not reasonable.  Defendants' strategy from the beginning of DTVN was to use aggressive promotions to get customers to sign up.  That strategy created the obvious risk that subscribers lured to DTVN by the promotions would have low to no engagement with the product.  *See* PSAC ¶¶ 615, 673–674.  Plaintiffs' factual allegations that Defendants "vigorously tracked and analyzed DTVN user activity," *see* PSAC ¶ 25, allow the Court to infer that AT&T was tracking whether their strategy was working or whether the promotions were costing the company more than they were worth.  *See id.* ¶ 546 (noting that "all promotional activity was studied 'very closely' and that AT&T forecasted the 'take rate,' pricing, and churn in evaluating all promotions); ¶ 548 (noting that "retention and promotion-based churn were already issues being discussed as a priority when [one of the CWs] joined the Company in July 2017").  What they do not allow the Court to infer is that AT&T senior management, including the Defendants, had to see in the data evidence of widespread fraud occurring across the country that caused them to know that the subscription numbers they were publicly reporting were materially overstated.[20]  As the Court stated previously, "[t]he fact that AT&T may have been overly optimistic about its ability to convert promotional customers into loyal subscribers and then decided to cut bait after experimenting with promotions does not state a claim for fraud."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 526.

In short, because the PSAC does not cure the defects previously identified in the FAC, Plaintiffs' motion to amend the complaint is denied.

---

[20]     On an October 24, 2018 earnings call to discuss the 2018 third quarter results, Defendant Donovan explained that AT&T "made the strategic decision to rationalize our promotions and special offers for DTVN. We're taking a more tailored, data-driven approach." PSAC ¶ 567.  Donovan further stated that "we focused on reducing promotions for low-value, high-churn customers." *Id.*  Although it is not impossible that Donovan was covering up a crackdown on widespread fraud, the more compelling inference is that Defendants attributed the high number of low to no engagement accounts with their strategy of pushing promotions, a strategy they brought to a close once they concluded that it was unsuccessful.

## CONCLUSION

For the reasons discussed above, Plaintiffs' motion to amend the complaint is DENIED.

Plaintiffs' claims are dismissed with prejudice.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

**Date:  September 27, 2021**
**       New York, New York**

**VALERIE CAPRONI**
**United States District Judge**